IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.: _____

MARTIN GWYNN

    Plaintiff,

v.

RABCO LEASING, INC.,
BRUCE D. RABON,
ALTON CATES, and
VIRGINIA HUNTER

    Defendants,

## COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

Comes now the Plaintiff, Martin F. Gwynn ("Gwynn" or "Plaintiff"), suing on his own behalf and on behalf of Hurricane Pass Traders, Inc., as a fifty percent (50%) shareholder, for his Complaint against Rabco Leasing, Inc. ("Rabco"), Bruce D. Rabon ("Rabon"), Alton Cates ("Cates"), Virginia Hunter ("Hunter"), (collectively "Defendants") and states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Gwynn is a resident of Florida having his principal place of residence in Pinellas County, 1406 Southridge Drive, Clearwater, Florida 33756.

2.     Separate Defendant Rabco is a Florida corporation duly organized and existing under laws of the State of Florida, with its principal place of business in Pinellas

1

County, 670 Second Street North, #C, Safety Harbor, Florida 34695, doing business within this judicial district.

3.      Separate Defendant Rabon is a Florida resident having his principal residence at 212 Leeward Island, Clearwater, Florida 33767-2305.

4.      Separate Defendant Cates is a Florida resident having his principal residence at 12904 Tar Flower Drive, Tampa, Florida 33626-2354.

5.      Separate Defendant Hunter is a Florida resident having her principal residence at 1987 East Lake Road, Palm Harbor, Florida 34685.

6.      This court has jurisdiction over the subject matter of the complaint pursuant to the Lanham Act under 28 U.S.C. 1338(a) and under 28 U.S.C. § 1367 for the remaining causes of action.

7.      Defendants are subject to personal jurisdiction in Florida because they are all residents of Florida and because Defendants' acts of fraud, trademark infringement and contractual tortuous interference, occurred either directly or indirectly within this judicial district (and elsewhere in the State of Florida and elsewhere in United States), Defendants have transacted business and caused damage to persons and/or property within this judicial district.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C 1391( b) and (c) because Defendants are subject to personal jurisdiction in this judicial district, have conducted business in this judicial district, certain parts of the act, as alleged below, occurred in this judicial district, a substantial part of the events or omissions giving rise to claim

2

occurred in this judicial district, and/or a substantial part of the property that is the subject of this action is situated in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Background of Business Relationships

9.      In late 1993, Gwynn was hired by William Short, President of Shorts, Inc., also known as William Short Clothiers ("WSC").

10.     On or about mid 1994, Gwynn, as Division Manager of WSC, opens the first "Max Slacks" store in Largo Mall. In the same capacity, Gwynn also opens the Max Slacks store on Belcher Road in Clearwater.

11.     By mid 1995, Max Slacks moves to Seminole Mall, closing the Largo store. Gwynn remains as Division Manager in this new store. The Max Slacks Belcher store remains in operation under Gwynn's management.

12.     In 1996, Gwynn adds a "t-shirt component" to Max Slacks (Seminole store) at his own expense. Gwynn acquires a heat press, a computer, and a printer, and uses these assets to produce stock and custom t-shirt inventory as a separate business unit within Max Slacks. WSC and Gwynn agree that ten percent (10%) of net sales from this t-shirt inventory will be paid to WSC as rent, with the remaining ninety percent (90%) paid to Gwynn as sales commission.

13.     In April 1997, all Max Slacks stores are closed. WSC decided that it no longer wanted to be in this retail category. Gwynn moves to WSC's Countryside store location, in an operational capacity, reporting directly to Rabon. Rabon is William Short's son-in-law.

14.    In early 1998, Rabon and Gwynn, while still employees of WSC, decided to create their own line of fishing motif t-shirts, as a partnership separate and apart from WSC.

15.    By mid 1998, Rabon and Gwynn recognized the need for a commercial graphics artist in order to expand the partnership's t-shirts operation. They jointly recruited commercial artist Kathy Zimmerman ("Zimmerman") and formed the Hurricane Pass Traders general partnership ("HPTGP"). Gwynn, Rabon and Zimmerman each owned thirty-three and one third percent (33.33%) of HPTGP as one third co-equal partners. Zimmerman was never an employee of WSC and hence never received any compensation directly from WSC.

16.    In general, the responsibilities of the HPTGP partners were as follows: 1) Zimmerman, as a free lance commercial graphics artist, created the artwork for the t-shirts; 2) Gwynn assumed the responsibilities for marketing, sourcing, manufacturing, and product development; and 3) Rabon assumed sales responsibilities.

