IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARTIN GWYNN

      Plaintiff,

                                                Case No.:  8:09-cv-02093

v.

RABCO LEASING, INC.,                            DISPOSITIVE MOTION
BRUCE D. RABON,
ALTON CATES,
VIRGINIA HUNTER,
HURRICANE PASS TRADERS, INC.

      Defendants.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Martin Gwynn ("Gwynn") moves for Partial Summary Judgment as there are no genuine material facts in dispute and Gwynn is entitled to judgment as a matter of law against Defendants Rabco Leasing Inc. ("Rabco"), Bruce D. Rabon ("Rabon"), Virginia Hunter ("Hunter"), and Hurricane Pass Trader's Inc. ("HPT").

## MEMORANDUM OF LAW

### I.     INTRODUCTION AND BACKGROUND

Defendant Rabco is a family owned corporation engaged in retail sales of various merchandise including sales of same on the Internet. Defendant Rabon is the CEO of Rabco and of HPT. Defendant Hunter is the longtime bookkeeper of Rabco and worked in a similar capacity for other related family businesses.  Plaintiff Gwynn is a 50% shareholder of HPT and a longtime employee of Rabco and its other related family businesses. Undisputed Fact ("Facts") ¶ 1.

1

At its core, this case is about a long time business relationship gone awry. Recognizing that the "little guy" often got the short end of the stick under traditional corporate law, the common law doctrine of "close corporations"[1] evolved to afford minority shareholders some protection. This is a story of two close corporations, HPT and Rabco, and the individual shareholders of each. Plaintiff brought four of the five counts as a shareholder derivative action on behalf of HPT.[2] The State of Florida provides Gwynn both statutory[3] and common law rights to bring a shareholders' derivative action. *See Timko v. Triasi*, 898 So.2d 89 (Fla. 5th DCA 2005). Shareholder derivative suits, as created by the common law, provide a means to enable shareholders to police "faithless directors and managers." *See Larsen v. Island Developers, Ltd.*, 769 So.2d 1071, 1072 (Fla. 3d DCA 2000)(quoting *Cohen v. Beneficial Indus. Loan Corp.*, 377 U.S. 541, 548 (1949)). In *Cohen*, the U. S. Supreme Court recognized that the shareholder derivative suit, born out of shareholder helplessness and frustration, was "long the chief regulator of corporate management." 337 U.S. 541, 548 (1949). *See also Larsen*, 769 So.2d 1071, 1072 (citing *Orange Groves Co. v. Hale*, 107 Fla. 304, 144 So. 674, 678 (1932)). The case at bar is the canonical example, for close corporations, of why this remedy exists. *See Tillis v. United Parts, Inc.*, 395 So.2d 618 (Fla. App. 5 Dist., 1981).

This case, to a large degree, turns on Florida corporate common law doctrine. Because corporate law is implicated in all of Plaintiff's HPT Counts, a short history of each corporation is provided.

---

[1] The phrase "close corporation" is a legal term of art in Florida corporate common law and is defined *infra*.
[2] Gwynn's Second Amended Complaint ("Complaint") contains four counts brought on behalf of HPT: 1) Fraudulent Misrepresentation (Count I) ("Fraud Count"); Trademark Infringement (Count II); Copyright Infringement (Count IV); and 4) Unjust Enrichment (Count V). (Doc. 34). Only Counts I, IV, and V are the subject of this motion ("HPT Counts").
[3] *See* § 607.07401, Fla. Stat. (2009).

Short History of HPT

In 1998, Rabon and Gwynn, while still employees of Shorts, Inc. (aka "William Shorts Clothiers" or "WSC"), and with the approval of WSC, entered into a partnership to create a "line" of fishing motif t-shirts with the intent of selling same to WSC and others. Facts ¶¶ 2-5. In that same year the partners jointly recruited commercial artist Kathy Zimmerman ("Zimmerman") and established the Hurricane Pass Traders general partnership ("HPTGP"). *Id*. HPTGP sold merchandise to WSC and others, accounted for in a separate WSC bank account. *Id*. None of the partners ever received remuneration of any kind from HPTGP; instead all profits were reinvested back into the partnership.

In 1999, during the "dot com" frenzy, Gwynn proposed to Rabon (at the time President of WSC and still partner in HPTGP) that WSC/HPTGP launch a store online. Facts ¶ 6. The online retail store Gwynn conceived of and launched went on to generate millions. Facts ¶ 23. In that same year, Gwynn, as an employee of WSC, proposed that he be paid a ten percent (10%) commission on all online revenue, and Rabon agreed. Facts ¶ 8. At no time during his employment tenure with WSC, and later with Rabco, did Gwynn ever earn a salary of more than $26,000 plus the 10% commission. Facts ¶ 9. Gwynn infused his own seed capital into HPTGP in order to launch the online store. Facts ¶ 10.