17.    HPTGP sold t-shirts to WSC and was directly compensated by WSC via arms length transactions. HPTGP also sold t-shirts to other customers. Revenues from HPTGP sales were deposited into an HPTGP checking account and funds were reinvested into HPTGP's business. At no time during the existence of HPTGP did any of the partners draw a salary or receive any other direct compensation from HPTGP's activities. Essentially, the partners invested "sweat equity" into HPTGP, with the expectation of a future return on investment.

18.    In January 1999, Gwynn, as part of a WSC/HPTGP strategic marketing initiative, talks to Rabon (now President of WSC) regarding doing business on the Internet.

4

Rabon is initially reluctant regarding Gwynn's proposed initiative and had difficulty understanding why customers would buy from WSC/HPTGP on the Internet. Rabon had even more difficulty grasping the concept, as proposed by Gwynn, that customers would not know they were buying from WSC/HPTGP, but rather would simply understand that they were purchasing well recognized brands from suppliers such as "Tommy Bahama," "Tori Richard," and others. Gwynn's concept was to create a branded website, with multiple retail categories, that would drive revenue to WSC and HPTGP (i.e. as a supplier of WSC), while WSC's role would transform, in part, into one of a fulfillment house, although WSC would continue to do a significant percentage of its business from its retail stores.

19.     By March 1999, William Short began closing down all of his retail operations as leases come up for renewal, since he was planning on retiring. Rabon, while still reluctant to do business on the Internet, agrees with Gwynn that it is worth pursuing, despite the fact that WSC had little money to purchase equipment and to recruit the necessary expertise required to underpin the new business model. In this same timeframe, Gwynn as a senior operational employee of WSC, proposes to Rabon that he be paid a ten percent (10%) commission on all WSC Internet sales (which included the sale of HPTGP inventory). Rabon accepts Gwynn's proposal regarding a commissioned based compensation plan.

20.     At no time prior to March 1999, or subsequent to this timeframe, when WSC becomes Rabco, did Gwynn ever receive a base salary from WSC or Rabco in excess of twenty-six thousand dollars ($26,000.00) per year. Gwynn's compensation was based, going forward from March 1999 until the termination of his employment by Rabco on July 21, 2009, on his base salary of twenty-six thousand dollars ($26,000.00) per year plus 10% of

monetized Internet sales that he generated through his own efforts and expertise. In addition, Gwynn was provided a company vehicle. Gwynn had a two-fold incentive to maximize WSC's Internet sales: 1) to increase his commissions related to his WSC pay for performance compensation plan; and 2) to increase the value of his interest in HPTGP.

21.     On or about April-May 1999, several hosting companies are interviewed to host WSC/HPTGP's online presence and AztecOne ("AZ1") is selected. During this same time frame Gwynn, out of his own pocket, purchases a computer, camera, software and other assets necessary to establish WSC/HPTGP's Internet presence. Gwynn invested over three thousand dollars ($3,000.00) of his own money on these assets in order to increase the intrinsic worth of Gwynn's thirty-three and one third percent (33.33%) share of HPTGP and to facilitate launching Gwynn's WSC pay for performance compensation plan.

22.     On October 7, 1999, WSC starts doing business on the Internet with the domain name "http://www.hurricanepass.com" and a leased shopping cart provided through WSC's relationship with AZ1.

23.     On July 16, 2001, Rabon registers the domain name "http://www.hurricanepasstraders.com" to WSC, despite the fact that he was, at the time, a general partner of HPTGP and this domain name contains the exact spelling, and trademark, of the general partnership name, and later that of Hurricane Pass Traders, Inc. (which Gwynn now owns fifty percent 50% interest in). During this same time period Rabon personally registers, as trademarks of WSC, the following HPTGP marks created by Zimmerman on December 17, 1999: 1) Hog Island Red; 2) Honeymoon Light; and 3) Caladesi Gold; and 4) Hurricane Pass Pale. Rabon registers these marks under WSC's name instead of the name of

their rightful and legal owner, HPTGP. These marks pertain to a series of beer label t-shirts first brought to market by HPTGP on June 1, 1999.

24. Zimmerman, during the timeframe spanning from 1998 to June 13, 2000, produced twenty (20) pieces of original artwork to be converted to heat transfers for HPTGP's t-shirt line of products, as well as two (2) 2 3'x6' paintings that now hang in Rabco's store, located at 107 Second Avenue North Street, St. Petersburg, FL 33701. The record of these assets "disappeared" from HPTGP's books and apparently these assets were never transferred to Hurricane Pass Traders, Inc.'s books when HPTGP subsequently incorporated.

25. On June 13, 2000, HPTGP buys out Zimmerman's thirty-three and one third percent (33.33%) share of HPTGP, leaving Gwynn and Rabon each fifty percent (50%) owners of HPTGP. On June 23, 2000, Gwynn writes Zimmerman a check for six thousand three hundred dollars ($6,300.00) as part of the buyout settlement agreement negotiated by Zimmerman's counsel.