Zimmerman, in 2000, after creating original artwork on behalf of HPTGP, apparently became unhappy with the lack of direct compensation, and sought the assistance of counsel in order to "cash out" her share of the partnership. Facts ¶ 14. Gwynn wrote a personal check to Zimmerman for $6,300 as part of a negotiated buyout and was subsequently repaid by HPTGP with interest. *Id*.

In 2002, HPTGP was incorporated as Hurricane Pass Traders, Inc. ("HPT") with Gwynn and Rabon each owning 50% of the shares. Facts ¶ 18. After HPT's incorporation Gwynn continued to evolve the online store. One of Gwynn's core innovations to the online store was the "feeder site

concept" ("FSC"). Facts ¶ 15.; *see also* <u>Exhibit W</u>, Gwynn's feeder site concept. The essence of the

FSC was to create a constantly "morphing" set of websites that would attract search engine traffic and

feed said traffic to a centralized website located at www.hurricanepasstraders.com ("Website") where

consumers would complete the purchase. *Id*. It was the FSC that consistently provided the Internet

traffic that allowed the online store to thrive. Facts ¶ 16.

<u>Short History of Rabco</u>

For the purposes of this case, Rabco's history starts with the purchase agreement it entered

into with WSC ("Agreement") around 2002. Facts ¶ 21. WSC sold its assets and liabilities to Rabco. *Id*.

Bruce Rabon and his wife Kathy Rabon are the sole shareholders of Rabco. Facts ¶ 22. Kathy Rabon

is Short's daughter. There is scant evidence in the record detailing the specifics of the Agreement,

except for: 1) a document memorializing a Rabco board of directors meeting pertaining to the

Agreement where no IP is referenced; (*See* <u>Exhibit U</u>, Rabco minutes) and 2) a purported

"reconfirmation" of the Agreement executed by Rabon and Hunter nearly ten years after the fact,

purporting that the IP was transferred as part of the purchase. *See* <u>Exhibit V</u>, "re-confirmation" of

WSC/Rabco purchase agreement.

<u>Gwynn's Business Relationship with WSC and Rabco</u>

In 1996, while employed at WSC, Gwynn launched a t-shirt business within a Max Slacks store

that he operated for WSC and was paid 90% of sales as commission; and 2) in 1995 Gwynn supplied

several WSC stores with a point-of-sale system (i.e. software and hardware) and was compensated

$171 per month per store as a 1099 employee. *See* Aff. Gwynn ¶¶ 2-3.

In 2002, after the execution of the Agreement between WSC and Rabco, Gwynn was hired by Rabco as retail operations manager, while maintaining his 50% interest in HPT.[4]  At no time in his employment with WSC or Rabco did Gwynn ever have a technical title. *See* Depo. Virginia Hunter 73:13-73:21 (August 16, 2010). Further, neither WSC nor Rabco ever paid for any technical training wherein Gwynn acquired his knowledge of hardware, software, or the Internet. *See* Depo. Virginia Hunter 124:20-125:23. Rather, Gwynn, like many Internet entrepreneurs, acquired his expertise through long hours of uncompensated "sweat equity" which he brought to bear as part of his contribution to HPTGP, and later to HPT.

In June 2009, the relationship between Gwynn and Rabon became acrimonious, both professionally and personally. On July 21, 2009, Gwynn was terminated as a Rabco employee. Thereafter, Rabon consistently refused to discuss with Gwynn how to resolve Gwynn's 50% ownership in HPT. *See* Aff. Gwynn ¶ 15; *see also* Exhibit H.  Moreover, Rabon used his influence with the Clearwater Police Department ("CPD") to wrongfully file a felony criminal complaint against Gwynn Facts ¶ 28.  CPD eventually dropped its investigation because Rabon failed to reveal material facts regarding the relationships between Rabco, HPT and Gwynn.

Gwynn created the IP that generated millions of dollars of online revenue on his own time, using his own resources and under his own direction, as a partner of HPTGP or as a 50% shareholder of HPT. *See* Exhibit S, revenue generated by online store. [5] Therefore, Rabco's confiscation of this IP has no basis in fact or law.

## II.    Statement of Undisputed Facts

    1.    Gwynn has worked with, and for, Rabon for over sixteen years.

---

[4] Gwynn business relationships with Rabco/Rabon were complex and multi-faceted. *See* Exhibit A.
[5] All exhibits are attached hereto and incorporated herein by reference.

2.    In early 1998, Rabon and Gwynn, while still employees of WSC, decided to create their own line of fishing motif t-shirts. *See Depo.* Hunter 24:13-25:24 (August 16, 2010); *see also* Depo. Gwynn 45:19-46:19 (August 24, 2010).

3.    In mid 1998, Rabon and Gwynn jointly recruited commercial artist Kathy Zimmerman ("Zimmerman") and formed the Hurricane Pass Traders general partnership ("HPTGP"). *Id.; see also* Depo. Rabon 114:18-119:19 (August 18, 2010); Depo. Gwynn 42:20-47:4.