26. In mid 2000, Gwynn creates the "feeder site" concept which provides the foundation for all subsequent search engine optimization ("SEO") work that is performed by WSC (later Rabco Leasing, Inc.) and HPTGP (later Hurricane Pass Traders, Inc.) in order to drive Internet sales for the respective entities. This concept uses additional vendor specific domain names and "landing pages" in order to feed a centralized website/shopping cart with customers interested in purchasing various branded merchandise. From mid 2000 through July 21, 2009, over sixty (60) feeder sites are created, maintained, and optimized for existing search engines.

7

27.     In 2001, Hurricane Pass Traders first appears as a "parked" domain name (i.e. "http://www.hurricanepasstraders.com") on the Internet. At this point in time WSC and HPTGP were still using the domain name "http://www.hurricanepass.com" to conduct online business.

28.     On January 22, 2002, "http://www.hurricanepasstraders.com" appears as an active website featuring "Tommy Bahama at Hurricane Pass Outfitters," feeding a leased shopping cart acquired through AZI. The previously used domain name (i.e. "http://www.hurricanepass.com") remains active as part of the "feeder concept."

29.     On March 25, 2002, "http://www.hurricanepasstraders.com" appears with a Hurricane Pass Traders masthead (i.e. HPTGP's trademark). This domain name is used as WSC/HPTGP's centralized website deploying a leased shopping cart acquired via AZI, and HPTGP copyrighted content, in order to generate Internet sales for both WSC and HPTGP.

30.     On July 3, 2002, HPTGP is incorporated as Hurricane Pass Traders, Inc. ("HPT"), a Florida corporation, with Gwynn and Rabon both named as the initial board members, and with each being a fifty percent (50%) shareholder.

31.     On or about October 18, 2002, HPT's bylaws were adopted by HPT's board and the following HPT officers were named: a) Rabon is named President and Secretary; and b) Gwynn is named Vice-President and Treasurer. One hundred shares of HPT stock are issued to both Rabon and Gwynn, thus confirming coequal fifty percent (50%) ownership of HPT by these respective shareholders. The distribution of the respective shares was signed by Rabon as President and Secretary of HPT.

8

32.    Article III of HPT's bylaws states that: "[t]he President will be the chief executive officer of the above named corporation, who generally and actively manages the business and affairs of the above named corporation subject to the directions of the Board of Directors." Article V ("Books and Records"), Section 3 ("Financial Information") of HPT's bylaws further states, *inter alia*, that "[i]f financial statements are prepared on the basis of generally accepted accounting principles, the annual financial statements must also be prepared on that basis. If the annual financial statements are reported on by a public accountant, said accountant's report shall accompany said statements. If said annual financial statements are not reported on by a public accountant, then the statements shall be accompanied by a statement of the president or the person responsible for the above named corporation's accounting records (a) stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and if not, describing the basis of preparation; and (b) describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year."

33.    Plaintiff Gwynn never received or reviewed HPT's annual financial statements, or HPT financial statements of any other kind, because to the best of Gwynn's knowledge none were ever produced, despite the fact that Rabon engaged CPA Cates to prepare HPT's annual Federal and State tax returns. Furthermore, to the best of Gwynn's knowledge, none of the other corporate formalities specified in HPT's bylaws were ever followed, and apparently no records exist indicating otherwise, since none were produced during Gwynn's review of HPT's corporate records on September 17, 2009. In short, during

the aforementioned review of HPT's records, HPT produced no records of any kind that would provide the foundation for a CPA to produce financial statements according to generally acceptable accounting principles (e.g. no general ledger, no accounts payable ledger, no account receivable ledger, etc.). Further discovery will be required in order to determine on what basis HPT's Federal and State tax returns were prepared. The only document Gwynn ever received was a Subchapter 'S' distribution form each year in order to file his individual tax return.

**Business Relationships and Facts Directly Related to Current Dispute**

34.    Sometime during the period between May 13, 2002 and September 19, 2003, Rabco either bought WSC's assets or bought WSC outright, under terms and conditions to be determined, and started doing business as Rabco Leasing, Inc.

35.    Rabon, while President of WSC, had entered in to a business relationship with Gwynn in 2002 (i.e. wherein Gwynn acquired fifty percent (50%) of HPT), in order to incentivize Gwynn to continue leveraging his Internet expertise on behalf of HPT, WSC, and subsequently Rabco. HPT has, to the best of Gwynn's knowledge, never hired any salaried employees or employees of any other kind (e.g. "1099 employees"), with the exception that on an ad hoc basis outside temporary labor would be employed in order to complete a large job, and for a time HPT utilized two commissioned sales representatives as independent contractors.