4.    HPTGP sold t-shirts to WSC and others via arms length transactions. *See* Depo. Gwynn 66:20-68:20, 84:12-89:02; *see also* Depo. Hunter 27:8-27-13, 53:25-54:2.

5.    Revenues from HPTGP sales were deposited into a WSC/HPTGP checking account and funds were reinvested into HPTGP's business. *Id.*; see also Depo. Rabon 120:6-120:16; Depo. Hunter 53:25-54:2.

6.    In January 1999, Gwynn talks to Rabon (now President of WSC) regarding doing business on the Internet. *See* Aff. Gwynn ¶ 5 (November 4, 2010).

7.    In March 1999, William Short began closing down all of his retail operations. Rabon agrees with Gwynn that doing business on the Internet is worth pursuing. *See* Aff. Gwynn ¶ 6.

8.    In or around March 1999, Gwynn proposes to Rabon that he be paid a ten percent (10%) commission on all WSC Internet sales and Rabon accepts.  *See* Depo. Hunter 76:6-77:14; *see also* Depo. Gwynn 195:21-196:24; Aff. Gwynn ¶ 7.

9.    At no time prior to March 1999, or subsequent to this timeframe, when WSC becomes Rabco, did Gwynn ever receive a base salary from WSC or Rabco in excess of twenty-six thousand dollars ($26,000.00) per year. *See* Depo. Hunter 76:1-77:1; *see also* Aff. Gwynn ¶ 8.

10.  In or around April-May 1999, Gwynn, out of his own pocket, purchases assets totaling over $3,000 to establish WSC/HPTGP's Internet presence. *See* Aff. Gwynn ¶; *see also* Depo. Gwynn 161:13-161:21.

11.  On July 16, 2001, Rabon registers the domain name "http://www.hurricanepasstraders.com" to WSC.  *See* Depo. Gwynn 159:25-161:4.

12.  In or around July 2001, Rabon personally registers, as trademarks of WSC, HPTGP marks created by Zimmerman. *See* Depo. Gwynn 33:22-33:24.

13.  Zimmerman, during the timeframe spanning from 1998 to June 13, 2000, produced original artwork to be converted to heat transfers for HPTGP's t-shirt line of products. The record of these assets "disappeared" from HPTGP's books. *See* Depo. Gwynn 57:13-58:13.

14.  On June 13, 2000, HPTGP negotiates to buy out Zimmerman's share of HPTGP, leaving Gwynn and Rabon each 50% owners of HPTGP. *See* Depo. Hunter 76:1-77:1; *see also* Depo. Rabon 125:25-126:4; Depo. Gwynn 96:25-97:10.

15.  In mid 2000, Gwynn instantiates the "feeder site" concept which provides the foundation for all subsequent search engine optimization ("SEO") work. This concept used additional vendor specific domain names and "landing pages" in order to feed a centralized website. *See* Depo. Rabon 153:2-153:15; *see also* Depo. Gwynn 57:13-58:13; Aff. Gwynn ¶ 11.

16.  From mid 2002 through July 21, 2009, over 60 feeder sites are created, maintained, and optimized by Gwynn for existing search engines. *See* Depo. Gwynn 57:13-58:13.

17.  On March 25, 2002, "http://www.hurricanepasstraders.com" appears with a Hurricane Pass Traders masthead (i.e. HPTGP's trademark). This domain name is used as the centralized website

from this date until Rabco filed its bankruptcy petition on April 16, 2010. *See* Depo. Gwynn 193:12-195:6.

18.  On July 3, 2002, HPTGP is incorporated as Hurricane Pass Traders, Inc. ("HPT"), a Florida corporation, with Gwynn and Rabon as 50% shareholders and board members. *See* Depo. Gwynn 99:6-99:13; *see also* Exhibit B pp. 5-8.

19.  On or about October 18, 2002, HPT's bylaws were adopted by HPT's board and the following HPT officers were named: a) Rabon is named President and Secretary; and b) Gwynn is named Vice-President and Treasurer. *See* Depo. Gwynn 99:14-100:6.

20.  Gwynn never received or reviewed HPT's annual financial statements, or HPT financial statements of any other kind. *See* Exhibit X; *see also* Aff. Gwynn ¶ 10.

21.  Rabco purchased WSC's assets and liabilities circa 2002. *See* Depo. Hunter 38:15-38:25; *see also* Depo. Rabon 233:19-234:21.

22.  Bruce Rabon and Kathy were the sole shareholders of Rabco. *See* Depo. Rabon 14:2-15:4.

23.  From 2002 through July 2009 the online store generated millions of dollars. *See* Depo. Rabon 145:5-145:10; *see also* Exhibit S.