36.    From 2003 through 2007, Gwynn continues to grow the Internet online sales business on behalf of HPT and Rabco. This growth is fueled in part by Gwynn's enhanced SEO activities and constant attention to innovation occurring in the marketplace. From 2003

through 2007, Rabco's Internet online sales gross revenue grew from approximately five

hundred and twenty seven thousand dollars ($527,000.00) to approximately eight hundred

and forty six thousand dollars ($846,600.00). These numbers are approximations, more exact

figures will be provided through discovery.

37.     On July 7, 2004, Rabco purchased, and began using, an Xcart (i.e. Xcart is a

vendor of e-commerce shopping carts and the name of its product as well). Said Xcart, when

"opened" by a prospective Internet customer, displays "Hurricane Pass Traders" as its

trademark/brand, with all Rabco/HPT "feeder" domain names and "landing pages" redirected

to this one centralized domain name/website/shopping cart. As of 2004, the copyright notice

at the bottom of the cart's page read "Copyright 2001-2004 Hurricane Pass Traders." As of

September 24, 2009 the copyright notice at the bottom of the cart's page now reads

"Copyright 1994-2009 Hurricane Pass Traders." In short since 2002, WSC, Rabco and HPT

all used HPT's intellectual capital (e.g. HPT's domain name, trademark and copyrighted

content) to drive their Internet sales.

38.     From the period on or about July 7, 2004, through the end of 2007, Rabco's

estimated online sales generated by HPT's website/shopping cart, under the domain name of

"http://hurricanepasstraders.com," grew to a high of nine hundred and twenty eight thousand

six hundred dollars ($928,600.00) in 2006, and fell slightly the following year by

approximately one hundred thousand dollars ($100,000.00). Rabco's estimated Internet sales

figures were not available for the years 2008 and 2009 to complete this analysis; nonetheless,

it is clear that Rabco experienced significant Internet based revenue growth during this

period. Gwynn's innovative "feeder concept", and the "sweat equity" he contributed to

11

HPT's intellectual capital, were primarily responsible for said revenue growth. While in the aggregate Rabco's retail stores generated a greater percentage of its total revenues, the Internet business was far more profitable. Historically, the net profit generated by Rabco's retail stores averaged between two percent (2%) and five percent (5%) of gross sales, while its Internet business net profit averaged between twenty percent (20%) and thirty percent (30%) of gross sales.

39.     On or about March 2008, HPT/Rabco started experiencing spam related email technical problems with their existing host, Global Tap, Inc. ("GTI"). These technical problems escalated into problems with existing Rabco/HPT shopping carts until Rabco/HPT moved their carts and e-commerce operations to a new host, Corporate Pride ("CP"), one year later. CP is a general partnership that was formed between Martin Gwynn, Sr. (i.e. Plaintiff) and Martin Gwynn, Jr., which started doing business in December 2008. CP had a number of existing customers prior to Rabco/HPT deciding to move their shopping carts and e-commerce operations from GTI's server to CP's server. Rabon, as President of Rabco and HPT, approved this decision once CP demonstrated that it had resolved all known technical problems that Rabco/HPT had experienced with GTI.

40.     Gwynn, in addition to his role a senior sales executive of Rabco, a fifty percent (50%) shareholder of HPT, a fifty percent (50%) owner of CP (i.e. Rabco's new e-commerce host) also maintained a commercial email account on Constant Contact ("http://www.constantcontact.com") under his d/b/a Takin Care of Business ("TCOB"). TCOB was used by Gwynn to send out commercial email to customers on behalf of Rabco/HPT and to other customers on behalf of CP. Rabon, as President of Rabco and HPT,

was clearly aware of Gwynn's activities and never complained of said activities until the current dispute arose.

41.    On or about June 2009, the relationship between Gwynn and Rabon became acrimonious, both professionally and personally.

42.    On June 22, 2009, Rabon called a meeting with Gwynn under the guise of discussing expenses that CP had incurred on behalf of Rabco/HPT (i.e. the meeting was purportedly to discuss CP reimbursement). When Gwynn arrived at the meeting with Rabon, Virginia Hunter was also present. Gwynn was presented with a document to sign, which Gwynn refused to sign without the advice of legal counsel. It appeared to Gwynn that Rabon wanted him to change the ownership of the domain names listed in the document to Rabon personally, instead of Rabco/HPT. Gwynn had a problem executing Rabon's request since the domain names were in the custodial care of CP. Gwynn contacted counsel and was advised to transfer the domain names into a Go Daddy account owned by Bruce Rabon as President of Rabco.