24.  During the period from 2002 to 2009 Rabco required that Gwynn, as a Rabco employee, share in advertising costs related to the online store. *See* Depo. Rabon 75:10-75:18; *see also* Depo. Hunter 75:15-78:16; Aff. Martin F. Gwynn ¶ 12.

25.  Rabco sold HPT t-shirts, on average, for $20.00.  *See* Aff. Gwynn ¶ 13.

26.  On or about June 2009, the relationship between Gwynn and Rabon became acrimonious, both professionally and personally. *See* Aff. Gwynn ¶ 14.

27.  On July 23, 2009, Gwynn signed a settlement agreement with Rabco.

28.  On August 31, 2009, Rabco/Rabon filed a criminal complaint against Gwynn alleging, *inter alia*, theft and embezzlement of trade secrets. After an investigation, Gwynn was never formally charged, and the Florida State Attorney's Office declined to pursue Rabco/Rabon's complaint. *See* Depo. Rabon 205:25-208:28; *see also* Aff. Gwynn ¶ 16; Exhibit F.

29.  The Marks in Exhibit P appeared on the Website located at www.hurricanepasstraders.com for approximately 10 years. *See* Aff. Gwynn ¶ 17.

30.  Gwynn created the Marks in 2009 and 1999 respectively. *Id.*

31.  A consumer purchasing goods on the Website had no idea it was Rabco that was collecting the payment. *See* Depo. Rabon 104:15-105:9.

32.  At all relevant times Gwynn authored the Work on the Website and on the feeder sites. *See* Depo. Gwynn 219:25-220:18.

33.  On April 16, 2010, Rabco filed a voluntary Chapter 7 Bankruptcy Petition ("Petition") in the U.S. Bankruptcy Court for the Middle District of Florida, Tampa Division.

34.  Rabco made statements under oath in its Petition which were inconsistent with statements made in pleadings filed in this action.

35.  On July 22, 2010, in its Chapter 7 Bankruptcy, Rabco filed an Amended Schedule B-Personal Property.

## III.    ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" only if there is a sufficient evidentiary

basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Once the moving party meets its initial burden of identifying for the Court materials that it believes demonstrate the absence of a genuine issue of material fact, the nonmoving party may not rely on mere allegations in the pleadings in order to preclude summary judgment. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). Instead the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id*. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      Summary Judgment On All HPT Counts Is Predicated On Controlling Authority Governing Close Corporations.**

Although the subject matter of each of Gwynn's HPT Counts differs, the resolution of each in favor of Gwynn is predicated on the controlling precedent that underpins close corporations. Close corporations are generally defined as having the following attributes: "(1) a small amount of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction, and operations of the corporation." *See generally Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 511-512 (1975) (hereafter "Donahue"); *see also Tillis v. United Parts, Inc.*, 395 So.2d 618, 619 (Fla. App. 5 Dist., 1981) (hereafter "Tillis").

Courts have long recognized the resemblance of close corporations to partnerships. In *Helms v. Duckworth*, former Supreme Court Justice Burger emphasized the relationship of a two-man close corporation to a partnership:

> In an intimate business venture such as this, stockholders of a close corporation occupy a position similar to that of joint adventurers and partners. While courts have sometimes declared stockholders 'do not bear toward each other that same relation of trust and confidence which prevails in partnerships,' this view ignores the practical realities of the organization and functioning of a small 'two-man' corporation organized to carry on a small business enterprise in which the stockholders, directors, and managers are the same persons. (footnotes omitted).

101 U.S.App.D.C. 390, 249 F.2d 482, 486 (1957). Indeed, a fundamental tenet of close corporations is "that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *See Donahue* at 115; *see also Tillis* at 619 ("Corporate officers, controlling the corporation through ownership of a majority of the stock, have a fiduciary relation to minority stockholders.").

Courts often rely on Judge Cardoza's formulation of the duty owed to one partner by another. *See Donahue* at 116. In *Meinhard v. Salmon*, Judge Cardoza succinctly stated the essence of this duty as follows:

> Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. . . . Not honesty alone, ***but the punctilio of an honor the most sensitive, is then the standard of behavior***. [emphasis added]

29 N.Y. 458, 164 N.E. 545, 546 (1928) (hereafter "Meinhard").

For the reasons discussed herein, and despite the equal distribution of shares, Rabon is the economically dominant shareholder in HPT and has consistently breached the fiduciary duty he owed to HPT, using his dominant economic position (as CEO of both HPT and Rabco) to "freeze out" HPT, to the material detriment of HPT. *See generally Hill v. Brady* (Fla.App. 5 Dist. 1999) (fiduciary duty found where one corporation "looted" another). It is the *duty owed* that is controlling and not the exact configuration of the entity or entities involved.