43.    On or about June 30, 2009, through August 6, 2009, Gwynn and Rabco/Rabon entered into a series of negotiations in order to determine who owed what to whom and to otherwise take steps to migrate Rabco/HPT's e-commerce operations from CP to a new host selected by Rabco. However, during this entire time Rabon refused to discuss with Gwynn how Gwynn's fifty percent (50%) ownership of HPT would be resolved (i.e. a final step required to completely sever the business relationships between the parties). This issue remains unresolved and is, in part, the basis of this Complaint by Gwynn against the named Defendants.

44.     On July 21, 2009, Gwynn was terminated as a Rabco employee. At this meeting were Plaintiff Gwynn, Sigrid Gunn on behalf of Plaintiff Gwynn, Rabon, Cates, and Hunter.

45.     On July 23, 2009, Gwynn signed a settlement agreement under duress in order to receive compensation for monies that were legally owed by Rabco/HPT to CP. Plaintiff Gwynn, and Sigrid Gunn on behalf of Plaintiff Gwynn, went to Rabco's Safety Harbor office, located at 670 Second Street North, #C, Safety Harbor, Florida 34695, where Hunter, Kathy O'Connor were also present.

46.     On July 30, 2009, the migration of Rabco/HPT's e-commerce operations to new host CityMind Group ("CM") was completed, a process that CP fully and transparently facilitated by providing all necessary security credentials and technical assistance required by CM. On this same day Gwynn picked up a reimbursement check for monies owed to CP, payment of which was contingent on CM's successful migration.

47.     On or about August 5-6, 2009, Rabco/Rabon, or an agent of same, wrongfully commandeered Gwynn's TCOB Constant Contact account. Rabco currently remains in full control of this account. An account which contained CP confidential information, a fact that Rabco/Rabon was fully aware of.

48.     On August 6, 2009, Gwynn provides Rabco/Rabon notice pursuant to Florida Statute 607.1602 that as a shareholder of HPT, he is entitled to see any and all records of HPT (e.g. accounting records, minutes of shareholder meetings, communications with shareholders, etc).

14

49.    On Thursday August 13, 2009, Gwynn visits Rabco's office, located at Second Street North, #C, Safety Harbor, Florida 34695, to review HPT's records, but is presented only with HPT's "checkbook" and a few other documents that he does not recognize. No Rabco staff responsible for maintaining HPT's books is made available to assist Gwynn during his review or in the identification of pertinent HPT documents.

50.    On August 31, 2009, Rabco/Rabon wrongfully filed a criminal complaint against Gwynn alleging, *inter alia*, theft and embezzlement of trade secrets. Gwynn has yet to be formally charged. Rabco/Rabon neglected to inform the Clearwater Police Department ("CPD") of certain material facts regarding the complex business relationships that existed between the parties (e.g. that Gwynn was a fifty percent (50%) shareholder of HPT and that nearly all of Rabco's Internet business was conducted on a domain name owned by HPT), which if known, may have precluded any investigation at all into Gwynn's activities. After a two hour taped interview at CPD headquarters on September 3, 2009, wherein Gwynn was represented by counsel, Detective William Smith of CPD's Cyber Unit, agreed that Gwynn could file a counter criminal complaint against Rabon, assuming the production of required evidence. On October 3, 2009, Gwynn delivered to CPD headquarters an eleven (11) page document, with attached thirteen (13) exhibits, jointly entitled "Martin Gwynn's Criminal Complaint Against Bruce D. Rabon," that provided background and evidence regarding Gwynn's criminal complaint against Rabon. It is Plaintiff Gwynn's belief that Rabon attempted to use the police power to prevent Gwynn from discovering the fraudulent activities alleged herein.

51.     On September 4, 2009, Gwynn's counsel provided notice to Rabco, via Rabco's counsel, that Gwynn would like to once again inspect HPT's books and that all records pursuant to Florida Statute 607.1602 should be made available; as well as the staff responsible for maintaining said records. Rabco is informed that Gwynn will be accompanied by counsel and by his forensic accounting team.

52.     On September 17, 2009, Gwynn, accompanied by counsel and Gwynn's accounting team, reviewed HPT's records at the office of Rabco's counsel. No Rabco staff responsible for the maintenance of HPT's records was made available for consultation. Brelon Hill, of Hill, Hiepe & Associates (Certified Public Accountants) participated on site, and Patric Zwolenski, of Blackhawk Investigations, LLC (Certified Public Accountant and retired IRS agent, Criminal Investigation Division), participated remotely on behalf of Gwynn.