Rabon used his position in both corporations to ensure that all the economic value was captured in Rabco, a corporation wholly owned by Rabon and his wife. Rabon's repeated breaches of his fiduciary duty to HPT (and Gwynn) necessitated this shareholder derivative action. Rabon treated Rabco as his alter ego, and by so doing he ensured that the economic value of both corporations would inure to him alone, contrary to law. In addition, Rabon treated Gwynn more like a partner than an employee. For example, he required Gwynn to bear one third of advertising costs related to online sales. Facts ¶ 24; *see also* <u>Exhibit G</u>.  Under Florida law, only partners are required to share equally in losses and profits.[6] The Eleventh Circuit has made it clear that it rejects the "exaltation of form over substance that resides in reliance on a label" to determine whether an individual is an employee or a partner. *See generally Fountain v. Metcalf, Zima & Co., P.A.*, 925 F.2d 1398, 1400 (C.A.11 (Ga.), 1991). As the Court in *Metcalf* noted, "the evidentiary value of a label is extremely limited, the economic reality of the role played being a more probative indication." *Id* at 1401.

Two essential predicates support this motion: 1) HPT unequivocally owns all the intellectual property in dispute; and 2) Defendants' conduct wrongfully concentrated all the economic value in Rabco, thereby entirely laying to waste all the economic value in HPT.

### C.    All of the Evidence Supports Plaintiff's Claims as a Matter of Law.

#### 1.    Fraudulent Misrepresentation (Count 1)

The essential elements of common-law fraud are: (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person. *See Ziemba v. Cascade Int'l, Inc.*, 256

---

[6] *See* Fla. Stat. 620.8401(2).

F.3d 1194, 1202 (11th Cir. 2001); *see also Mettler, Inc. v. Ellen Tracy, Inc., 648 So.2d 253 (Fla. 2d DCA 1994)*. [Note: The remainder of page 13, and pages 14-15, are redacted and filed under seal.]

---

There are no material facts in dispute and Gwynn is entitled to summary judgment and damages on his Fraud Count as a matter of law.

### 3.   Copyright Infringement (Count 4).

A plaintiff alleging copyright infringement must show that it owns a valid copyright and that a defendant copied the protectable elements of the copyrighted work. *See Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1253 (11th Cir. 2007).

HPT's copyright registration for the Website (the "Work" or "Work") correctly states that the author is Hurricane Pass Traders, Inc. (i.e. "HPT"). *See* Exhibit O. The U.S. Copyright Office's online registration process requires a designation of "Work made for hire" whenever the author is an entity. A business entity, such as a corporation, is a legal fiction and cannot "author" anything.

It is undisputed that Gwynn was the author of HPT's copyrighted content, as contained in its Website. Contrary to Defendants' self-serving assertions, Gwynn did not create the Work as an employee of WSC or Rabco. *See* Answer Doc. 65, affirmative defense 15. Rather, Gwynn, created the Work of authorship first as general partner in HPTGP and subsequently as a 50% shareholder and officer of HPT. *See* Depo. Gwynn 219:25-220:18. In short, Gwynn authored the work as part of his "sweat equity" contribution to HPTGP (i.e. from 1999 to 2002) and later as part of his "sweat equity" contribution to HPT (i.e. from 2002 until 2009). *Id.*

It is not uncommon for partners or shareholders to contribute "sweat equity" to business entities—in fact, for startups this is likely the rule rather than the exception. As the U.S. Supreme Court made clear in *Community for Creative v. Reid*, a court should "apply general common law of agency principles to ascertain whether the work was prepared by an employee or an independent contractor"

before making the determination as to whether the Work was made "for hire" under §101(1) of the copyright statute. 490 U.S. 730 (1989) (hereafter "Reid"); *see also* Title 17 U.S.C. §101(1).[9]

The critical question here is whether Gwynn is an agent of HPT for the purposes of making the correct determination under the statute. As is true in most close corporations, Gwynn is both a shareholder and an officer of HPT. *See* <u>Exhibit B</u>, pp. 5-8. It is axiomatic that officers are agents of their respective corporations. In *Reid*, the Court indicated that a non-exhaustive list of factors, based on the common law of agency, no one of which is dispositive, should be used to make the "employee" determination. *See Reid* at 751-752. These factors include: 1) the right of a party to determine the manner in which a work is created; 2) the skills required; 3) the source of the instrumentalities; 4) the duration of the work; and 5) the relationship between the parties. *Id*.

The factors are applicable to HPT as follows: 1) as a corporation HPT is well within its rights to determine how its work should be accomplished; 2) it also within its rights to name officers with certain skill sets (i.e. Gwynn and Rabon); 3) the instrumentalities used were investments made first in HPTGP, and later in HPT, by their respective shareholders; 4) Gwynn made "sweat equity" contributions to HPTGP and HPT for over ten years; and 5) Gwynn had a longtime shareholder interest and was highly incentivized to make said contributions to HPTGP and HPT. *See* Depo. Gwynn 219:25-220:18.