53.     Post review of HPT's records, the consensus conclusion of Gwynn's counsel and accounting team can be summarized as follows:

a) Rabco's accounts payable ("AP") to HPT does not match HPT's accounts receivables ("AR") from Rabco; the discrepancy between the AP and AR numbers is significant and material; this, despite the fact that the same bookkeeper (Hunter) and CPA (Cates) maintained and/or reported on both Rabco and HPT records (e.g. on Federal and State tax returns);

b) HPT had "missing inventory" of approximately four thousand two hundred thirty-four (4,234) t-shirts that Gwynn's counsel and his accounting team concluded should have been accounted for it one of three ways:

1) it should have been recorded in HPT's AR records as sales (and it wasn't);

2) it should have showed up in HPT's checkbook as deposits for sales consummated (and it didn't); or

3) it should have been written off as a bad debt (and it wasn't); and c) that the HPT records made available provided insufficient detail to allow for the proper presentation of tax returns or financial statements according to generally accepted accounting principles ("GAAP").

54.     On September 23, 2009, Gwynn's counsel sent correspondence to Rabco's counsel asking for a reasonable explanation regarding these accounting anomalies and that if HPT had additional records that had not been presented, then Gwynn and his team would be interested in further review. No response was received from Rabco's counsel regarding either a reasonable explanation or additional HPT records, despite correspondence from Rabco's counsel that a substantive response was forthcoming.

**The Business Relationships Summarized**

55.     There are several distinct business relationships that existed between Gwynn and Rabon, and through Rabon, with the other Defendants. There is one business relationship that continues to exist (i.e. Gwynn and Rabon each remain fifty percent (50%) shareholders of HPT). Without a fundamental understanding of these relationships, it is difficult to understand the allegations contained herein, and especially with respect to how these allegations pertain to Gwynn's shareholder derivative suit as fifty percent (50%) shareholder of Hurricane Pass Traders, Inc. ("HPT") and on behalf of HPT. While most, if not all, of these relationships are referenced within this section, the proper context and foundation of

these relationships requires more elaboration (Exhibit A: Graphic Representation of Business Relationships Past and Present).

56.     Rabco, Rabon, and the other named Defendants (i.e. agents of Rabco), have participated in activities, jointly and severally, to assist Rabon in breaching both his fiduciary duty and his duty of loyalty to HPT. These are duties that Rabon owed HPT as President and Chairman of the Board of HPT. These breaches have resulted in increasing the value of Rabco's shares at the expense of HPT's shares. Such breaches have occurred over a period of years resulting in the misstatement of HPT's assets (both tangible and intangible) for the purpose of Federal and State income tax reporting, and for the purpose of reducing the overall valuation of HPT to the detriment of HPT's shareholders; but in particular to the detriment of shareholder Gwynn, since any loss in HPT's valuation generally inured to Rabco, and Rabco's shareholders. To the best of Plaintiff's knowledge, Rabon and his wife, Kathy Rabon, own one hundred percent (100%) of Rabco's shares.

57.     Defendants Rabon, Cates, and Hunter are directly responsible for maintaining the accounting records of both Rabco and HPT. Defendant Hunter is Rabco's bookkeeper and a long time employee of Rabco. Defendant Cates is a certified public accountant who was hired by Rabon, as President of both Rabco and HPT, to purportedly maintain both Rabco's books and HPT's books according to GAAP accounting standards (i.e. as reflected in HPT's bylaws). Plaintiff Gwynn had no corporate responsibility for providing financial information to Rabon, Hunter or Cates for the purposes of financial reporting of either entity.

58.     Defendant Rabon, as President of Rabco, and over a period of years, leveraged (and continues to leverage) HPT's intellectual property (i.e. copyrights and

trademarks) for Rabco's benefit without any compensation to HPT, and thereby reduces the value of HPT's shares and breaches the aforementioned duties.

## FIRST CAUSE OF ACTION

### [Damages for Fraud]

59.    Gwynn incorporates by reference all the allegations set forth in this Complaint as if fully set forth herein.

60.    This cause of action pertains to all named Defendants.

61.    Defendants individually and jointly made material false representations regarding HPT's accounts receivables ("AR") and HPT's inventory and other assets over a period of years, which resulted in material misrepresentations on HPT's Federal and State tax returns and on the individual "K1 Forms" that both Gwynn and Rabon received, based on HPT's Subchapter 'S' status. Defendants all participated and were fully responsible for the maintenance of both HPT's books and Rabco's books. The net effect of these misrepresentations was to understate both HPT's tax burden and Rabco's tax burden, and to grossly undervalue HPT's shares.