There does not exists a contract, license agreement, HPT board of directors meeting, or any other evidence showing that HPT conveyed any of its exclusive rights under the copyright statute to Rabco.  Nevertheless in 2002, after execution of its Agreement with WSC, Rabco repeatedly copied, published and distributed the Work in violation of HPT's copyright. Rabon, as the dominant shareholder, owed a fiduciary duty to HPT (and Gwynn) of a "punctilio of an honor the most sensitive."

---

[9] Title 17 U.S.C. § 101 definition of "Work made for hire" contains two prongs, only prong (1) is applicable because the Work in question was not a "specially ordered or commissioned" work.

*See Meinhard* at 546. Rabon breached this duty, ensuring that all of HPT's economic value inured to Rabco. Further, when Gwynn attempted to assert his rights as an HPT shareholder, Rabon used his position power to attempt to destroy Gwynn, both personally and professionally, by wrongfully filing a criminal complaint against Gwynn and by denying Gwynn the value contained in his 50% ownership interest in HPT. Facts ¶ 28.

Rabon is personally liable for the copyright infringement as is Rabco. Courts have stated that, under the Copyright Act, an individual who is the dominant influence in a corporation, and through his position can control the acts of that corporation, may be held jointly and severally liable with the corporate entity for copyright infringement. *See Southern Bell Telephone and Telegraph Co. v. Associated Telephone Directory Publishers*, 756 F.2d 801, 811 (11th Cir.1985).  In this case, Rabon was in fact the dominant influence in Rabco and controlled its acts such that he may be held jointly and severally liable with Rabco for the infringement.

There are no material facts in dispute and Gwynn is entitled to summary judgment and damages on its copyright count as a matter of law.

### 4.      Unjust Enrichment (Count 5).

To prevail on a claim of unjust enrichment, a plaintiff must show: (1) it conferred a benefit on the defendant of which defendant is aware; (2) defendant voluntarily accepted and retained the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying for it. *See Nova Information Systems, Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1006-1007 (11th Cir. 2004); *see also Shibata v. Lim*, 133 F.Supp.2d 1311 (M.D. Fla., 2000). Unjust enrichment is a cause of action founded on the equitable principle that a person should not be

permitted to unjustly to enrich themselves at the expense of another. *See Lowry v. Lowry*, 463 So.2d

540, 541 (Fla.2d D.C.A.1985) (citing 66 Am.Jur.2d, Restitution and Implied Contracts § 3 (1973)).

Rabco's claims to the ownership of the IP in dispute are pure fiction, based only on Rabon's

fiat and decree, consistent with his treatment of Rabco as his alter ego, but having no basis in fact or

law. All indicia of ownership point to HPT as the rightful owner of said IP, for example: 1) the business

model for retail sales on the Internet, as later adopted and misappropriated by Rabco, had its genesis

in HPTGP—both the idea and the original expression was part and parcel of Gwynn's contribution to

the partnership; 2) all traffic from the "feeder site concept" created by Gwynn went to a Website with

the address  bearing HPT's corporate name (i.e. www.hurricanepasstraders.com) and with "Hurricane

Pass Traders" branding on every page; and 3) all online customer acquisition occurred on the same

centralized website. Facts ¶¶ 15, 31-32; *see also* Aff. Gwynn ¶¶ 11, 16.

Rabon testified that he agreed that Gwynn should be a 50% shareholder in HPT because

Gwynn was a 50% partner in HPTGP and because Gwynn had certain computer expertise. *See* Depo.

Rabon 130:3-131:4. Rabon, in his testimony, did not identify any computer expertise on his part that

warranted a 50% share in HPT. *Id*. In fact, despite being a CEO of a small company that had generated

millions of dollars of revenue on the Internet, Rabon lacked a basic business understanding of Internet

fundamentals. *See* Depo. Rabon 148:2-150:18.

There is no evidence in the record that anyone but Gwynn provided the Internet expertise that

fueled the online business. Moreover, it was not solely Gwynn's technical expertise that allowed the

online store to thrive (i.e. where other "dot com" startups failed) but rather, it was the combination of his

retail marketing expertise and his technical acumen that proved to be the winning combination. In short,

Gwynn poured his "sweat equity" into HPTGP and HPT for over a decade and has yet to see a single

dollar in distribution from either entity.

Rabon used his dominant position in a manner that ensured Rabco would reap the entire

benefit of HPT's intellectual capital; by so doing he breached his fiduciary duty to HPT, and to Gwynn.

Rabco and Rabon knowingly accepted the benefit conferred. To allow HPT's intellectual property to be

confiscated, without compensation, would be manifestly unjust under these circumstances.

Wherefore Gwynn, on behalf of HPT, respectfully asks that this Court right the wrong that has

been perpetrated, and grant HPT damages in compensation therewith.