62.    Defendants knew, or should have known, that these statements were false since: a) Defendants were the only individuals responsible for the production of financial information for both corporate entities; and b) the inconsistencies would have been obvious even to a business person with a basic understanding of accounting, let alone a CPA (Cates), a bookkeeper of many years (Hunter), and an experienced corporate CEO (Rabon). For example, it is a fundamental accounting principle that HPT's AR from Rabco should match Rabco's accounts payable ("AP") to HPT, absent a reasonable explanation. Gwynn's forensic

accounting team found no reasonable explanation for these discrepancies. (Exhibits B and C: Gwynn's Accounting Team Analysis). As stated *supra*, Gwynn's counsel sent correspondence to Rabco's counsel, post the HPT records review, asking for an explanation of these discrepancies and none was ever received (Exhibit D: September 21, 2009 Letter). Rabco's AP to HPT has not matched HPT's AR from Rabco for a number of years. (Exhibits B and C: Gwynn's Accounting Team Analysis). There exist similar basic inconsistencies regarding HPT's inventory and other assets that, on their face, defy any reasonable explanation. (Exhibits B and C: Gwynn's Accounting Team Analysis). Furthermore, Gwynn, after learning of these discrepancies, and prior to engaging counsel and his forensic accounting team; served a demand letter on Rabco, on behalf of HPT, enumerating these anomalies in some detail. (Exhibit E: August 13, 2009 Demand Letter).

63.. Gwynn had no knowledge that HPT's Federal and State tax returns, or his individual "K1 Form," contained material misrepresentations. Gwynn was likewise not aware of the other aforementioned anomalies on HPT's books. Gwynn had no direct or indirect participation in the preparation of HPT's financial information and financial statements, and had no reason to inquire until the professional and personal relationship between Gwynn and Rabon had deteriorated to a point beyond repair. Gwynn's first review of an HPT tax return occurred on August 13, 2009. As an indication of who was in financial control of HPT, despite the fact that Gwynn was nominally Vice President and a fifty percent (50%) shareholder, Cates refused to provide Gwynn HPT's tax returns until seeking, and acquiring, permission from CEO Rabon. Furthermore, Gwynn had to invoke Florida Statute 607.1602 (which allows shareholders to review a corporations records), and provide the required

notice, before Gwynn was allowed to review a woefully incomplete set of records. (Exhibit F: Gwynn's Correspondence Invoking Florida Statute 607.1602; Exhibits B and C: Gwynn's Accounting Team Analysis).

64.     Defendants knew that HPT and Gwynn would act on their material misrepresentations because they jointly and individually understood that both HPT and Gwynn were required by law to file annual tax returns/forms. HPT was required to file Federal and State income tax returns, and Gwynn was required to include data from his Subchapter 'S' based "K1 Form" in reporting to the Internal Revenue Service ("IRS") on a yearly basis. as part of his individual tax return. Defendants also understood, based on their experience and background that any understatement of HPT's assets would result in an undervaluation of the corporation, if and when Gwynn should decide to "cash out" of his fifty percent (50%) share.

65.     HPT and Gwynn did in fact repeatedly act on Defendants' material misrepresentations by submitting inaccurate and understated tax returns/forms to the IRS and to the State of Florida (i.e. in the case of HPT) over a number of years, the net result of which is likely to be an additional tax liability owed by Gwynn to the IRS, as well as fines likely to be levied against Gwynn by the IRS. Furthermore, Gwynn has had to take extraordinary measures to review, let alone determine the value of, his fifty percent (50%) shares in HPT. The value of which Gwynn, with knowledge and information, believes may be grossly understated for other reasons discussed herein.

## SECOND CAUSE OF ACTION

### [Damages for Trademark Infringement 15 U.S.C §§ 1114, 1125 *et seq.*]

66.     Gwynn incorporates by reference all the allegations set forth in this Complaint as if fully set forth herein.

67.     This cause of action pertains to named Defendants Rabco and Rabon.

68.     HPT is the rightful and legal owner of the "Hurricane Pass Traders" mark ("the Mark" or "Mark") including how the Mark has been used on HPT's website located at "http://www.hurricanepasstraders.com."

69.     Rabon, as CEO of WSC, wrongfully registered the Mark with the State of Florida under WSC, when in fact he was a general partner of HPTGP at the time, a general partnership that later became Hurricane Pass Traders, Inc.

70.     Rabon, as CEO of Rabco, has wrongfully allowed HPT's Mark to be used by Rabco without a license from, or compensation to, HPT—in direct breach of Rabon's fiduciary duty and duty of loyalty to HPT as CEO of same.

71.     Rabco has wrongfully used the Mark, HPT's website, domain name, and other intellectual capital to generate millions of dollars in revenue.

72.     Upon information and belief, Rabco and Rabon's conduct has been and is willful and deliberate with the intent to deprive HPT of revenue and to undervalue the goodwill and net worth of the corporation, HPT—thereby undermining Gwynn's fifty percent (50%) share as well.