**D.     Rabco's Counterclaims Must Be Dismissed**

**1.     The Doctrine of Judicial Estoppel Bars Rabco's Counterclaims**

Rabco's Counterclaims must be dismissed as they are barred by judicial estoppel.  The

purpose of the doctrine of judicial estoppel is "to protect the integrity of the judicial process by

prohibiting parties from changing positions according to the exigencies of the moment." *See Robinson*

*v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) (citations omitted). The essence of this

doctrine is to "prevent a party from asserting a claim in a legal proceeding that is inconsistent with a

claim taken by the party in a previous proceeding," and has often been applied in this Circuit with

respect to bankruptcy proceedings.  *Id*; *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir.

2002).

In *Burnes*, the Court described the two prong judicial estoppel test: 1) "it must be shown that

the allegedly inconsistent positions were made under oath in a prior proceeding" and 2) "such

inconsistencies must be shown to have been calculated to make a mockery of the judicial system."

*Burnes*, at 1285. The *Burnes* Court also established that **the debtor is not provided the luxury of**

**remedying its failure to comply with its affirmative duty**.  *Burnes*, at 1286-1288. The rationale

behind this principle is that allowing an *ex post facto* remedy would imply that "a debtor should consider

disclosing potential assets only if he is caught concealing them"—a moral hazard that would undermine

the very foundation of the judicial system.  *See generally Id*.

In this case, Rabco has made inconsistent statements under oath; namely, in the case at bar

and in its Bankruptcy Petition.[10]  Rabco's Bankruptcy Petition, filed on April 16, 2010, contains the

following declaration signed by Bruce Rabon:

**DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the President of Rabco Leasing, Inc. named as debtor in this case, declare under penalty of perjury
that I have read the foregoing summary and schedules, consisting of 26 sheets, and that they are true
and correct to the best of my knowledge, information and belief.

In Schedule B of the Petition, under item 21, Rabco stated that it had **no contingent and**

**unliquidated claims of any nature**, including counterclaims.  However, on May 4, 2010, less than

three weeks after the Bankruptcy Petition was filed, Rabco asserted counterclaims against Gwynn in

this action.  Even *before* the Bankruptcy Petition was filed Rabco had asserted similar counterclaims

against Gwynn. *See* Court Doc. 30 filed on December 18, 2009, four months before the filing of the

Bankruptcy Petition.  Although the December counterclaims were ultimately dismissed as procedurally

defective, the allegations made therein are substantially similar to allegations made by Rabco in its

May 4, 2010 Counterclaims.  Compare Court Doc. 30, paragraphs 32-36; 37 and 39; 40-43; to Doc. 65,

paragraphs 46-50; 51 and 53; 54-57 respectively.

Rabco has made additional inconsistent statements under oath.  For example, although Rabco

identified no third party claims in its Bankruptcy Petition, it sought to assert third party claims in this

---

[10] *See* Case No. 8:10-bk-08849-CPM Filed in the U.S. Bankruptcy Court for the Middle District of Florida, Tampa Division on
April 16, 2010; *see also* Exhibit J.

action.  *See* Court Docs 30 and 70/73.   In its Bankruptcy Petition, in response to Schedule B Question

22, Rabco stated that it **owned no intellectual property**, including copyrights.  Yet in this action,

Rabco specifically alleges ownership of intellectual property. *See* <u>Exhibit J</u> at 9 (Bankruptcy Petition);

Court Doc. 40 at 17 (Rabco's motion to dismiss indicating it owns IP); *see* Court Doc. 65 32-54

(Rabco's Answer and Counterclaims).

Rabco's Bankruptcy Petition also states in answer to Schedule B Question 23, that **it owns no**

**licenses, franchises, and other general intangibles**.  However, in its Answer to this action, Rabco

admits that it is the owner of certain domain names (a form of intangibles).[11] *See* Court Doc. 65,

Counterclaim at 37.  In the Bankruptcy Petition, in answer to Schedule B Question 24, Rabco states

that it **owns no customer lists or other compilations**. However, in its Answer, Rabco stated, in part:

"[c]ount III is barred in whole because Defendant Rabco had a qualified privilege to protect its own …

customer lists …." Court Doc. 65 at 13.

Rabco concealed its counterclaims, third party demands, and intellectual property from the

Bankruptcy Court and only amended its Bankruptcy Petition to include alleged causes of action and

intellectual property on July 22, 2010, three months after its original filing, and **only after** the

concealments were brought to this Court's attention by Plaintiff (See Doc. 76).  Although Rabco stated

in its Response to Gwynn's Motion to Dismiss (Doc. 84, page 5) that it planned to "continue

coordinating amendments to the bankruptcy petition to … identify specific intellectual property that was

broadly identified as 'websites,'" Rabco has made no efforts to amend its Bankruptcy Petition to

properly identify the "websites" which it values, together with other intellectual property, at a mere

$1,500, total.