73.     Upon information and belief the undermining of HPT's goodwill and net worth directly inures to the benefit of Rabon—who together with his wife Kathy Rabon, own one hundred percent (100%) equity interest in Rabco.

## THIRD CAUSE OF ACTION

### [Damages for Interference With A Contractual Relationship]

74.     Gwynn incorporates by reference all the allegations set forth in this Complaint as if fully set forth herein.

75.     This cause of action pertains to named Defendants Rabco and Rabon.

76.     Gwynn had a valid contractual relationship with Constant Contact, Inc. ("CC"); a provider of Internet based commercial email services, under an account registered and paid for by Gwynn's d/b/a TCOB.

77.     Rabco and Rabon had full knowledge that Gwynn used his CC account to send commercial email on behalf of Rabco, HPT and CP. CP is the general partnership that Plaintiff had established with his son on December 12, 2008, and which had clients completely separate and apart from any Rabco/HPT clients. Rabco/HPT were in fact one of a number of CP clients that CP provided e-commerce services to.

78.     By intentional and improper interference, Rabco and Rabon commandeered Gwynn's CC account on August 6, 2009, by using well known cyber intrusion methods. Rabco and Rabon remain in full control of this account, having changed all registration and payment information to Rabco. This intentional contractual interference on the part of Rabco and Rabon has significantly disrupted Gwynn's business activities and allowed Rabco and Rabon to wrongfully obtain access to CP's trade secrets and confidential information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

1.  Judgment on the first cause of action (Fraud)

    a.  To compensate Plaintiff, on behalf of HPT, as compensatory damages the full amount currently owed to HPT by Rabco, for HPT inventory that Defendants have wrongfully acquired and/or wrongfully accounted/paid for—inventory that should have been accounted for under GAAP and was not. In addition, to compensate HPT for the deliberate and wrongful conduct on the part of the Defendants, an amount of punitive damages equal to one hundred and fifty thousand dollars ($150,000.00). To compensate Plaintiff Gwynn, as an individual and for compensatory damages, the full amount of taxes and fines owed to the IRS by Gwynn caused directly by Defendants misconduct. In addition, to compensate Plaintiff Gwynn, as an individual and for punitive damages, seventy-five thousand dollars ($75,000.00) for the deliberate and wrongful conduct on the part of Defendants.

    b.  Plaintiff recovers attorneys' fees and costs of this action, and that those costs are taxed against Defendants Rabco, Rabon, Cates and Hunter, including prejudgment interest as of the date of the filing of this Complaint.

2.  Judgment on the second cause of action (Trademark Infringement)

    a.  To compensate Plaintiff, on behalf of HPT, for damages regarding Rabco/Rabon's wrongful use of HPT's trademark to generate sales for Rabco without compensation to HPT, or its shareholders. Plaintiff seeks an

award and accounting of Rabco's Internet profits, some percentage of which are directly attributable to the use of HPT's Mark, website, domain name, and other intellectual property, which HPT should receive as compensatory damages, after a proper determination has been made. In addition, that damages sustained by HPT are trebled in light of Defendants' intentional misconduct.

      b.     Plaintiff recovers attorneys' fees and costs of this action, and that these costs are taxed against Defendants Rabco and Rabon, including prejudgment interest as of the date of the filing of this Complaint.

3.     Judgment on the third cause of action (Contractual Interference)

      a.     To compensate Plaintiff Gwynn for the loss of the benefit of the bargain that Gwynn had under his Constant Contact, Inc. contract, and for the cost to rebuild a useful commercial email list on behalf of CP and HPT, compensatory damages in the amount of ten thousand dollars ($10,000.00). Further, since Rabco and Rabon pursued a course of action that they knew would cause damage to Plaintiff's contractual relationship, and that such action was pursued with malice, or such reckless disregard of the consequences from which malice may be inferred, that this Court grant punitive damages to Plaintiff in an amount that it sees fit.

      b.     Plaintiff recovers attorneys' fees and costs of this action, and that these costs are taxed against Defendants Rabco and Rabon, including prejudgment interest as of the date of the filing of this Complaint.

4.    For such other and further relief as the Court deems just and proper.

### Designation of Place of Trial

Plaintiff hereby designates Tampa, Florida as the place of trial of the above-styled matter.

### Request for Jury Trial

Plaintiff Gwynn hereby requests trial by jury of the above-styled matter.


Respectfully submitted,


Carlos A. Leyva
Florida Bar No. 0051017
**DIGITAL BUSINESS LAW GROUP, P.A.**
1001 Starkey Rd. #18
Largo, FL  33771
(800) 516-7903 phone
(800) 257-9128 fax
cleyva@digitalbusinesslawgroup.com

**ATTORNEY FOR PLAINTIFF
MARTIN F. GWYNN**