---

[11] A domain name is an identification label that defines a realm of administrative autonomy, authority, or control in the Internet, based on the Domain Name System (DNS).

In making inconsistent statements under oath to this Court, and to the Bankruptcy Court, Rabco clearly attempted to "change positions according to the exigencies of the moment." *See Robinson*, supra. The amendment which Rabco made to the Bankruptcy Petition after the concealment of assets was brought to this Court's attention is of no moment, as allowing such an *ex post facto* remedy to avoid judicial estoppel is not permitted, because it would imply that "a debtor should consider disclosing potential assets only if he is caught concealing them," – which is exactly what Rabco has done in this case. *See Burnes* at 1286-1288.

There is no question that Rabco made inconsistent statements under oath, therefore, the first prong of the judicial estoppel test is met.  The second inquiry is whether the concealment or inconsistent statements were deliberately made to manipulate the judicial system. "While an estopped party's contradiction must be intentional, such intent may be inferred from the record." *See Burnes*, 291 F.3d at 1285.

As discussed *supra*, it is evident from the record that Rabco intended to assert claims against Gwynn, and third parties even before the Bankruptcy Petition was filed.  Further, Rabco stated in the Bankruptcy Petition that it did not own intellectual property, licenses, etc., but claimed remuneration from Gwynn, and others for alleged damages to intellectual property.  In light of these facts, and the conduct of Rabon/Rabco at all times relevant to these proceedings, Rabco cannot credibly state that its concealment of intellectual property and alleged causes of action was inadvertent.  One can easily infer from the record that Rabco's concealment was in fact intentional.

There is also an "additional consideration" that weighs in favor of applying judicial estoppel to bar Rabco's counterclaims.  *See New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).   Since July 2010, Rabco's Bankruptcy Trustee has been represented by the same attorney that is representing

Rabco in this action.  *See* <u>Exhibit K</u> (Order on Application To Employ Special Counsel).  In her application to employ special counsel, the Trustee specifically stated that she desired to employ "Robert Smeltzer … as special counsel to represent her in connection with an intellectual property matter initiated pre-petition, including the counterclaims and third party demands asserted by Rabco herein."  *See* <u>Exhibit L</u>. Clearly Rabco, and the Trustee knew that the statements made in the Bankruptcy Petition under oath were, and continue to be, inconsistent with the claims made by Rabco in this action. Further, despite representation by identical counsel, and ample opportunity to make an appearance in this action on behalf of the estate, Rabco's Chapter 7 Trustee has made no attempt to intervene in this matter, nor has she sought to be substituted as the real party in interest.[12]  See *In the Matter of Shelton*, Case No. 07-81534-JAC-7 (Bankr. N.D. Ala. 4/26/2010).  Accordingly, for the reasons stated herein, there are no genuine issues of material fact and Rabco's counterclaims must be dismissed inasmuch as Rabco and its Trustee are judicially estopped from pursuing the counterclaims against Gwynn.

## 2.    Rabco Has No Standing to Pursue Counterclaims

Rabco's Counterclaims must be dismissed, as it has no standing to pursue those claims.  All of a debtor's assets, both tangible and intangible (i.e. intellectual property), including pre-petition causes of action (i.e. counterclaims), vest in the bankruptcy estate upon filing of the Bankruptcy Petition and only the trustee in bankruptcy has standing to pursue causes of action belonging to the estate.  *See Parker v. Wendy's Intern.*, *Inc.*, 365 F.3d 1268 (11th Cir. 2004); *Waldron v. Brown*, 536 F.3d 1239, 1242 (11th Cir.2008); § 11 U.S.C. 541(a)(1) and1306. Further, although she has had ample opportunity to do so, the estate's Trustee has not attempted to intervene in this matter on behalf of the estate, nor

---

[12] The trustee recently added additional counsel.

has she sought to be substituted as the real party in interest.  Accordingly, the counterclaims against Gwynn must be dismissed, as Rabco has no standing to pursue them.

## IV.    CONCLUSION

For the foregoing reasons, Gwynn respectfully requests that this Court enter summary judgment in its favor, for all HPT Counts: 1) fraudulent misrepresentation; 2) copyright infringement; and 3) unjust enrichment. Gwynn also respectfully requests that Defendants' counterclaims be dismissed.


Respectfully submitted,


By: *s/ Carlos A. Leyva*
Carlos A. Leyva
Florida Bar No. 0051017
**DIGITAL BUSINESS LAW GROUP, P.A.**
1001 Starkey Rd. #18
Largo, FL  33771
(800) 516-7903 phone
(800) 257-9128 fax
cleyva@digitalbusinesslawgroup.com
**ATTORNEY FOR PLAINTIFF**
**MARTIN F. GWYNN**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 5, 2010, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing.

By: *s/ Carlos A. Leyva*
      Carlos A. Leyva