IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARTIN GWYNN,

     Plaintiff,

v.                                    Case No.: 8:09-cv-02093

RABCO LEASING, INC.,
BRUCE D. RABON,
ALTON CATES, VIRGINIA HUNTER,
and HURRICANE PASS TRADERS,
INC.,

     Defendants.
_____/

VOLUME I
DEPOSITION OF:
BRUCE RABON

TAKEN BY:    Attorney for Plaintiff

DATE:        August 18, 2010

TIME:        9:04 a.m. - 5:57 p.m.

PLACE:      Executive Reporting Services
             13555 Automobile Boulevard
             Clearwater, Florida 33762

Examination of the witness taken before:

Jerry Lefler CSR RPR CRR CM
Executive Reporting Service
Ulmerton Business Center
13555 Automobile Boulevard, Suite 100
Clearwater, Florida 33762

Page 2

1    APPEARANCES:

2
             CARLOS A. LEYVA, ESQ.
3            Digital Business Law Group, P.A.
             1001 Starkey Road, #18
4            Largo, Florida 33771

5            Attorneys for Plaintiff

6
             ROBERT SMELTZER, ESQ.
7            Lowis & Gellen, LLP
             200 W. Adams Street, Suite 1900
8            Chicago, Illinois 60606

9            Attorney for Virginia Hunter

10

11   ALSO PRESENT:

12   Martin Gwynn
     Virginia Hunter
13

14                   I N D E X

15                                              PAGE

16      Direct Examination by Mr. Leyva              4

17      Certificate of Court Reporter             193

18      Certificate of Reporter Oath              194

19      Errata Sheet                              195

20      Read and Sign letter                      196

21

22

23

24

25

1               E X H I B I T S

2

3                                                      MARK
   Rabon
4

   1       Gwynn's FRCP Rule 26 Initial Disclosures      78
5
   2       Report from State of Florida website          83
6
   3       Sample invoices                              106
7
   4       Letter dated April 26, 2000, re Kathy        114
8          Zimmerman and HPT

9   5       Bank ledger with copy of a check             132

10  6       Bank of America statement, Shorts Inc HPT    137

11  7       Transfer of funds document                   140

12  8       Original Petition                            152

13  9       Amended Petition                             152

14  11      Packet of documents starting with            170
           RAB0000380
15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1      THEREUPON,                                        09:03:38a

 2                      BRUCE RABON                        09:03:38a

 3      was adduced as the deponent herein, and being first   09:03:38a

 4      duly sworn upon oath, was questioned and testified    09:03:38a

 5      as follows:                                       09:03:38a

 6                   DIRECT EXAMINATION                    09:03:38a

 7   BY MR. LEYVA:                                         09:03:38a

 8      Q.   Good morning.  My name is Carlos Leyva; I    09:03:38a

 9   represent Martin Gwynn.  Mr. Rabon, I will be asking    09:03:42a

10   you questions, and the court reporter will take down my   09:03:46a

11   questions and your responses.  I'll try to let you    09:03:49a

12   finish answering a question before I ask another      09:03:51a

13   question.  I'll try to do a better job of that.       09:03:54a

14          Remember to answer the questions out loud.  We   09:03:57a

15   all have a tendency to say, "Uh-huh," nod our heads.    09:04:01a

16   Those won't be appropriate answers, because the court    09:04:05a

17   reporter can't really capture that.                   09:04:07a

18          If you don't understand a question, please let    09:04:08a

19   me know.  Do you understand that you're under oath?    09:04:12a

20      A.   Yes.                                          09:04:20a

21      Q.   When you're done here today, you have a right    09:04:20a

22   to read and sign your deposition, and please let us    09:04:23a

23   know before the end of our time together if you would    09:04:25a

24   like to read and sign, or waive it.  Okay.            09:04:27a

25          I'm just going to go into some background       09:04:31a
```

| | | |
|---|---|---|
| 1 | questions, and I will -- there is a chronology here.  I | 09:04:34a |
| 2 | will try to clue you in as to where we're at in the | 09:04:37a |
| 3 | chronology, if that's helpful to you. | 09:04:41a |
| 4 | What is your full name? | 09:04:43a |
| 5 | A.   Bruce David Rabon. | 09:04:44a |
| 6 | Q.   Have you ever gone by another name or | 09:04:46a |
| 7 | nickname? | 09:04:47a |
| 8 | A.   No. | 09:04:49a |
| 9 | Q.   Have you ever been deposed? | 09:04:51a |
| 10 | A.   No. | 09:04:52a |
| 11 | Q.   Have you ever testified in court? | 09:04:54a |
| 12 | A.   No. | 09:04:55a |
| 13 | Q.   Have you ever been a plaintiff or a defendant | 09:04:58a |
| 14 | in another lawsuit? | 09:05:00a |
| 15 | A.   I'm trying to remember the Robert Graham -- I | 09:05:12a |
| 16 | don't think so, no. | 09:05:16a |
| 17 | Q.   Well, can you tell me about the Robert Graham | 09:05:19a |
| 18 | lawsuit?  Was it a lawsuit? | 09:05:22a |
| 19 | A.   We sued them.  I don't think that they ever | 09:05:23a |
| 20 | filed suit against us, so I'm -- I don't believe so. | 09:05:29a |
| 21 | Q.   So, I mean, in that case you were the | 09:05:33a |
| 22 | plaintiff.  There was -- | 09:05:35a |
| 23 | A.   Right. | 09:05:37a |
| 24 | Q.   -- a suit filed? | 09:05:38a |
| 25 | A.   We were. | 09:05:39a |

| | | |
|---|---|---|
| 1 | Q.   You guys were the plaintiff, and that suit | 09:05:40a |
| 2 | settled; is that correct? | 09:05:42a |
| 3 | A.   Yes. | 09:05:42a |
| 4 | Q.   Okay.  Are you take anything medication today? | 09:05:42a |
| 5 | A.   Blood pressure medication. | 09:05:46a |
| 6 | Q.   Okay. | 09:05:48a |
| 7 | A.   Cholesterol medication. | 09:05:51a |
| 8 | Q.   Okay.  We're going to take a break about every | 09:05:52a |
| 9 | hour and-a-half, all right.  If you need to take a | 09:05:55a |
| 10 | break, for whatever reason, sooner than that, we can. | 09:05:57a |
| 11 | A.   Thank you. | 09:06:00a |
| 12 | Q.   What's your date of birth? | 09:06:01a |
| 13 | A.   10-11-57. | 09:06:02a |
| 14 | Q.   What's your current address? | 09:06:06a |
| 15 | A.   212 Leeward Island, Clearwater, Florida. | 09:06:06a |
| 16 | Q.   Your prior address? | 09:06:12a |
| 17 | A.   107 Park Street, Safety Harbor, Florida. | 09:06:14a |
| 18 | Q.   Are you currently employed? | 09:06:18a |
| 19 | A.   No. | 09:06:19a |
| 20 | Q.   What was your last employment? | 09:06:24a |
| 21 | A.   Rabco Leasing. | 09:06:26a |
| 22 | Q.   And what position did you hold at Rabco | 09:06:28a |
| 23 | Leasing? | 09:06:30a |
| 24 | A.   I was the President, owner. | 09:06:30a |
| 25 | Q.   And for how long?  Just approximately. | 09:06:33a |

| | | | |
|---|---|---|---|
| 1 | A. | In excess of 14 years. | 09:06:39a |
| 2 | Q. | Okay.  Are you married? | 09:06:41a |
| 3 | A. | Yes. | 09:06:43a |
| 4 | Q. | Your spouse's name? | 09:06:43a |
| 5 | A. | Kathy. | 09:06:45a |
| 6 | Q. | And it's Kathy Rabon? | 09:06:48a |
| 7 | A. | Right. | 09:06:50a |
| 8 | Q. | Okay.  What year were you married? | 09:06:50a |
| 9 | A. | 1978. | 09:06:54a |
| 10 | Q. | That's a good question to get right, in case | 09:06:59a |
| 11 | your wife reads the transcript. | | 09:07:01a |
| 12 | A. | Thirty-two years. | 09:07:03a |
| 13 | | MR. SMELTZER:  Off the record real quick. | 09:07:05a |
| 14 | | (Discussion held off the record.) | 09:07:07a |
| 15 | | MR. LEYVA:  Okay. | 09:07:39a |
| 16 | Q. | Do you have children? | 09:07:41a |
| 17 | A. | Yes. | 09:07:42a |
| 18 | Q. | And your children's names? | 09:07:42a |
| 19 | A. | Chad Rabon, Casey Rabon. | 09:07:44a |
| 20 | Q. | Okay.  Ever been arrested for a crime? | 09:07:46a |
| 21 | A. | No. | 09:07:51a |
| 22 | Q. | Ever filed personal bankruptcy? | 09:07:52a |
| 23 | A. | No. | 09:07:54a |
| 24 | Q. | Did you review any documents in preparation | 09:07:56a |
| 25 | for your deposition? | | 09:07:58a |

1      A.   Just my interrogatories, Jenna's          09:08:00a

2  interrogatories.                                    09:08:05a

3      Q.   Okay.  Have you signed any written statements   09:08:06a

4  or made any recorded statements related to this     09:08:12a

5  lawsuit?                                            09:08:14a

6      A.   No.                                        09:08:15a

7      Q.   Affidavits?                                09:08:15a

8      A.   No.                                        09:08:16a

9      Q.   Okay.  Did you read or listen to any recorded   09:08:16a

10 statements, look at any diagrams or photographs, or did   09:08:21a

11 somebody else read you any statements before the   09:08:25a

12 deposition?                                         09:08:27a

13      MR. SMELTZER:  I'll object to compound.        09:08:27a

14 BY MR. LEYVA:                                       09:08:31a

15      Q.   Can you answer the question?  Or I can break   09:08:31a

16 it up for you.                                      09:08:34a

17      A.   Break it up.                              09:08:34a

18      Q.   Sure, sure.                               09:08:35a

19      Did you read or listen to any recorded        09:08:36a

20 statements prior to the deposition?                 09:08:40a

21      A.   No.                                       09:08:44a

22      Q.   Did you look at any diagrams or photographs   09:08:46a

23 prior to the deposition?                            09:08:48a

24      A.   I looked at my websites.  I looked at the   09:08:51a

25 websites.                                           09:08:54a

| | | |
|---|---|---|
| 1 | Q.  That's fine. | 09:08:55a |
| 2 | MR. SMELTZER:  Just to clarify, are you | 09:08:58a |
| 3 | talking about in preparation for the depo, or at | 09:09:00a |
| 4 | any time prior? | 09:09:02a |
| 5 | MR. LEYVA:  No, no.  Before the | 09:09:03a |
| 6 | deposition.  This is all in preparation for the | 09:09:05a |
| 7 | deposition, all right. | 09:09:07a |
| 8 | Q.  And the last part.  Did anybody -- did anyone | 09:09:08a |
| 9 | read you any statements -- | 09:09:15a |
| 10 | A.  No. | 09:09:16a |
| 11 | Q.  -- in preparation for the deposition? | 09:09:16a |
| 12 | A.  No. | 09:09:17a |
| 13 | Q.  Okay.  So, just in general, tell me everything | 09:09:18a |
| 14 | you did to get ready for this deposition. | 09:09:21a |
| 15 | A.  I reviewed some of our websites.  Again, read | 09:09:24a |
| 16 | interrogatories, my answers, some of Jenna's answers. | 09:09:28a |
| 17 | Q.  Did you meet with your attorney? | 09:09:32a |
| 18 | A.  I have met with him. | 09:09:34a |
| 19 | Q.  Was there anyone else in the room when you met | 09:09:36a |
| 20 | with your attorney? | 09:09:39a |
| 21 | A.  No. | 09:09:44a |
| 22 | Q.  Okay.  I'm going to ask you some questions | 09:09:44a |
| 23 | about your education.  Where did you go to high school? | 09:09:48a |
| 24 | A.  Dunedin High. | 09:09:50a |
| 25 | Q.  Dunedin High.  Did you graduate from Dunedin | 09:09:52a |

1     High?                                                   09:09:55a

2          A.   Yes.                                          09:09:55a

3          Q.   Did you attend college or junior college?     09:09:55a

4          A.   St. Petersburg Junior College.               09:09:57a

5          Q.   Did you graduate?                             09:10:00a

6          A.   Yes.                                          09:10:01a

7          Q.   What kind of courses did you take at          09:10:03a

8     St. Petersburg Junior College?                         09:10:06a

9          A.   It was an A.A. degree, so it was, you know,   09:10:07a

10    varied courses, all the -- English lit, comp,           09:10:10a

11    humanities, business courses.  I took one accounting    09:10:14a

12    course, maybe two.                                       09:10:17a

13         Q.   You --                                        09:10:20a

14         A.   Some advertising courses.  That's why I have  09:10:21a

15    an A.A. degree from there.                               09:10:24a

16         Q.   That A.A. degree is in something, right?  It's 09:10:25a

17    in business?                                             09:10:28a

18         A.   It's not in business.                         09:10:28a

19         Q.   It's not in business?                         09:10:29a

20         A.   No.                                           09:10:30a

21         Q.   You don't recall --                           09:10:30a

22         A.   It was just a general A.A. degree.            09:10:30a

23         Q.   Okay.  I'm going to ask this, but I think you 09:10:33a

24    described it.  There wasn't any particular area of      09:10:41a

25    study or concentration --                               09:10:43a

Page 11

| | | |
|---|---|---|
| 1 | A.   No. | 09:10:45a |
| 2 | Q.   -- in that A.A.? | 09:10:46a |
| 3 | A.   No. | 09:10:47a |
| 4 | Q.   Okay.  I'm going to transition now to work | 09:10:47a |
| 5 | experience. | 09:10:50a |
| 6 | During the last 30 years, how many employers | 09:10:51a |
| 7 | have you worked for? | 09:10:54a |
| 8 | A.   The last 30 years? | 09:10:55a |
| 9 | Q.   Yes. | 09:10:56a |
| 10 | A.   One.  Well, two. | 09:10:57a |
| 11 | Q.   And so, can you name those? | 09:11:00a |
| 12 | A.   Shorts, Incorporated, Rabco Leasing. | 09:11:03a |
| 13 | Q.   Those are the only two in the last 30 years? | 09:11:06a |
| 14 | A.   Yeah, that I can recall exactly. | 09:11:08a |
| 15 | Q.   Sure.  Now, Mr. Short -- when you worked for | 09:11:10a |
| 16 | Mr. Short, was it at William Short's Clothiers or one | 09:11:21a |
| 17 | of the other companies? | 09:11:25a |
| 18 | A.   I worked for William Short Clothiers, and I | 09:11:30a |
| 19 | did work for Direct Menswear, so that would be a third | 09:11:33a |
| 20 | one, another company that he had. | 09:11:36a |
| 21 | Q.   Okay. | 09:11:38a |
| 22 | A.   Yeah. | 09:11:38a |
| 23 | Q.   Did Mr. Short have controlling interest, to | 09:11:38a |
| 24 | the best of your knowledge, in those -- | 09:11:41a |
| 25 | A.   I'm not -- | 09:11:43a |

Page 12

1    Q.   -- companies?                                    09:11:44a

2    A.   -- familiar if he had controlling interest or   09:11:44a

3  not.                                                    09:11:46a

4         MR. SMELTZER:  Wait until he finishes the        09:11:46a

5    whole, entire question.  Wait so you guys won't       09:11:49a

6    be talking over each other.                           09:11:51a

7  BY MR. LEYVA:                                           09:11:56a

8    Q.   When you worked for Mr. Short, did you report    09:11:56a

9  to Mr. Short?  Was he your boss?  Was he your direct    09:12:01a

10  boss?                                                  09:12:05a

11   A.   When?                                            09:12:06a

12   Q.   When you worked for William Short's Clothiers    09:12:07a

13  or one of the other companies, or the prior company.  I  09:12:10a

14  don't recall what you said --                          09:12:13a

15        MR. SMELTZER:  I'll object as compound.          09:12:14a

16    You might want to break that one up.                 09:12:16a

17        MR. LEYVA:  Okay, that's fine.                   09:12:18a

18   Q.   Let me break it down this way.  When you         09:12:18a

19  worked for William Short's Clothiers, was Mr. Short    09:12:20a

20  your boss?  Did you report to him?                     09:12:24a

21   A.   Initially, no.                                   09:12:28a

22   Q.   Okay.  Who did you report to initially?          09:12:29a

23   A.   Dick Kahne and Mel Mealey.                       09:12:31a

24   Q.   Okay.  And what titles or positions did they     09:12:35a

25  have?                                                  09:12:38a

1    A.   Dick Kahne was the -- I guess he would have          09:12:39a

2    been called the general manager of the company.  Mel      09:12:45a

3    Mealey was the supervisor of the retail stores.           09:12:47a

4    Q.   Okay.                                                 09:12:50a

5    A.   I reported to Mel Mealey and Dick Kahne.             09:12:51a

6    Q.   Okay.  And after how many years -- I'm just          09:12:54a

7    going to say WSC, if you don't mind.                      09:13:00a

8    A.   Uh-huh.                                               09:13:02a

9    Q.   -- did you start reporting to Mr. Short?             09:13:03a

10   A.   Maybe two to three years.  I can't recall,          09:13:08a

11   it's so long ago, but maybe two to three years later.     09:13:13a

12   Q.   Okay.  And at that time when you started             09:13:15a

13   reporting directly to Mr. Short, what was your title?     09:13:17a

14   A.   Probably general manager, if I had to guess.        09:13:20a

15   I don't recall.                                           09:13:23a

16   Q.   Okay.  So, equivalent --                             09:13:23a

17   A.   Or, you know, or store supervisor.                  09:13:26a

18   Q.   Do you recall whether or not that position was       09:13:30a

19   equivalent to your former boss's positions in the         09:13:32a

20   organization?                                             09:13:36a

21   A.   No.                                                  09:13:36a

22   Q.   No?                                                  09:13:37a

23   A.   No.                                                  09:13:37a

24   Q.   You just started reporting to Mr. Short for          09:13:38a

25   other reasons, okay.                                      09:13:40a

1      A.   Right.                                          09:13:41a

2      Q.   All right.  Now, were you the founder of Rabco  09:13:41a

3   Leasing, Inc.?  I mean, did you create it?              09:13:46a

4      A.   I'm the original -- I didn't create it.         09:13:55a

5      Q.   Okay.  I mean, you may have had an attorney      09:14:02a

6   create it or a CPA create it.                           09:14:04a

7      A.   Right.                                          09:14:06a

8      Q.   But did you initiate that?  That's what I mean   09:14:06a

9   by the "founder."                                       09:14:08a

10     A.   Yeah.                                           09:14:13a

11     Q.   Okay.                                           09:14:14a

12     A.   Yeah.                                           09:14:15a

13     Q.   And at the time that Rabco Leasing, Inc., was   09:14:17a

14   incorporated, were you the sole shareholder?           09:14:20a

15     A.   No.                                             09:14:23a

16     Q.   Okay.  Can you tell me who the other            09:14:24a

17   shareholders were?                                     09:14:26a

18     A.   Kathy Rabon.                                    09:14:27a

19     Q.   Okay.  Is that it?                              09:14:28a

20     A.   Yes.                                            09:14:30a

21     Q.   At the time it was founded, it was two.         09:14:30a

22     A.   Right.                                          09:14:34a

23     Q.   You and your wife were --                       09:14:34a

24     A.   Right.                                          09:14:35a

25     Q.   And have you and your wife remained sole        09:14:36a

Page 15

1    shareholders of Rabco Leasing, Inc.?                      09:14:39a

2        A.   Yes.                                             09:14:41a

3        Q.   Okay.  There are no other shareholders?          09:14:42a

4        A.   Right.                                           09:14:44a

5        Q.   All right.  Do you recall about,                09:14:44a

6    approximately, the time frame when Rabco was             09:14:53a

7    incorporated?                                            09:15:03a

8        A.   Maybe the early '90s.  I'm not really total     09:15:09a

9    sure about that.                                         09:15:12a

10       Q.   Was it prior to the time that you went to work  09:15:13a

11   for WSC?                                                 09:15:17a

12       A.   No.                                             09:15:19a

13       Q.   It was not?                                     09:15:20a

14       A.   No.                                             09:15:21a

15       Q.   Okay.  And you may have said this.  I may be    09:15:21a

16   repeating myself.  At what year did you first start      09:15:26a

17   working for WSC?                                         09:15:29a

18       A.   It could have been in the '70s.                 09:15:33a

19       Q.   In the 70's?                                    09:15:38a

20       A.   Uh-huh.  I know I don't look that old, but      09:15:38a

21   yeah.                                                    09:15:42a

22       Q.   No, that's fine.                                09:15:42a

23            So Rabco Leasing -- but you went to work for    09:15:44a

24   WSC after that.  I mean, you incorporated Rabco          09:15:48a

25   after --                                                 09:15:51a

1    A.   Exactly.                                        09:15:51a

2    Q.   -- you first started working with WSC.          09:15:52a

3    A.   Yes.                                            09:15:58a

4    Q.   Did you remain a WSC W2 employee the entire     09:15:58a

5    time up to and including when the assets were        09:16:03a

6    purchased?  And I have to ask you when the assets were  09:16:06a

7    purchased, but --                                    09:16:10a

8         MR. SMELTZER:  Let me object to the form.       09:16:12a

9         MR. LEYVA:  That's fine.  That's fine.          09:16:13a

10   Q.   Here's what I'm trying to get at.  You          09:16:16a

11   indicated that you went to work for WSC in the '70s. 09:16:20a

12   A.   Correct.                                        09:16:23a

13   Q.   And then you incorporated Rabco Leasing, Inc.,  09:16:24a

14   after that.                                          09:16:27a

15   A.   Uh-huh.                                         09:16:27a

16   Q.   Okay.  When you incorporated Rabco Leasing,     09:16:28a

17   Inc., were you still a W2 employee of WSC?           09:16:31a

18   A.   I can't recall if we were running simultaneous  09:16:38a

19   payrolls -- In other words, Rabco had one and William  09:16:46a

20   Short Clothiers had one -- so I don't know the answer 09:16:49a

21   to that question.                                    09:16:52a

22   Q.   Okay.  So you may have been a W2 employee of    09:16:53a

23   WSC or Rabco during that time, if you were running   09:16:56a

24   joint; is that --                                    09:17:01a

25   A.   Yes.                                            09:17:02a

```
 1      Q.   -- what you're saying?  You just don't know?     09:17:02a

 2      A.   Yes.                                             09:17:05a

 3      Q.   Because you were running multiple operations,    09:17:05a

 4  concurrent.                                               09:17:07a

 5      A.   I don't recall if we were running two separate   09:17:08a

 6  payrolls then.                                            09:17:11a

 7      Q.   Yes.  Let me refer back to the time -- Well,     09:17:12a

 8  let me ask you this:  Approximately when were the         09:17:21a

 9  assets purchased from WSC -- assets and liabilities?      09:17:25a

10      A.   2002ish, somewhere --                            09:17:32a

11      Q.   Okay, that's fine.                               09:17:35a

12      A.   2003, 2002 to '3.                                09:17:36a

13      Q.   So up until that time -- and I just want to      09:17:39a

14  clarify -- up until that time, you were either a W2       09:17:42a

15  employee of WSC or of Rabco.                              09:17:48a

16      A.   Yes.                                             09:17:50a

17      Q.   Okay.  You were maintaining -- both companies    09:17:50a

18  were operational at the same time, is my point.          09:17:53a

19      A.   Yes.                                             09:17:56a

20      Q.   And during that time, prior to 2002, what        09:17:56a

21  goods and/or services did Rabco sell, produce?  What      09:18:00a

22  business was Rabco in during that time?                   09:18:04a

23      A.   Retail clothing.                                 09:18:06a

24      Q.   Retail clothing?                                 09:18:08a

25      A.   Yes.                                             09:18:09a
```

1    Q.   So you had retail stores?                        09:18:09a

2    A.   Yes.                                             09:18:11a

3    Q.   Rabco had some retail stores and William         09:18:12a

4  Shorts, Inc., had retail stores?                        09:18:14a

5    A.   Yes.                                             09:18:16a

6    Q.   Okay.  What kind of goods were sold at Rabco's   09:18:17a

7  retail stores during this time period?  This is prior   09:18:30a

8  to 2002.                                                09:18:32a

9    A.   Suits, coats, dress shirts, sports wear,         09:18:38a

10  shoes.                                                  09:18:41a

11    Q.   Was that different from the kind of goods that   09:18:43a

12  were sold at WSC?  I mean, were they competing          09:18:46a

13  businesses?  Did you sell the same kinds of goods, or   09:18:51a

14  were they different kinds of goods?                     09:18:53a

15    A.   WSC did sell some of that kind of merchandise    09:18:55a

16  as well, yes.                                           09:18:58a

17    Q.   There was some overlap?                          09:18:59a

18    A.   Yes.                                             09:19:00a

19    Q.   How much overlap?                                09:19:00a

20    A.   Quite a bit.                                     09:19:02a

21    Q.   Quite a bit?                                     09:19:02a

22    A.   Right.                                           09:19:03a

23    Q.   Okay.  So, since Rabco's founding, what          09:19:04a

24  positions have you held at Rabco?                       09:19:18a

25    A.   At Rabco?                                        09:19:20a

Page 19

| | | |
|---|---|---|
| 1 | Q.   Yet. | 09:19:25a |
| 2 | A.   President. | 09:19:26a |
| 3 | Q.   You've always been President? | 09:19:28a |
| 4 | A.   Store cleaner, take out the garbage guy. | 09:19:29a |
| 5 | Q.   You were always in charge? | 09:19:32a |
| 6 | A.   Right. | 09:19:34a |
| 7 | Q.   You never reported to anybody else at Rabco, | 09:19:34a |
| 8 | is what I'm trying to get at. | 09:19:37a |
| 9 | A.   Exactly. | 09:19:38a |
| 10 | Q.   Yes.  Approximately -- and I know this is | 09:19:39a |
| 11 | tough to remember -- but approximately in what year did | 09:19:49a |
| 12 | Rabco first become profitable? | 09:19:53a |
| 13 | A.   I don't recall that. | 09:19:58a |
| 14 | Q.   You don't recall if it was prior to 2002? | 09:20:00a |
| 15 | After 2002? | 09:20:03a |
| 16 | A.   I can't.  I absolutely cannot recall that. | 09:20:04a |
| 17 | Q.   Okay.  And we may have covered this, but I | 09:20:07a |
| 18 | don't know if we covered this specifically.  What was | 09:20:19a |
| 19 | your position, title, when you first started working at | 09:20:22a |
| 20 | WSC? | 09:20:26a |
| 21 | A.   Salesman. | 09:20:26a |
| 22 | Q.   You were a salesman? | 09:20:27a |
| 23 | A.   Uh-huh. | 09:20:28a |
| 24 | Q.   Okay. | 09:20:29a |
| 25 | A.   Yes.  Sorry. | 09:20:30a |

| | | |
|---|---|---|
| 1 | Q.   Were employees at WSC assigned formal job | 09:20:35a |
| 2 | titles, or it was salesman/store manager, sort of | 09:20:40a |
| 3 | generic? | 09:20:47a |
| 4 | A.   There were store managers. | 09:20:48a |
| 5 | Q.   Right. | 09:20:50a |
| 6 | A.   I was a salesman. | 09:20:50a |
| 7 | Q.   Okay.  There wasn't titles of V.P. of | 09:20:51a |
| 8 | Marketing, V.P. of Advertising, those kinds of titles? | 09:20:54a |
| 9 | A.   No. | 09:20:58a |
| 10 | Q.   Okay.  Who was your last boss when you worked | 09:20:58a |
| 11 | for WSC? | 09:21:04a |
| 12 | A.   Bill Short. | 09:21:08a |
| 13 | Q.   During your employment at WSC, you were | 09:21:13a |
| 14 | promoted -- I think you indicated you were promoted | 09:21:16a |
| 15 | once.  Or at least it seemed like a promotion. | 09:21:20a |
| 16 | How many times were you promoted while you | 09:21:23a |
| 17 | worked at WSC? | 09:21:24a |
| 18 | A.   Perhaps once, yeah. | 09:21:28a |
| 19 | Q.   Okay. | 09:21:30a |
| 20 | A.   I don't -- yeah. | 09:21:30a |
| 21 | Q.   That's fine.  So you started working, you had | 09:21:31a |
| 22 | some other boss. | 09:21:34a |
| 23 | A.   Right. | 09:21:35a |
| 24 | Q.   And then you started working for Mr. Short. | 09:21:35a |
| 25 | A.   Yes. | 09:21:37a |

1    Q.   And at that time, was that a promotion for you        09:21:38a

2    when you started reporting directly to Mr. Short?          09:21:41a

3    A.   Perhaps it was a promotion.                           09:21:45a

4    Q.   Was there an increased salary?                        09:21:48a

5    A.   Perhaps not.                                          09:21:49a

6    Q.   Okay.  All right.  Did you ever supervise            09:21:51a

7    other employees, as their boss, in the positions that      09:21:57a

8    you've held at WSC?                                        09:21:59a

9    A.   Ask that one more time.                               09:22:01a

10    Q.   In the positions that you held at WSC -- I           09:22:03a

11    think you described two so far.  You had your initial      09:22:07a

12    job and then when you started reporting to Mr. Short.      09:22:10a

13    Did you supervise other employees?  Were you other        09:22:13a

14    employees' boss?  Did other employees report to you?      09:22:19a

15    A.   Yes.                                                 09:22:22a

16    Q.   And if so, whom?                                     09:22:23a

17    A.   Ray Shuster, William Harvey, Martin.                 09:22:28a

18    Q.   Yep.                                                 09:22:46a

19    A.   You know, those are the ones -- I can't             09:22:46a

20    remember all their names.                                 09:22:50a

21    Q.   Did Ms. Hunter report to you at WSC?                 09:22:52a

22    A.   Yeah.                                                09:22:57a

23    Q.   Okay.  So as her role as a bookkeeper at WSC,        09:22:59a

24    she reported to you?                                      09:23:03a

25    A.   Yes.                                                 09:23:04a

1      Q.   And these other individuals, were they store          09:23:05a

2  managers?  Sales people?                                        09:23:08a

3      A.   Let me go back to the question with Jenna.            09:23:11a

4  She would report to me and Bill Short.                          09:23:13a

5      Q.   Okay.  So she had dual sort of reporting.             09:23:15a

6      A.   Right.                                                 09:23:18a

7      Q.   That's fine.  These other individuals,                09:23:18a

8  including Martin, that you named, were they sales               09:23:20a

9  people?  Store managers?  I mean, what roles did they           09:23:22a

10  play?                                                           09:23:26a

11      A.   Sales people, store managers, Director of            09:23:27a

12  Retail Operations.                                             09:23:33a

13      Q.   Okay.  So at that point when you had this            09:23:35a

14  staff, you had personnel that were working in multiple         09:23:38a

15  stores?                                                        09:23:41a

16          MR. SMELTZER:  Well, I'll object to the               09:23:42a

17      question because you said "at that point."  I             09:23:43a

18      don't think we've established a time frame.               09:23:47a

19          MR. LEYVA:  Okay.                                     09:23:51a

20      Q.   Let me back up.  The point I'm talking about         09:23:51a

21  is when you first had people reporting to you at WSC.          09:23:53a

22      A.   Yes.                                                  09:23:57a

23      Q.   And you enumerated several -- listed several         09:23:57a

24  people that reported to you.                                   09:24:01a

25      A.   Yes.                                                  09:24:02a

1     Q.   Okay.  And apart from Ms. Hunter, those other        09:24:02a

2  people that reported to you, what job titles and/or         09:24:10a

3  functions or responsibilities did they have?               09:24:14a

4     A.   Store salesmen, store managers, receiving           09:24:17a

5  department people.                                          09:24:22a

6     Q.   Okay.  And were these -- was your staff spread      09:24:24a

7  across stores?                                              09:24:30a

8     A.   Yes.                                                09:24:32a

9     Q.   Retail stores?                                      09:24:33a

10    A.   Yes.                                                09:24:34a

11    Q.   Okay.  And how many stores at that time, do         09:24:34a

12 you remember?                                               09:24:39a

13    A.   At what time?                                       09:24:49a

14    Q.   At the time when you first acquired this            09:24:55a

15 staff, when you first had people reporting to you.          09:24:57a

16    A.   Three.                                              09:25:03a

17    Q.   There were three stores?                            09:25:04a

18    A.   Uh-huh.  Yes.                                       09:25:05a

19    Q.   Okay.  Now, is it true that Mr. Gwynn was a         09:25:06a

20 WSC employee at the same time that you were a WSC           09:25:18a

21 employee?  I mean, there was an overlap, right?             09:25:21a

22    A.   Yes.                                                09:25:24a

23    Q.   Yes, okay.  And who did -- to the best of your      09:25:25a

24 knowledge, who did Mr. Gwynn report to at WSC when he       09:25:31a

25 was first hired?                                            09:25:33a

Page 24

1      A.   Bill Short.                                    09:25:36a

2      Q.   Okay.  So is it fair to say that Mr. Short was  09:25:37a

3  the person that directly hired Mr. Gwynn?              09:25:44a

4      A.   As I recall, yes.                             09:25:47a

5      Q.   Were you present at Mr. Gwynn's interview?    09:25:50a

6      A.   Yes.                                          09:25:54a

7      Q.   You were.  Okay.                              09:25:55a

8      A.   At least one that I recall of.                09:25:57a

9      Q.   Okay.  And do you recall for what purpose or  09:25:59a

10  for what job Mr. Gwynn was hired?                     09:26:05a

11     A.   He was hired, as I recall, he was going to --  09:26:10a

12  I think he ran our Gulf View Mall store, as I recall.  09:26:18a

13  We had a store up at Gulf View Square Mall.           09:26:22a

14     Q.   So he was hired to be a store manager, in that  09:26:25a

15  capacity?                                             09:26:29a

16     A.   Right, yes.                                   09:26:30a

17     Q.   Okay.  And I think you answered this question.  09:26:30a

18  He started working at that particular store you just  09:26:36a

19  indicated?                                            09:26:38a

20     A.   As I recall, yes.                             09:26:39a

21     Q.   Okay.                                         09:26:40a

22     A.   He -- yes.                                    09:26:41a

23     Q.   Do you recall -- and you may not.  At the time  09:26:46a

24  that Mr. Gwynn was hired, he was hired as a W2         09:26:50a

25  employee; do you recall?                              09:26:53a

Page 25

```
 1      A.   Yes.                                         09:26:55a

 2      Q.   Do you recall, in the interview, whether or  09:26:56a

 3  not it was -- that the interview or the job was       09:26:59a

 4  structured as kind of a try before you buy, kind of a 09:27:05a

 5  temporary, "We're going to see if this works out" type 09:27:09a

 6  job?                                                  09:27:12a

 7      A.   I don't recall that.                         09:27:12a

 8      Q.   You don't recall?                            09:27:13a

 9      A.   No.                                          09:27:14a

10      Q.   Okay.  I'm going to move on, transition here 09:27:14a

11  to some of your store concepts.  Or WSC's store       09:27:21a

12  concepts.                                             09:27:25a

13           How was the concept of the WSC division Max  09:27:26a

14  Slacks developed?                                     09:27:29a

15      A.   I don't understand your question.            09:27:34a

16      Q.   Let me try it this way.  What kinds of goods 09:27:37a

17  did Max Slacks sell?                                  09:27:41a

18      A.   For lack of a better word, old man's clothing. 09:27:46a

19      Q.   Okay.                                        09:27:52a

20      A.   Polyester pants, bright pink, yellow, green  09:27:52a

21  sport coats, adjustable pants.                        09:27:57a

22      Q.   Those were in fashion at the time, I think,  09:27:59a

23  right?                                                09:28:02a

24      A.   For old people.                              09:28:02a

25      Q.   Right.  So that was -- that's what I meant by 09:28:03a
```

Page 26

```
 1    "concept."  That was the target market --              09:28:05a

 2        A.   Right.                                        09:28:07a

 3        Q.   -- for that concept, for Max Slacks.          09:28:08a

 4        A.   Yes.                                          09:28:11a

 5        Q.   Okay.  And who was the store manager that     09:28:12a

 6    first ran the first Max Slacks store?                  09:28:16a

 7        A.   Martin.                                       09:28:36a

 8        Q.   Okay.  Mr. Gwynn?                             09:28:39a

 9        A.   Uh-huh.                                       09:28:40a

10        Q.   And where was that first Max Slacks store     09:28:41a

11    located?                                               09:28:43a

12        A.   If I recall, it was Largo Mall.               09:28:44a

13        Q.   Okay.  Do you recall how long this particular 09:28:48a

14    first store, Max Slacks, how long it remained open?    09:28:54a

15        A.   No.                                           09:28:57a

16        Q.   Okay.  Did that particular store eventually   09:28:58a

17    move to another location?                              09:29:01a

18        A.   What do you mean "move to"?                   09:29:07a

19        Q.   Well, assuming it was in Largo Mall --        09:29:11a

20        A.   Right.                                        09:29:15a

21        Q.   -- did it shut down operations in Largo Mall  09:29:16a

22    and move to another mall?                              09:29:18a

23        A.   It closed and another one opened.            09:29:20a

24        Q.   Yes, that's what I'm referring to.  And that  09:29:21a

25    other one that opened, it was another Max Slacks; is   09:29:23a
```

1    that correct?                                              09:29:28a

2         A.   Yes.                                             09:29:28a

3         Q.   And where did that Max Slacks --                 09:29:29a

4         A.   I believe that was Seminole Mall.                09:29:31a

5         Q.   Okay.  Were there any other Max Slacks stores    09:29:32a

6    that were opened?                                          09:29:35a

7         A.   Yes.                                             09:29:37a

8         Q.   And where were they located?                     09:29:39a

9         A.   One was 300 south Belcher Road, Clearwater,      09:29:41a

10   Florida.                                                   09:29:46a

11        Q.   Is that the only other one?                      09:29:47a

12        A.   I think so.  As I recall, yes.                   09:29:48a

13        Q.   Okay.                                            09:29:52a

14        A.   I'm just not totally sure.                       09:29:52a

15        Q.   That's fine.  Did Mr. Gwynn supervise the        09:29:54a

16   activities -- I think we were down to two Max Slacks       09:29:57a

17   stores now that we've identified --                        09:30:02a

18        A.   Okay.                                            09:30:04a

19        Q.   -- that operated concurrently.  Is that true?    09:30:04a

20        A.   Yes.                                             09:30:06a

21        Q.   One in Seminole and one on Belcher.              09:30:06a

22        A.   Yes.                                             09:30:10a

23        Q.   Was Mr. Gwynn's role and responsibility to       09:30:12a

24   supervise those two stores?                                09:30:19a

25        A.   Yes.                                             09:30:20a

```
 1      Q.   Do you recall what Mr. Gwynn was paid during      09:30:28a

 2   the time he operated the Max Slacks stores?               09:30:30a

 3      A.   No.                                                09:30:34a

 4      Q.   Do you recall whether his compensation was        09:30:35a

 5   structured as salary plus commission, or just salary?     09:30:38a

 6      A.   I don't recall that.                               09:30:41a

 7      Q.   Okay.  To the best of your knowledge -- Well,      09:30:46a

 8   let me ask you this first:  Did you have NCR registers,    09:30:53a

 9   cash registers, at Max Slacks stores?                      09:30:58a

10      A.   I don't recall them being NCR registers.           09:31:04a

11      Q.   Okay.                                              09:31:08a

12      A.   That's National Cash Register Company.             09:31:08a

13      Q.   Yes.                                               09:31:11a

14      A.   I don't recall them being that name.               09:31:12a

15      Q.   Okay.  But they were cash registers of a           09:31:15a

16   particular manufacturer?                                  09:31:20a

17      A.   Yes.                                               09:31:21a

18      Q.   Maybe not NCR.                                     09:31:21a

19      A.   Yes.                                               09:31:23a

20      Q.   Okay.  Now, these particular cash registers,       09:31:23a

21   did they ever malfunction and have to be replaced?        09:31:32a

22      A.   It's electronic.  Yes.                             09:31:35a

23      Q.   They did?  Yes.                                    09:31:37a

24           And did you replace them with the same             09:31:39a

25   manufacturer, or did you replace them with something      09:31:43a
```

Page 29

| Line | | Time |
|---|---|---|
| 1 | else? | 09:31:46a |
| 2 | A.   I don't recall. | 09:31:46a |
| 3 | Q.   Okay.  So, to the best of your knowledge, | 09:31:48a |
| 4 | these cash registers were not replaced by a point of | 09:31:55a |
| 5 | sales system that Mr. Gwynn integrated as part of his | 09:32:00a |
| 6 | Taking Care of Business business? | 09:32:04a |
| 7 | A.   That isn't what you asked. | 09:32:06a |
| 8 | Q.   I'm asking that. | 09:32:08a |
| 9 | A.   So, what's the question? | 09:32:08a |
| 10 | Q.   My question is:  These cash registers, when | 09:32:09a |
| 11 | they malfunctioned, do you recall them being replaced | 09:32:12a |
| 12 | by a system that Mr. Gwynn developed and leased to Max | 09:32:15a |
| 13 | Slacks? | 09:32:19a |
| 14 | A.   I recall leasing some computer equipment for | 09:32:20a |
| 15 | cash registers from Gwynn, yes. | 09:32:27a |
| 16 | Q.   Okay.  That was my question. | 09:32:29a |
| 17 | A.   Okay. | 09:32:31a |
| 18 | Q.   And do you recall if Mr. Gwynn was paid | 09:32:32a |
| 19 | approximately $171 a month per store for these | 09:32:37a |
| 20 | registers? | 09:32:41a |
| 21 | A.   I recall it because it was brought up the | 09:32:42a |
| 22 | other day, and I had completely forgotten about it. | 09:32:44a |
| 23 | Q.   Okay.  And do you recall whether Mr. Gwynn was | 09:32:47a |
| 24 | paid as an independent contractor, this $171 a month, | 09:32:54a |
| 25 | to his Taking Care of Business fictitious name, or was | 09:32:58a |

Page 30

1    he paid as part of his salary?                          09:33:01a

2        A.   He was 1099ed.                                 09:33:03a

3        Q.   Okay.  He was 1099ed for the taking care of    09:33:05a

4    business?                                               09:33:08a

5        A.   For --                                         09:33:09a

6        Q.   For the cash register leasing.                 09:33:09a

7        A.   It was paid to Martin Gwynn on a 1099 form.    09:33:14a

8        Q.   Okay.  But, at the same time, he still         09:33:17a

9    maintained his responsibilities as store managers of    09:33:20a

10   Max Slacks?                                             09:33:22a

11       A.   Yes.                                           09:33:24a

12       Q.   And was a W2 employee at the time --           09:33:24a

13       A.   Yes.                                           09:33:26a

14       Q.   -- correct?                                    09:33:27a

15            So he was a W2 employee; he had this other     09:33:27a

16   business where he got paid as a 1099 contractor.        09:33:30a

17            MR. SMELTZER:  Object to the form.             09:33:33a

18            MR. LEYVA:  Would you like me to repeat the    09:33:35a

19       question?                                           09:33:37a

20            THE DEPONENT:  Right.                          09:33:37a

21   BY MR. LEYVA:                                           09:33:38a

22       Q.   Okay.  I just wanted to clarify.  I think      09:33:38a

23   you've answered it.                                     09:33:40a

24            He was paid as a 1099 contractor, right, for   09:33:41a

25   this registers that he leased to Max Slacks stores?  I  09:33:45a

1    believe that's what you said.                        09:33:49a

2         A.   The equipment --                           09:33:51a

3         Q.   Right.                                      09:33:53a

4         A.   -- like any other type equipment that we might  09:33:53a

5    procure from any -- from an outside source.          09:34:01a

6         Q.   Correct.  That's all I'm saying.  I think you  09:34:04a

7    indicated that he got paid for that --               09:34:06a

8         A.   Right.                                      09:34:08a

9         Q.   -- on a 1099.                               09:34:09a

10        A.   Right.                                      09:34:10a

11        Q.   Okay.  And my follow-up question was, during  09:34:11a

12   that time that he got paid as a 1099, he was still a W2  09:34:14a

13   employee --                                          09:34:17a

14        A.   Yes.                                        09:34:18a

15        Q.   Okay.  We're good.                          09:34:19a

16             Mr. Rabon, during Mr. Gwynn's tenure as     09:34:30a

17   Operations Manager of the Max Slacks stores, who did  09:34:33a

18   Mr. Gwynn report to?                                 09:34:36a

19        A.   I'd say Bill Short.                         09:34:48a

20        Q.   Okay.  Did WSC have a store in New Port     09:34:50a

21   Richey?                                              09:35:06a

22        A.   Yes.                                        09:35:07a

23        Q.   Was that New Port Richey store converted into  09:35:08a

24   a Max Slacks-type store?  I mean, I can clarify if you  09:35:12a

25   would like.                                          09:35:23a

1      A.   Please.                                          09:35:24a

2      Q.   Yes.  I think we previously covered that Max     09:35:25a

3  Slacks sold polyester suits to old people, or something   09:35:27a

4  like that, right?  That was the target demographic.       09:35:32a

5      A.   Right.                                           09:35:35a

6      Q.   That was the target market.                      09:35:35a

7           My question was, was the WSC store that          09:35:37a

8  existed in New Port Richey, was it converted into that    09:35:40a

9  type of store that sold those types of goods?             09:35:43a

10      A.   It always had those types of goods in it.       09:35:45a

11      Q.   Okay.  Prior to the Max Slacks concept.         09:35:51a

12      A.   Correct.  It's New Port Richey.                 09:35:54a

13      Q.   Yes.  I'm talking about New Port Richey, yes.   09:35:55a

14      A.   Right.                                          09:35:58a

15      Q.   So it always existed in that form?              09:35:58a

16      A.   Right.                                          09:36:00a

17      Q.   Okay.  Now I want to switch gears here to a     09:36:01a

18  point in time where WSC started closing stores.          09:36:11a

19      A.   Uh-huh.                                         09:36:14a

20      Q.   Can you tell me the reason why the stores       09:36:15a

21  started to close?                                        09:36:19a

22      A.   Leases were coming up, rents were going to go   09:36:23a

23  way up.                                                  09:36:28a

24      Q.   Right.                                          09:36:29a

25      A.   Bill Short was the majority stockholder and he  09:36:31a

```
 1    was wanting to begin his retirement.              09:36:34a

 2        Q.   Right.  Now, you said Bill Short was the  09:36:38a

 3    majority stockholder.  Were you aware of the other 09:36:44a

 4    stockholders in WSC?                              09:36:48a

 5        A.   Yes.                                      09:36:50a

 6        Q.   And they were?                            09:36:50a

 7        A.   Bruce Rabon, Kathy Rabon.                 09:36:51a

 8        Q.   And no others?  That was the complete list? 09:36:56a

 9        A.   Yes.                                      09:36:59a

10        Q.   Okay.  So, at the time of the transfer of 09:36:59a

11    assets between WSC and Rabco, Bill Short, yourself and 09:37:04a

12    your wife were the only shareholders of WSC; is that 09:37:13a

13    correct?                                          09:37:17a

14        A.   Yes.                                      09:37:17a

15        Q.   And you and your wife were the only       09:37:18a

16    shareholders of Rabco --                          09:37:21a

17        A.   Yes.                                      09:37:22a

18        Q.   -- at that time?                          09:37:22a

19        A.   Yes.                                      09:37:23a

20        Q.   Okay.  Did Mr. Gwynn assist in -- for the 09:37:23a

21    reasons that you enumerated, did he assist in the 09:37:33a

22    closing of the stores?                            09:37:36a

23        A.   As did other employees, yes.             09:37:40a

24        Q.   Right.  That was part of his responsibilities. 09:37:42a

25    If Mr. Short made a decision to close a store, on some 09:37:45a
```

Page 34

1    occasion, Mrs. Gwynn facilitated that closing of the          09:37:49a

2    store.                                                        09:37:52a

3        A.   It's possible.  It's possible that he could         09:37:55a

4    have been involved in that.                                   09:38:00a

5        Q.   Okay.  How did a store get closed?  You just        09:38:01a

6    sold off inventory?  You transferred inventory?               09:38:07a

7        A.   Well --                                              09:38:09a

8        Q.   How did that work?                                   09:38:09a

9             MR. SMELTZER:  Wait until he's done.                 09:38:10a

10            THE DEPONENT:  Ask the question again,               09:38:16a

11   please.                                                       09:38:17a

12   BY MR. LEYVA:                                                 09:38:17a

13       Q.   Tell me about the process, the store closing        09:38:17a

14   process.  How was that done?  Did you sell off               09:38:20a

15   inventory?  Transfer inventory to another store?             09:38:22a

16       A.   Both.                                                09:38:24a

17       Q.   Okay.  So you tried to dispose -- get rid of        09:38:24a

18   the inventory, obviously, before you closed it down.         09:38:28a

19       A.   Yes.                                                 09:38:32a

20       Q.   Yeah.  Were there like fire sales on the            09:38:33a

21   merchandise, to get people to buy before you closed?         09:38:36a

22       A.   Some of the merchandise.                            09:38:40a

23       Q.   Okay.  During the time of these store              09:38:41a

24   closures, was WSC experiencing difficult financial          09:38:51a

25   times?  I mean, were these hard times for WSC from a        09:39:01a

1  revenue perspective, from a cost perspective?                09:39:06a

2       A.   I don't recall that.                               09:39:08a

3       Q.   Okay.  So at no time during these closures did     09:39:09a

4  you ever consider seeking employment elsewhere other         09:39:14a

5  than WSC?                                                    09:39:18a

6       A.   Yes.                                               09:39:21a

7       Q.   Yes, you never considered --                       09:39:22a

8       A.   I did consider.                                    09:39:23a

9       Q.   Oh, you did consider.                              09:39:24a

10       A.   Right.                                            09:39:25a

11       Q.   And for what reasons?                             09:39:26a

12       A.   I was getting a little bit tired of retail,       09:39:29a

13  wanting something a little more stable.                     09:39:33a

14       Q.   You just wanted to do something different at      09:39:35a

15  that time?                                                  09:39:38a

16       A.   Yes.                                              09:39:39a

17       Q.   Okay.  Did Mr. Gwynn purchase a heat press,       09:39:39a

18  heat transfers and T-shirts and run a T-shirt business      09:39:47a

19  within the Max Slacks store at Seminole?  Do you recall     09:39:51a

20  that?                                                       09:39:54a

21            MR. SMELTZER:  Object as to compound.             09:39:54a

22            THE DEPONENT:  Can you ask the question?          09:39:58a

23            MR. LEYVA:  Absolutely.                           09:40:00a

24       Q.   Did Mr. Gwynn run a T-shirt business within       09:40:02a

25  the Max Slacks store at Seminole that was separate          09:40:07a

Page 36

1    from, accounted for, paid for separate from the          09:40:10a

2    Seminole store?                                          09:40:15a

3         A.   I don't recall it being a separate business.  09:40:15a

4         Q.   Okay.  Was he compensated differently for the 09:40:17a

5    sale of these T-shirts and --                            09:40:20a

6         A.   I don't recall that.                           09:40:21a

7         Q.   Okay.  I'm going to back up to the first part  09:40:23a

8    of it.                                                   09:40:28a

9              Do you recall that he bought a heat press and  09:40:29a

10   heat transfers to create T-shirts?                       09:40:31a

11        A.   No.  I remember a heat press.  I have no idea  09:40:34a

12   who paid for it.                                         09:40:38a

13        Q.   Okay.  So, there was a -- you remember a heat  09:40:39a

14   press --                                                 09:40:42a

15        A.   Yes.                                           09:40:42a

16        Q.   -- being bought.                               09:40:42a

17        A.   Right.                                         09:40:44a

18        Q.   You don't recall who purchased it?            09:40:44a

19        A.   I don't recall a heat press.                   09:40:50a

20        Q.   Okay.  What was it you said you did recall?   09:40:54a

21   We can have the court reporter read it back.            09:41:03a

22        A.   Read it back.                                 09:41:07a

23           (Record read at this point.)                    09:41:08a

24           THE DEPONENT:  And now I'm saying I don't       09:41:29a

25        actually recall a heat press.                      09:41:31a

Page 37

1        MR. LEYVA:  Okay.       09:41:33a

2   Q.  So, do you recall a heat transfer?    09:41:33a

3   A.  A heat transfer?  What do you -- what is a   09:41:36a

4  "heat transfer" to you?  What is that?    09:41:41a

5   Q.  I have no idea what a heat transfer is, but  09:41:44a

6  what I would guess it is, is a way that you transfer  09:41:47a

7  some -- something on a T-shirt.    09:41:50a

8   A.  I recall images being printed on some sort of  09:41:54a

9  paper --    09:41:59a

10   Q.  Okay.    09:42:00a

11   A.  -- that you could buy at Staples, and someone  09:42:01a

12  could iron on with an iron, a home iron, on a shirt.  I  09:42:05a

13  remember that.    09:42:12a

14   Q.  Yeah.  I mean, I don't know anything about  09:42:12a

15  heat presses or heat transfers, but that sounds like  09:42:16a

16  that could have been it.  I mean, that was the process,  09:42:19a

17  right?  Somebody ironed on --    09:42:22a

18   A.  Right.    09:42:23a

19   Q.  -- something to a T-shirt --    09:42:23a

20   A.  Right.    09:42:25a

21   Q.  -- some design, and that T-shirt got sold.  Is  09:42:25a

22  that correct?  Is that how you recall it?    09:42:28a

23   A.  Yes.    09:42:31a

24   Q.  Okay, that's fine.    09:42:31a

25        Now, I think you've already answered the  09:42:38a

Page 38

```
 1    question.  Either you don't recall how Mr. Gwynn was      09:42:44a
 2    compensated or how --                                     09:42:47a
 3        A.   I don't recall that, no.                         09:42:48a
 4        Q.   Did Mr. Gwynn do this with -- or were these      09:42:49a
 5    T-shirts sold in the Seminole store with WSC management   09:42:54a
 6    approval?                                                 09:42:57a
 7        A.   Yes.                                             09:43:00a
 8        Q.   Okay.  When did Mr. Gwynn first start            09:43:09a
 9    reporting to you directly at the WSC Countryside store?   09:43:14a
10        A.   When?                                            09:43:33a
11        Q.   The time period would have been when all but     09:43:44a
12    two of the WSC stores had been closed.  There were two    09:43:51a
13    WSC stores left.  I'm assuming one was Countryside, one   09:43:57a
14    was elsewhere, at about that time.                        09:44:01a
15             Was that the time that Mr. Gwynn started         09:44:04a
16    reporting to you directly?                                09:44:06a
17        A.   That very well could have been the time.         09:44:09a
18        Q.   Okay.  Do you recall approximately what year     09:44:11a
19    that may have been?                                       09:44:19a
20        A.   Mid '90s.  Mid '90s.                             09:44:24a
21        Q.   Okay.                                            09:44:29a
22        A.   Perhaps.                                         09:44:29a
23        Q.   And what were Mr. Gwynn's duties and/or          09:44:31a
24    responsibilities at the WSC Countryside store when he     09:44:34a
25    reported to you?  What was he responsible for?            09:44:39a
```

Page 39

1     A.   Well, selling on the floor.                          09:44:44a

2     Q.   Okay.  I mean, so he was a retail sales guy?         09:44:47a

3     A.   Helping me run the store.                            09:44:51a

4     Q.   Okay.                                                09:44:53a

5     A.   You know, I don't recall a title.                    09:44:54a

6     Q.   Right.  So he had multiple responsibilities.         09:44:58a

7  He sold stuff on the floor.                                  09:45:02a

8     A.   As did everybody.                                    09:45:03a

9     Q.   Yes.  Which is not unusual with a small              09:45:04a

10  company --                                                  09:45:06a

11     A.   That's right.                                       09:45:06a

12         MR. SMELTZER:  You guys are talking over             09:45:08a

13     each other.                                              09:45:09a

14         THE DEPONENT:  I know it.                            09:45:10a

15         MR. SMELTZER:  Just wait until Carlos comes          09:45:10a

16     up for air.  Then you can start.                         09:45:12a

17         MR. LEYVA:  You could be waiting a long              09:45:17a

18     time.                                                    09:45:19a

19         MR. SMELTZER:  Carlos sometimes seems like           09:45:20a

20     he's coming up for air, but he's not yet.  Like          09:45:22a

21     all of us.                                               09:45:25a

22  BY MR. LEYVA:                                               09:45:32a

23     Q.   During this same time period, I believe, did       09:45:32a

24  Mr. Gwynn, while he reported to you at the WSC              09:45:35a

25  Countryside store -- That's the time period I'm            09:45:39a

1    referring to -- did he perform various advertising        09:45:41a

2    functions such as creating and distributing fliers,       09:45:46a

3    postcards, booklets, marking collateral, to help sales?    09:45:50a

4        A.   Ask that again, please.                           09:45:57a

5        Q.   Okay.  At the time period that he reported to      09:45:59a

6    you at the WSC Countryside store, you said he was a        09:46:01a

7    sales guy, he was on the floor, he helped you run the      09:46:04a

8    business.  He had multiple hats that he wore.              09:46:07a

9            As part of what he did, did he perform some        09:46:11a

10   advertising/marketing-related functions such as           09:46:14a

11   creating and distributing fliers, postcards, booklets?    09:46:20a

12   Marketing collateral.                                     09:46:25a

13       A.   Not solely on his own.                            09:46:26a

14       Q.   Okay.  Did he contribute to that effort?          09:46:28a

15       A.   Yes.                                              09:46:31a

16       Q.   Who else participated in that effort?             09:46:31a

17       A.   Me.                                               09:46:33a

18       Q.   So it was you and Martin --                       09:46:33a

19       A.   Right.                                            09:46:36a

20       Q.   -- that put that stuff together and got it out    09:46:36a

21   there?                                                    09:46:39a

22       A.   Yes.                                              09:46:40a

23       Q.   Okay.  And again, approximately what time         09:46:40a

24   frame was that?                                           09:46:49a

25       A.   As I recall --                                    09:46:51a

Page 41

1    Q.  Mid '90s?                                              09:46:52a

2    A.  Perhaps the mid '90s.                                  09:46:53a

3    Q.  And how long did that Countryside store last,          09:46:54a

4  was it in existence?                                         09:46:59a

5    A.  Maybe until the late '90s, 2000ish.                    09:47:00a

6    Q.  So approximately five years.                           09:47:04a

7    A.  Yes.                                                   09:47:06a

8    Q.  More or less.                                          09:47:06a

9    A.  Yes.                                                   09:47:07a

10   Q.  Okay.  During that entire time, Mr. Gwynn              09:47:07a

11 reported to you at the Countryside store?  I mean, he        09:47:12a

12 was -- during these four years.                              09:47:17a

13   A.  Well, he -- as I recall, it's very likely that         09:47:19a

14 he reported to both me and Bill Short.                       09:47:30a

15   Q.  Okay, that's fine.  During this entire time?           09:47:33a

16   A.  Yes.                                                   09:47:36a

17   Q.  So he had -- he had a dotted line or some kind         09:47:36a

18 of line, reporting line, to Mr. Short as well?               09:47:40a

19   A.  Yes.                                                   09:47:43a

20   Q.  And do you recall why there was that split?            09:47:44a

21      MR. SMELTZER:  I'll object to the form.                 09:47:56a

22      THE DEPONENT:  Ask the question again.                  09:47:59a

23      MR. LEYVA:  Yeah.                                       09:48:01a

24   Q.  I'm just interested as to -- he reported to            09:48:01a

25 you directly at the store.  I think we've established        09:48:04a

Page 42

1   that, correct?                                              09:48:07a

2       A.   Yes.                                               09:48:07a

3       Q.   You said at the time, these five years from        09:48:08a

4   1995 to 2000, approximately five years, that he had         09:48:10a

5   some sort of reporting to Mr. Short as well.                09:48:14a

6       A.   Yes.                                               09:48:16a

7       Q.   And my question is, why was the reporting          09:48:17a

8   function, to the best of your knowledge, split that         09:48:21a

9   way?  Why did he report to you for some things and to       09:48:23a

10  Mr. Short for some things?                                  09:48:26a

11      A.   I wouldn't know the answer to that question.       09:48:28a

12      Q.   Okay.  Now, these fliers, postcards, booklets,     09:48:29a

13  this marketing collateral that you and Mr. Gwynn            09:48:42a

14  created, at this time, between 1995 and 2000, were they     09:48:44a

15  distributed via the Internet or, you know, what we call     09:48:51a

16  now "snail mail"?  How were they gotten out to the          09:48:56a

17  public, to the consuming public?                            09:48:59a

18          MR. SMELTZER:  I'm sorry.  What kind of             09:49:00a

19      things distributed?  I missed the first part of        09:49:02a

20      that.                                                   09:49:06a

21          MR. LEYVA:  That's fine.                            09:49:06a

22      Q.   I believe Mr. Rabon said that Mr. Gwynn and        09:49:08a

23  himself created certain marketing collateral -- fliers,    09:49:10a

24  postcards, booklets, advertising marketing stuff,           09:49:18a

25  right, to improve the sales of the store, I think.  Is      09:49:22a

Page 43

1    that correct?                                             09:49:24a

2         A.   Just like any advertising.                     09:49:26a

3         Q.   Right, exactly.  And you guys -- you and        09:49:27a

4    Martin jointly participated in the creation of that      09:49:30a

5    collateral.                                              09:49:32a

6         A.   Yes.                                           09:49:34a

7         Q.   That stuff.  Okay.                             09:49:34a

8              And so my question was, during this time, was  09:49:35a

9    that collateral, that stuff, distributed electronically  09:49:39a

10   via E-mail or via the U.S. mail?                         09:49:43a

11        A.   U.S. mail.                                     09:49:47a

12        Q.   Okay.  And I may have confused you, and --     09:49:47a

13   some of us refer to that as "snail mail" now.            09:49:52a

14        A.   Right.  you can't electronically send a paid   09:49:54a

15   piece of paper, I don't think.                           09:50:00a

16        Q.   Well, you can today.  That's what I meant.     09:50:00a

17             The Internet was starting at that time, right? 09:50:04a

18   It really hadn't taken off, I don't think, but it was    09:50:09a

19   around in 1995.  So I was just trying to clarify:  Was   09:50:12a

20   this done, you know, via paper or over the Internet?     09:50:14a

21   Okay.                                                    09:50:19a

22             Do you recall that you and/or Mr. Gwynn        09:50:20a

23   jointly produced a postcard for holiday 1998 featuring   09:50:26a

24   four Big Rock Fish T-shirts?                             09:50:30a

25        A.   Yes, Big Rock T-shirts.                        09:50:37a

Page 44

1    Q.   Yes.                                                    09:50:39a

2    A.   Yes.                                                    09:50:40a

3    Q.   Now, was Big Rock a brand name?  A supplier?            09:50:41a

4  I mean --                                                      09:50:47a

5    A.   Yes.                                                    09:50:48a

6    Q.   Okay.  They supplied T-shirts.                          09:50:48a

7    A.   Yes.                                                    09:50:52a

8    Q.   A kind of T-shirts.  Okay.                              09:50:52a

9         And the Countryside store sold those T-shirts?          09:50:54a

10   A.   Yes.                                                    09:50:57a

11   Q.   Okay.  And so this postcard was to promote the          09:50:58a

12  sales of those T-shirts?                                      09:51:01a

13   A.   Yes.                                                    09:51:03a

14   Q.   What kind of relationship did --                        09:51:08a

15   A.   One of the postcards.                                   09:51:10a

16   Q.   Okay.  There were more.  What did the other             09:51:11a

17  postcards target?                                             09:51:16a

18   A.   I don't recall what they would be, but we sold          09:51:17a

19  suits and coats in that store as well.                       09:51:19a

20   Q.   So there may have been postcards for other              09:51:22a

21  stuff other than T-shirts.                                    09:51:24a

22   A.   Yes.                                                    09:51:25a

23   Q.   Okay.  Now, how would you describe the working          09:51:25a

24  relationship or the business relationship between             09:51:33a

25  WSC -- or maybe it was just the Countryside store --          09:51:36a

Page 45

1    and Big Rock?                                              09:51:40a

2        A.   I don't understand the question.                 09:51:42a

3        Q.   I mean, did you have a good working              09:51:43a

4    relationship?  When they said they were going to ship     09:51:45a

5    goods, did they ship them on time?  When they said        09:51:48a

6    there were goods available, were they available?          09:51:51a

7        A.   Sometimes yes, sometimes no.                     09:51:53a

8        Q.   Okay.  Now, at the time you created this         09:51:55a

9    postcard to promote these Big Rock T-shirts, did they     09:51:58a

10   actually have the T-shirts in inventory to fulfill the    09:52:06a

11   demand that was created by the promotion?                 09:52:12a

12           MR. SMELTZER:  Did Big Rock?                      09:52:14a

13           MR. LEYVA:  Do you recall?  Yeah, Big Rock.       09:52:17a

14           THE DEPONENT:  Yes and no.                        09:52:18a

15   BY MR. LEYVA:                                             09:52:21a

16       Q.   So they fulfilled part of the demand and they   09:52:21a

17   couldn't fulfill the rest of the demand?  Or how would    09:52:23a

18   you characterize that?                                    09:52:26a

19       A.   First of all, we had Big Rock T-shirts in the   09:52:28a

20   store before the postcards.                               09:52:30a

21       Q.   Okay.                                            09:52:32a

22       A.   It had been an ongoing vendor of that store.    09:52:34a

23       Q.   Sure.                                            09:52:37a

24       A.   So sometimes they had the T-shirts and          09:52:40a

25   sometimes they didn't.                                    09:52:43a

Page 46

1    Q.   Okay.  But I had a specific question here        09:52:45a

2    related to this postcard marketing campaign --        09:52:47a

3    A.   Right.                                           09:52:50a

4    Q.   -- that was created.  Right?  And you guys       09:52:50a

5    created and distributed this postcard, I'm assuming, to  09:52:53a

6    increase demand for these T-shirts that the Countryside  09:52:56a

7    store would sell; is that correct?                    09:53:01a

8    A.   Not solely to increase the demand.               09:53:03a

9    Q.   Okay.  For what other reasons would you --       09:53:06a

10   A.   To market Hurricane Pass Outfitters and          09:53:08a

11   Trading Company.                                       09:53:12a

12   Q.   So not just to sell T-shirts, but to get the     09:53:12a

13   brand out there?                                       09:53:17a

14   A.   Yes.                                              09:53:18a

15   Q.   Right?  I mean -- okay.                           09:53:18a

16        So it had a dual -- the postcard and this         09:53:22a

17   other collateral as well had dual purposes?            09:53:25a

18   A.   What other collateral?                            09:53:28a

19   Q.   Fliers, booklets, things that we talked about     09:53:29a

20   that you and Mr. Gwynn jointly created.                09:53:33a

21   A.   Advertising the name and the product and/or       09:53:36a

22   price.                                                 09:53:38a

23   Q.   Right.  So I want to get back to, though, this    09:53:38a

24   particular holiday 1998 postcard, this particular one. 09:53:46a

25   Was it widely distributed by the store, by the         09:53:53a

Page 47

1    Countryside store?                                            09:53:58a

2         A.   I can't recall what list we would have used --      09:54:04a

3         Q.   Right.                                              09:54:06a

4         A.   -- to distribute it.                                09:54:07a

5         Q.   Okay.  Do you recall that it produced               09:54:08a

6    significant or good demand?  How would you                    09:54:12a

7    characterize --                                               09:54:15a

8         A.   The result was good.                                09:54:16a

9         Q.   So, my question specifically was related to         09:54:17a

10   this holiday 1998 postcard, and only related to this          09:54:20a

11   1998.  Did Big Rock have the merchandise on hand to           09:54:26a

12   fulfill the demand that you guys created?                     09:54:31a

13        A.   Yes and no.                                         09:54:34a

14        Q.   Okay.  So we're good.  So, they fulfilled some      09:54:36a

15   of the demand created by the 1998 postcard, and not all       09:54:41a

16   of it.                                                        09:54:46a

17             What do you mean by "No"?  "Yes" and "No."          09:54:47a

18   I'll let you explain that.  What do you mean by "Yes"         09:54:49a

19   and "No"?                                                     09:54:52a

20        A.   Okay.  We procured or made -- had purchase          09:54:52a

21   orders for "X" amount of T-shirts from Big Rock.              09:55:01a

22        Q.   Okay.                                               09:55:04a

23        A.   We took approximately half of that order in         09:55:04a

24   initially to support -- I don't recall if it was the          09:55:09a

25   postcard or just the store -- but then we were to bring       09:55:16a

Page 48

1   in the balance of it at some later date.                    09:55:22a

2        When we went to bring in the balance at some           09:55:26a

3   later date, they had sold perhaps 50 percent of what        09:55:28a

4   they should have held for Hurricane Pass Outfitters and     09:55:32a

5   Trading Company -- they had sold it to other clients.       09:55:35a

6        Q.   Okay.                                             09:55:39a

7        A.   So yes, they supported it; yes, we had plenty     09:55:39a

8   of inventory, but then they didn't have all that we had     09:55:43a

9   ordered, in the end.                                        09:55:50a

10       Q.   Right, correct.  So, for that second half of      09:55:51a

11  the purchase order that they didn't fulfill, it appears     09:55:57a

12  that Countryside generated more demand, right, than         09:56:02a

13  there were inventory.                                       09:56:08a

14       I mean, you had some customers that were               09:56:08a

15  looking for goods, these T-shirts, and they couldn't        09:56:11a

16  get them.                                                   09:56:13a

17       MR. SMELTZER:  I'll object to the form of              09:56:15a

18       the question.  It mischaracterizes what he said.       09:56:15a

19       THE DEPONENT:  We still -- We still -- We              09:56:20a

20       had inventory of the T-shirts --                       09:56:22a

21  BY MR. LEYVA:                                               09:56:24a

22       Q.   Right.                                            09:56:24a

23       A.   -- of all the designs.  I would say, more         09:56:25a

24  likely, they didn't -- they didn't have the product for    09:56:29a

25  which I needed it for.                                      09:56:37a

Page 49

1          I wanted to sustain the business, and they had          09:56:42a

2    sold a portion of the balance of the inventory.          09:56:46a

3        Q.   Okay.  I mean, that's fair.  I'm just trying          09:56:51a

4    to be clear whether you had customers coming into the          09:56:53a

5    store wanting to get the T-shirts, and you couldn't          09:56:55a

6    fulfill it, okay.          09:56:58a

7        A.   As it happens with every single vendor.          09:56:59a

8        Q.   Right.  And you said -- the other thing was          09:57:02a

9    you wanted product that was selling well, the second          09:57:04a

10   half of this purchase order.          09:57:09a

11       A.   As with any other product, yes.          09:57:09a

12       Q.   Okay.  Now, to the best of your understanding,          09:57:12a

13   was this experience with Big Rock the genesis of what          09:57:25a

14   I'm calling HTPGP General Partnership between you,          09:57:31a

15   Mr. Gwynn, Ms. Zimmerman?          09:57:36a

16       A.   What do you mean, "genesis"?          09:57:38a

17       Q.   Well, Big Rock sold T-shirts, correct?          09:57:40a

18   Apparently they were unable to fulfill a particular          09:57:45a

19   purchase order, not to your satisfaction.  They said          09:57:47a

20   they were going to fulfill it; for whatever reason,          09:57:51a

21   they sold it.          09:57:54a

22          Did that trigger the idea, in your mind,          09:57:55a

23   Mr. Gwynn's mind, "Why don't we go into the T-shirt          09:57:58a

24   business"?          09:58:01a

25       A.   I wouldn't say solely.          09:58:02a

Page 50

1    Q.   Okay.  But what other factors, then?  So --     09:58:03a

2    A.   What factored into it was the department that    09:58:08a

3  I created within William Short Clothiers called         09:58:11a

4  Hurricane Pass Outfitters and Trading Company that sold  09:58:14a

5  a number of vendor brands that had marine-themed fish    09:58:18a

6  and the like on that clothing.                          09:58:24a

7    Q.   Okay.                                            09:58:27a

8    A.   So, having that merchandise in the store --      09:58:27a

9    Q.   Right.                                           09:58:31a

10    A.   -- and seeing the interest in it and the        09:58:31a

11  specific T-shirts with fish on them, it was a           09:58:34a

12  culmination of all of that.                             09:58:39a

13    Q.   Okay.                                            09:58:41a

14    A.   That had --                                      09:58:41a

15    Q.   So some activities you were already doing,       09:58:42a

16  right?                                                  09:58:44a

17    A.   Yes.                                             09:58:45a

18    Q.   They were somewhat analogous to what Big Rock    09:58:45a

19  did.                                                    09:58:48a

20    A.   Yes.                                             09:58:49a

21    Q.   I'm assuming Big Rock had -- yes.  They were     09:58:49a

22  fish T-shirts; is that correct?                         09:58:53a

23    A.   The ones that we bought from them, yes.          09:58:54a

24    Q.   So you kind of had a fish concept or something   09:58:57a

25  already within this division that you created.          09:58:59a

Page 51

1    A.   Yes.                                                    09:59:02a

2    Q.   Okay.  And those two things jointly triggered          09:59:02a

3    the partnership, or the idea for the partnership?           09:59:07a

4         MR. SMELTZER:  I'll object just to the use             09:59:10a

5    of the "division."  I think he said                         09:59:13a

6    "department."                                               09:59:15a

7         MR. LEYVA:  Can you read that back.                    09:59:16a

8         (Record read at this point.)                           09:59:18a

9         MR. SMELTZER:  I don't know if that's                  10:00:05a

10   meaningful.  I just wanted to get the verbiage              10:00:06a

11   consistent.                                                 10:00:09a

12        MR. LEYVA:  No, that's fine.                           10:00:09a

13   Q.   Mr. Rabon, I'm going to switch gears here a            10:00:17a

14   little bit and start talking about corporations,           10:00:20a

15   starting with Rabco.  And the time period that we're in    10:00:25a

16   now is Rabco post July 2002.                               10:00:29a

17   A.   Okay.                                                  10:00:36a

18   Q.   So, July 2002 being when Hurricane Pass               10:00:36a

19   Traders, Inc., was incorporated.                           10:00:39a

20   A.   Okay.                                                  10:00:43a

21   Q.   So that's the line of demarcation.                    10:00:43a

22        I know I've asked you this, but I'm just              10:00:51a

23   trying to establish the time period maybe a little more    10:00:55a

24   specifically.                                               10:00:59a

25        In July, 2002, had you already purchased the          10:01:02a

Page 52

1    assets and certain debt from WSC, or did it occur after      10:01:06a

2    that?                                                         10:01:11a

3         A.   I don't recall that specific --                    10:01:15a

4         Q.   Whether it was before or after?                    10:01:20a

5         A.   Yeah.  I don't recall that.                        10:01:21a

6         Q.   Was it on or about that time frame, though?        10:01:22a

7         A.   In and around, perhaps, yes.                       10:01:24a

8         Q.   Shortly before or shortly after?                   10:01:26a

9         A.   I can't say.                                       10:01:28a

10        Q.   I mean, was it a year before?  A year after?       10:01:29a

11        A.   I don't recall.  I guess Hurricane Pass            10:01:48a

12   Traders was after it.  I don't recall --                     10:01:51a

13        Q.   So the incorporation of Hurricane Pass             10:01:56a

14   Traders, Inc., in July 2002, was after the asset -- Is       10:02:00a

15   that what you --                                             10:02:04a

16        A.   I don't recall specifically --                     10:02:05a

17        Q.   No, that's fine.  I'm not trying to press you.     10:02:08a

18   I mean, you think it was after.                              10:02:11a

19        A.   Yes.                                               10:02:13a

20        Q.   Okay.  At any rate, it was sometime near this      10:02:13a

21   time period.                                                 10:02:17a

22        A.   Yes.                                               10:02:18a

23        Q.   Okay.  At this time period, July 2002, who         10:02:18a

24   were the officers of Rabco, and what positions did they      10:02:26a

25   hold?                                                        10:02:31a

Page 53

| | | | |
|---|---|---|---|
| 1 | A. | I was -- I'm recalling I was the President. | 10:02:35a |
| 2 | Q. | Right. | 10:02:39a |
| 3 | A. | I do not recall the title of my wife. | 10:02:40a |
| 4 | | Virginia had a title, and I don't recall what that was. | 10:02:49a |
| 5 | Q. | Were those the only officers in July of 2002? | 10:02:57a |
| 6 | A. | I believe. | 10:03:03a |
| 7 | Q. | Okay. | 10:03:04a |
| 8 | A. | I'm not totally sure. | 10:03:04a |
| 9 | Q. | Mr. Short was not an officer? | 10:03:07a |
| 10 | A. | I don't recall that.  I don't know that. | 10:03:09a |
| 11 | | MR. SMELTZER:  Are we talking about Rabco? | 10:03:10a |
| 12 | | MR. LEYVA:  Yes. | 10:03:13a |
| 13 | Q. | So he may have been; you just don't recall. | 10:03:13a |
| 14 | A. | Yes. | 10:03:16a |
| 15 | Q. | Okay.  And your wife, Kathy, may have had a | 10:03:16a |
| 16 | | title, and you don't recall that?  What -- | 10:03:20a |
| 17 | A. | Yes. | 10:03:23a |
| 18 | Q. | As an officer. | 10:03:23a |
| 19 | A. | Yes. | 10:03:24a |
| 20 | Q. | Okay.  Did Rabco have a Board of Directors? | 10:03:25a |
| 21 | A. | Yes. | 10:03:31a |
| 22 | Q. | And who was on the Board? | 10:03:32a |
| 23 | A. | Those same people. | 10:03:34a |
| 24 | Q. | So, your wife? | 10:03:37a |
| 25 | A. | Right. | 10:03:39a |

1     Q.   Yourself, Ms. Hunter.                          10:03:39a

2     A.   Yes.                                           10:03:42a

3     Q.   And possibly Mr. Short?                        10:03:44a

4     A.   Yes.                                           10:03:46a

5     Q.   Okay.  Did Board members receive compensation  10:03:46a

6   for participating on the Board?                       10:03:55a

7     A.   I don't believe so.                            10:04:16a

8     Q.   To the best of your understanding, had the    10:04:21a

9   Board members received compensation, would that       10:04:23a

10  compensation be reflected in your Quickbooks?         10:04:25a

11       MR. SMELTZER:  Objection, calls for             10:04:34a

12    speculation.                                        10:04:35a

13       THE DEPONENT:  What time frame?                 10:04:41a

14  BY MR. LEYVA:                                          10:04:44a

15    Q.   July of 2002.  On or about there.              10:04:44a

16    A.   In July of 2002, I don't recall that that --   10:04:50a

17  that there -- I don't recall Board members receiving a 10:04:57a

18  salary.                                                10:05:02a

19    Q.   At any time after that, did the Board members  10:05:02a

20  receive compensation?                                  10:05:05a

21    A.   Not all of them.                               10:05:07a

22    Q.   Some Board members did?                        10:05:09a

23    A.   Yes.                                           10:05:11a

24    Q.   Which Board members did?                       10:05:11a

25    A.   Kathy Rabon.                                   10:05:12a

Page 55

| | | |
|---|---|---|
| 1 | Q.   And?  That was it? | 10:05:14a |
| 2 | A.   As I recall. | 10:05:16a |
| 3 | Q.   Ms. Hunter didn't receive? | 10:05:17a |
| 4 | A.   No. | 10:05:19a |
| 5 | Q.   Mr. Short didn't receive? | 10:05:19a |
| 6 | A.   No. | 10:05:20a |
| 7 | Q.   Okay.  I mean, you were the President of the | 10:05:21a |
| 8 | company. | 10:05:25a |
| 9 | MR. SMELTZER:  Presuming he was on the | 10:05:26a |
| 10 | Board. | 10:05:28a |
| 11 | MR. LEYVA:  Yeah, yeah.  We don't know. | 10:05:28a |
| 12 | That's an open question, right. | 10:05:30a |
| 13 | MR. SMELTZER:  I guess that's an objection | 10:05:31a |
| 14 | to form.  Sorry. | 10:05:32a |
| 15 | BY MR. LEYVA: | 10:05:37a |
| 16 | Q.   I mean, the compensation was paid, was it not, | 10:05:37a |
| 17 | from a Rabco bank account, to the Board members? | 10:05:42a |
| 18 | MR. SMELTZER:  Objection as to form. | 10:05:46a |
| 19 | BY MR. LEYVA: | 10:05:48a |
| 20 | Q.   How was the compensation to the Board members | 10:05:48a |
| 21 | paid -- to your wife? | 10:05:50a |
| 22 | MR. SMELTZER:  The same -- | 10:05:52a |
| 23 | BY MR. LEYVA: | 10:05:56a |
| 24 | Q.   You indicated that your wife received | 10:05:56a |
| 25 | compensation as being a Board member. | 10:05:58a |

Page 56

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:06:00a |
| 2 | Q.   In what form was that compensation paid? | 10:06:00a |
| 3 | A.   She would have received a check. | 10:06:03a |
| 4 | Q.   And how often was that check written? | 10:06:05a |
| 5 | Monthly?  Quarterly?  Yearly? | 10:06:08a |
| 6 | A.   If I had to recall, monthly. | 10:06:10a |
| 7 | Q.   And do you recall the amount? | 10:06:13a |
| 8 | A.   I think it was a thousand dollars. | 10:06:14a |
| 9 | Q.   Okay.  Now, did your wife, Kathy, play an | 10:06:17a |
| 10 | active role in managing Rabco's affairs? | 10:06:24a |
| 11 | A.   No. | 10:06:28a |
| 12 | Q.   So her role was as a Board member? | 10:06:30a |
| 13 | A.   Yes. | 10:06:35a |
| 14 | Q.   Was that the extent of her role? | 10:06:36a |
| 15 | A.   No. | 10:06:41a |
| 16 | Q.   Okay.  So what other roles did she play other | 10:06:42a |
| 17 | than Board member? | 10:06:46a |
| 18 | A.   Well, we discussed on numerous occasions the | 10:06:47a |
| 19 | activities of the business, potential leases.  She | 10:06:54a |
| 20 | would have input into all of that. | 10:06:58a |
| 21 | Q.   Okay.  So she was a 50 percent shareholder. | 10:07:01a |
| 22 | A.   Exactly. | 10:07:03a |
| 23 | Q.   Correct.  So she was going to have some input | 10:07:04a |
| 24 | into strategy. | 10:07:07a |
| 25 | A.   Right. | 10:07:07a |

Page 57

1    Q.   Right?  Now, did Kathy receive a salary from          10:07:08a

2    Rabco?                                                     10:07:15a

3    A.   Not to my knowledge, no.                              10:07:16a

4    Q.   Okay.  Did Kathy receive any other kind of            10:07:18a

5    compensation?  The use of a company automobile?            10:07:27a

6    Whatever form that might be.                               10:07:31a

7    A.   I don't recall an automobile.                         10:07:43a

8    Q.   Okay.  Now, you previously testified that you         10:07:45a

9    had two sons; is that correct?                             10:07:55a

10   A.   Uh-huh.  Yes.                                         10:07:58a

11   Q.   One is Casey.                                         10:07:59a

12   A.   Yes.                                                  10:08:00a

13   Q.   And the other one?                                    10:08:00a

14   A.   Chad.                                                 10:08:02a

15   Q.   Chad.  Okay.                                          10:08:03a

16        Now, was Casey Rabon ever a W2 employee --            10:08:04a

17   A.   Yes.                                                  10:08:10a

18   Q.   -- of Rabco?                                          10:08:10a

19        And what was Casey's duties and/or                    10:08:14a

20   responsibilities?  What did he do?                         10:08:16a

21   A.   He worked in our stores in the summers and            10:08:18a

22   perhaps over the holidays.                                 10:08:20a

23   Q.   Do you recall his salary?                             10:08:23a

24   A.   I don't.                                              10:08:27a

25   Q.   Did Casey receive any other type of                   10:08:30a

1    compensation from Rabco?  The use of an automobile?          10:08:33a

2         A.   He had an automobile.                             10:08:38a

3         Q.   That was paid for by -- was it a Rabco            10:08:39a

4    automobile?                                                 10:08:42a

5         A.   Yes.                                              10:08:42a

6         Q.   Rabco paid for the gas?                           10:08:43a

7         A.   No.                                               10:08:45a

8         Q.   Rabco pay for the insurance?                      10:08:45a

9         A.   Yes.                                              10:08:47a

10        Q.   Rabco pay for the maintenance?                    10:08:50a

11        A.   No, not exclusively.                              10:08:54a

12        Q.   Okay.  So Casey paid some of the maintenance;     10:08:57a

13   is that correct?                                            10:09:00a

14        A.   Or I did personally.                              10:09:00a

15        Q.   Or you did personally.                            10:09:02a

16             MR. SMELTZER:  I'm going to object to the         10:09:03a

17        relevance of the line of questioning.                  10:09:04a

18   BY MR. LEYVA:                                               10:09:11a

19        Q.   Now, did Casey attend college?                    10:09:11a

20        A.   Yes.                                              10:09:13a

21        Q.   What college did he attend?                       10:09:13a

22        A.   Florida Southern College.                         10:09:14a

23        Q.   And did Casey remain a W2 employee of Rabco       10:09:18a

24   during the time that he attended college?                   10:09:20a

25        A.   At times.                                         10:09:22a

```
 1      Q.   How would you characterize that, "at times"?     10:09:25a
 2   I mean, he was away at college and he remained a W2       10:09:29a
 3   employee; is that correct?                                10:09:33a
 4      A.   For the first year-and-a-half or so of college    10:09:36a
 5   he was not.                                               10:09:38a
 6      Q.   Okay.  For the time that he was at college and    10:09:41a
 7   he was a W2 employee, what was his role in Rabco?         10:09:49a
 8      A.   He was kind of an extended marketing type         10:09:54a
 9   person.                                                   10:10:02a
10      Q.   Okay.  And what did he do in those extended       10:10:04a
11   marketing type activities?                                10:10:08a
12      A.   Some of his activities included maybe wearing     10:10:09a
13   Guy Harvey product around the school, which is very       10:10:12a
14   popular amongst college university students.              10:10:15a
15      Q.   Okay.                                             10:10:17a
16      A.   Talking about the product.                        10:10:17a
17      Q.   Okay.  Did his salary remain the same when he     10:10:19a
18   worked in the summer and when he was away to school?      10:10:24a
19      A.   I don't remember.                                 10:10:26a
20      Q.   Okay.  Did any of your other children work at     10:10:27a
21   Rabco?                                                    10:10:31a
22      A.   Yes.                                              10:10:32a
23      Q.   I assume Chad.  What was Chad's roles,            10:10:32a
24   responsibilities?                                         10:10:38a
25      A.   Chad was a salesman.  I don't recall ever --      10:10:38a
```

Page 60

| | | |
|---|---|---|
| 1 | it's possible I let him be a manager for a while, but I | 10:10:47a |
| 2 | think he was predominantly a salesman. | 10:10:51a |
| 3 | Q.   Do you recall his salary? | 10:10:53a |
| 4 | A.   No. | 10:10:54a |
| 5 | Q.   Did Chad receive any other type of | 10:10:59a |
| 6 | compensation?  A company automobile? | 10:11:01a |
| 7 | A.   No. | 10:11:06a |
| 8 | Q.   Did he -- | 10:11:14a |
| 9 | A.   Well, he may have had a company automobile for | 10:11:15a |
| 10 | a month or two. | 10:11:20a |
| 11 | Q.   Okay. | 10:11:22a |
| 12 | A.   I don't recall him having a vehicle in the | 10:11:23a |
| 13 | company other than a month or two, perhaps. | 10:11:28a |
| 14 | Q.   Now, were there other store managers, store | 10:11:31a |
| 15 | employees, that had vehicles, company vehicles? | 10:11:34a |
| 16 | A.   Yes. | 10:11:36a |
| 17 | Q.   Did all the store managers? | 10:11:36a |
| 18 | A.   No. | 10:11:37a |
| 19 | Q.   How was that determined? | 10:11:38a |
| 20 | A.   Need. | 10:11:42a |
| 21 | Q.   Whether a particular store manager had a need, | 10:11:46a |
| 22 | I mean -- | 10:11:48a |
| 23 | A.   For that position. | 10:11:49a |
| 24 | Q.   To fulfill business requirements? | 10:11:52a |
| 25 | A.   Right. | 10:11:54a |

```
 1      Q.   Okay.  I'm going to transition now, we're        10:11:55a
 2   going off to a different topic.                          10:12:06a
 3           Did the shareholders of Rabco make loans to      10:12:07a
 4   Rabco?                                                   10:12:10a
 5      A.   Yes.                                             10:12:11a
 6      Q.   And why were these loans required?               10:12:15a
 7           MR. SMELTZER:  Objection as to form.             10:12:18a
 8           THE DEPONENT:  The loan, as I recall it,         10:12:24a
 9      was in the form -- this is a recollection.  It        10:12:32a
10      was paid to me as a -- Rabco paid me a -- like a      10:12:39a
11      lump sum distribution.  I paid the taxes on that      10:12:46a
12      lump sum distribution.  My tax rate would be          10:12:51a
13      lower than Rabco's, and then I lent the money         10:12:55a
14      back to the company.                                  10:12:59a
15   BY MR. LEYVA:                                            10:13:03a
16      Q.   So there was some tax advantage from             10:13:03a
17   structuring the loan that way?                           10:13:06a
18      A.   For the company.                                 10:13:08a
19      Q.   Yes.                                             10:13:09a
20      A.   Yes.                                             10:13:10a
21      Q.   Yes.  Now, you said just one loan.  Was that     10:13:11a
22   the only loan that was ever made by a shareholder?       10:13:14a
23      A.   As I recall.                                     10:13:16a
24      Q.   Okay.  Was there any interest paid on these      10:13:18a
25   loans?                                                   10:13:21a
```

Page 62

```
 1        A.    It's possible.  I don't recall.  It could --    10:13:29a
 2   it's possible.                                            10:13:37a
 3        Q.    Okay.  And to the best of your recollection,    10:13:37a
 4   were all such loans repaid by Rabco to the                10:13:42a
 5   shareholders?                                             10:13:47a
 6        A.    No.                                            10:13:48a
 7        Q.    They were not repaid?                          10:13:49a
 8        A.    No.                                            10:13:50a
 9        Q.    And there was only this one particular loan --  10:13:54a
10        A.    As I recall.                                   10:13:57a
11        Q.    -- right?                                      10:13:57a
12              So we're just talking about one loan.  Do you  10:13:58a
13   recall the amount of that loan?                           10:14:00a
14        A.    I don't.  It could be in the 30 to $40,000     10:14:05a
15   range.                                                    10:14:10a
16        Q.    And do you recall how much of that loan was    10:14:14a
17   repaid?                                                   10:14:17a
18        A.    No.                                            10:14:18a
19        Q.    But some of it was repaid?                     10:14:22a
20        A.    Yes.                                           10:14:23a
21        Q.    Okay.                                          10:14:23a
22        A.    It could have been more.  I don't recall the   10:14:28a
23   number.                                                   10:14:30a
24        Q.    That's fine.  Now, were these loans repaid     10:14:30a
25   anytime within two years of Rabco's bankruptcy filing?    10:14:36a
```

Page 63

```
 1        MR. SMELTZER:  I'll object to the relevancy          10:14:40a
 2     to this action.                                         10:14:41a
 3        THE DEPONENT:  What's the question?                  10:14:42a
 4        MR. LEYVA:  Answer the question, please.             10:14:43a
 5        THE DEPONENT:  What's the question?                  10:14:45a
 6  BY MR. LEYVA:                                              10:14:46a
 7     Q.   Were any of these loans repaid within two         10:14:46a
 8  years of Rabco's bankruptcy filing?  This one loan that    10:14:49a
 9  you talked about, the 30, $40,000, were there payments     10:14:54a
10  made -- any payments made --                              10:14:57a
11     A.   I don't recall that.  I don't know.               10:15:00a
12     Q.   Okay.                                             10:15:02a
13     A.   I'm sorry.                                        10:15:02a
14     Q.   No, that's fine.  Would you like to take a        10:15:03a
15  break?                                                    10:15:08a
16     A.   Yeah, I could hit the restroom.                   10:15:10a
17        MR. LEYVA:  Anybody need a break?                   10:15:13a
18        MR. SMELTZER:  Sure.  Can we do a                   10:15:14a
19     housekeeping matter on the record first?              10:15:19a
20           Carlos, I wanted to give you some               10:15:20a
21     documents.  I'm not going to bore the court           10:15:24a
22     reporter with all of the Bates numbers, but           10:15:29a
23     basically it's within the -- I don't know that        10:15:32a
24     they're all sequential, but it looks like             10:15:35a
25     between RAB00001961 and 1993.  There's a few          10:15:39a
```

Page 64

1    pages -- maybe one page missing in there that we        10:15:49a
2    had previously designated as Attorney's Eyes            10:15:52a
3    Only, but since they're Quickbooks reports, and         10:15:56a
4    we've removed the designation on Quickbooks as          10:16:00a
5    Attorney's Eyes Only, I want to give you these          10:16:02a
6    hard copies of the reports.                             10:16:06a
7         MR. LEYVA:  Okay.                                  10:16:07a
8         MR. SMELTZER:  Under a Confidential                10:16:08a
9    designation rather than Attorney's Eyes Only.           10:16:09a
10        MR. LEYVA:  Got it.  Yeah.                          10:16:12a
11             (Recess held at this time.)                    10:16:13a
12   BY MR. LEYVA:                                           10:28:13a
13   Q.   Mr. Rabon, I would like to take us back to the     10:28:13a
14   time frame of July 2002, the time frame, more or less,  10:28:19a
15   we established that assets were purchased from WSC,      10:28:25a
16   okay, and liabilities.  So I'm going to go back as far  10:28:28a
17   as the dates, but that time frame.                      10:28:32a
18   A.   Okay.                                              10:28:34a
19   Q.   You said it was a little before, a little          10:28:34a
20   after.                                                  10:28:37a
21        Now, did Rabco buy WSC's shares -- that is,        10:28:38a
22   the company -- in its entirety?  Was it that kind of    10:28:44a
23   transaction?                                            10:28:47a
24   A.   There -- Ask the question one more time.           10:28:52a
25   Q.   There's several ways that these deals can be       10:28:58a

```
 1    structured, okay.  Sometimes a company just out -- you      10:29:01a

 2    know, HP buys a company in its entirety, right, they        10:29:06a

 3    buy all the shares.  They just don't own the company.       10:29:11a

 4    They don't buy specific assets.                             10:29:13a

 5        A.   HP?                                                10:29:15a

 6        Q.   Hewlett Packard --                                 10:29:16a

 7        A.   Okay.                                              10:29:18a

 8        Q.   -- Microsoft, Google.  I'm just trying to give     10:29:18a

 9    you an example of what I mean.  Right.                      10:29:21a

10             They buy the shares of this company, and they      10:29:22a

11    own all the shares, okay.  And other times there's just     10:29:24a

12    assets that are bought.                                     10:29:26a

13             And I'm just trying to figure out, this            10:29:29a

14    arrangement between you and WSC -- between Rabco and        10:29:32a

15    WSC, was it just assets and liabilities, or did you buy     10:29:36a

16    shares?                                                     10:29:39a

17        A.   Did not buy shares.                                10:29:41a

18        Q.   You did not buy shares.  Okay.                     10:29:42a

19             So you bought assets, correct?                     10:29:49a

20        A.   Yes.                                               10:29:52a

21        Q.   Did you buy all of WSC's assets?                   10:29:52a

22        A.   Yes.                                               10:29:58a

23        Q.   All of them?                                       10:29:59a

24        A.   To my knowledge, yes.                              10:30:00a

25        Q.   Okay.  And you bought WSC's liabilities as         10:30:02a
```

1    well?  Or, did you buy WSC's liabilities?  Debt.          10:30:09a

2        A.   We assumed those.                                10:30:15a

3        Q.   Yes.                                             10:30:15a

4        A.   Yes.                                             10:30:16a

5        Q.   Did you assume all WSC's --                      10:30:16a

6        A.   To my knowledge.                                 10:30:20a

7        Q.   -- debt?                                         10:30:22a

8             Now, was there any written agreement that        10:30:28a

9    memorialized the purchase of these assets and             10:30:30a

10   liabilities?                                              10:30:33a

11       A.   There were.  There was minutes from meetings     10:30:35a

12   at that point about the agreement, and recently I did a   10:30:47a

13   document that reaffirmed what that agreement was about.   10:30:58a

14       Q.   How recent was that document done?               10:31:06a

15       A.   Last few months.                                 10:31:08a

16       Q.   And for what purpose?                            10:31:11a

17       A.   Just to confirm what the agreement was for.      10:31:12a

18       Q.   Was that document executed by yourself and       10:31:19a

19   Mr. Short?                                                10:31:22a

20       A.   By myself.                                       10:31:22a

21       Q.   Mr. Short did not sign that?  I mean, did you    10:31:24a

22   create this document saying, "This memorializes our       10:31:26a

23   arrangement," and you both signed, or --                  10:31:30a

24       A.   I signed it as President of the company.         10:31:32a

25       Q.   Okay.  But Mr. Short didn't sign it?             10:31:34a

| | | |
|---|---|---|
| 1 | A.   Right. | 10:31:37a |
| 2 | Q.   Okay.  And just to be clear, then, other than | 10:31:37a |
| 3 | this document that you created as of a couple months | 10:31:52a |
| 4 | ago, and meeting minutes at the time -- are those | 10:31:55a |
| 5 | minutes available? | 10:31:59a |
| 6 | A.   I believe they are. | 10:31:59a |
| 7 | MR. SMELTZER:  Those are my Attorney's Eyes | 10:32:01a |
| 8 | Only docs. | 10:32:03a |
| 9 | MR. LEYVA:  Okay. | 10:32:04a |
| 10 | MR. SMELTZER:  As is the other one, which | 10:32:05a |
| 11 | we can talk about. | 10:32:07a |
| 12 | MR. LEYVA:  Okay, that's fine. | 10:32:08a |
| 13 | Q.   So there were the meeting minutes that were | 10:32:16a |
| 14 | available, right; there's this document you created as | 10:32:20a |
| 15 | of two months ago.  Any other documents other than the | 10:32:23a |
| 16 | accounting transactions entered on the respective | 10:32:31a |
| 17 | books? | 10:32:34a |
| 18 | A.   Ask that one more time. | 10:32:37a |
| 19 | Q.   Let me break it up for you. | 10:32:41a |
| 20 | So, when you bought these assets, right, from | 10:32:43a |
| 21 | WSC, they became assets on Rabco's books, did they not? | 10:32:46a |
| 22 | A.   Yes. | 10:32:51a |
| 23 | Q.   So that's a form of capturing what was bought, | 10:32:52a |
| 24 | because it probably came off of WSC's books and came | 10:32:57a |
| 25 | onto your books. | 10:33:00a |

Page 68

1     A.   Yes.                                              10:33:01a

2     Q.   The same thing for the liabilities, the debt     10:33:01a

3   that you bought.                                         10:33:05a

4     A.   Yes.                                              10:33:05a

5     Q.   Right?  Would have come off of WSC's books and   10:33:06a

6   gone onto your books, correct?                          10:33:10a

7     A.   Yes.                                              10:33:11a

8     Q.   So, I'm just trying to summarize, we have        10:33:11a

9   three things that memorialize the transfer:  The        10:33:15a

10   minutes, this document you created, and the entries    10:33:18a

11   made in the accounting of the respective companies.    10:33:21a

12     A.   Yes.                                             10:33:25a

13     Q.   Right?  And that's the extent of it.            10:33:25a

14     A.   Yes.                                             10:33:27a

15     Q.   Okay.  Were there any intellectual property     10:33:28a

16   assets, copyrights, trademark, trade secrets, that were 10:33:36a

17   bought from WSC?                                        10:33:40a

18          MR. SMELTZER:  I'll object to the form.  I      10:33:46a

19       think it's been asked and answered.                10:33:48a

20          THE DEPONENT:  Ask --                           10:33:50a

21          MR. LEYVA:  No, this is a specific question     10:33:52a

22       of a type of asset.                                10:33:53a

23     Q.   You say that you purchased all the assets.      10:33:54a

24   I'm asking about a specific type of asset.             10:33:56a

25     A.   It would have included those.                   10:33:59a

Page 69

1      Q.   Were there any, do you know, to the best of        10:34:00a

2  your knowledge --                                           10:34:02a

3           MR. SMELTZER:   I'll object to the form.           10:34:02a

4  BY MR. LEYVA:                                               10:34:04a

5      Q.   -- copyright, trademark, trade secrets?            10:34:04a

6      A.   Ask that one more time.                            10:34:08a

7      Q.   Okay.  Just to lay the predicate here.  You        10:34:13a

8  have already indicated that Rabco bought all of WSC's       10:34:18a

9  assets, did you not?                                        10:34:23a

10     A.   Right.                                             10:34:24a

11     Q.   Okay.  But I'm asking a specific question          10:34:25a

12 about a type of asset that was bought.                      10:34:30a

13     A.   Yes.                                               10:34:32a

14     Q.   All right.  A trademark, a copyright, trade        10:34:32a

15 secrets.                                                    10:34:38a

16          Were there any of those type of assets that        10:34:40a

17 were bought, to the best of your knowledge?                 10:34:42a

18     A.   To the best of my knowledge, it would have         10:34:44a

19 included all of that.                                       10:34:46a

20     Q.   Okay.  So assuming that it did include some of     10:34:51a

21 that, are you aware of how those assets, those              10:34:55a

22 intangible assets, would have been recorded on Rabco's      10:35:01a

23 books?                                                      10:35:06a

24     A.   I'm not aware of how it would be recorded.         10:35:08a

25     Q.   Okay.  Was the Hurricane Pass trademark one of     10:35:11a

Page 70

1     the assets that was purchased from WSC at that time?          10:35:26a

2          MR. SMELTZER:  Again, I think that's asked              10:35:42a

3     and answered, but you can answer.                            10:35:43a

4          THE DEPONENT:  What's that?                             10:35:46a

5          MR. SMELTZER:  I think that's asked and                 10:35:47a

6     answered, but you can answer it again.                       10:35:48a

7          THE DEPONENT:  Was the -- Ask the question              10:35:55a

8     one more time.                                               10:35:56a

9  BY MR. LEYVA:                                                   10:36:02a

10         Q.   Well, let me ask this question:  Is it your        10:36:02a

11    contention that Rabco owns the Hurricane Pass                10:36:05a

12    trademark?                                                   10:36:09a

13         A.   Rabco owns it?                                     10:36:12a

14         Q.   Yes.  Do you believe -- Is it your contention      10:36:13a

15    that Rabco owns the Hurricane Pass trademark?                10:36:18a

16         A.   When?                                              10:36:25a

17         Q.   Well, we're talking in the 2002 time period.       10:36:28a

18    But at any time.  Now.                                       10:36:32a

19         Before you filed bankruptcy, did Rabco own the         10:36:33a

20    Hurricane Pass trademark?                                    10:36:37a

21         A.   I would say yes.                                   10:36:40a

22         Q.   I mean, you are aware, I believe, that it's        10:36:42a

23    listed in your bankruptcy petition as one of the assets      10:36:45a

24    that you own.                                                10:36:48a

25         A.   Yes.                                               10:36:48a

1    Q.   Okay.  So before filing bankruptcy, Rabco --          10:36:49a

2    A.   Yes.                                                  10:36:52a

3    Q.   -- owned --                                           10:36:52a

4         And how did Rabco come to acquire ownership in        10:36:57a

5    the Hurricane Pass trademark?  That was my question.       10:37:02a

6    Did you get that as an asset from WSC, or purchase it      10:37:04a

7    after that?                                                10:37:08a

8         How did you acquire ownership of the Hurricane        10:37:10a

9    Pass trademark?                                            10:37:13a

10        MR. SMELTZER:  I think that's asked and               10:37:21a

11   answered, too, but --                                      10:37:22a

12        THE DEPONENT:  As I recall, I would -- not            10:38:00a

13   remembering the specific time frame, but that --          10:38:06a

14   I believe I would have -- that would have been            10:38:11a

15   part of that arrangement.                                  10:38:13a

16   BY MR. LEYVA:                                              10:38:17a

17   Q.   The asset arrangement with WSC?                       10:38:17a

18   A.   I'm sorry?                                            10:38:19a

19   Q.   The asset purchase arrangement with WSC?             10:38:19a

20   A.   I believe so.                                         10:38:22a

21   Q.   Okay.  Now, was Mr. Short's commission               10:38:24a

22   payments, royalty payments -- however we want to          10:38:33a

23   characterize them -- from Internet orders part of that    10:38:36a

24   original agreement?                                        10:38:39a

25   A.   Yes, they were.  He felt as though he was            10:38:43a

Page 72

1    entitled to it because the websites were developed        10:38:47a

2    while we were employed by him.                            10:38:50a

3        Q.   Now, did WSC ever sell goods online prior to     10:38:56a

4    the HTPGP partnership?  Did they conduct E-commerce       10:39:04a

5    operations, actually sell online --                       10:39:10a

6        A.   I believe so.                                    10:39:17a

7        Q.   -- from their websites?                          10:39:18a

8        A.   Yes.                                             10:39:20a

9        Q.   And those websites had shopping carts, or were   10:39:20a

10   they just displaying goods --                             10:39:23a

11       A.   Shopping carts, I believe.                       10:39:25a

12       Q.   Do you recall which websites?  WSC website,      10:39:27a

13   now, specifically.                                        10:39:33a

14       A.   Shorts, Inc., Hurricanepass.com.                 10:39:35a

15       Q.   So Hurricanepass.com was a domain name that      10:39:50a

16   was owned by WSC?  Is that --                             10:39:56a

17       A.   Yes.                                             10:40:03a

18       Q.   And that would have been part of the assets      10:40:04a

19   that you acquired from WSC?                               10:40:05a

20       A.   Yes.                                             10:40:07a

21       Q.   Okay.  So the commission payments for Internet   10:40:09a

22   orders for Mr. Short was part of the original             10:40:14a

23   arrangement, correct?  That's what you indicated.         10:40:17a

24   Mr. Short's commission payments from Internet orders --   10:40:22a

25           MR. SMELTZER:  Asked and answered.                10:40:25a

Page 73

| | | |
|---|---|---|
| 1 | THE DEPONENT:  It's not Internet orders. | 10:40:26a |
| 2 | BY MR. LEYVA: | 10:40:29a |
| 3 | Q.   Okay.  What was it? | 10:40:29a |
| 4 | A.   Sales. | 10:40:31a |
| 5 | Q.   All sales? | 10:40:32a |
| 6 | A.   Internet sales. | 10:40:33a |
| 7 | Q.   Okay.  From Internet sales. | 10:40:34a |
| 8 | A.   You don't get a sale on every order. | 10:40:37a |
| 9 | Q.   That's fine. | 10:40:38a |
| 10 | Now, is that arrangement between Rabco and | 10:40:43a |
| 11 | Mr. Short -- was that captured in this document that | 10:40:47a |
| 12 | you produced -- | 10:40:50a |
| 13 | A.   Yes. | 10:40:52a |
| 14 | Q.   -- two months ago? | 10:40:52a |
| 15 | A.   As I recall, yes. | 10:40:53a |
| 16 | Q.   Were the percentages captured? | 10:40:54a |
| 17 | A.   I don't recall that. | 10:40:56a |
| 18 | Q.   Was the threshold captured? | 10:40:57a |
| 19 | A.   I don't recall that. | 10:41:00a |
| 20 | Q.   Was there a threshold? | 10:41:01a |
| 21 | A.   Yes. | 10:41:02a |
| 22 | Q.   What was the threshold? | 10:41:02a |
| 23 | A.   I don't remember the number. | 10:41:03a |
| 24 | Q.   10,000?  50,000?  100,000? | 10:41:05a |
| 25 | MR. SMELTZER:  Objection, calls for | 10:41:10a |

Page 74

| | | |
|---|---|---|
| 1 | speculation. | 10:41:12a |
| 2 | THE DEPONENT:  I don't recall. | 10:41:13a |
| 3 | BY MR. LEYVA: | 10:41:16a |
| 4 | Q.   So, you don't know -- or do you know how long | 10:41:16a |
| 5 | these commission payments were to go on? | 10:41:19a |
| 6 | A.   They were to go on for a period -- If you | 10:41:25a |
| 7 | reached a plateau, a number that his commissions would | 10:41:29a |
| 8 | equal, then they might have ceased or they might have | 10:41:33a |
| 9 | been reduced. | 10:41:38a |
| 10 | Q.   And that plateau would be a revenue number, a | 10:41:41a |
| 11 | payment number.  An amount of money, right? | 10:41:45a |
| 12 | A.   A payment number. | 10:41:50a |
| 13 | Q.   Okay.  I just want to be clear.  That | 10:41:52a |
| 14 | arrangement was captured in this document that you did | 10:41:55a |
| 15 | a couple months ago, was it? | 10:41:58a |
| 16 | A.   Yes, as I recall, yes. | 10:42:02a |
| 17 | Q.   Okay.  So, the flip side of that is these | 10:42:05a |
| 18 | payments weren't to go on forever, right?  I mean, | 10:42:09a |
| 19 | there was definitely a cutoff point where you said, | 10:42:14a |
| 20 | "The deal is done"; is that correct? | 10:42:16a |
| 21 | A.   The -- Ask it again. | 10:42:19a |
| 22 | Q.   When you entered into this agreement to pay | 10:42:24a |
| 23 | Mr. Short commissions, right, for Internet sales, was | 10:42:27a |
| 24 | it your intention that this commission would go on | 10:42:33a |
| 25 | forever? | 10:42:35a |

Page 75

1      A.   No.  There would have been a stopping point.      10:42:36a

2      Q.   There was a stopping point, right?      10:42:38a

3      A.   Yes.      10:42:40a

4      Q.   And that stopping point, you captured in --      10:42:40a

5    you believe you captured in this document?      10:42:42a

6      A.   Perhaps.      10:42:44a

7      Q.   Okay.  Certainly, it was your intention that      10:42:44a

8    they would stop at some point in time.      10:42:47a

9      A.   Right.      10:42:49a

10      Q.   Okay.  Mr. Rabon, you're familiar with the      10:42:49a

11    term "per-pay-click advertising," are you not?      10:43:00a

12      A.   Yes.      10:43:04a

13      Q.   To the best of your knowledge, did Mr. Short,      10:43:04a

14    Mr. Gwynn and Rabco participate in the equal sharing of      10:43:12a

15    these per-pay-click costs monthly?      10:43:17a

16      A.   Participated.  I would say Mr. Short and      10:43:24a

17    Mr. Gwynn's commissions were reduced because of the      10:43:30a

18    pay-per-clicks.      10:43:38a

19      Q.   Correct.  And were they reduced -- Well, let      10:43:40a

20    me ask you this:  Did Rabco participate --      10:43:42a

21      A.   Yes.      10:43:46a

22      Q.   So is it fair to say that the participation      10:43:46a

23    was a third, a third, a third, in the cost?      10:43:49a

24      MR. SMELTZER:  I'll object to the form,      10:43:53a

25      mischaracterizes his testimony.      10:43:56a

Page 76

```
 1          MR. LEYVA:  I'm asking --                    10:43:59a

 2          THE DEPONENT:  Ask it again.                 10:44:00a

 3   BY MR. LEYVA:                                       10:44:01a

 4      Q.   There were these per-pay-click costs, right, 10:44:01a

 5   that were incurred on a monthly basis.  What was the 10:44:05a

 6   split between Mr. Short, Mr. Gwynn and Rabco in the  10:44:08a

 7   percentage of the costs that each party --          10:44:13a

 8      A.   I don't recall it exactly.                  10:44:15a

 9          MR. SMELTZER:  Objection.  He didn't say     10:44:16a

10      that they participated in the costs.             10:44:18a

11          MR. LEYVA:  Can you read that back, please.  10:44:20a

12          MR. SMELTZER:  You're misstating his prior   10:44:23a

13      testimony.                                       10:44:26a

14          MR. LEYVA:  Can you read it back, please.    10:44:26a

15             (Record read at this point.)              10:44:29a

16   BY MR. LEYVA:                                       10:45:05a

17      Q.   Okay.  So I'm going to ask a follow-up      10:45:05a

18   question again, since there was some confusion as to 10:45:08a

19   that.                                               10:45:10a

20          Mr. Gwynn and Mr. Short's commissions were   10:45:11a

21   reduced, correct?                                   10:45:14a

22      A.   Yes.                                        10:45:15a

23      Q.   Were they reduced by some percentage of the 10:45:17a

24   monthly costs?                                      10:45:20a

25      A.   Their portion of those pay-per-clicks.      10:45:23a
```

| | | |
|---|---|---|
| 1 | Q.   Yes. | 10:45:29a |
| 2 | A.   Yes. | 10:45:30a |
| 3 | Q.   And by what percentage is that? | 10:45:30a |
| 4 | A.   You know, not recalling exactly, but it could | 10:45:34a |
| 5 | have been a third, a third. | 10:45:37a |
| 6 | Q.   And did Rabco pay for the other third? | 10:45:39a |
| 7 | A.   Yes. | 10:45:42a |
| 8 | Q.   Did Rabco pay for the third from the company, | 10:45:44a |
| 9 | or did you personally pay for the third? | 10:45:48a |
| 10 | MR. SMELTZER:  Object to the form. | 10:45:51a |
| 11 | THE DEPONENT:  I don't recall specifically. | 10:45:56a |
| 12 | The company perhaps. | 10:45:59a |
| 13 | MR. LEYVA:  Okay. | 10:45:59a |
| 14 | Q.   Can you give me an approximate time frame -- | 10:46:03a |
| 15 | months, years -- to the best of your understanding, how | 10:46:09a |
| 16 | long these three parties -- Mr. Gwynn, Mr. Short and | 10:46:14a |
| 17 | Rabco -- participated in splitting these per-pay-click | 10:46:20a |
| 18 | costs? | 10:46:26a |
| 19 | MR. SMELTZER:  Objection, mischaracterizes | 10:46:26a |
| 20 | the prior testimony. | 10:46:27a |
| 21 | THE DEPONENT:  I don't recall exactly how | 10:46:31a |
| 22 | long. | 10:46:32a |
| 23 | BY MR. LEYVA: | 10:46:34a |
| 24 | Q.   Can you just give me an approximate number? | 10:46:34a |
| 25 | Is it three months? | 10:46:37a |

Page 78

| | | |
|---|---|---|
| 1 | MR. SMELTZER:  Same objection. | 10:46:38a |
| 2 | MR. LEYVA:  Answer the question, please. | 10:46:40a |
| 3 | THE DEPONENT:  It was off-and-on. | 10:46:41a |
| 4 | BY MR. LEYVA: | 10:46:45a |
| 5 | Q.  Can you explain to me what you mean by | 10:46:45a |
| 6 | "off-and-on"? | 10:46:47a |
| 7 | A.  Sometimes we did them; sometimes we didn't. | 10:46:47a |
| 8 | It would be at Martin's suggestion that we do it, as it | 10:46:51a |
| 9 | would be a different way to market, enhance his | 10:46:59a |
| 10 | commission. | 10:47:02a |
| 11 | Q.  Okay.  I want to introduce Exhibit 1. | 10:47:07a |
| 12 | (Plaintiff's Exhibit 1 was marked for | 10:47:14a |
| 13 | identification.) | 10:47:14a |
| 14 | BY MR. LEYVA: | 10:47:18a |
| 15 | Q.  Just to characterize this exhibit, it was an | 10:47:18a |
| 16 | exhibit that was disclosed as part of Mr. Gwynn's Rule | 10:47:22a |
| 17 | 26 initial disclosures, which was marked Exhibit D-1 at | 10:47:26a |
| 18 | the time. | 10:47:31a |
| 19 | Mr. Rabon, please take some time to | 10:47:45a |
| 20 | familiarize yourself with this, and you can let me know | 10:47:48a |
| 21 | when you'd like to proceed. | 10:47:51a |
| 22 | A.  Yeah.  I don't know specifically what this is. | 10:48:15a |
| 23 | Q.  That's fine.  I'm going to ask you some | 10:48:19a |
| 24 | questions, then, and you can answer. | 10:48:21a |
| 25 | A.  Uh-huh. | 10:48:23a |

Page 79

1      Q.   To the best of your understanding, does this          10:48:24a

2   document represent a PPC cost breakdown by month?            10:48:27a

3      A.   I don't -- I don't -- I don't know what -- I          10:48:35a

4   don't know what this report is.                              10:48:39a

5      Q.   You've never seen a report that looks like            10:48:41a

6   this?                                                         10:48:42a

7      A.   I don't recall it.  It's -- I don't recall --         10:48:44a

8   This is not a, you know, a document that we -- that I         10:48:53a

9   did or --                                                     10:49:01a

10      Q.   Let me ask you a question.  Were there               10:49:02a

11   reports, spreadsheets or other types of reports, that       10:49:04a

12   you reviewed that captured the monthly PPC costs,           10:49:09a

13   per-pay-click costs?                                         10:49:13a

14      A.   I don't recall looking at reports.  I recall         10:49:15a

15   talking about the cost, but I don't recall specifically      10:49:18a

16   looking at reports.                                          10:49:23a

17      Q.   Or that reports were generated?  Do you know         10:49:25a

18   if reports were generated?                                   10:49:28a

19      A.   I don't recall that.                                 10:49:30a

20      Q.   Okay.                                                10:49:31a

21      A.   I recall -- No.                                      10:49:32a

22      Q.   I have no further questions on this exhibit.         10:49:49a

23   That's fine.                                                 10:49:51a

24          Mr. Rabon, you attended Ms. Hunter's                  10:49:58a

25   deposition on 8-16; is that correct?                         10:50:01a

Page 80

1    A.   Monday, yes.                                    10:50:05a

2    Q.   Yes.  Do you recall that Ms. Hunter indicated  10:50:05a

3  something to the effect that spreadsheets that         10:50:12a

4  contained William Short's Internet sales commissions   10:50:16a

5  were on a computer that blew up, malfunctioned?  Do you 10:50:19a

6  recall that?                                           10:50:23a

7    A.   Yes.                                            10:50:24a

8    Q.   Can you tell me, to the best of your            10:50:24a

9  understanding, this computer that blew up,             10:50:32a

10 malfunctioned, do you know whether that was the same   10:50:35a

11 computer Ms. Hunter used to keep her Quickbooks data   10:50:37a

12 base?                                                  10:50:41a

13   A.   I wouldn't have any idea.                       10:50:41a

14   Q.   You don't know.  Can you tell me, to the best   10:50:42a

15 of your knowledge, whether the hard drive from the     10:50:46a

16 computer that blew up or malfunctioned was actually    10:50:48a

17 salvaged and copied to a new computer?                 10:50:52a

18   A.   Not to my knowledge.  I don't -- I don't know   10:50:56a

19 what was salvaged from it.                             10:51:00a

20   Q.   That's fair.  Can you tell me, to the best of   10:51:01a

21 your knowledge, whether there was an independent       10:51:07a

22 technology contractor that replaced and salvaged said  10:51:09a

23 hard drive?                                            10:51:12a

24   A.   I don't know.                                   10:51:19a

25        MR. SMELTZER:  I'll object to foundation,       10:51:21a

Page 81

1     given his prior answer.                                    10:51:23a

2         MR. LEYVA:  That's fine, that's fine.                  10:51:24a

3     Q.   I mean, as CEO, you may not know these things;       10:51:26a

4  is that correct?                                             10:51:29a

5     A.   Correct.                                             10:51:29a

6     Q.   That's fine.  I'm going to -- Just to set the        10:51:31a

7  foundation here, Mr. Rabon, I'm going to ask you some        10:51:45a

8  questions related to intellectual property.                  10:51:48a

9         Are you comfortable with that term, what that         10:51:50a

10  term means?                                                 10:51:52a

11     A.   Somewhat.                                           10:51:54a

12     Q.   Would it include trademarks, in your mind?          10:51:55a

13     A.   I'm sorry?                                          10:51:58a

14     Q.   Would it include trademarks?                        10:51:59a

15     A.   Somewhat.  I'm not a lawyer, so --                  10:52:01a

16     Q.   That's fine.                                        10:52:03a

17     A.   -- I don't know the specific definitions of         10:52:04a

18  them.                                                       10:52:06a

19     Q.   I understand that.  I'm asking you from a           10:52:06a

20  business -- President of a company's perspective, not a     10:52:07a

21  legal perspective.                                          10:52:12a

22     A.   Okay.                                               10:52:13a

23     Q.   Are you comfortable with the term "trademark"       10:52:13a

24  means an intangible property, intellectual property --      10:52:17a

25     A.   Yes.                                                10:52:20a

Page 82

1    Q.   -- copyright, trade secrets.                        10:52:20a

2    A.   Yes.                                                10:52:23a

3         MR. SMELTZER:  Is that a "Yes"?                     10:52:28a

4         THE DEPONENT:  Yes.                                 10:52:29a

5         MR. SMELTZER:  When we're talking about             10:52:30a

6    intellectual property, you'll understand it to          10:52:31a

7    mean at least those three things.                        10:52:34a

8         MR. LEYVA:  Correct.  That's what I'm               10:52:36a

9    trying to establish.  I don't want to confuse           10:52:37a

10   you with the term.                                      10:52:39a

11        THE WITNESS:  If I need to, I'll ask the            10:52:39a

12   question.                                               10:52:44a

13   BY MR. LEYVA:                                           10:52:45a

14   Q.   That's fine.  I think you may have answered         10:52:45a

15   this, but I need to ask it again in this context.  I    10:52:46a

16   apologize.                                              10:52:49a

17        Approximately how long have you held the title      10:52:49a

18   of President of Rabco?  Fifteen years?                   10:52:52a

19   A.   Thereabouts.                                        10:52:54a

20   Q.   So, I mean, given that, would you consider          10:53:02a

21   yourself to be a seasoned, experienced executive?        10:53:05a

22   A.   Somewhat, yes.                                      10:53:09a

23   Q.   Now, Mr. Rabon, do you understand, from a           10:53:17a

24   business perspective, from a President of a company's    10:53:21a

25   perspective -- I'm not asking for a legal opinion here.  10:53:25a

Page 83

1    I just want to set the context -- that there's a basic          10:53:27a

2    and fundamental distinction between the legal rights            10:53:31a

3    and privileges of a corporation, right, on the one              10:53:34a

4    hand, that are separate from the rights and privileges          10:53:38a

5    of a shareholder of a corporation?                              10:53:43a

6       A.    Yes.                                                    10:53:46a

7       Q.    I mean, you understand that those are two              10:53:47a

8    distinct concepts?                                              10:53:49a

9       A.    Yes.                                                    10:53:52a

10       Q.    Mr. Rabon, you had testified that it's your           10:54:05a

11    contention that Rabco owns the Hurricane Pass                  10:54:10a

12    trademark, correct?                                            10:54:13a

13          MR. SMELTZER:   Object, asked and answered,              10:54:19a

14       I think two or three times.                                 10:54:21a

15          THE DEPONENT:   Either through the purchase              10:54:23a

16       of Short's or having purchased -- having it on              10:54:26a

17       its own.  I just don't recall that --                       10:54:30a

18          MR. LEYVA:   Okay.                                       10:54:34a

19       Q.    I'd like to introduce an exhibit related to a        10:54:34a

20    company called Hurricane Pass Outfitters, Inc., and to        10:54:41a

21    the registration of the Hurricane Pass trademark with         10:54:45a

22    the State of Florida.  This is Exhibit Number 2.              10:54:48a

23          (Plaintiff's Exhibit 2 was marked for                    10:54:53a

24       identification.)                                            10:54:53a

25                      ///////////////                              10:55:15a

Page 84

1    BY MR. LEYVA:                                          10:55:15a

2         Q.   Mr. Rabon, please take some time to         10:55:15a

3    familiarize yourself with this exhibit.  I'll return to   10:55:18a

4    pieces of it, but just let me know when you're ready to   10:55:21a

5    proceed.                                              10:55:25a

6         A.   Okay.                                       10:55:50a

7              MR. SMELTZER:  Make sure you read it all.   10:55:53a

8              THE DEPONENT:  Okay.                        10:57:14a

9    BY MR. LEYVA:                                          10:57:27a

10        Q.   Mr. Rabon, did you at one time own controlling   10:57:27a

11   equity interest in Hurricane Pass Outfitters, Inc.?    10:57:31a

12             MR. SMELTZER:  Object to the form of the    10:57:38a

13        question.                                        10:57:39a

14             THE DEPONENT:  Ask the question one more    10:57:41a

15        time.                                            10:57:42a

16             MR. SMELTZER:  You're going to keep staring   10:57:47a

17        at it.  Just listen to the question and then     10:57:49a

18        he'll ask you something about the document if he   10:57:51a

19        wants you to.                                    10:57:53a

20             THE DEPONENT:  Okay.                        10:57:56a

21   BY MR. LEYVA:                                          10:57:56a

22        Q.   Mr. Rabon, at one particular time, did you   10:57:56a

23   have an equity interest in Hurricane Pass Outfitters,   10:58:03a

24   Inc.?  Were you a shareholder, owner of Hurricane Pass   10:58:06a

25   Outfitters, Inc.?                                     10:58:10a

Page 85

| | | |
|---|---|---|
| 1 | MR. SMELTZER:  I'll object to the form, | 10:58:12a |
| 2 | it's compound. | 10:58:14a |
| 3 | THE DEPONENT:  Can you break it -- | 10:58:16a |
| 4 | BY MR. LEYVA: | 10:58:18a |
| 5 | Q.   Were you a shareholder of Hurricane Pass | 10:58:18a |
| 6 | Outfitters, Inc.? | 10:58:20a |
| 7 | A.   Yeah, I would say -- yeah, I owned it. | 10:58:35a |
| 8 | Q.   Were you the founder? | 10:58:40a |
| 9 | A.   Founder? | 10:58:41a |
| 10 | Q.   Yes.  Did you establish it? | 10:58:42a |
| 11 | A.   I would say yes. | 10:58:43a |
| 12 | Q.   Were there any other shareholders? | 10:58:44a |
| 13 | A.   Probably would be my wife, as I recall.  I | 10:58:50a |
| 14 | don't recall it that specific, but -- | 10:58:59a |
| 15 | Q.   Now, this document, this first page here says | 10:59:04a |
| 16 | that Hurricane Pass Outfitters, the corporation, was | 10:59:07a |
| 17 | filed with State of Florida on 6-12-1998.  Is that | 10:59:12a |
| 18 | about the time that you recall founding Hurricane Pass | 10:59:18a |
| 19 | Outfitters? | 10:59:21a |
| 20 | MR. SMELTZER:  Inc.? | 10:59:25a |
| 21 | MR. LEYVA:  Inc., yes. | 10:59:26a |
| 22 | THE DEPONENT:  That would be the date this | 10:59:27a |
| 23 | was filed. | 10:59:28a |
| 24 | MR. LEYVA:  Yes. | 10:59:29a |
| 25 | THE DEPONENT:  Yes. | 10:59:30a |

Page 86

1    BY MR. LEYVA:                                               10:59:30a

2        Q.   I mean, that matches to when you recall           10:59:30a

3    founding the company; is that correct?                     10:59:34a

4        A.   Starting it as that entity, yes.                  10:59:39a

5        Q.   Okay, that's all I'm asking.                      10:59:42a

6             Now, were you a W2 employee of WSC at the time    10:59:47a

7    that Hurricane Pass Outfitters, Inc., was founded?         10:59:53a

8        A.   I don't recall.                                   11:00:02a

9        Q.   So this would have been in June, 1998.            11:00:08a

10       A.   I could have been a W2 employee of both           11:00:14a

11   companies.                                                 11:00:17a

12       Q.   And by "both companies," you mean --              11:00:17a

13       A.   Rabco with WSC.                                   11:00:20a

14       Q.   So there were times when you were a W2ed          11:00:25a

15   employee of both Rabco and WSC?                            11:00:28a

16       A.   It's possible.                                    11:00:31a

17       Q.   That you were on the payrolls for both            11:00:32a

18   companies?                                                 11:00:34a

19       A.   If we ran simultaneously, it's possible, and I    11:00:34a

20   don't recall.                                              11:00:37a

21       Q.   That's fine.  That's fine.                        11:00:38a

22            Mr. Rabon, looking at the exhibit that I just     11:00:59a

23   handed you, Exhibit 2, did you register the Hurricane      11:01:02a

24   Pass trademark under the corporate name Hurricane Pass     11:01:09a

25   Outfitters, Inc.?                                          11:01:13a

Page 87

1           MR. SMELTZER:  Objection as to form.                11:01:24a

2           THE DEPONENT:  Ask the question again,              11:01:30a

3      please.                                                  11:01:32a

4           MR. LEYVA:  Yes.                                    11:01:35a

5      Q.   Did you register the trademark Hurricane Pass       11:01:38a

6      with the State of Florida under the name Hurricane Pass  11:01:43a

7      Outfitters, Inc.?                                        11:01:47a

8           MR. SMELTZER:  Same objection.                      11:01:52a

9           THE DEPONENT:  This doesn't say "Hurricane          11:01:54a

10     Pass."                                                   11:01:55a

11     BY MR. LEYVA:                                            11:02:00a

12     Q.   Answer the question, please.  That's not the        11:02:00a

13     question I asked you, whether it says it.                11:02:03a

14          Did you register it under Hurricane Pass            11:02:05a

15     Outfitters, Inc., is the question?                       11:02:06a

16     A.   Did I register what?                                11:02:09a

17     Q.   The trademark "Hurricane Pass."                     11:02:11a

18          MR. SMELTZER:  Look at the document, if you         11:02:25a

19     need to.                                                 11:02:27a

20          MR. LEYVA:  Please turn to -- I think it's          11:02:28a

21     page 4 of the document.  That's page 4.                  11:02:31a

22          THE DEPONENT:  This is page 4?                      11:02:42a

23          MR. LEYVA:  Yes.                                    11:02:44a

24     Q.   Can you tell me what it says at the top of the      11:02:44a

25     document as a title?                                     11:02:47a

Page 88

```
 1          MR. SMELTZER:  Wait, wait, wait.              11:02:47a

 2          MR. LEYVA:  Are we all there?                 11:02:48a

 3          MR. SMELTZER:  The record's going to          11:02:50a

 4      reflect the wrong page number.  What he's         11:02:51a

 5      looking at is not page 4 in my stack.             11:02:55a

 6          THE DEPONENT:  It's several pages back.       11:02:59a

 7          MR. LEYVA:  Let's number these.  My           11:03:01a

 8      apologies.  Yes, my mistake.  It's page 7.  Is    11:03:02a

 9      that correct?  Page 7?                            11:03:27a

10          THE DEPONENT:  Okay.                          11:03:40a

11      BY MR. LEYVA:                                     11:03:43a

12          Q.  Can you read to me what the title of this 11:03:43a

13      application -- the title at the top of this page, in 11:03:45a

14      bold?                                             11:03:49a

15          A.  "Application for Registration of a Trademark 11:03:49a

16      or Service Mark."                                 11:03:55a

17          Q.  Can you read to me the name and address to 11:03:57a

18      whom acknowledgment should be sent to.            11:04:02a

19          A.  Bruce D. Rabon, care of William Short     11:04:05a

20      Clothiers, 27001 U.S. 19 North, Suite 1007, Clearwater, 11:04:07a

21      33761.                                            11:04:14a

22          Q.  And the applicant's name is?              11:04:15a

23          A.  Hurricane Pass Outfitters and Trading Company. 11:04:18a

24          Q.  Okay.  I want you to skip down, and it says 11:04:22a

25      there's a Florida registration number, it starts with 11:04:27a
```

Page 89

1    P98.  Do you see that?                                    11:04:30a

2        A.   Yes.                                             11:04:32a

3        Q.   Followed by 000052765.  You see that number?    11:04:32a

4        A.   Yes.                                             11:04:38a

5        Q.   Do you understand what that number is?          11:04:39a

6        A.   Probably -- I don't know exactly what that      11:04:50a

7    number would be, no, at this point.                      11:04:53a

8        Q.   Do you believe that it represents the type of   11:04:57a

9    number that the Florida Secretary of State issues for    11:05:04a

10   corporations?  A corporation number?                     11:05:07a

11            MR. SMELTZER:  Objection as to foundation.      11:05:10a

12            THE DEPONENT:  Yeah, I don't know who would     11:05:12a

13       put that number there.                               11:05:16a

14            MR. LEYVA:  Okay.                                11:05:17a

15       Q.   Are you aware that Rabco has a number with the  11:05:18a

16   State of Florida that's its corporation number?          11:05:22a

17       A.   If that's how they keep track of them.          11:05:27a

18       Q.   Okay.  I'd like you to turn back to the first   11:05:29a

19   page.  Just for the record, this is a report that        11:05:31a

20   reflects Hurricane Pass Outfitters, Inc., filing         11:05:42a

21   information from the State of Florida.  Can you read me   11:05:47a

22   that number, document number.                            11:05:49a

23       A.   P98000052765.                                   11:05:51a

24       Q.   Correct.  Is that not the same number that was  11:05:57a

25   on page 7, Florida registration number?                  11:06:00a

Page 90

1      A.   Yes, the same number.                          11:06:17a

2      Q.   This number, assuming it represents the        11:06:31a

3  corporate number issued by the State of Florida, okay,  11:06:40a

4  and all corporations issued in the State of Florida get 11:06:47a

5  issued a number, then that is the number that was used, 11:06:50a

6  was it not, in the application for the registration of  11:06:54a

7  trademark on page 7?                                    11:06:57a

8      A.   They're the same numbers.                      11:07:03a

9      Q.   Correct.  So, given this exhibit, Mr. Rabon,   11:07:06a

10  would you say that you registered the Hurricane Pass    11:07:16a

11  Traders trademark "Hurricane Pass" under the name of    11:07:17a

12  Hurricane Pass Outfitters, Inc.?                        11:07:24a

13          MR. SMELTZER:  Objection as to form.           11:07:27a

14          THE DEPONENT:  Yeah, that's what it looks       11:07:32a

15      like.                                               11:07:33a

16          MR. LEYVA:  Okay.                               11:07:48a

17      Q.   Mr. Rabon, again referring to this exhibit,   11:07:54a

18  the first page, does it indicate to you that Hurricane  11:07:58a

19  Pass Outfitters, Inc., was administratively dissolved   11:08:01a

20  on September 14th, 2007?                                11:08:08a

21      A.   That's what it says.                           11:08:19a

22      Q.   Is that your understanding?  I mean, you had  11:08:21a

23  indicated that you were the founder and shareholder of  11:08:24a

24  that corporation.                                       11:08:26a

25      A.   Uh-huh, yes.                                   11:08:27a

Page 91

1     Q.   So you stopped -- did you stop doing business?          11:08:32a

2   Is that why you allowed the corporation to dissolve            11:08:36a

3   administratively?                                              11:08:42a

4         MR. SMELTZER:  Objection to form.  It                    11:08:42a

5      presumes it did business.                                   11:08:44a

6   BY MR. LEYVA:                                                  11:08:47a

7     Q.   Did Hurricane Pass Outfitters do business,             11:08:47a

8   Mr. Rabon?                                                     11:08:49a

9     A.   It looks like, to me, we stopped sending               11:08:50a

10   reports to them at that point.                                11:08:52a

11    Q.   What business was Hurricane Pass Outfitters,           11:08:53a

12   Inc., in?                                                     11:08:54a

13    A.   Retail apparel.                                        11:08:57a

14    Q.   Did it keep a set of books?                            11:09:00a

15    A.   No.                                                    11:09:03a

16    Q.   It did not?                                            11:09:05a

17    A.   No.                                                    11:09:09a

18    Q.   Did it buy merchandise from suppliers and sell        11:09:10a

19   goods to consumers?                                           11:09:14a

20    A.   No.  It -- no.                                        11:09:17a

21         MR. LEYVA:  I'd like to ask for about a                11:09:48a

22      five-minute break, or 10 minutes.                          11:09:52a

23         MR. SMELTZER:  Yeah, fine.                             11:09:55a

24         (Recess held at this time.)                            11:09:56a

25                //////////////////                              11:24:15a

1    BY MR. LEYVA:                                          11:24:15a

2       Q.   Mr. Rabon, given this exhibit, would you      11:24:15a

3    please turn to -- This is actually page 4 now.        11:24:20a

4            Can you read what the trademark expiration    11:24:30a

5    date is for this trademark, please.                   11:24:35a

6       A.   12-4-2008.                                    11:24:43a

7       Q.   Correct.  So this trademark is no longer      11:24:48a

8    valid.                                                11:24:52a

9            MR. SMELTZER:  Objection as to form, and it   11:24:52a

10           calls for a legal conclusion.                 11:24:55a

11   BY MR. LEYVA:                                         11:25:01a

12      Q.   To the best of your understanding, given that 11:25:01a

13   this trademark is expired --                          11:25:04a

14      A.   I wouldn't know.                              11:25:06a

15           MR. SMELTZER:  Same objection.                11:25:07a

16           THE DEPONENT:  I wouldn't know.               11:25:08a

17   BY MR. LEYVA:                                         11:25:09a

18      Q.   You wouldn't know what?                       11:25:09a

19      A.   If it's expired or not.                       11:25:10a

20      Q.   It says it's expired here.  That's all I'm    11:25:12a

21   asking you.  You read the expiration date.  It said   11:25:15a

22   12-24-2008.                                           11:25:18a

23           MR. SMELTZER:  Same objections.               11:25:19a

24   BY MR. LEYVA:                                         11:25:20a

25      Q.   Correct?                                      11:25:20a

Page 93

| | | | |
|---|---|---|---|
| 1 | A. | It says it expired 12-4-2008. | 11:25:21a |
| 2 | Q. | Correct.  And my question to you is, given | 11:25:24a |
| 3 | your understanding, as a President of an Internet | | 11:25:29a |
| 4 | company -- and this relates to intellectual property -- | | 11:25:32a |
| 5 | do you think that this trademark is now available for | | 11:25:35a |
| 6 | someone else to register -- | | 11:25:38a |
| 7 | A. | I don't know that. | 11:25:40a |
| 8 | Q. | -- in the State of Florida? | 11:25:41a |
| 9 | A. | I don't know the answer to that. | 11:25:42a |
| 10 | Q. | You don't know that? | 11:25:43a |
| 11 | A. | No. | 11:25:44a |
| 12 | Q. | Okay, that's fine. | 11:25:44a |
| 13 | | I want to go back a little bit to -- I want to | 11:25:46a |
| 14 | come back to this trademark, but I want to go back to | | 11:25:50a |
| 15 | Hurricane Pass Outfitters, Inc. | | 11:25:53a |
| 16 | | You said that there were no books kept; is | 11:25:56a |
| 17 | that correct? | | 11:25:59a |
| 18 | A. | There were no books. | 11:26:01a |
| 19 | Q. | Yes. | 11:26:02a |
| 20 | A. | As there were no sales. | 11:26:03a |
| 21 | Q. | Did Hurricane Pass Outfitters hold leases? | 11:26:10a |
| 22 | A. | Hurricane Pass Outfitters -- | 11:26:16a |
| 23 | Q. | Outfitters, Inc. | 11:26:18a |
| 24 | A. | Hold leases? | 11:26:19a |
| 25 | Q. | Yeah.  Did it manage leases? | 11:26:20a |

Page 94

1    A.   I believe the Bay Walk lease, they put it in                11:26:28a

2  Hurricane Pass Outfitters.  I'm not sure it said "Inc."            11:26:31a

3    Q.   Who is "they"?                                              11:26:35a

4    A.   Bay Walk.                                                   11:26:36a

5    Q.   How could they put it in Hurricane Pass                     11:26:38a

6  Outfitters?  Wasn't it a company that you controlled?             11:26:39a

7  I mean, I don't understand.                                        11:26:43a

8    A.   I'm sorry?                                                  11:26:43a

9    Q.   How could they put it in Hurricane Pass                     11:26:44a

10 Outfitters, Inc.?                                                  11:26:45a

11       MR. SMELTZER:  Why don't we ask him who                      11:26:49a

12    he's referring to as "they" first.                              11:26:50a

13       MR. LEYVA:  Yeah.                                            11:26:52a

14    Q.   Who is "they"?                                             11:26:52a

15    A.   The lease at Bay Walk, whoever produced that               11:26:57a

16 lease for Bay Walk.                                                11:27:02a

17    Q.   And who is Bay Walk?                                       11:27:06a

18    A.   A shopping center in St. Petersburg.                       11:27:07a

19    Q.   That's not a store, it's not a WSC property;               11:27:09a

20 is that correct?                                                   11:27:12a

21    A.   Right.                                                     11:27:13a

22    Q.   It's a shopping center in St. Pete.                        11:27:13a

23    A.   Right.                                                     11:27:15a

24    Q.   Okay.  And I'm just trying to understand this.             11:27:16a

25 And Hurricane Pass Outfitters, Inc., had a lease with             11:27:21a

1   Bay Walk shopping center?                                11:27:27a

2       A.   I'm not sure it said "Inc." or not.            11:27:29a

3   Hurricane -- It's something they put on -- that Bay      11:27:34a

4   Walk -- and I'm not sure if it said "Inc." or just       11:27:37a

5   "Hurricane Pass Outfitters."                             11:27:40a

6            They did not use Rabco, as I recall, as I       11:27:42a

7   believe.  I don't have the document in front of me.  I   11:27:53a

8   haven't looked at it in years.                           11:27:55a

9       Q.   Did Rabco have a store at the Bay Walk          11:27:59a

10  shopping center?                                         11:28:03a

11      A.   Yes.                                            11:28:03a

12      Q.   And this lease that we were referring to would  11:28:04a

13  have been a lease related to a Rabco store?              11:28:06a

14      A.   Yes.                                            11:28:09a

15      Q.   And you're indicating that Bay Walk shopping    11:28:12a

16  center would have put "Hurricane Pass Outfitters" or     11:28:14a

17  "Hurricane Pass Outfitters, Inc."?                       11:28:18a

18      A.   As I recall, I think they used that name on     11:28:20a

19  the lease somehow.                                       11:28:23a

20      Q.   But you have no idea why they would put some    11:28:25a

21  outside company's name on a lease that, on its face,     11:28:29a

22  doesn't pertain --                                       11:28:34a

23      A.   Our stores were called Hurricane Pass           11:28:34a

24  Outfitters.                                              11:28:36a

25           MR. SMELTZER:  When you say "our," be           11:28:37a

1     specific.                                              11:28:39a

2         THE WITNESS:  Rabco's stores were called           11:28:39a

3     Hurricane Pass Outfitters.                             11:28:41a

4         MR. SMELTZER:  This is like alphabet soup.         11:28:42a

5         THE DEPONENT:  Right.                              11:28:44a

6         MR. LEYVA:  Okay.                                  11:28:45a

7     Q.   So, we don't know whether Bay Walk used           11:28:45a

8     "Hurricane Pass Outfitters, Inc." or "Hurricane Pass   11:28:48a

9     Outfitters," correct --                                11:28:51a

10    A.   Correct.                                          11:28:53a

11    Q.   -- on the lease.                                  11:28:54a

12    A.   Correct.                                          11:28:55a

13    Q.   Were there any other leases, that you're aware    11:28:55a

14    of, that were in the name of either Hurricane Pass     11:28:57a

15    Outfitters or Hurricane Pass Outfitters, Inc.?         11:28:59a

16    A.   Not that I can recall.                            11:29:06a

17    Q.   Was any financial transaction -- Did any          11:29:16a

18    financial transactions occur between Rabco, either     11:29:18a

19    Hurricane Pass Outfitters or Hurricane Pass, Inc., and 11:29:24a

20    Bay Walk shopping center?  I mean, was there money that 11:29:27a

21    exchanged hands?                                       11:29:32a

22    A.   Ask that one more time.                           11:29:33a

23    Q.   Was there any financial transactions that         11:29:35a

24    occurred between Rabco Leasing, Inc., and the name of  11:29:36a

25    the party that was on the lease?                       11:29:39a

1        You said that the Bay Walk shopping center put        11:29:41a

2    either "Hurricane Pass Outfitters," correct, or        11:29:44a

3    "Hurricane Pass Outfitters, Inc.," you couldn't recall.    11:29:48a

4    Was there any money that exchanged hands, that went to    11:29:50a

5    one of those entities, either Hurricane Pass        11:29:54a

6    Outfitters --        11:29:57a

7        MR. SMELTZER:  I'll object to the form,        11:29:57a

8        because two of those entities are the same        11:30:00a

9        entity.        11:30:03a

10        THE DEPONENT:  From Rabco?  Hurricane Pass        11:30:04a

11        Outfitters, Inc., was formed to protect that        11:30:05a

12        name.  That was a name that Rabco was using in        11:30:10a

13        daily business, a shortened version of Hurricane        11:30:17a

14        Pass Outfitters and Trading Company.        11:30:21a

15        MR. LEYVA:  That wasn't my question.  Okay.        11:30:24a

16        Q.  My question was, regarding this lease, did        11:30:26a

17    Hurricane Pass Outfitters, Inc., receive money from        11:30:31a

18    Rabco Leasing and pay money to Bay Walk shopping        11:30:34a

19    center, or was there any financial transactions between    11:30:39a

20    these three parties that included Hurricane Pass        11:30:41a

21    Outfitters, if it was a fictitious name, or Hurricane    11:30:44a

22    Pass Outfitters, Inc.?        11:30:48a

23        MR. SMELTZER:  I'm going to object to the        11:30:49a

24        form of the question.  I think you've got to        11:30:50a

25        split it up, because Rabco and Hurricane Pass        11:30:52a

| | | |
|---|---|---|
| 1 | Outfitters, that's Rabco's stores, just so you | 11:30:54a |
| 2 | know.  So you can't -- | 11:30:59a |
| 3 | MR. LEYVA:  That's fine. | 11:31:00a |
| 4 | MR. SMELTZER:  Two of those entities are | 11:31:01a |
| 5 | the same.  Why don't we just talk about Rabco | 11:31:02a |
| 6 | and this -- | 11:31:05a |
| 7 | MR. LEYVA:  Yeah, that's fine. | 11:31:06a |
| 8 | MR. SMELTZER:  All right. | 11:31:07a |
| 9 | MR. LEYVA:  Just to clarify. | 11:31:08a |
| 10 | Q.  And we don't know the answer right now.  You | 11:31:10a |
| 11 | don't recall whether it was Hurricane Pass Outfitters, | 11:31:13a |
| 12 | Inc., that was on the lease at the Bay Walk shopping | 11:31:14a |
| 13 | center; is that correct? | 11:31:19a |
| 14 | A.  Hurricane Pass Outfitters, Inc., was not on | 11:31:21a |
| 15 | it. | 11:31:23a |
| 16 | Q.  I mean Hurricane Pass Outfitters, Inc..  I'm | 11:31:23a |
| 17 | sorry.  There's too many Hurricane Passes. | 11:31:26a |
| 18 | A.  Right. | 11:31:28a |
| 19 | Q.  Hurricane Pass Outfitters, Inc.; you said you | 11:31:29a |
| 20 | did not recall whether that was the name -- | 11:31:32a |
| 21 | A.  Right. | 11:31:34a |
| 22 | Q.  Okay.  And you don't recall or don't know if | 11:31:34a |
| 23 | any money exchanged hands -- and I'm talking about | 11:31:37a |
| 24 | Inc., now, Hurricane Pass Outfitters, Inc.  Okay -- | 11:31:42a |
| 25 | between Rabco Leasing, Inc., Hurricane Pass Outfitters, | 11:31:45a |

1    Inc., and the Bay Walk shopping center mall.  These        11:31:47a

2    three entities.  Did money exchange hands?                 11:31:53a

3         A.   Ask me -- Break the question up, if you can,     11:31:55a

4    between who the money's going to.                          11:31:58a

5         Q.   I don't know.                                    11:32:02a

6         A.   There are three --                               11:32:02a

7         Q.   That's my question.                              11:32:04a

8              Was Hurricane Pass Outfitters, Inc., somehow     11:32:07a

9    collecting money for this lease or paying money --         11:32:10a

10        A.   No.                                              11:32:13a

11        Q.   -- for the lease?                                11:32:14a

12             So no money -- Hurricane Pass Outfitters,        11:32:16a

13   Inc., the corporation, right, the one we said expired,     11:32:18a

14   okay, never received any money or paid any money           11:32:23a

15   regarding this lease at the Bay Walk shopping center?      11:32:26a

16   That's the question?                                       11:32:30a

17             MR. SMELTZER:  I'll object to the form.          11:32:30a

18   You said it expired.  He didn't say it expired.            11:32:31a

19             THE DEPONENT:  What is that?                      11:32:34a

20             MR. SMELTZER:  Never mind.  We're                11:32:36a

21   getting -- it's tangential.                                11:32:37a

22             THE DEPONENT:  Rabco paid the lease.             11:32:40a

23             MR. LEYVA:  Okay.                                11:32:43a

24        Q.   And it paid the lease to?                        11:32:44a

25        A.   The Semblers, that owned Bay Walk.               11:32:49a

Page 100

| | | |
|---|---|---|
| 1 | Q.   That's fine.  Okay, that's the answer.  That's | 11:32:52a |
| 2 | fine. | 11:32:53a |
| 3 | MR. SMELTZER:  It seems -- sometimes it's | 11:32:54a |
| 4 | as easy as it seems.  Sometimes it's not.  If | 11:32:58a |
| 5 | that helps anything. | 11:33:03a |
| 6 | MR. LEYVA:  That's brilliant. | 11:33:04a |
| 7 | MR. SMELTZER:  Isn't it? | 11:33:06a |
| 8 | MR. LEYVA:  Yeah. | 11:33:06a |
| 9 | Q.   Mr. Rabon, I would like to go back to this | 11:33:13a |
| 10 | Hurricane Pass trademark, okay. | 11:33:17a |
| 11 | These documents suggest that you registered | 11:33:21a |
| 12 | that trademark under Hurricane Pass Outfitters, Inc.; | 11:33:26a |
| 13 | is that correct? | 11:33:32a |
| 14 | A.   The Hurricane Pass Outfitters and trademark -- | 11:33:36a |
| 15 | the Hurricane Pass Outfitters and Trading Company | 11:33:42a |
| 16 | trademark? | 11:33:45a |
| 17 | Q.   I'm talking about the trademark that's listed | 11:33:46a |
| 18 | on this exhibit that I gave you. | 11:33:48a |
| 19 | A.   Right.  That was a trademark name of William | 11:33:50a |
| 20 | Short Clothiers. | 11:33:52a |
| 21 | Q.   This document, however, we've established, has | 11:33:54a |
| 22 | the corporate number of Hurricane Pass Outfitters, Inc. | 11:33:59a |
| 23 | A.   Well, yeah. | 11:34:02a |
| 24 | Q.   This is what the document says, is it not? | 11:34:03a |
| 25 | A.   Right.  Hurricane Pass Outfitters, Inc., | 11:34:06a |

1    didn't have a store.  This was a trademark --                11:34:08a

2        Q.   Mr. Rabon, I didn't ask you if they had a          11:34:14a

3    store.  I asked you, did you register -- I want to move     11:34:17a

4    on now --                                                   11:34:20a

5        A.   I think I made a mistake when I registered it.     11:34:20a

6        Q.   You think you made a mistake when you              11:34:23a

7    registered this trademark?                                  11:34:24a

8        A.   It's a William Short Clothiers trademark.          11:34:27a

9        Q.   Despite the fact that that's not what this         11:34:30a

10   says.  Is that what you --                                  11:34:31a

11       MR. SMELTZER:  Objection as to form.                    11:34:32a

12   BY MR. LEYVA:                                               11:34:33a

13       Q.   Is that your testimony?                            11:34:33a

14       A.   Yes.                                               11:34:34a

15       Q.   You made a mistake.  Okay.                         11:34:34a

16       A.   As I recall it, yes.                               11:34:36a

17       Q.   Now I want to go back to -- Given that you         11:34:43a

18   made this mistake -- Intellectual property assets           11:34:46a

19   assigned to one corporation don't freely flow to            11:34:54a

20   another corporation.                                        11:34:56a

21           If this trademark was registered under              11:34:58a

22   Hurricane Pass Outfitters, Inc., by what mechanism did      11:35:00a

23   Rabco or WSC acquire ownership of the mark?                 11:35:06a

24       MR. SMELTZER:  Objection, calls for a legal             11:35:11a

25       conclusion.  And it also misstates the law              11:35:13a

| | | |
|---|---|---|
| 1 | patently. | 11:35:16a |
| 2 | THE DEPONENT:  I'm not sure of the answer | 11:35:18a |
| 3 | to your question. | 11:35:19a |
| 4 | BY MR. LEYVA: | 11:35:21a |
| 5 | Q.   This trademark was registered under a | 11:35:21a |
| 6 | corporation called Hurricane Pass Outfitters, Inc. | 11:35:25a |
| 7 | MR. SMELTZER:  Objection as to form. | 11:35:29a |
| 8 | MR. LEYVA:  He's already answered the | 11:35:30a |
| 9 | question. | 11:35:32a |
| 10 | THE DEPONENT:  It says that. | 11:35:32a |
| 11 | MR. LEYVA:  Yes. | 11:35:33a |
| 12 | Q.   So, it does not indicate that during this time | 11:35:35a |
| 13 | period Rabco Leasing, Inc., or anybody else, had the | 11:35:38a |
| 14 | rights, in the State of Florida, to this trademark. | 11:35:43a |
| 15 | MR. SMELTZER:  Same objection, it calls for | 11:35:51a |
| 16 | a legal conclusion. | 11:35:52a |
| 17 | MR. LEYVA:  There's no legal conclusion. | 11:35:54a |
| 18 | We're talking about basic ownership of | 11:35:55a |
| 19 | intellectual property that an Internet -- | 11:35:57a |
| 20 | President of an Internet company should be aware | 11:36:01a |
| 21 | of.  It's an ownership question, not an I. P. | 11:36:03a |
| 22 | question. | 11:36:05a |
| 23 | THE DEPONENT:  It would have been -- It was | 11:36:05a |
| 24 | a name used in William Short Clothiers.  It was | 11:36:08a |
| 25 | their -- It was their trademark. | 11:36:11a |

```
 1  BY MR. LEYVA:                                      11:36:18a

 2      Q.   So there are no documents, Mr. Rabon, are 11:36:18a

 3  there, that Hurricane Pass Outfitters assigned any 11:36:21a

 4  rights in this trademark to Rabco Leasing, Inc., or to 11:36:24a

 5  William Short Clothiers.  Are there any documents?  11:36:28a

 6          MR. SMELTZER:  You mean Hurricane Pass      11:36:31a

 7      Outfitters, Inc.?                               11:36:31a

 8          MR. LEYVA:  Yes.                            11:36:35a

 9          THE DEPONENT:  Say that one more time.      11:36:36a

10  BY MR. LEYVA:                                       11:36:37a

11      Q.   Are there any documents at Hurricane Pass  11:36:37a

12  Outfitters, Inc., the entity that registered this   11:36:39a

13  trademark --                                        11:36:44a

14      A.   Not that I'm aware of, that I can recall.  11:36:44a

15      Q.   -- that assigned any rights to Rabco Leasing, 11:36:46a

16  Inc., or WSC?                                       11:36:49a

17      A.   Not that I can recall or remember.         11:36:50a

18      Q.   That's fine.  However, Mr. Rabon, it is true 11:36:55a

19  that you list the Hurricane Pass mark on your       11:37:09a

20  bankruptcy petition as something that Rabco owns, do 11:37:12a

21  you not?                                            11:37:15a

22      A.   I listed the Hurricane Pass mark?          11:37:16a

23      Q.   That's correct.  That's my question.       11:37:21a

24      A.   I don't recall.  I don't recall specifically 11:37:22a

25  everything that was listed.                         11:37:26a
```

Page 104

1      Q.   Okay.  We'll come back to that, because we        11:37:27a

2  have the petition, and we have some questions related       11:37:29a

3  to that.                                                    11:37:33a

4         Mr. Rabon, did the name "Rabco Leasing, Inc."        11:37:40a

5  ever appear on any of the websites that Rabco listed in     11:37:45a

6  its bankruptcy petition?  I think there were 63 or 64.      11:37:51a

7         MR. SMELTZER:  Could you repeat that                 11:37:56a

8     question?                                                11:37:58a

9         MR. LEYVA:  Yes.                                     11:37:58a

10        MR. SMELTZER:  Or he could --                        11:37:59a

11        MR. LEYVA:  I'll be happy --                         11:38:00a

12        MR. SMELTZER:  If you want to change it,             11:38:01a

13    you can do that.                                         11:38:03a

14        MR. LEYVA:  I'll be happy to repeat it.              11:38:04a

15     Q.   When I use the term "websites" now, just for       11:38:05a

16  clarity, I'm going to say the websites that were           11:38:08a

17  registered -- it's a reference to those websites listed    11:38:12a

18  in your amended bankruptcy petition related to Schedule    11:38:16a

19  B, Item Number 22.  Okay?                                  11:38:19a

20        So just for the record, so there's no                11:38:22a

21  confusion, those are the websites that I'm referring       11:38:24a

22  to.  Okay.                                                 11:38:28a

23        So the question is, Mr. Rabon, did the name          11:38:29a

24  "Rabco Leasing, Inc." ever appear -- visibly, visible,     11:38:32a

25  displayable -- on any of the websites that Rabco listed    11:38:41a

Page 105

1    in its bankruptcy petition?                              11:38:44a

2         MR. SMELTZER:  I'll object as to                    11:38:46a

3    foundation.  I'm not sure he was involved in             11:38:48a

4    Schedule B.  I mean, the amended one.                    11:38:51a

5         MR. LEYVA:  That's fine.                            11:38:56a

6    Q.   The websites that Rabco allegedly owned, did        11:38:56a

7    Rabco Leasing, Inc. -- the name.  That's all I'm         11:38:59a

8    saying.                                                  11:39:02a

9    A.   I don't recall seeing.                              11:39:03a

10   Q.   Does it ever appear anywhere on those               11:39:04a

11   websites -- Rabco Leasing?                               11:39:07a

12   A.   Not that I recall seeing.                           11:39:09a

13   Q.   Did "Rabco Leasing, Inc." ever appear on any        11:39:14a

14   of the automatic invoices that were generated to        11:39:17a

15   customers that bought goods online from these websites?  11:39:21a

16   A.   I'm not sure.  We had a number of -- the Visa,      11:39:38a

17   the charge card receipts, at times could have said      11:39:49a

18   that.                                                    11:39:53a

19   Q.   This is a specific question related to              11:39:58a

20   Internet sales orders, okay.  And were there automatic   11:40:02a

21   invoices --                                              11:40:06a

22        When a purchase was made in a shopping cart,        11:40:07a

23   okay, was there an automatic invoice sent to the         11:40:09a

24   customer --                                              11:40:12a

25   A.   Oh, I don't think of that as an invoice.            11:40:13a

Page 106

1      Q.   Okay.  It says "Invoice" on it.                    11:40:16a

2           There's a document that was sent to a              11:40:19a

3   customer, correct, when an order was placed online via     11:40:20a

4   shopping cart?                                              11:40:25a

5      A.   What do you mean, "sent"?                           11:40:28a

6      Q.   I meant sent via E-mail, telling the               11:40:31a

7   customer -- Like you buy something on Amazon, you get a     11:40:35a

8   confirmation E-mail saying, "You just bought something      11:40:39a

9   at Amazon."                                                 11:40:42a

10          If you bought something at Rabco, was there a      11:40:43a

11  confirmation saying, "You just bought something on this     11:40:45a

12  website"?                                                   11:40:47a

13     A.   There would have been a document.                  11:40:47a

14     Q.   My question is, did "Rabco Leasing, Inc.," the     11:40:49a

15  name, ever appear on any of those documents that were       11:40:52a

16  sent to customers once an online order was placed?          11:40:56a

17     A.   Not to my knowledge.  Not that I can recall.       11:41:01a

18     Q.   I'd like to introduce Exhibit Number 3, which      11:41:07a

19  are some sample invoices that reflect the document that     11:41:13a

20  was sent, or kinds of documents that were sent.             11:41:20a

21          (Plaintiff's Exhibit 3 was marked for             11:41:24a

22      identification.)                                        11:41:24a

23  BY MR. LEYVA:                                               11:41:28a

24     Q.   Mr. Rabon, let me know when you're ready to        11:41:28a

25  proceed.                                                    11:41:31a

1    A.    Okay.                                              11:41:56a

2    Q.    Now we're discussing the document that you         11:42:02a

3    said -- you didn't call an invoice, but let's just       11:42:06a

4    refer to it as the document that was sent to an online   11:42:11a

5    customer when they purchased something, okay.            11:42:13a

6          Is this exhibit representative of the kind of      11:42:15a

7    document that would have been sent by E-mail to a        11:42:18a

8    customer that purchased something online?                11:42:20a

9    A.    I don't know that it was sent by E-mail or if      11:42:28a

10   this is something that the customer printed from the     11:42:32a

11   cart.                                                    11:42:36a

12   Q.    Okay, that's fair.  You don't know that an         11:42:44a

13   E-mail was generated.  The customer may have printed     11:42:47a

14   it?                                                      11:42:51a

15   A.    Yes.                                               11:42:52a

16   Q.    Now, to the best of your knowledge, is that        11:43:04a

17   the way the X-Cart -- Do you use X-Cart?  Are you        11:43:06a

18   familiar with the term "X-Cart"?                         11:43:11a

19   A.    Yes.                                               11:43:13a

20   Q.    And you've used the X-Cart software.               11:43:13a

21   A.    I've worked, in a sense of pulling off orders.     11:43:21a

22   Q.    My question is:  Is X-Cart what you used over      11:43:30a

23   the last five years, three years, to sell orders         11:43:35a

24   online?  Shopping cart.                                  11:43:38a

25   A.    For a few years.                                   11:43:40a

1      Q.   Isn't it true that the X-Cart software          11:43:45a

2   generates an E-mail to a customer that looks like this?   11:43:49a

3      A.   I don't -- I'm not familiar if it sends an        11:43:52a

4   E-mail or they print it.                                  11:43:56a

5      Q.   You don't know?                                   11:43:57a

6      A.   No.                                               11:43:58a

7      Q.   Okay.  Mr. Rabon, can you tell me the date on     11:43:58a

8   this invoice?  It's right under the header invoice.       11:44:06a

9      A.   Which document?                                   11:44:13a

10      Q.   The first document, on the top.                  11:44:15a

11      A.   The date on this invoice?                        11:44:18a

12      Q.   Yes.                                             11:44:20a

13      A.   Wednesday, June 9th, 2010.                       11:44:20a

14      Q.   And can you read me that line right underneath   11:44:26a

15   the black banner out there.  It starts with, "You        11:44:30a

16   have ..."                                                11:44:35a

17      A.   "You have received this notification from        11:44:35a

18   Hurricane Pass Outfitters because you are a registered   11:44:37a

19   user or you or some other registered user requested      11:44:40a

20   some information for you from our store."                11:44:43a

21      Q.   Can you read me, on top of that, the From and    11:44:48a

22   the To.                                                  11:44:51a

23      A.   Barely.  It looks like from James Saunders to    11:44:53a

24   Martin Gwynn, M. Gwynn, at Verizon.net.                  11:44:59a

25      Q.   And the subject?                                 11:45:04a

Page 109

1    A.   Hurricane Pass Outfitters order 27315        11:45:05a

2    notification.                                     11:45:16a

3        Q.   Does this look like an E-mail notification   11:45:17a

4    that X-Cart might send, to you?                   11:45:19a

5        A.   To me?                                    11:45:24a

6        Q.   Not to you personally.  Does this look like an   11:45:24a

7    E-mail notification that would --                 11:45:27a

8        A.   Again, I don't know if it's E-mailed to the   11:45:29a

9    customer or they go and print it.                 11:45:32a

10       Q.   Okay.  But I'm asking you, does this look like   11:45:34a

11   an E-mail notification?  It has a From, a To, E-mail   11:45:36a

12   addresses.                                        11:45:42a

13       Is there anything in here that would indicate   11:45:43a

14   to you that the customer actually printed this instead   11:45:45a

15   of receiving it via E-mail?                       11:45:48a

16       A.   I don't know how they did it.            11:45:51a

17       Q.   That's fine.                             11:45:52a

18       A.   I don't --                               11:45:53a

19       Q.   That's fine.                             11:45:53a

20       Mr. Rabon, can you please read the date on the   11:45:59a

21   second page.                                      11:46:02a

22       A.   June 22nd, 2010.                         11:46:02a

23       Q.   And the company or the notification from?  You   11:46:05a

24   received this notification from what entity name?   11:46:10a

25       A.   Hurricane Pass Outfitters.              11:46:13a

1     Q.   Thank you.                                      11:46:15a

2          Mr. Rabon, to the best of your knowledge,       11:46:33a

3     would an Internet customer that bought goods online  11:46:39a

4     from Rabco, or on Rabco's alleged websites, would they 11:46:42a

5     have any way of knowing that the payments for such   11:46:48a

6     orders were being deposited into a bank account      11:46:51a

7     controlled by Rabco?                                 11:46:54a

8     A.   Ask the question one more time.                 11:46:58a

9     Q.   Any customers that went to the websites         11:47:04a

10    allegedly owned by Rabco, bought goods, would they have 11:47:08a

11    any way of knowing that they were doing business with 11:47:12a

12    Rabco Leasing, Inc.?                                 11:47:16a

13    A.   Okay.  Just one more time.  Sorry.              11:47:26a

14    Q.   Which part of the question don't you            11:47:31a

15    understand?                                          11:47:32a

16    A.   Just ask it one more time.                      11:47:33a

17    Q.   Okay.  Customers went out to those websites,    11:47:34a

18    correct --                                           11:47:40a

19    A.   Right.                                          11:47:40a

20    Q.   -- and they bought goods, correct?  Would they  11:47:40a

21    know, or have any way of knowing that the payments that 11:47:44a

22    they were making for those goods that they bought were 11:47:48a

23    going to Rabco Leasing, Inc.?                        11:47:52a

24    A.   I don't -- I don't -- I don't know what they    11:47:53a

25    would know.  I don't -- I don't -- I don't have any  11:47:56a

Page 111

```
1    idea where they would think the payment's going.          11:48:00a
2        Q.   I mean, my question is, there was any visible     11:48:02a
3    indication to a customer?                                  11:48:06a
4        A.   Visible where?                                    11:48:06a
5        Q.   Anywhere.  On the website, in the invoice,        11:48:07a
6    anywhere that would --                                     11:48:10a
7        A.   Not here.                                         11:48:10a
8        Q.   Anywhere.  That would lead a consumer to          11:48:11a
9    believe that they were doing business or making           11:48:15a
10   payments to Rabco Leasing, Inc.?                          11:48:17a
11       A.   Are you asking where they think their money      11:48:36a
12   will be deposited?                                         11:48:40a
13       MR. SMELTZER:  No, that's not what he                  11:48:42a
14   asked.  Why don't you just read back the                   11:48:43a
15   question.  If the court reporter would read it            11:48:45a
16   back.                                                      11:48:48a
17       (Record read at this point.)                           11:48:48a
18       THE DEPONENT:  I don't think there would be           11:49:17a
19   anything on the website or on this order that             11:49:18a
20   would indicate that they're not doing business            11:49:29a
21   with -- Did you say "Rabco"?                               11:49:33a
22       MR. LEYVA:  Can you read him the question             11:49:38a
23   again, please.                                             11:49:40a
24       (Record read at this point.)                           11:49:41a
25       MR. SMELTZER:  Okay.  Just to clarify one             11:50:08a
```

```
 1      thing.  We're talking about Internet customers,        11:50:09a

 2      right?                                                 11:50:11a

 3          MR. LEYVA:  No, no, no.  We are talking            11:50:12a

 4      about Internet customers, through the website,         11:50:14a

 5      purely that.                                           11:50:17a

 6          THE WITNESS:  I don't think they could see         11:50:18a

 7      on the website or on this that they were doing         11:50:19a

 8      business with Rabco.                                   11:50:23a

 9          MR. LEYVA:  Okay.                                  11:50:24a

10          MR. SMELTZER:  That's all he asked.                11:50:28a

11          MR. LEYVA:  That's all I was asking.               11:50:29a

12          THE DEPONENT:  Okay.  So then I answered           11:50:30a

13      that earlier, I think.  Okay.                          11:50:32a

14          MR. SMELTZER:  Yeah, it was slightly               11:50:36a

15      different.                                             11:50:38a

16          MR. LEYVA:  Well, we could stop.  This is a        11:50:42a

17      good stopping point.  It's about five minutes to       11:50:44a

18      noon.                                                  11:50:46a

19          MR. SMELTZER:  My stomach has been --              11:50:48a

20              (Recess held at this time)                     11:50:54a

21  BY MR. LEYVA:                                              01:21:01p

22      Q.  Mr. Rabon, you ready to continue?                  01:21:01p

23      A.  Ready.                                             01:21:03p

24      Q.  I'm going to ask a question about copyright.       01:21:04p

25  It's really not intended to be a trick question.  I       01:21:11p
```

```
 1    think you probably answered it before, but you answered      01:21:13p

 2    it while you were answering a trademark question, all        01:21:17p

 3    right.  So I'm going to take a cut at this.                   01:21:20p

 4          Are you familiar with the copyright notices            01:21:24p

 5    that are usually placed on the bottom and on each page       01:21:33p

 6    of a website?                                                01:21:38p

 7    A.    I've seen them.                                        01:21:39p

 8    Q.    It says "Copyright," whatever, "2010" --              01:21:40p

 9    A.    Right.                                                 01:21:42p

10    Q.    -- the name of the company, et cetera, right?         01:21:42p

11    A.    Right.                                                 01:21:44p

12    Q.    So my question is, in the websites, these 64          01:21:46p

13    or whatever alleged websites that Rabco owns, did           01:21:50p

14    "Rabco Leasing, Inc." ever appear in that copyright         01:21:54p

15    notice, or was it some other entity name?                   01:21:58p

16    A.    "Rabco" was not on it.                                01:22:01p

17    Q.    Do you remember which entities were?                  01:22:04p

18    A.    Not right off --                                      01:22:06p

19    Q.    But you know "Rabco Leasing, Inc." did not           01:22:07p

20    appear?                                                      01:22:12p

21    A.    Right.                                                 01:22:12p

22    Q.    Mr. Rabon, are you familiar at all with the          01:22:30p

23    term "Internet archive"?                                    01:22:32p

24    A.    I know what the two words mean, but I don't          01:22:38p

25    know what they mean in conjunction.                         01:22:41p
```

1    Q.   Okay, that's fine.                                    01:22:46p

2         A similar term is called the "Way Back               01:22:47p

3    machine."  Have you ever heard of that term?               01:22:51p

4    A.   Recently.                                             01:22:54p

5    Q.   Recently?                                             01:22:55p

6    A.   Right.                                                01:22:55p

7    Q.   Can you tell me what you think the Way Back           01:22:56p

8    machine does?                                              01:22:57p

9    A.   It -- you can go back and look at websites as         01:22:58p

10   they were in a particular year or month.                   01:23:04p

11   Q.   Yeah.  It's not always accurate, is it?  Or do        01:23:09p

12   you know?                                                  01:23:12p

13   A.   I would have no idea.  I don't own the Way            01:23:12p

14   Back machine, so --                                        01:23:16p

15   Q.   That's fine.  That's exactly what it does, it         01:23:17p

16   keeps an archive of how it looked some point back in       01:23:20p

17   time.                                                      01:23:24p

18        At this point I would like to enter -- I think       01:23:24p

19   it's Exhibit 4, letters from Kathy Zimmerman's             01:23:30p

20   attorneys regarding HTPGP.                                 01:23:37p

21        Mr. Rabon, take some opportunity to read it.         01:23:46p

22   Let me know when you're ready to go forward, and if you    01:23:50p

23   need to go back to it, just let me know and we can do      01:23:53p

24   that.                                                      01:23:56p

25        (Plaintiff's Exhibit 4 was marked for                01:23:56p

1    identification.)                                          01:23:56p

2         THE DEPONENT:  Okay.                                 01:28:19p

3    BY MR. LEYVA:                                             01:28:26p

4         Q.  Mr. Rabon, did you and Mr. Gwynn jointly        01:28:26p

5    recruit Kathy Zimmerman to create artwork for HTPGP?     01:28:29p

6         A.  Did we jointly recruit her?                     01:28:34p

7         Q.  Yes.                                            01:28:36p

8         A.  As I recall, yes.                               01:28:37p

9         Q.  Was she someone that you knew personally, that  01:28:39p

10   Martin knew personally, or how did you find --           01:28:41p

11        A.  I didn't know her personally.                   01:28:44p

12        Q.  You found out about her somewhere, and you and  01:28:45p

13   Martin interviewed her --                                01:28:47p

14        A.  Yes.                                            01:28:48p

15        Q.  -- is that correct?                             01:28:48p

16            And Mr. Rabon, Ms. Zimmerman was a graphics     01:28:52p

17   artist, was she not?  Is that how you would describe     01:28:57p

18   what she did?                                            01:29:00p

19        A.  She was an artist.  I don't know if she was --  01:29:04p

20   what's the difference between a graphics artist and an   01:29:08p

21   artist.                                                  01:29:12p

22        Q.  But she created artwork, and you guys had a     01:29:12p

23   need for some artwork; is that correct?                  01:29:15p

24        A.  Yes.                                            01:29:17p

25        Q.  And what type of artwork did HTPGP have a need  01:29:17p

1    for?                                                      01:29:24p

2        A.    Marine life.                                    01:29:26p

3        Q.    Was this artwork that was going to go on        01:29:29p

4    T-shirts or on goods to be sold?                          01:29:32p

5        A.    Yes.                                            01:29:35p

6        Q.    Were there no graphics artists within WSC that  01:29:43p

7    were available, that had these kinds of skills?           01:29:48p

8        A.    Were there no graphic artists in William Short  01:29:53p

9    Clothiers?                                                01:29:55p

10       Q.    Right.  That had similar skills.                01:29:56p

11       A.    You know, I don't know.                         01:29:58p

12       Q.    Okay.                                           01:29:59p

13       A.    I have no idea.                                 01:29:59p

14       Q.    That's fine.  Did Ms. --                        01:30:00p

15            MR. SMELTZER:  Wait, I'm sorry, Carlos.          01:30:12p

16       You can decide to do it or not, but I'm asking        01:30:14p

17       for a clarification on the last answer, because       01:30:18p

18       sometimes you'll ask a sort of almost like a          01:30:21p

19       two-part question.                                    01:30:24p

20            MR. LEYVA:  Sure.                                01:30:24p

21            MR. SMELTZER:  You said, "Was the artwork        01:30:25p

22       going to be used on T-shirts?" and then you said      01:30:31p

23       "or any other goods."                                 01:30:36p

24            MR. LEYVA:  That's fine.                         01:30:38p

25            MR. SMELTZER:  And he said, "Yes," and I'm       01:30:38p

```
 1      not really sure what he said yes to, T-shirts or      01:30:40p

 2      everything.  I just didn't know.                      01:30:43p

 3           MR. LEYVA:  Yeah, yeah.  We can go back to       01:30:44p

 4      that.                                                 01:30:46p

 5           THE DEPONENT:  Okay.                             01:30:47p

 6  BY MR. LEYVA:                                             01:30:47p

 7      Q.   I'll re-ask the question.  The artwork that      01:30:47p

 8  Ms. Zimmerman was going to produce on behalf of HTPGP,   01:30:53p

 9  what was the end product that artwork would be            01:30:58p

10  used on?                                                  01:31:03p

11      A.   Reproduced on T-shirts.                          01:31:04p

12      Q.   On any other end products, goods or services?   01:31:07p

13  Goods, probably.                                          01:31:10p

14      A.   Images were digitized and then could be          01:31:11p

15  embroidered on something.                                 01:31:17p

16      Q.   Okay.  All right.  And that "something" would    01:31:19p

17  be a T-shirt, or it could be something else?              01:31:22p

18      A.   Or a hat.                                        01:31:24p

19      Q.   Or a hat.  Okay, all right.                      01:31:26p

20           So there were multiple products that this        01:31:28p

21  artwork could potentially go on.                          01:31:30p

22           MR. SMELTZER:  I'll object to the form of        01:31:35p

23      the question.                                         01:31:36p

24           THE WITNESS:  A few products.                    01:31:37p

25           MR. LEYVA:  Okay.                                01:31:39p
```

| | | |
|---|---|---|
| 1 | Q.   And a few -- you named two, T-shirts and | 01:31:39p |
| 2 | hats. | 01:31:43p |
| 3 | A.   And hats. | 01:31:43p |
| 4 | Q.   Okay, that's fine.  Did Ms. Zimmerman become a | 01:31:44p |
| 5 | partner in HTPGP? | 01:31:49p |
| 6 | MR. SMELTZER:  I'll object, to the extent | 01:31:51p |
| 7 | it calls for a legal conclusion, but you can | 01:31:52p |
| 8 | obviously talk about your understanding. | 01:31:56p |
| 9 | THE DEPONENT:  She was a third of whatever | 01:31:59p |
| 10 | entity we had. | 01:32:03p |
| 11 | MR. LEYVA:  That's fine. | 01:32:06p |
| 12 | Q.   You know, partnership, little side T-shirt | 01:32:07p |
| 13 | business.  She was a third of whatever entity that was; | 01:32:10p |
| 14 | is that correct? | 01:32:13p |
| 15 | A.   Yes. | 01:32:13p |
| 16 | Q.   That's fine.  And isn't it true that that | 01:32:14p |
| 17 | ownership in HTPGP was split evenly between yourself, | 01:32:18p |
| 18 | Mr. Gwynn and Ms. Zimmerman?  Those were the -- | 01:32:23p |
| 19 | A.   Yes. | 01:32:29p |
| 20 | Q.   -- parties?  All right. | 01:32:29p |
| 21 | Now, Mr. Rabon, isn't it true that there were | 01:32:32p |
| 22 | plans, even as early as the time that Ms. Zimmerman | 01:32:38p |
| 23 | became part of the side business, to incorporates this | 01:32:42p |
| 24 | side business into Hurricane Pass Traders, Inc.?  That | 01:32:46p |
| 25 | was the intent? | 01:32:50p |

|   |   |   |
|---|---|---|
| 1 | A.  It was the intent to at some point incorporate | 01:32:53p |
| 2 | the triad of these three people. | 01:33:00p |
| 3 | Q.  Yes. | 01:33:03p |
| 4 | A.  Whether it was the intent to incorporate it in | 01:33:05p |
| 5 | Hurricane Pass Traders, I don't know. | 01:33:10p |
| 6 | Q.  That's fine.  But there was an intent to | 01:33:12p |
| 7 | incorporate, to form a corporation between these three | 01:33:16p |
| 8 | parties; is that correct? | 01:33:19p |
| 9 | A.  Right. | 01:33:19p |
| 10 | Q.  Isn't it true that Ms. Zimmerman created | 01:33:26p |
| 11 | artwork on behalf of this entity -- I won't call it a | 01:33:28p |
| 12 | partnership -- on behalf of this entity at a time when | 01:33:33p |
| 13 | she was not a W2 employee of an entity? | 01:33:40p |
| 14 | A.  She created the artwork and -- that's kind of | 01:33:50p |
| 15 | compound.  Ask me -- | 01:33:54p |
| 16 | Q.  Let me ask it this way:  Was Ms. Zimmerman | 01:33:56p |
| 17 | ever a W2 employee of this entity? | 01:34:00p |
| 18 | A.  Of -- No. | 01:34:03p |
| 19 | Q.  Was she ever a 1099 employee of this entity? | 01:34:06p |
| 20 | MR. SMELTZER:  I'll object to the form of | 01:34:14p |
| 21 | that question. | 01:34:15p |
| 22 | THE DEPONENT:  No. | 01:34:16p |
| 23 | MR. SMELTZER:  I don't know if you can have | 01:34:18p |
| 24 | a 1099 employee, but it's semantics. | 01:34:20p |
| 25 | THE DEPONENT:  No, I don't believe so. | 01:34:24p |

| | | |
|---|---|---|
| 1 | MR. LEYVA:  Okay. | 01:34:25p |
| 2 | Q.   Now, Mr. Rabon, I'm going to ask you some more | 01:34:42p |
| 3 | specific questions about these letters.  And if you | 01:34:46p |
| 4 | need time to review, just ask. | 01:34:48p |
| 5 | A.   These documents? | 01:34:50p |
| 6 | Q.   Yes, these particular documents. | 01:34:51p |
| 7 | Mr. Rabon, to the best of your knowledge, | 01:34:53p |
| 8 | please describe why Ms. Zimmerman decided to leave the | 01:34:55p |
| 9 | entity. | 01:34:59p |
| 10 | A.   Well, I think her husband decided for her.  He | 01:35:04p |
| 11 | had just recently been laid off from Home Depot and | 01:35:08p |
| 12 | they needed money, and he wanted to know why no money | 01:35:13p |
| 13 | was going out, being paid to the triad. | 01:35:17p |
| 14 | Q.   Correct. | 01:35:21p |
| 15 | A.   And the response to that was all the money was | 01:35:22p |
| 16 | staying into it to develop the line. | 01:35:24p |
| 17 | Q.   Okay.  So neither Ms. Zimmerman, yourself or | 01:35:27p |
| 18 | Mr. Gwynn had received any compensation -- | 01:35:32p |
| 19 | A.   As I recall -- | 01:35:35p |
| 20 | Q.   -- from this entity? | 01:35:37p |
| 21 | A.   Yes, as I recall. | 01:35:38p |
| 22 | Q.   Okay.  This question is in reference to the | 01:35:50p |
| 23 | exhibit and page 1. | 01:35:52p |
| 24 | Mr. Rabon, would you tell me, as contained in | 01:35:59p |
| 25 | Ms. Zimmerman's letter -- really written on her behalf | 01:36:02p |

Page 121

1    from the eXclusively Accident Attorney firm, what term        01:36:07p

2    her attorney used to refer to this entity, as contained       01:36:14p

3    in the first paragraph.                                        01:36:19p

4        A.   And what's your question?                            01:36:34p

5        Q.   What was the term that Ms. Zimmerman's               01:36:37p

6    attorney used to refer to the entity?  The first              01:36:39p

7    paragraph.                                                     01:36:47p

8        A.   "Interest."                                          01:36:47p

9        Q.   Third sentence.                                      01:36:47p

10       MR. SMELTZER:  I'll object to the form of                 01:36:52p

11   the question.                                                  01:36:53p

12       MR. LEYVA:  That's fine.                                  01:36:54p

13       Q.   In the first paragraph of this letter, does         01:36:55p

14   Ms. Zimmerman's attorney refer to Ms. Zimmerman --            01:37:00p

15   starting the second sentence, midway, "Ms. Zimmerman          01:37:07p

16   had discussions regarding the formation of a                   01:37:10p

17   corporation, to be known as Hurricane Pass Traders            01:37:12p

18   (HPT)" in parenthesis, "with the business of the              01:37:16p

19   corporation being the production and sales of apparel         01:37:18p

20   and reproduced artwork."                                      01:37:21p

21       MR. SMELTZER:  I'll object that you put a                 01:37:23p

22   plural on the "Trader."                                        01:37:25p

23       MR. LEYVA:  That's fine.                                  01:37:28p

24       Q.   My question, now --                                  01:37:30p

25       A.   "Corporation."                                       01:37:32p

```
 1      Q.   No.  The term that her attorney used to        01:37:32p

 2   describe the entity.                                    01:37:36p

 3      A.   "Formation."                                    01:37:38p

 4      Q.   We'll move on.  We'll move on.  That's fine.    01:37:42p

 5           To the best of your knowledge, what does the    01:37:54p

 6   reference to a "corporation" mean to you in this first  01:37:57p

 7   paragraph?                                              01:37:59p

 8      A.   What does a reference to a corporation mean?    01:38:02p

 9      Q.   Yes.                                            01:38:04p

10      A.   That at some point there would be a             01:38:05p

11   corporation of these three people.                      01:38:08p

12      Q.   And that would be a separate and distinct       01:38:11p

13   entity from whatever the entity was prior to that; is   01:38:14p

14   that correct?                                           01:38:18p

15      A.   No.                                             01:38:23p

16      Q.   No, it's not correct?                           01:38:25p

17      A.   What was prior to that?                         01:38:27p

18      Q.   The entity that was made up of you,             01:38:30p

19   Ms. Zimmerman and Mr. Gwynn.  That's what was prior to  01:38:33p

20   that.                                                   01:38:36p

21           MR. SMELTZER:  I'll object to the form, to      01:38:37p

22        the extent that presumes that there was an         01:38:39p

23        entity.                                            01:38:41p

24           THE DEPONENT:  There was only --                01:38:43p

25   BY MR. LEYVA:                                           01:38:44p
```

1      Q.   We've described it as an entity, have you not?      01:38:44p
2   And you took issue with the description of it as a      01:38:47p
3   partnership, so we decided to call it an entity.   I      01:38:50p
4   mean, the three people, the triad, as you referred it      01:38:53p
5   to, that entity.      01:38:57p
6      A.   There was never this, then this.   It was      01:38:58p
7   always one thing.      01:39:03p
8      Q.   I don't know what you mean.   Please explain      01:39:05p
9   that to me.   What was always one thing?      01:39:08p
10      A.   There wasn't a before and then another group      01:39:10p
11   of three later, two separate entities.      01:39:17p
12      Q.   Mr. Rabon, let me ask you this question:   Is a      01:39:22p
13   corporation different, the form of a corporation      01:39:26p
14   different than this thing that you guys had in the side      01:39:29p
15   T-shirt business?      01:39:34p
16      A.   Form?      01:39:34p
17      Q.   Is it a different business form?      01:39:35p
18      A.   Yes.      01:39:39p
19         MR. SMELTZER:   I'll object to the form.      01:39:39p
20   BY MR. LEYVA:      01:39:41p
21      Q.   Yes, it is a different form?      01:39:41p
22      A.   It formalizes it.      01:39:45p
23      Q.   But, in your mind, there's no distinction      01:39:47p
24   between one and the other?   Between what you had before      01:39:50p
25   and the formation of a corporation, is there any      01:39:53p

Page 124

```
 1   distinction, in your mind, between one and the other,        01:39:56p
 2   or are they one in the same to you?                          01:39:59p
 3       A.   In legal terms --                                   01:40:00p
 4       Q.   No, in business terms.  I'm not asking a legal      01:40:01p
 5   question here.  I'm asking a business question to an         01:40:04p
 6   executive, president of a company.                           01:40:07p
 7            Is there any distinction, in your mind,             01:40:09p
 8   between the one and the other?                               01:40:11p
 9       A.   No.                                                 01:40:18p
10       Q.   What does the reference to a draft                  01:40:26p
11   agreement -- the second paragraph, it says "a rough          01:40:28p
12   draft of an agreement."  What does that reference mean       01:40:33p
13   to you, if anything?                                         01:40:37p
14       A.   That perhaps there's a document that we talked      01:40:40p
15   about what the intention was.                                01:40:42p
16       Q.   What type of document, to the best of your          01:40:48p
17   understanding, might that be?                                01:40:50p
18       A.   I don't know.                                       01:40:53p
19       Q.   Might it be an operating agreement of a             01:40:54p
20   corporation?                                                 01:40:56p
21       A.   I don't know.                                       01:40:59p
22       Q.   Do you know what an operating agreement of a        01:41:01p
23   corporation is?                                              01:41:03p
24       A.   I understand it.                                    01:41:05p
25       Q.   What is it?                                         01:41:05p
```

Page 125

```
 1      A.   Basically outlining what the intent of the        01:41:09p
 2   corporation is, what it's going to do.                    01:41:12p
 3      Q.   Anything else?  Okay.  I'd like to turn your      01:41:16p
 4   attention to the same exhibit, page 5, I think, if I      01:41:31p
 5   didn't misnumber these, in physical order.                01:41:35p
 6           MR. SMELTZER:  That's the Settlement --           01:41:46p
 7           MR. LEYVA:  Yes.                                  01:41:47p
 8           MR. SMELTZER:  -- and Release Agreement.          01:41:48p
 9           MR. LEYVA:  It says "Settlement and Release       01:41:49p
10   Agreement."                                               01:41:52p
11      Q.   Would you like to take some time to read this     01:41:54p
12   agreement again?                                          01:41:57p
13      A.   Okay.                                             01:42:34p
14      Q.   Based on your reading and understanding of        01:42:38p
15   this agreement, did Mr. Gwynn personally buy out          01:42:41p
16   Ms. Zimmerman's share in this entity, or was she bought   01:42:45p
17   out by HTPGP?                                             01:42:50p
18           MR. SMELTZER:  I'll object, to the extent         01:42:59p
19      it calls for a legal conclusion.  But, again, I        01:43:00p
20      think the way he's asking for is just your             01:43:02p
21      understanding.                                         01:43:07p
22           THE DEPONENT:  A check was written by Gwynn       01:43:09p
23      on behalf of HPT.                                      01:43:14p
24   BY MR. LEYVA:                                             01:43:19p
25      Q.   Now, the language here, bullet number 1, can      01:43:19p
```

1    you read that to me.                                       01:43:23p

2         A.    "By signing this agreement Zimmerman hereby     01:43:24p

3    assigns and conveys whatever interest she may have in      01:43:27p

4    HPT to Gwynn."                                             01:43:30p

5         Q.    As a matter of fact, it doesn't say "to Gwynn   01:43:30p

6    or HTPGP," does it?  It says "Gwynn," period.              01:43:36p

7         A.    That's correct.                                 01:43:44p

8         Q.    On what basis do you contend that it was        01:43:45p

9    conveyed to Gwynn on behalf of HTPGP?                      01:43:48p

10        A.    This document is addressed to me and Gwynn.     01:43:54p

11   Furthermore, the entity that ended up with Gwynn and       01:44:01p

12   Rabon paid Gwynn back, with interest.                      01:44:06p

13        Q.    Okay.  So there was a check written to Gwynn    01:44:09p

14   for $6,300?                                                01:44:12p

15        A.    Plus interest.                                  01:44:14p

16        Q.    Plus interest.  And what account was that       01:44:14p

17   check written from?                                        01:44:18p

18        A.    The HPT account that was established.           01:44:20p

19        Q.    HTPGP.  This is the time of HTPGP.  We haven't  01:44:25p

20   gotten to HPT, Inc., yet.                                  01:44:28p

21        A.    You asked me where the check came from.         01:44:30p

22        Q.    Right.                                          01:44:32p

23        A.    It came from the checking account that HPT      01:44:32p

24   established.                                               01:44:35p

25        Q.    What checking account was that?  Was it the     01:44:35p

Page 127

1    Shorts, Inc./HPT account?                              01:44:38p

2        A.   I can't recall specifically.  It could have    01:44:42p

3    been the Premier account.  If I may, you have copies of  01:44:44p

4    it, and it says, "Including interest."                 01:44:49p

5        Q.   We have copies of it?                          01:44:56p

6            MS. HUNTER:  Uh-huh.                            01:45:02p

7            MR. SMELTZER:  As much as you want to help.     01:45:03p

8            MR. LEYVA:  Thank you.                          01:45:04p

9            MR. SMELTZER:  You want to go further,          01:45:10p

10        after Monday?                                       01:45:11p

11            MS. HUNTER:  Uh-uh.                             01:45:12p

12   BY MR. LEYVA:                                           01:45:15p

13        Q.   Now, there was a separate -- was this account  01:45:15p

14   that we have copies of an account that was part of     01:45:19p

15   William Short's Clothiers?                             01:45:24p

16        A.   I don't recall whether it was part of that    01:45:25p

17   account or a new account established by HPT.           01:45:27p

18        Q.   No, this is in the HTPGP time period.  HPT,   01:45:32p

19   Inc., is not formed at this moment in time.  When --   01:45:35p

20   This is circa June 2006, just to get our time frames   01:45:39p

21   correct, because it's important.  This is circa June or  01:45:43p

22   July 2000.                                             01:45:47p

23        A.   2000.                                         01:45:48p

24        Q.   Right.  Not 2002.  HPT, Inc., came into       01:45:49p

25   existence in July of 2002.                             01:45:53p

Page 128

1          MR. SMELTZER:  I guess I'll object to the          01:45:55p

2      form of the question or the statement, because I      01:45:56p

3      don't think he said when it was reimbursed.           01:45:58p

4              It could have been reimbursed -- I            01:46:01p

5      don't know -- 2002, 2003, when it existed.  I         01:46:03p

6      just don't know.                                       01:46:06p

7          MR. LEYVA:  Right.                                01:46:06p

8      Q.   And I'm asking specifically, was it reimbursed   01:46:07p

9   from an HTPGP account at this period in time, on or     01:46:10p

10  about this period in time when Mr. Gwynn wrote a        01:46:14p

11  personal check to Ms. Zimmerman?                        01:46:18p

12     A.   I think the checkbook -- and I'm just going     01:46:20p

13  from memory -- says "Shorts, Inc./HPT."                 01:46:23p

14     Q.   Okay.  And so that Shorts, Inc./HPT, did it,    01:46:30p

15  in fact, exist at that period of time, before HPT,     01:46:44p

16  Inc., was formed?  This is circa July 2000 now.        01:46:47p

17     A.   I don't recall the time frame.  It was         01:46:52p

18  certainly there to write the check.                    01:46:54p

19     Q.   Okay, that's fine.                              01:46:56p

20         Mr. Rabon, when HTPGP, the entity that was a    01:47:18p

21  triad, and was no longer a triad when Ms. Zimmerman    01:47:24p

22  left, was incorporated into HPT, Inc.                   01:47:27p

23         MR. SMELTZER:  Can you read that back,          01:47:31p

24     please.  I missed it.                                01:47:33p

25         (Record read at this point.)                    01:47:34p

```
 1   BY MR. LEYVA:                                          01:47:56p

 2       Q.   At that time of the incorporation of HPT,     01:47:56p

 3   Inc., on what basis was it decided that you would be -- 01:47:59p

 4   you would hold 50 percent of the shares and Mr. Gwynn   01:48:04p

 5   would hold 50 percent of the shares?                   01:48:08p

 6       A.   We mutually agreed to that.                   01:48:11p

 7       Q.   So please describe to me, from a business     01:48:18p

 8   perspective, the contribution you felt you brought to   01:48:21p

 9   HPT that warranted a distribution of 50 percent of the  01:48:25p

10   shares.                                                01:48:30p

11       A.   The credit facility, the storing of different 01:48:35p

12   components of the business -- the transfers, the       01:48:44p

13   machines, the T-shirts in the stores.                  01:48:49p

14       Q.   So facilities operations --                   01:48:52p

15       A.   Relationships with vendors, being able to buy 01:48:56p

16   something on credit.                                   01:48:58p

17       Q.   Okay.  Anything else?                         01:48:59p

18       A.   That's -- There could be.  Those are the      01:49:04p

19   things that come to my mind.                           01:49:06p

20       Q.   From your perspective, please describe why    01:49:08p

21   Mr. Gwynn's contribution to HPT, Inc., warranted 50     01:49:15p

22   percent of the shares.                                 01:49:19p

23       A.   Why Gwynn's -- Well, we started out with three 01:49:25p

24   people.  One person was removed, it left two.  He got   01:49:29p

25   50 percent and I got 50 percent.                       01:49:34p
```

1     Q.  So it was just an arbitrary decision?     01:49:36p

2     A.  Right.     01:49:39p

3     Q.  But can you describe to me the skill sets,     01:49:39p

4  similar to things that you brought to the table, that     01:49:42p

5  Mr. Gwynn brought to the table to warrant a 50 percent     01:49:45p

6  share in this corporation that you were forming.     01:49:48p

7     A.  He had some -- because of his computer     01:49:58p

8  background, he had some graphics knowledge, I'll say.     01:50:04p

9  It was a way for me to also help him.  I could have     01:50:14p

10  done the T-shirt business and had him as an employee.     01:50:20p

11     Q.  So you did it out of charity?  Is that --     01:50:24p

12     A.  I didn't do it out of charity.     01:50:29p

13     Q.  Okay.     01:50:31p

14     A.  I'm --     01:50:31p

15     Q.  You answered that you were an experienced     01:50:33p

16  business executive.  Do experienced business executives     01:50:35p

17  tend to just give away a 50 percent share of a business     01:50:38p

18  just because, arbitrary, I pick a number?  "We were one     01:50:41p

19  third here, we're 50 percent there."  Is that typically     01:50:45p

20  how you would conduct business or how you would form a     01:50:48p

21  corporation?     01:50:51p

22     A.  That's not typical.     01:50:51p

23     Q.  Correct.  So tell me a little bit more about     01:50:52p

24  Mr. Gwynn's computer expertise, graphics and --     01:50:55p

25     A.  Well, I don't know that he had graphics.  He     01:51:00p

1    knew how to go into Corel Draw or go into programs        01:51:05p

2    where you could buy thousands of images of sharks or      01:51:11p

3    airplanes or boats, pull them off, put them on            01:51:15p

4    something.                                                01:51:18p

5        Q.   Was this something that he did as part of his    01:51:19p

6    job at William Short Clothiers, Inc.?  Was that part of   01:51:22p

7    his job function at WSC?                                   01:51:27p

8        A.   To do what?                                      01:51:29p

9        Q.   To do exactly what you just said, this          01:51:30p

10   computer-related work.                                    01:51:33p

11       A.   I wouldn't say it was part of his job.          01:51:35p

12       Q.   Would you say -- I didn't hear the answer, so   01:51:39p

13   can you tell me again?                                    01:51:42p

14       A.   I wouldn't say it was, you know -- he did it,   01:51:43p

15   but it wasn't necessarily a requirement.                  01:51:47p

16       Q.   I don't understand.  Was it part of his job     01:51:51p

17   responsibilities at WSC to go into Corel Draw, go out     01:51:55p

18   to websites to look at how to buy stuff?  Was that part   01:52:00p

19   of his job at WSC?                                        01:52:03p

20           MR. SMELTZER:  I'll object to the form.          01:52:05p

21       It's compound.  Wait until he's done, please.        01:52:07p

22           THE DEPONENT:  No.                               01:52:11p

23           MR. LEYVA:  Okay.                                01:52:13p

24       Q.   At this point, I would like to introduce        01:52:23p

25   Exhibit 5.  It appears to be a document that represents   01:52:24p

Page 132

1    an HPT ledger.  Also contains what appears to be either     01:52:30p

2    a check or bank transfer from a specified account.          01:52:35p

3          (Plaintiff's Exhibit 5 was marked for                01:52:39p

4       identification.)                                         01:52:39p

5    BY MR. LEYVA:                                               01:53:04p

6       Q.   Mr. Rabon, let me know when you've had enough       01:53:04p

7    time to study this document.                                01:53:08p

8       A.   Okay.                                               01:54:04p

9       Q.   Mr. Rabon, at the top of this document there's      01:54:07p

10   the word "Name:" followed by three letters.  What are       01:54:15p

11   they?                                                       01:54:18p

12      A.   The top line?                                       01:54:21p

13      Q.   Yes.                                                01:54:22p

14      A.   It says "HPT."                                      01:54:23p

15      Q.   And on the line under "Account No." there           01:54:25p

16   appears to be a year.  What year is that?                   01:54:30p

17      A.   2001.                                               01:54:31p

18      Q.   Is this a document ledger that you recognize?       01:54:33p

19      A.   Not specifically.                                   01:54:41p

20      Q.   Does it appear to be a document ledger related      01:54:47p

21   to the HTPGP entity?                                        01:54:51p

22      A.   I don't know if it pertains to the "GP"             01:54:57p

23   portion of that.  I don't know that.                        01:55:01p

24      Q.   This is 2001, so HPT, Inc., was formed July         01:55:01p

25   2002.                                                       01:55:08p

1      So when you say it doesn't appear to be to the     01:55:10p

2  "GP" part, can you clarify that for me?               01:55:17p

3      A.   Well, I guess everything that I've understood  01:55:20p

4  through this, the "GP" was the triad.  This is after   01:55:23p

5  that.                                                  01:55:26p

6      Q.   That's correct.  It's after the triad but it's 01:55:34p

7  before HPT, Inc.  That's the correct time frame.       01:55:37p

8      But is it a ledger that pertains to the entity     01:55:44p

9  that formerly had three and now it has two?            01:55:48p

10     A.   It looks like it could be.                    01:55:51p

11     Q.   Okay.  About midway down there's a date that  01:55:52p

12  says "5-14."  Read the date column.                   01:55:59p

13     A.   Uh-huh.                                        01:56:04p

14     Q.   It says, "Sales to Short #1101."  Can you tell 01:56:05p

15  me what that might pertain to?                         01:56:11p

16     MR. SMELTZER:  I'll object to the lack of          01:56:19p

17     foundation.                                         01:56:21p

18     THE DEPONENT:  Whoever wrote this -- I             01:56:23p

19     don't know their bookkeeping method and how --     01:56:27p

20     what that would mean.                               01:56:29p

21  BY MR. LEYVA:                                          01:56:34p

22     Q.   Now, who would have been the bookkeeper for   01:56:34p

23  HTPGP either when there was three or two?  Who was the 01:56:37p

24  bookkeeper that took care of this?                     01:56:42p

25     A.   Probably Linda Dejung, for the most part, yep. 01:56:49p

1    Q.    For the most part.  Was there anybody else?        01:56:54p

2    A.    No.  I think she generally kept this book.        01:56:56p

3    Q.    And who did Lynn Dejung report to at WSC?        01:57:02p

4    A.    Probably Bill Short.        01:57:09p

5    Q.    What was her title?        01:57:12p

6    A.    She was a bookkeeper.        01:57:14p

7    Q.    She reported directly to Bill Short?        01:57:17p

8    A.    You know, she was a bookkeeper.  He sat right        01:57:19p

9    outside her office.        01:57:25p

10    Q.    There was no other financial controller at WSC        01:57:28p

11    who she might have reported to at the time?        01:57:33p

12    A.    I don't recall who the entire staff was at        01:57:37p

13    that time.        01:57:40p

14    Q.    But you were a WSC employee at the time, were        01:57:42p

15    you not?        01:57:46p

16    A.    Yes.        01:57:46p

17    Q.    Okay.  Now, there's a second entry here, it        01:57:47p

18    says, "Shorts-Admin," it looks like it says "Pay        01:57:53p

19    received."  On 5-14.  Do you see that?        01:57:57p

20    A.    Yes.        01:58:01p

21    Q.    For the amount of $500.  Do you have any idea        01:58:01p

22    what that entry might be?        01:58:07p

23    A.    No.        01:58:08p

24    Q.    Okay.  Now, this is -- if you would turn this        01:58:12p

25    so you can look at this -- I'm not sure what this        01:58:18p

1    document is, so you can look at that piece that's got a          01:58:20p

2    little Sticky Note on it.                                         01:58:24p

3          Do you recognize this document as a check?  A               01:58:25p

4    transfer?  Is it anything -- That document right there,           01:58:27p

5    yes.                                                              01:58:32p

6       A.   I can't read that.                                        01:58:32p

7       Q.   Okay.  About the middle of the document, do               01:58:35p

8    you recognize something that says -- the number 0046?             01:58:43p

9       A.   I'm sorry, I don't.                                       01:58:55p

10      Q.   Do you wear glasses?                                      01:58:56p

11      A.   I have contacts on.                                       01:58:58p

12      Q.   You have them on now?                                     01:58:59p

13      A.   Yeah.                                                     01:59:00p

14      Q.   And you don't recognize -- You can't see 0046?           01:59:01p

15      A.   Oh, right, my bad.  Okay, okay.  "Tran 00046."           01:59:04p

16   I see that.                                                       01:59:09p

17      Q.   All right.  And two lines down from that, it             01:59:10p

18   looks like the word is "Account."  Is that correct?              01:59:15p

19   Would you agree?                                                  01:59:21p

20      A.   I see that.                                               01:59:21p

21      Q.   Now, it looks to me like it appears to be                01:59:25p

22   there's an account number that's barely legible, but             01:59:28p

23   can you make out what the last three numbers are on              01:59:31p

24   that account?                                                     01:59:34p

25      A.   The last -- the middle one is "2."  I can't              01:59:41p

Page 136

1    clearly make out the first or the third.                    01:59:45p

2        Q.   I'm asking about the last three right now.         01:59:49p

3        A.   Okay.  I'm talking of your three.  Let's just      01:59:51p

4    talk about your three.                                      01:59:54p

5        Q.   I see what you're saying.                          01:59:56p

6        A.   I can make out the "2."  I'm not comfortable       01:59:57p

7    with number one or number three.                            02:00:00p

8        Q.   Okay.  Moving to the left of that, can you         02:00:04p

9    make out a "66"?                                            02:00:10p

10       A.   On that same line?                                 02:00:18p

11       Q.   Yes.                                               02:00:19p

12       A.   I can make out one "6," it appears.                02:00:20p

13       Q.   Okay.  Do you have any idea what that account      02:00:30p

14   number represents, and if it represents the Shorts,        02:00:38p

15   Inc./HPT account?                                           02:00:40p

16       A.   No, I don't know.                                  02:00:43p

17       Q.   You don't know?                                    02:00:43p

18       A.   No, I don't know.                                  02:00:45p

19       Q.   That's fine.                                       02:00:47p

20            MR. SMELTZER:  I think we told you that in         02:00:48p

21       Interrogatories, didn't we?  This can be off the       02:00:50p

22       record.                                                 02:00:53p

23            (Discussion held off the record.)                 02:00:54p

24   BY MR. LEYVA:                                               02:01:44p

25       Q.   Mr. Rabon, I would like to introduce what         02:01:44p

Page 137

```
 1   appears to be a Bank of America account and activity      02:01:46p
 2   related to it labeled "Shorts Inc HPT" that spans from    02:01:52p
 3   12-1-02 to 12-31-02.                                      02:01:58p
 4       A.   Is this the same thing?                          02:02:15p
 5       Q.   Yes, I'm sorry.                                  02:02:17p
 6            (Plaintiff's Exhibit 6 was marked for            02:02:30p
 7       identification.)                                      02:02:30p
 8            MR. SMELTZER:  Carlos, can I ask you             02:04:00p
 9       something off the record while he's looking at        02:04:02p
10       that?                                                 02:04:03p
11            MR. LEYVA:  Sure.                                02:04:04p
12              (Discussion held off the record.)             02:04:04p
13            THE DEPONENT:  Okay.                             02:05:17p
14            MR. LEYVA:  Okay.                                02:05:19p
15       Q.   Mr. Rabon, on the first page of this document,  02:05:22p
16   the top right-hand corner, can you tell me what the      02:05:25p
17   account number is?                                       02:05:27p
18       A.   003669732525.                                   02:05:30p
19       Q.   Correct.  Now, is it your understanding that    02:05:40p
20   this Shorts, Inc./HPT account was part of other William  02:05:47p
21   Shorts accounts at Bank of America?  Is this a           02:05:56p
22   William -- WSC account?                                  02:05:58p
23            MR. SMELTZER:  I'll object to the form.         02:06:01p
24            THE DEPONENT:  What do you mean by "part"?      02:06:07p
25   BY MR. LEYVA:                                            02:06:15p
```

Page 138

1    Q.   Well, a corporation can have an account at a          02:06:15p

2    bank, right?  They can have multiple accounts at a         02:06:19p

3    bank, more than one -- checking, savings, whatever,        02:06:23p

4    okay.  Was this Shorts, Inc./HPT part of a WSC account?    02:06:26p

5    Did William Short's Clothier control the account that      02:06:33p

6    was named Shorts, Inc./HPT?                                02:06:36p

7    A.   No, HPT did.                                          02:06:40p

8    Q.   HPT, Inc., or HTPGP?                                  02:06:47p

9    A.   Whoever -- whoever this check -- this account         02:06:54p

10   refers to, HPT, that's who controlled this account.       02:06:57p

11   Q.   Did HPT, Inc., ever have an account at Bank of        02:07:05p

12   America?  Inc..                                            02:07:09p

13   A.   I don't recall.  I don't know.                        02:07:12p

14   Q.   You don't know?                                       02:07:15p

15   A.   Not right offhand.                                    02:07:16p

16   Q.   Okay.  Now, do you believe it to be -- this           02:07:19p

17   Shorts, Inc., account that we're referring to here at      02:07:34p

18   Bank of America, the account that HTPGP, the triad, the    02:07:37p

19   entity between you, Ms. Zimmerman and Mr. Gwynn, used      02:07:40p

20   to conduct business?  Is it one in the same account?      02:07:44p

21       MR. SMELTZER:  I'll object to the form,                02:07:50p

22       presupposes that the triad had one, an account,        02:07:51p

23       at any time.                                           02:07:56p

24       THE DEPONENT:  This is dated 12-1-02.  I                02:07:57p

25       think that's a couple years after Zimmerman was        02:08:00p

Page 139

```
 1      gone.                                               02:08:03p

 2           MR. LEYVA:  That's not my question.            02:08:04p

 3      Q.   My question was:  Is this the same account?    02:08:05p

 4  We have -- We can go back in the record.                02:08:10p

 5           You made reference to an account at the time   02:08:12p

 6  of HTPGP, some account.  I'm asking you, is this        02:08:14p

 7  account, the Shorts, Inc./HPT account, bank account,    02:08:19p

 8  the one that was used when you, Mr. Gwynn and           02:08:24p

 9  Ms. Zimmerman had the entity?                           02:08:27p

10           MR. SMELTZER:  I'll object --                  02:08:29p

11           THE DEPONENT:  I made a reference that we      02:08:30p

12      had an account?                                     02:08:31p

13           MR. SMELTZER:  Let me object.                  02:08:32p

14      Mischaracterizes his prior testimony.               02:08:34p

15           MR. LEYVA:  Can we go back when we started     02:08:35p

16      talking about HTPGP accounts, please.  It may be    02:08:37p

17      15 minutes back.                                    02:08:41p

18              (Discussion held off the record.)           02:08:43p

19  BY MR. LEYVA:                                           02:08:43p

20      Q.   You indicated that Mr. Gwynn was reimbursed,   02:08:43p

21  with interest, for the personal payment that he made to 02:09:13p

22  Ms. Zimmerman, correct?                                 02:09:18p

23      A.   Correct.                                       02:09:19p

24      Q.   Is that correct?  Did you not reference that   02:09:19p

25  it was made from an account, some account, with         02:09:21p
```

Page 140

1    interest?                                                    02:09:23p

2       A.   Yes.                                                 02:09:24p

3       Q.   What I'm asking you:  Is that account that you       02:09:24p

4    referenced, is it the Shorts, Inc./HPT account, one in       02:09:26p

5    the same?  Are those accounts one in the same?               02:09:30p

6       A.   I don't know.                                        02:09:32p

7       Q.   You don't know.  Fine.                               02:09:32p

8            I would like to introduce Exhibit 7.  It             02:09:51p

9    appears to be a Bank of America transfer of funds from       02:09:55p

10   the Shorts, Inc./HPT to an account controlled by HPT,        02:09:59p

11   Inc.                                                         02:10:04p

12          (Plaintiff's Exhibit 7 was marked for                 02:10:05p

13          identification.)                                      02:10:05p

14       MR. SMELTZER:  Can you read back that                    02:10:06p

15   question, please.                                            02:10:08p

16      (Record read at this point.)                              02:10:10p

17       MR. SMELTZER:  I'll object to the                        02:10:32p

18   statement, to the extent it suggested that the               02:10:34p

19   Shorts, Inc./HPT account was not controlled by               02:10:39p

20   HPT.  You are obviously free to ask him whatever             02:10:43p

21   you want about it.                                           02:10:50p

22       THE DEPONENT:  Can I get a copy that's not               02:10:52p

23   covered?  Okay.  What are you saying this is a               02:10:56p

24   copy of?  Give me that one more time.                        02:11:45p

25       MR. SMELTZER:  I already made an objection.              02:11:49p

Page 141

1       Just let him ask questions about the document.          02:11:51p

2            MR. LEYVA:  I'm going to ask questions,            02:11:53p

3       yes.                                                    02:11:55p

4       Q.   Does this appear to you to be a check register     02:11:56p

5       related to HPT, Inc.?                                   02:12:00p

6       A.   Yes, it could be.                                  02:12:07p

7       Q.   Can you read the date, the top right-hand          02:12:09p

8       corner.  It looks like it's entry 1000.  Just read the  02:12:12p

9       date.                                                   02:12:21p

10      A.   The date, 4-9-04.                                  02:12:21p

11      Q.   Right.  And to the right of that, can you read     02:12:25p

12      that amount?                                            02:12:27p

13      A.   8664.                                              02:12:31p

14      Q.   Correct.                                           02:12:36p

15           MR. SMELTZER:  I'm sorry.  We're talking           02:12:37p

16      about -- Can you read back the question?                02:12:39p

17      Because I thought you said the amount of the            02:12:44p

18      check.                                                  02:12:46p

19           THE DEPONENT:  Right.                              02:12:47p

20           MR. SMELTZER:  And then I heard "8664."            02:12:48p

21           THE DEPONENT:  Right.                              02:12:51p

22           MR. SMELTZER:  Is that what it said?               02:12:55p

23      (Record read at this point.)                            02:12:57p

24           MR. SMELTZER:  He's asking for amount.             02:13:07p

25           THE DEPONENT:  To the right of that.               02:13:08p

Page 142

1          MR. SMELTZER:  Yeah.                          02:13:10p

2          THE DEPONENT:  Okay.                          02:13:10p

3          MR. LEYVA:  Can we go off the record.         02:13:15p

4          MR. SMELTZER:  Let me object to the form of   02:13:21p

5     the question, after the fact.                      02:13:23p

6          MR. LEYVA:  On what grounds?                   02:13:26p

7          MR. SMELTZER:  Because I didn't look at       02:13:31p

8     that as an amount, so to the extent it             02:13:32p

9     presupposes that that number is an amount.         02:13:34p

10         MR. LEYVA:  Okay.                              02:13:40p

11         MR. SMELTZER:  I'm just looking at the        02:13:41p

12    other stuff.  I don't want this on the record.     02:13:43p

13    I'll be quiet.                                     02:13:49p

14    BY MR. LEYVA:                                      02:13:55p

15       Q.   Mr. Rabon, do you recall a deposit of funds  02:13:55p

16    made into HPT, Inc.'s, bank account around this time  02:14:00p

17    frame, 4-9-04, for that amount, 8664?               02:14:06p

18       A.   I don't recall it.                          02:14:15p

19       Q.   But if there was such an entry, it would be in  02:14:21p

20    your Quickbooks system, would it not, in the HPT, Inc.?  02:14:27p

21    Because this is 4-9-04.                             02:14:31p

22         MR. SMELTZER:  I'll object to the form of     02:14:34p

23    the question.                                      02:14:35p

24    BY MR. LEYVA:                                      02:14:38p

25       Q.   Let me ask it again.  If this was a deposit  02:14:38p

Page 143

1    that was made into an HPT, Inc., account, would that be          02:14:41p

2    reflected in HPT, Inc.'s accounting?                             02:14:46p

3        A.   It is reflected right here.                             02:14:56p

4        Q.   So you agree this is an HPT, Inc., ledger and           02:15:01p

5    it --                                                            02:15:05p

6        A.   I said I assumed it was.  You asked me if it            02:15:05p

7    looked like businesses that it did, and I said it looks          02:15:08p

8    like it.                                                         02:15:10p

9        Q.   Right.                                                  02:15:11p

10       A.   Yes.                                                    02:15:12p

11       Q.   Now are you saying that for certain that it             02:15:12p

12   is?  I mean, are --                                              02:15:14p

13       A.   I still maintain this looks like it could be            02:15:16p

14   from a register for HPT.                                         02:15:18p

15       Q.   Okay.  And that amount would be reflected in            02:15:22p

16   the check register in HPT, Inc., correct?                        02:15:24p

17       A.   If this is, in fact, from that register, yes.           02:15:28p

18       Q.   Okay.                                                   02:15:31p

19       A.   Uh-huh, sure.                                           02:15:32p

20       Q.   And would the transfer, where these funds came          02:15:36p

21   from, also be reflected in that check register?                 02:15:38p

22           MR. SMELTZER:  I'll object to foundation.                02:15:45p

23           THE DEPONENT:  I don't -- I don't know that              02:15:47p

24       it would.                                                    02:15:49p

25           MR. LEYVA:  Okay.                                        02:15:51p

```
 1      Q.   Mr. Rabon, I would like to return your        02:16:26p

 2   attention to Exhibit 6, page 2, at the bottom.  Can you  02:16:28p

 3   tell me what, at the very bottom, the date in the last   02:17:01p

 4   entry.                                                   02:17:08p

 5      A.   7-1.                                             02:17:12p

 6      Q.   And there's a balance column, and can you tell   02:17:14p

 7   me the amount?                                           02:17:17p

 8      A.   8,664.70.                                        02:17:18p

 9      Q.   And the name on this account at the top of the   02:17:22p

10   page?                                                    02:17:24p

11      A.   Shorts Inc HPT.                                  02:17:25p

12      Q.   Does that amount match the amount on            02:17:28p

13   Exhibit 7, the dollar amount?                            02:17:31p

14      A.   It appears, except for perhaps the 70 cents.     02:17:43p

15      Q.   Correct.  Thank you.                             02:17:48p

16      A.   And my copy is cut off.                          02:18:01p

17      Q.   Yes.                                             02:18:03p

18      A.   I don't know how far out it goes.                02:18:04p

19      Q.   Yes, it doesn't show, that's correct.            02:18:06p

20           Mr. Rabon, as President of Rabco, did you        02:18:14p

21   preside, as President, over a corporation that           02:18:20p

22   generated millions of dollars of Internet sales revenue  02:18:24p

23   over a period of years; is that correct?                 02:18:28p

24      A.   Ask that one more time.                          02:18:34p

25      Q.   Mr. Rabon, as President of Rabco, did you        02:18:39p
```

1    preside over a corporation that generated millions of          02:18:43p

2    dollars of Internet sales revenue over a period of             02:18:45p

3    years?  Is that correct?                                       02:18:50p

4         A.   Internet sales, yes.                                 02:18:52p

5         Q.   Can you quantify how many millions over a            02:18:55p

6    period of years?  Ballpark.                                    02:18:58p

7         A.   Several million.  I don't know the number            02:19:04p

8    right offhand.                                                 02:19:08p

9         Q.   Two?  Four?  Five?                                   02:19:10p

10        A.   Could be.                                            02:19:11p

11             MR. SMELTZER:  Object, calls for                     02:19:12p

12        speculation.                                              02:19:13p

13             MR. LEYVA:  Okay.                                    02:19:13p

14        Q.   To the best of your knowledge, approximately         02:19:16p

15   how many years did Rabco conduct business online using        02:19:17p

16   shopping cart technology?                                      02:19:23p

17        A.   I'm not sure.                                        02:19:35p

18        Q.   Can you give me an approximate time?  Was it         02:19:41p

19   2002?  2003?  2004?  2001?                                     02:19:43p

20        A.   I don't --                                           02:19:48p

21        Q.   When Rabco first started doing E-commerce and        02:19:48p

22   selling goods online via shopping cart.                       02:19:51p

23        A.   I don't recall if it was called a "cart" back       02:20:00p

24   then.                                                          02:20:03p

25        Q.   Okay.  So let me ask you this:  By whatever it       02:20:06p

```
 1   was called, what I'm referring to is customers actually      02:20:13p
 2   being able to go online and purchase goods and paying        02:20:20p
 3   for those goods online, completing the transaction           02:20:25p
 4   online.  Like you do at Amazon, like you do in a             02:20:30p
 5   million places on the web.  Whether you call it              02:20:34p
 6   "shopping cart technology," that's my -- that's what         02:20:36p
 7   I'm calling "E-commerce."  Consumers can actually            02:20:40p
 8   purchase online.                                             02:20:42p
 9           At what point in time did Rabco start doing          02:20:43p
10   that?                                                        02:20:46p
11           MR. SMELTZER:  Object, asked and answered,           02:20:56p
12       calls for speculation.                                   02:20:57p
13           THE DEPONENT:  It -- To my recollection, it          02:21:01p
14       would be when -- when Rabco, in the agreement,           02:21:04p
15       got all the assets from Shorts.                          02:21:21p
16           MR. LEYVA:  Correct.                                 02:21:28p
17       Q.   So it would -- would it not approximate the         02:21:29p
18   time when Mr. Short began receiving commissions from         02:21:32p
19   Internet sales; is that correct?                             02:21:37p
20       A.   I'm not -- I don't know that for sure.              02:21:47p
21       Q.   Which part don't you know for sure?                 02:21:54p
22       A.   The part about his commission.                      02:21:58p
23       Q.   So you may have started doing E-commerce            02:22:05p
24   transactions prior to the time that he received             02:22:07p
25   commissions?                                                 02:22:09p
```

1      A.   He may have got a commission earlier, but --          02:22:09p

2      Q.   I'm a little confused.  I don't mean to be           02:22:18p

3  difficult here.                                               02:22:20p

4           It was my understanding that Mr. Short's            02:22:22p

5  commissions were based on Internet sales, correct?           02:22:24p

6      A.   Correct.                                             02:22:28p

7      Q.   Those were Internet sales that were conducted        02:22:28p

8  where a consumer could purchase online; is that              02:22:31p

9  correct?                                                      02:22:33p

10     A.   Right.                                               02:22:33p

11     Q.   Okay.  So, are you saying that Mr. Short could       02:22:34p

12  have received commissions on Internet sales prior to         02:22:42p

13  the time that Rabco started doing Internet sales?            02:22:46p

14     A.   I don't know what he did.  I don't -- I have        02:22:50p

15  no idea what he did.  Could he have taken some               02:22:55p

16  additional salary?  It's possible.  I don't know.           02:22:57p

17     Q.   I'm referring to Rabco's commissions that were       02:23:00p

18  paid to Mr. Short.                                           02:23:02p

19     A.   So that happened when I -- when Rabco took          02:23:03p

20  over all the assets of Short's, Inc., is when those          02:23:08p

21  payments began.                                              02:23:12p

22     Q.   Okay.  And that was about 2002, 2003.  We've        02:23:13p

23  gone over this before.                                       02:23:18p

24     A.   Yeah.                                                02:23:19p

25     Q.   In that time frame.                                 02:23:19p

Page 148

1      A.   Whenever the transition took place.          02:23:20p

2      Q.   Okay, that's fine.                           02:23:22p

3           So, Mr. Rabon, would it be fair to say that, 02:23:31p

4   as President of a corporation, that your company has 02:23:34p

5   been conducting business online for a number of years? 02:23:36p

6      A.   Yes.                                         02:23:39p

7      Q.   Mr. Rabon, are you familiar with the term   02:23:40p

8   "search engine optimization"?                        02:23:45p

9      A.   Yes.                                         02:23:49p

10     Q.   Are you familiar with its acronym, SEO?  That 02:23:49p

11  it's called SEO?                                     02:23:55p

12     A.   Yes.                                         02:23:56p

13     Q.   Please describe your general understanding of 02:23:59p

14  what "search engine optimization" means from a business 02:24:02p

15  perspective.                                         02:24:08p

16     A.   That is using key words, important words,    02:24:09p

17  words that perhaps describe the product or the name of 02:24:21p

18  the product in what I call the bowels of the website, 02:24:23p

19  to help in search engine optimization.               02:24:28p

20     Q.   The bowels of the website.  Can you clarify  02:24:32p

21  that for me?                                         02:24:34p

22     A.   The inside of the business -- the web        02:24:36p

23  business.  The --                                    02:24:39p

24     Q.   Are you familiar with the term "metatags"?   02:24:45p

25     A.   Somewhat.                                    02:24:49p

Page 149

```
1        Q.   Can you describe your general understanding of    02:24:51p
2   what that term means.                                        02:24:53p
3        A.   I kind of think of "metatags" and "key words"     02:24:57p
4   as similar things.  I'm not a Webmaster.                     02:25:00p
5        Q.   No, I understand.  But you presided over a         02:25:07p
6   business that generated millions of dollars of Internet      02:25:10p
7   online sales, and that's the -- I'm asking you as            02:25:12p
8   President of that corporation, not as a technical            02:25:15p
9   person.                                                      02:25:18p
10        Do you know, in general, what sort of                  02:25:22p
11   user-provided content is usually incorporated into          02:25:24p
12   metatags or key words?  What is usually put into a          02:25:28p
13   metatag?                                                    02:25:33p
14        A.   I'm not sure what would be put into a metatag.    02:25:33p
15        Q.   Are metatags usually displayed to Internet        02:25:36p
16   consumers or are they hidden?                               02:25:39p
17        A.   I believe they would be hidden.                   02:25:42p
18        Q.   What is your understanding of the function        02:25:45p
19   that metatags perform vis-a-vis search engine               02:25:47p
20   optimization?  What's their function?                       02:25:52p
21        A.   Perhaps like what key words would do.             02:25:56p
22        Q.   And what do they do?  I mean, why are they        02:26:00p
23   good, or a good thing or a bad thing with respect to        02:26:03p
24   search engine optimization?                                 02:26:06p
25        A.   Well, the way I understand it, you're putting     02:26:09p
```

Page 150

1    in whatever these terms or words are perhaps the way an          02:26:12p

2    end user, the customer's going to search for them.                02:26:18p

3        Q.   Okay.                                                    02:26:20p

4        A.   And if that works most of the time, then it             02:26:20p

5    helps your ranking in the search engines.                         02:26:24p

6        Q.   Okay.  What kinds of files are metatags                  02:26:29p

7    contained in?                                                     02:26:36p

8        A.   I'm sorry?                                               02:26:37p

9        Q.   What kinds of files?  You described something           02:26:37p

10   as the "bowels of the website."  Do you know what kind          02:26:40p

11   of files a metatag is contained within?                           02:26:43p

12       A.   No.                                                      02:26:46p

13       Q.   That's fine.  To the best of your                       02:26:46p

14   understanding, as President of Rabco, can you explain            02:26:51p

15   the relationship between metatags and the content that          02:26:54p

16   an Internet user sees visibly displayed on a page?  Is          02:26:59p

17   there a relationship between the two?                             02:27:04p

18       A.   I don't know.                                           02:27:06p

19       Q.   Okay.  Mr. Rabon, are you generally familiar           02:27:07p

20   with Google search engine technology?                             02:27:13p

21       A.   Somewhat.                                               02:27:17p

22       Q.   Do you use Google search on a regular basis?           02:27:17p

23       A.   Yes.                                                    02:27:20p

24       Q.   Are you familiar with Google's search engine           02:27:24p

25   page rank algorithm?                                              02:27:26p

Page 151

1      A.    Yes.                                          02:27:31p

2      Q.    To the best of your knowledge, can you        02:27:34p

3   describe the original core concept that underpinned    02:27:35p

4   Google's page rank algorithm?  Why was the page rank   02:27:39p

5   algorithm important?  Do you understand what it was     02:27:44p

6   based on?                                              02:27:47p

7         MR. SMELTZER:  I'll object to the question,      02:27:47p

8      foundation.                                          02:27:50p

9         THE DEPONENT:  I don't understand the            02:27:51p

10     question.                                            02:27:52p

11  BY MR. LEYVA:                                           02:27:52p

12     Q.    You said you were familiar with Google's page 02:27:52p

13  rank algorithm; is that correct?                        02:27:55p

14     A.    I don't know if I -- I'm familiar with their  02:27:56p

15  search engine.  I don't know what the algorithm         02:27:59p

16  necessarily relates to it.  I'm not that Internet       02:28:02p

17  savvy.                                                  02:28:06p

18     Q.    Okay, that's fine.  Mr. Rabon, are you        02:28:06p

19  familiar with a site called "Alexa"?                    02:28:11p

20     A.    No.                                            02:28:14p

21     Q.    Mr. Rabon, have you personally created web    02:28:17p

22  pages?                                                  02:28:19p

23     A.    No.                                            02:28:20p

24     Q.    Okay.  I'm going to move on to some questions 02:28:29p

25  regarding the bankruptcy petition, so I'm going to      02:28:31p

introduce two exhibits. One is the original petition, and the other one is the amended petition. 02:28:37p 02:28:44p

A. Can we take a break so I can hit the restroom? 02:28:52p

MR. LEYVA: Absolutely. 02:28:56p

(Recess held at this time.) 02:28:56p

(Plaintiff's Exhibits 8 & 9 were marked for identification.) 02:40:24p 02:40:24p

BY MR. LEYVA: 02:40:59p

Q. Mr. Rabon, before we proceed to talk about the bankruptcy petition, I just had a couple questions to finish up the Internet stuff we were discussing. 02:40:59p 02:41:02p 02:41:05p

Mr. Rabon, did you principally rely on Mr. Gwynn for his search engine optimization expertise for Rabco's alleged websites? Was he the person that you relied on for search engine optimization? 02:41:07p 02:41:12p 02:41:16p 02:41:20p

A. Yes. 02:41:25p

Q. Is it true that you relied on Mr. Gwynn also to create the content for Rabco's alleged websites? 02:41:29p 02:41:32p

A. Let me go back to that first question. I relied on him, but it was a joint effort. Many times did I suggest information that should be in the key words. 02:41:38p 02:41:42p 02:41:49p 02:41:52p

Q. Okay. Did you suggest anything else other than key words, on how you would optimize to drive traffic to your sites? 02:41:55p 02:41:58p 02:42:04p

Page 153

```
1      A.   Not that I can recall.                    02:42:08p

2      Q.   Do you understand the concept behind the  02:42:11p

3   feeder site concept that Mr. Gwynn created?  You  02:42:15p

4   understand the importance of the feeder site concept 02:42:19p

5   vis-a-vis driving traffic to these sites?          02:42:23p

6          MR. SMELTZER:  Objection to the form of the 02:42:26p

7      question.                                       02:42:27p

8          THE DEPONENT:  Ask it one more time.        02:42:31p

9   BY MR. LEYVA:                                       02:42:35p

10     Q.   Yes.  You said that you and Mr. Gwynn played a 02:42:35p

11  joint role at times on the SEO activity and that you 02:42:38p

12  would suggest certain key words, okay.  And what I'm 02:42:44p

13  asking is, do you understand the concept of the feeder 02:42:47p

14  sites that fed traffic to HurricanePassTraders.com? 02:42:50p

15     A.   I understood that concept.                 02:43:03p

16     Q.   What was your understanding of that concept? 02:43:05p

17  Why did it work?                                    02:43:07p

18     A.   I don't know that it always worked.  Some of 02:43:11p

19  the feeder sites had specific words in the URL.     02:43:21p

20     Q.   Correct.  And so how did having these sites 02:43:36p

21  help drive traffic, in addition to key words?       02:43:40p

22          I mean, was there something else that was   02:43:44p

23  important about the feeder concept?  If you don't know, 02:43:46p

24  then that's fine.                                   02:43:49p

25     A.   I don't know of something else.            02:43:50p
```

Page 154

```
 1      Q.   Was there anyone else that you relied on      02:43:53p

 2   besides yourself and Mr. Gwynn for search engine      02:43:55p

 3   optimization work for Rabco's alleged websites?       02:43:58p

 4      A.   Not that I can recall offhand.  Perhaps the    02:44:09p

 5   Aztec 1 people did initially.                          02:44:14p

 6      Q.   Who at Aztec 1?                                02:44:16p

 7      A.   Kristi, whatever her last name is.             02:44:17p

 8      MR. SMELTZER:  Is that all one word?                02:44:23p

 9   BY MR. LEYVA:                                          02:44:27p

10      Q.   Is she the owner of Aztec 1?  Is she the       02:44:27p

11   proprietor, the owner?  Kristi.                        02:44:32p

12      A.   I suspect she was.                             02:44:34p

13      Q.   And other than Mr. Gwynn, who did you rely on  02:44:37p

14   to create content, actually the pages, the content, the  02:44:39p

15   images, the things that made up the website?  Who did  02:44:43p

16   you rely on besides Mr. Gwynn?                         02:44:47p

17      A.   And myself.                                    02:44:49p

18      MR. SMELTZER:  I'll object to -- I don't            02:44:49p

19      think he testified to that yet.                     02:44:51p

20      THE DEPONENT:  Along with myself sometimes.         02:44:54p

21   BY MR. LEYVA:                                          02:44:57p

22      Q.   I previously asked you a question, "Did you    02:44:57p

23   create web pages yourself?" and you said, "No."        02:44:59p

24      A.   Right.                                         02:45:02p

25      Q.   So how did you help Mr. Gwynn -- in what       02:45:02p
```

1    capacity did you help Mr. Gwynn create content for the          02:45:06p

2    websites?                                                       02:45:09p

3        A.   That would be discussing how I think they             02:45:12p

4    should look, how pages should look, how artwork should         02:45:15p

5    look.                                                           02:45:18p

6        Q.   Okay.                                                  02:45:18p

7        A.   How it needs to be -- words need to be spelled        02:45:19p

8    correctly.                                                      02:45:25p

9        Q.   Layout and design and look and feel and things        02:45:25p

10   like that; is that correct?                                     02:45:28p

11       A.   Yes.                                                   02:45:29p

12       Q.   I don't want to put words in your mouth.              02:45:29p

13       A.   Yes.                                                   02:45:32p

14       Q.   Okay.  I want to walk through parts of the           02:45:32p

15   Petition, starting with -- Exhibit 9 is the Amended            02:45:45p

16   Petition.  I want to start with Exhibit 8.                      02:45:54p

17       A.   I only have 9.                                         02:45:56p

18       Q.   Mr. Rabon, we're going to go through this by          02:46:52p

19   page, so if you'd prefer to take a look at a page and          02:46:55p

20   then as we move to the next page, prefer to do it that         02:47:00p

21   way.  There's quite a bit here, and we're not going to         02:47:03p

22   go through, obviously, every entry on here.                     02:47:06p

23       A.   Okay.                                                  02:47:10p

24       Q.   This is the original Petition.                        02:47:14p

25       A.   This is Exhibit 8.                                     02:47:19p

1      Q.   Exhibit 8, that's correct.                    02:47:21p

2      A.   Okay.                                         02:47:22p

3      Q.   It's correct that the nature of the business,  02:47:23p

4   on page 1, is left blank; is that correct?           02:47:28p

5      A.   You're asking me that?                        02:47:36p

6      Q.   Yes.                                          02:47:37p

7      A.   Where is that line?                           02:47:37p

8      Q.   It's the box after the address, 670 2nd, in   02:47:40p

9   the middle box.  It says, "Nature of Business."       02:47:50p

10     A.   I'm not seeing that.                          02:47:58p

11     Q.   Right here.                                   02:48:01p

12     A.   Okay.                                         02:48:03p

13     Q.   I'm just asking you to confirm that it was    02:48:06p

14   left blank.                                          02:48:08p

15     A.   Yes, it appears so.                           02:48:09p

16        MR. SMELTZER:   I was looking at the address    02:48:12p

17     up here.                                           02:48:13p

18        THE DEPONENT:  Me, too.                         02:48:14p

19   BY MR. LEYVA:                                        02:48:14p

20     Q.   The box to the right, top box, it says        02:48:14p

21   "Chapter of Bankruptcy Code under which the Petition is  02:48:17p

22   filed.  Chapter 7"; is that correct?                 02:48:19p

23     A.   Correct.                                      02:48:21p

24     Q.   And then the box underneath that, "Nature of  02:48:21p

25   Debts," can you read to me the check.  Which box is   02:48:23p

Page 157

1    checked?  What is the language there?                    02:48:28p

2        A.   It says "Debts are primarily consumer debts,   02:48:31p

3    defined in 11 U.S.C. 101(8) as 'incurred by an          02:48:33p

4    individual primarily for a personal family household    02:48:39p

5    purpose.'"                                              02:48:44p

6        Q.   Correct.  Now, this was Rabco Leasing, Inc.,   02:48:44p

7    the corporation's, Chapter 7 Petition, was it not?      02:48:47p

8        A.   Yes.                                           02:48:52p

9        Q.   Do you consider Rabco's debt to be primarily   02:48:54p

10   consumer debt?                                          02:48:57p

11         MR. SMELTZER:  I'll object, to the extent         02:48:58p

12      it calls for a legal conclusion.                     02:49:00p

13         THE DEPONENT:  I didn't fill this out.            02:49:03p

14   BY MR. LEYVA:                                           02:49:05p

15       Q.   Who filled it out?                             02:49:05p

16       A.   Steve Fishman.                                 02:49:07p

17       Q.   You signed this document, did you not, under   02:49:08p

18   penalty of perjury?  Did you read this document when    02:49:10p

19   you signed it?                                          02:49:13p

20         MR. SMELTZER:  It's two questions.                02:49:14p

21   BY MR. LEYVA:                                           02:49:16p

22       Q.   Did you sign this document, or were you aware  02:49:16p

23   that you signed this document under penalty of perjury? 02:49:19p

24         MR. SMELTZER:  Page 3.                            02:49:39p

25         THE DEPONENT:  Thirty?                            02:49:40p

Page 158

1         MR. SMELTZER:  Page 3.                          02:49:41p

2         THE DEPONENT:  I see it.  I don't have a        02:49:54p

3     signature here.                                     02:49:56p

4         MR. SMELTZER:  He asked the question.  You      02:50:07p

5     haven't answered it yet.                            02:50:10p

6         THE DEPONENT:  I said I didn't -- there's       02:50:12p

7     no signature here.                                  02:50:13p

8   BY MR. LEYVA:                                         02:50:17p

9     Q.   My question is:  Were you aware that you       02:50:17p

10    signed this document, the document that you did sign, 02:50:20p

11    under penalty of perjury?                           02:50:24p

12        MR. SMELTZER:  I'll object to the form of       02:50:25p

13    the question.  He just said he didn't --            02:50:26p

14  BY MR. LEYVA:                                         02:50:28p

15    Q.   Whether or not there's a signature on this     02:50:28p

16    document or not, my question is, were you aware, and 02:50:30p

17    did your bankruptcy counsel make you aware that you had 02:50:34p

18    to sign this document under penalty of perjury?  That's 02:50:36p

19    the question.                                       02:50:39p

20    A.   I don't recall if I was told that.             02:50:43p

21    Q.   You don't recall if you were told that?        02:50:48p

22        Mr. Rabon, did you sign both your original      02:51:26p

23    Petition and your Amended Petition?                 02:51:29p

24    A.   I would assume so.  I don't recall.            02:51:50p

25    Q.   You don't recall whether or not you signed     02:51:56p

Page 159

1    either one?                                                    02:51:58p

2        A.    Correct.                                             02:51:59p

3        Q.    Mr. Rabon, can you tell me what necessitated         02:52:22p

4    filing an Amended Petition?                                    02:52:27p

5        A.    Can we take a quick break?                           02:52:30p

6        Q.    Absolutely.  How long of a quick break?              02:52:32p

7        A.    About five minutes.                                  02:52:35p

8        Q.    Fine.  We'll step out.                               02:52:36p

9              (Recess held at this time.)                          02:52:37p

10   BY MR. LEYVA:                                                  03:00:18p

11       Q.    Mr. Rabon, I turn your attention to Exhibit 9,       03:00:18p

12   the Amended Petition, the last page.  There's a                03:00:27p

13   Declaration there.  Can you read that to me, please.           03:00:35p

14       A.    "I, Bruce Rabon, President of Rabco Leasing,         03:00:40p

15   Inc., named as debtor in this case, declare under              03:00:43p

16   penalty of perjury that we have read the foregoing             03:00:47p

17   amended Schedule B with Exhibits A, B, C and D,                03:00:50p

18   consisting of nine sheets (including this declaration),        03:00:55p

19   and that it's true and correct to the best of my               03:00:57p

20   information and belief."                                       03:01:01p

21       Q.    Is that your signature there?                        03:01:02p

22       A.    Yes.                                                 03:01:03p

23       Q.    Thank you.  I'd like to turn your attention          03:01:06p

24   back to the original Petition.  What schedule is this,         03:01:14p

25   so we can point him to the right place?                        03:01:25p

Page 160

1        Mr. Rabon, I'm going to ask you a question          03:02:03p

2  regarding the Statement of Financial Affairs.  It        03:02:06p

3  relates to 19a and b.                                     03:02:09p

4     A.   You want me to look at something in here?         03:02:11p

5     Q.   No.  I'm going to share yours.  I'm telling       03:02:13p

6  you where it's at.                                        03:02:16p

7     A.   Okay.                                             03:02:17p

8     Q.   It says, "List all bookkeepers and accountants    03:02:17p

9  who within the two years immediately preceding the        03:02:21p

10 filing of this bankruptcy case kept or supervised the     03:02:24p

11 keeping of books of account and records of the debtor."   03:02:28p

12        And would you read the answer, please.  It's       03:02:33p

13 this one right here.                                       03:02:36p

14    A.   Okay.                                             03:02:36p

15        MR. SMELTZER:  Where?  I'm sorry, Carlos.           03:02:42p

16 Where are we on?  It's all Schedule A, but I               03:02:44p

17 didn't see that.  Thanks.                                 03:02:53p

18        THE DEPONENT:  Okay.                                03:03:04p

19 BY MR. LEYVA:                                              03:03:08p

20    Q.   And who does it say there?                         03:03:08p

21    A.   Alton Cates.                                       03:03:10p

22    Q.   And 19b -- Well, excuse me.  Did Ms. Hunter        03:03:14p

23 work with you on this bankruptcy petition?                03:03:21p

24    A.   Yes.                                               03:03:23p

25    Q.   Is there a reason why she's not listed as one      03:03:24p

Page 161

1   of the bookkeepers and accountants who within the two          03:03:26p

2   years immediately preceding the file of this bankruptcy        03:03:28p

3   case kept or supervised the keeping of books of account        03:03:31p

4   and records of the debtor?  Is that just an oversight?         03:03:34p

5   Should she have been listed?                                   03:03:39p

6          MR. SMELTZER:  I'll object to foundation,               03:03:40p

7      to the extent it calls for a legal conclusion.             03:03:42p

8          THE DEPONENT:  I don't know why she was                03:03:44p

9      left off of there.                                          03:03:44p

10         MR. LEYVA:  That's fine.                                03:03:45p

11     Q.  19b, I'm going to read it to you, and I'm               03:03:48p

12  going to pass it back to you and you can read the             03:03:51p

13  answer.  "List all firms or individuals who within the        03:03:53p

14  two years immediately preceding the filing of this            03:03:56p

15  bankruptcy case have audited the books of accounts and        03:03:58p

16  records or prepared a financial statement of the              03:04:01p

17  debtor."  Could you read the name and the address,           03:04:04p

18  please.                                                        03:04:06p

19     A.  Alton Cates.                                            03:04:11p

20     Q.  And the address, is that Mr. -- Can you read           03:04:27p

21  the address for the record.                                   03:04:30p

22     A.  13059 West Linebaugh Avenue, Suite 102, Tampa,         03:04:31p

23  Florida.                                                       03:04:37p

24     Q.  Do you know whether or not that's Mr. Cates'           03:04:37p

25  business address?                                             03:04:40p

Page 162

```
 1      A.   I don't know if that's his exact address.        03:04:41p

 2      Q.   Okay, that's fine.                               03:04:42p

 3           So, did Mr. Cates, in fact, two years            03:04:49p

 4  immediately preceding the filing of this bankruptcy       03:04:52p

 5  case, audit the books of Rabco Leasing, Inc.?             03:04:55p

 6      A.   I don't -- I'm not an accountant, so I can't     03:05:04p

 7  tell you if what he did is considered an audit.           03:05:09p

 8      Q.   Well, what was it that he did?  It says          03:05:13p

 9  "audit," Mr. Rabon.                                       03:05:15p

10      A.   Let me see --                                    03:05:17p

11      Q.   Audited the books.                               03:05:18p

12           MR. SMELTZER:  Objection as to foundation,       03:05:24p

13      and to the extent it calls for a legal                03:05:32p

14      conclusion.                                           03:05:34p

15           THE DEPONENT:  Yeah.  I don't know what          03:05:35p

16      "auditing the books" in that context would be.        03:05:36p

17  BY MR. LEYVA:                                             03:05:38p

18      Q.   Let me ask you this:  As a business executive    03:05:38p

19  with at least over 15 years experience, as you've         03:05:41p

20  described it, what would an audited financial statement   03:05:44p

21  consist of?                                               03:05:49p

22           MR. SMELTZER:  The same objection, but you       03:05:57p

23      can talk about your understanding.                    03:05:59p

24           THE DEPONENT:  My understanding is that it       03:06:01p

25      would be someone who is actually coming in, you       03:06:03p
```

Page 163

1      know, going over your books, reviewing them.        03:06:05p

2   BY MR. LEYVA:                                          03:06:12p

3      Q.   Do they usually prepare a report when they     03:06:12p

4   audit, in your business understanding?                 03:06:15p

5      A.   Probably would.                                03:06:17p

6      Q.   Would that report be signed by the person      03:06:19p

7   preparing it?                                          03:06:22p

8           Let me ask you this question:  As a business   03:06:27p

9   executive, if you were going to have someone come in   03:06:31p

10  and do a financial audit, would that person be a CPA or 03:06:34p

11  a bookkeeper?                                           03:06:38p

12     A.   I don't know.  I suppose it could be either.   03:06:42p

13     Q.   No.  I'm asking, you as the President, would   03:06:43p

14  you --                                                  03:06:46p

15     A.   I don't know.                                  03:06:46p

16          MR. SMELTZER:  He's answered it.               03:06:48p

17          MR. LEYVA:  Okay.                              03:06:48p

18     Q.   So did, in fact, Mr. Cates come in and perform 03:06:50p

19  an audit, as to your understanding of the audit, within 03:06:53p

20  the last two years, the way you described the audit?    03:06:57p

21     A.   I don't know that my understanding is what     03:06:59p

22  that means.                                             03:07:01p

23     Q.   I'm not asking you that.  I'm asking you, did  03:07:02p

24  Mr. Cates, in your own words, come in and do what you   03:07:04p

25  said was an audit?                                      03:07:08p

1    A.  No.         03:07:10p

2    Q.  He did not?      03:07:10p

3    A.  No.         03:07:11p

4    Q.  Did anyone, in the last two years, come in and  03:07:16p

5  do an audit, based on your terminology?  03:07:18p

6    A.  No.         03:07:20p

7    Q.  Is it your understanding, then, this is a  03:07:22p

8  mistake?  03:07:24p

9       MR. SMELTZER:  Objection as to --  03:07:26p

10  BY MR. LEYVA:  03:07:28p

11    Q.  Number 19.  03:07:28p

12       MR. SMELTZER:  -- the form of the question.  03:07:29p

13       THE DEPONENT:  I don't know that that's a  03:07:30p

14  mistake.  I don't -- I don't know.  03:07:31p

15  BY MR. LEYVA:  03:07:33p

16    Q.  Let me ask you a question.  Did you review  03:07:33p

17  this answer and the entire Petition with your attorney?  03:07:35p

18    A.  I went over the documents.  03:07:37p

19    Q.  You did?  Did you go over each line item, the  03:07:39p

20  question and answer?  03:07:42p

21    A.  We went over the document.  03:07:44p

22    Q.  So you did not go over each line item.  I  03:07:47p

23  asked a specific question.  03:07:50p

24    A.  I don't recall if we went over each line item.  03:07:51p

25  We did go over the document.  03:07:53p

Page 165

| | | |
|---|---|---|
| 1 | Q.   That's fine. | 03:07:54p |
| 2 |     I would like to turn your attention to | 03:08:00p |
| 3 | Exhibit 9.  It's the amended bankruptcy petition.  And | 03:08:03p |
| 4 | in particular, it's on the second page, Item Number 22, | 03:08:18p |
| 5 | Schedule B. | 03:08:23p |
| 6 |     MR. SMELTZER:  Back on 9? | 03:08:26p |
| 7 |     MR. LEYVA:  Nine.  This is 9.  This is the | 03:08:27p |
| 8 | Amended Petition. | 03:08:30p |
| 9 | Q.   It's page 2, Mr. Rabon. | 03:08:49p |
| 10 | A.   What's that? | 03:08:50p |
| 11 | Q.   It's page 2. | 03:08:51p |
| 12 | A.   Okay.  Okay. | 03:08:52p |
| 13 | Q.   Before we move on, Mr. Rabon, I would like to | 03:09:11p |
| 14 | ask you one more question about Mr. Cates. | 03:09:13p |
| 15 |     Did Mr. Cates work with your bankruptcy | 03:09:15p |
| 16 | attorney, participate in the review of this Petition? | 03:09:19p |
| 17 | Meet with you? | 03:09:23p |
| 18 | A.   Meet with me? | 03:09:25p |
| 19 | Q.   And/or -- | 03:09:26p |
| 20 |     MR. SMELTZER:  I'll object -- | 03:09:27p |
| 21 | BY MR. LEYVA: | 03:09:28p |
| 22 | Q.   Meet with you.  Did he meet with you? | 03:09:28p |
| 23 | A.   No. | 03:09:30p |
| 24 | Q.   Did he meet with your bankruptcy attorney to | 03:09:31p |
| 25 | prepare this Petition? | 03:09:32p |

Page 166

1      A.   Not that I'm aware of.  I'm not sure.          03:09:33p

2      Q.   Okay.  Let me start by asking, what           03:09:37p

3   necessitated the amendment of your bankruptcy petition?  03:09:47p

4   Your understanding of what necessitated the amendment.   03:09:52p

5      A.   To clarify the first Petition, or whatever.   03:10:04p

6      Q.   Clarify in what way?                           03:10:09p

7      A.   The first document.                            03:10:11p

8      Q.   Right.  To clarify in what way?                03:10:12p

9      A.   In this particular case, probably the website  03:10:15p

10  information.                                            03:10:21p

11     Q.   The original Petition contained just websites;  03:10:22p

12  is that correct?  We can go back and look at it.        03:10:28p

13  That's correct.                                         03:10:56p

14          Is it your understanding that the original     03:10:56p

15  Petition -- You need time, Rob?                         03:10:58p

16          MR. SMELTZER:  Yeah.                            03:11:00p

17          MR. LEYVA:  Fine.                               03:11:02p

18          THE DEPONENT:  Okay.                            03:11:05p

19  BY MR. LEYVA:                                           03:11:09p

20     Q.   Is it your understanding that the original     03:11:09p

21  Petition, Schedule B and Number 22, contains solely     03:11:10p

22  websites secured by Colonial for an amount of $1,500,    03:11:15p

23  without a specific list of websites?                    03:11:23p

24     A.   I -- I didn't -- My bankruptcy attorney --      03:11:28p

25  this is what he put.                                    03:11:41p

Page 167

1    Q.   He just invented it?  Where did he get this          03:11:44p

2  number?  Where did he get the number?                       03:11:48p

3    A.   Well --                                              03:11:50p

4    Q.   I mean, the $1,500.                                  03:11:51p

5    A.   He said --                                           03:11:55p

6         MR. SMELTZER:  No, no, no.  That's                   03:11:56p

7  protected by attorney/client privilege in this             03:11:57p

8  matter and every other.  You need not disclose,            03:12:00p

9  unless you voluntarily choose to, which I advise           03:12:03p

10  you against, any communications between you and           03:12:05p

11  your bankruptcy attorney.                                 03:12:07p

12  BY MR. LEYVA:                                             03:12:09p

13    Q.   Did you have any input as to the $1,500 amount     03:12:09p

14  in Schedule B of your original Petition?                  03:12:15p

15         MR. SMELTZER:  I'm going to object to that,        03:12:20p

16  because I think it calls for him to disclose the          03:12:21p

17  attorney/client protected --                              03:12:24p

18         MR. LEYVA:  Answer the question, please.           03:12:25p

19         MR. SMELTZER:  I'm instructing you not to          03:12:26p

20  answer.                                                   03:12:28p

21         MR. LEYVA:  Go out and see if we can get           03:12:32p

22  the Magistrate on the phone.                              03:12:34p

23            (Recess held at this time.)                     03:12:41p

24             (Record read at this time)                     03:14:29p

25         THE DEPONENT:  Yes.                                03:14:46p

Page 168

1        MR. LEYVA:  Thank you.                          03:14:52p

2   Q.  I'm going to turn your attention to the         03:14:56p

3   Amended Petition.  The Amended Petition, Mr. Rabon, has   03:14:57p

4   an Exhibit B and an Exhibit C; is that correct?     03:15:17p

5   A.  At least those, yes.                            03:15:25p

6   Q.  Can you describe to me, just in general terms,  03:15:27p

7   what Exhibit B contains?                            03:15:29p

8        MR. SMELTZER:  I'll object.  I think the       03:15:53p

9        document speaks for itself.  You can answer.   03:15:55p

10       THE DEPONENT:  Yeah.  "All of the text         03:15:58p

11       images, layout or arrangement, HTML source code,   03:16:02p

12       domain names, subdomain names, subdomains,     03:16:06p

13       links, metatags, key words, connections, landing   03:16:08p

14       pads, registrations and other information      03:16:11p

15       relating to the following sites."              03:16:13p

16       MR. LEYVA:  Okay, you don't need to read       03:16:15p

17       each sites.                                    03:16:17p

18   Q.  These are sites and domain names owned by      03:16:17p

19   Rabco -- allegedly owned by Rabco Leasing, Inc., is 03:16:21p

20   that correct, to the best of your knowledge?       03:16:22p

21   A.  To the best of my knowledge.                   03:16:24p

22   Q.  And Exhibit C -- and both of these are related 03:16:28p

23   to Item Number 22 on Schedule B.  Can you read to me   03:16:34p

24   what it says in bold under Exhibit C.              03:16:39p

25   A.  "Rabco Trademarks, Item # 22."                 03:16:45p

Page 169

1    Q.   Okay.  And is it your understanding, in the          03:16:52p

2    amended bankruptcy petition, that both Exhibit B and       03:16:56p

3    Exhibit C, Schedule B, Number 22, are valued at $1,500?    03:17:02p

4    A.   That's the price on the document.                     03:17:18p

5    Q.   That's all I'm asking.                                03:17:21p

6         Is it your understanding that the intellectual        03:17:25p

7    capital that helped generate millions of dollars of        03:17:28p

8    revenue over a period of years is now valued at $1,500,    03:17:31p

9    as per the intellectual property that's included           03:17:40p

10   specifically in Exhibit B and Exhibit C.?                  03:17:44p

11   A.   That's the value we used.                             03:17:47p

12   Q.   That wasn't my question.  My question is, do          03:17:50p

13   you think that that is the accurate value?                 03:17:53p

14        MR. SMELTZER:  I'll object, to the extent             03:18:00p

15        it calls for a legal conclusion of what "value"       03:18:02p

16        is in bankruptcy.  But you can answer your            03:18:07p

17        understanding.                                        03:18:09p

18        THE DEPONENT:  Yeah.  I don't -- yeah,                03:18:09p

19        perhaps.                                              03:18:13p

20   BY MR. LEYVA:                                              03:18:15p

21   Q.   Well, let me ask you this question:  Are these        03:18:15p

22   assets -- is it your understanding that the amounts        03:18:20p

23   that you put on your bankruptcy petition are the           03:18:24p

24   amounts that the Trustee will attempt to sell the          03:18:27p

25   assets for?                                                03:18:30p

```
 1      A.   I have no idea what she'll try to sell them      03:18:31p

 2    for.                                                    03:18:34p

 3      Q.   You have no idea?  Okay.                         03:18:34p

 4         MR. SMELTZER:  That's what he said.                03:18:40p

 5         THE DEPONENT:  Yeah, I have no idea.               03:18:41p

 6         MR. LEYVA:  That's fine.  That's fine.             03:18:42p

 7      Q.   Mr. Rabon, I'm going to turn back to            03:18:50p

 8    Exhibit B.  There's a list of domain names; is that    03:18:53p

 9    correct?                                                03:18:55p

10      A.   Yes.                                             03:19:03p

11      Q.   I'm going to introduce Exhibit 11 that has a    03:19:07p

12    Rabco Bates number of RAB000380, Exhibit 11.           03:19:12p

13         (Plaintiff's Exhibit 11 was marked for           03:19:19p

14      identification.)                                      03:19:19p

15         MR. SMELTZER:  Just so the record is clear,       03:19:27p

16      this is a document from plaintiff that we Bates      03:19:29p

17      labeled.                                              03:19:34p

18         THE DEPONENT:  That we what?                      03:19:36p

19         MR. SMELTZER:  That we Bates labeled.  We         03:19:37p

20      put our number on it.                                03:19:39p

21         THE DEPONENT:  Well, that's where he got          03:19:41p

22      it, down here.                                        03:19:41p

23         MR. SMELTZER:  This is not from us.               03:19:41p

24         MR. LEYVA:  I object to that.  There's no         03:19:42p

25      foundation laid that it's one of our documents       03:19:44p
```

```
 1    that you Bates numbered.  That's to be            03:19:46p

 2    determined at some --                             03:19:48p

 3        MR. SMELTZER:  No, no.  It's your Exhibit J   03:19:49p

 4    attached to your pleadings in the case.           03:19:51p

 5        MR. LEYVA:  Attached to what pleadings in     03:19:53p

 6    the case?  Be specific.                           03:19:55p

 7        MR. SMELTZER:  It was, I believe, the         03:19:57p

 8    26(A)1.  I can absolutely guarantee this is your  03:19:59p

 9    document.  So I object -- I was -- what I was      03:20:03p

10    objecting to is the suggestion, if any -- I        03:20:07p

11    didn't know that you were intending to do this     03:20:10p

12    or not -- the suggestion that the document came    03:20:11p

13    from us because it had a Bates number on it from   03:20:14p

14    us.                                               03:20:18p

15        MR. LEYVA:  Okay.  So your contention is       03:20:19p

16    that we produced this as part of our FRPC Rule     03:20:23p

17    26 disclosures, and you gave it back to us; is     03:20:27p

18    that correct?                                     03:20:29p

19        MR. SMELTZER:  Yes.                            03:20:29p

20        MR. LEYVA:  You Bates stamped it and gave     03:20:30p

21    it back to us.                                    03:20:31p

22        MR. SMELTZER:  Yes, because I wanted to be     03:20:32p

23    able to use it.                                   03:20:34p

24        MR. LEYVA:  That's fine.                       03:20:35p

25        MR. SMELTZER:  Yeah.                           03:20:35p
```

```
 1   BY MR. LEYVA:                                          03:20:41p
 2      Q.   Mr. Rabon, with respect to those domain names  03:20:41p
 3   in Exhibit B, is it your contention that they are all  03:20:47p
 4   owned by Rabco Leasing, Inc.?                          03:20:53p
 5         MR. SMELTZER:  Can you read back the             03:20:57p
 6      question.                                           03:20:58p
 7            (Record read at this point.)                  03:20:59p
 8         MR. SMELTZER:  You're asking him currently,      03:21:13p
 9      if it's his understanding that currently Rabco      03:21:15p
10      owns all these, or as of the time that --           03:21:18p
11         MR. LEYVA:  As of the time that it was           03:21:21p
12      filed.                                              03:21:22p
13         MR. SMELTZER:  Okay.  So as -- the question      03:21:22p
14      is, as of July 20th, 2010, was this your            03:21:25p
15      understanding that Rabco owned all these domain     03:21:28p
16      names?                                              03:21:33p
17         THE DEPONENT:  Okay.  So please ask me the       03:22:24p
18      question one more time.                             03:22:26p
19         MR. LEYVA:  Can you repeat the question.         03:22:27p
20            (Record read at this point.)                  03:22:29p
21         THE DEPONENT:  Currently they are not.  At       03:22:50p
22      the time of the filing, they were.                  03:22:51p
23   BY MR. LEYVA:                                          03:22:56p
24      Q.   Can you explain that to me?  I mean, they      03:22:56p
25   weren't -- I understood they weren't -- they currently 03:23:00p
```

Page 173

1    aren't.  Do you own some of these personally, these          03:23:03p

2    domain names now personally?                                 03:23:06p

3         A.   Yes.                                               03:23:08p

4         Q.   Wasn't it your understanding that these domain     03:23:08p

5    names were property of the bankruptcy estate?                03:23:10p

6         A.   No.                                                03:23:12p

7         Q.   That wasn't your understanding?                    03:23:13p

8         A.   No.                                                03:23:15p

9              MR. SMELTZER:  I'll object to lack of time         03:23:15p

10        frame.                                                  03:23:17p

11   BY MR. LEYVA:                                                03:23:18p

12        Q.   At the time that you submitted Exhibit B in        03:23:18p

13   your Amended Petition -- I think it was the 20th of          03:23:23p

14   July.  I could be mistaken.  What's the date on here?        03:23:28p

15   7-20-2010 -- were these domain names owned by Rabco          03:23:30p

16   Leasing, Inc.?                                               03:23:37p

17             MR. SMELTZER:  Well, I'll object, only to          03:23:39p

18        this extent -- to the form of the question.             03:23:40p

19        Because I think an amended schedule goes back to        03:23:43p

20        the time of Petition, so that the whole -- I            03:23:45p

21        don't know that -- I think the effect of the            03:23:47p

22        Amended Petition is to go back to the time of           03:23:49p

23        the Original Petition and say, "As of the time I        03:23:52p

24        filed bankruptcy --"                                    03:23:54p

25             MR. LEYVA:  That's fine.  That's fine.             03:23:56p

Page 174

| | | |
|---|---|---|
| 1 | MR. SMELTZER:  Okay. | 03:23:57p |
| 2 | THE DEPONENT:  At the time of the | 03:23:58p |
| 3 | bankruptcy, this appears to be the list. | 03:23:59p |
| 4 | BY MR. LEYVA: | 03:24:02p |
| 5 | Q.   Did some of these domain names expire post the | 03:24:02p |
| 6 | time that you filed bankruptcy? | 03:24:06p |
| 7 | A.   Yes. | 03:24:07p |
| 8 | Q.   And did you purchase -- | 03:24:08p |
| 9 | A.   Yes. | 03:24:10p |
| 10 | Q.   And they were property of the estate at the | 03:24:12p |
| 11 | time they expired, were they not? | 03:24:16p |
| 12 | MR. SMELTZER:  I'll object to the form of | 03:24:18p |
| 13 | the question. | 03:24:19p |
| 14 | MR. LEYVA:  We just established that we | 03:24:20p |
| 15 | went back to the original time of the Petition | 03:24:22p |
| 16 | and that these were the -- owned by Rabco | 03:24:23p |
| 17 | Leasing, Inc. | 03:24:25p |
| 18 | MR. SMELTZER:  So immediately prior to | 03:24:27p |
| 19 | expiration. | 03:24:28p |
| 20 | MR. LEYVA:  Okay. | 03:24:29p |
| 21 | Q.   So -- | 03:24:30p |
| 22 | A.   What's the question? | 03:24:32p |
| 23 | Q.   You listed these as estate property, correct? | 03:24:34p |
| 24 | A.   Yes. | 03:24:38p |
| 25 | Q.   And Rabco owned them at the time, and they had | 03:24:38p |

Page 175

1    not expired; is that correct?                          03:24:41p

2        A.   Right.                                        03:24:43p

3        Q.   And you allowed them to expire, didn't renew  03:24:45p

4    them under Rabco Leasing, Inc..                         03:24:50p

5            MR. SMELTZER:  I'll object to the form of      03:24:53p

6        the question.                                      03:24:57p

7            MR. LEYVA:  It's a specific question.          03:24:58p

8        Q.   They were -- Were these domain names in a     03:25:00p

9    Rabco Leasing, Inc., registrar account?                03:25:03p

10       A.   Yes.                                          03:25:06p

11       Q.   Were they in a Go Daddy account?              03:25:06p

12       A.   Yes.                                          03:25:10p

13       Q.   And who had control of that Go Daddy account? 03:25:11p

14       A.   I did.                                        03:25:14p

15       Q.   Did you get notices that these domain names   03:25:15p

16   were about to expire?                                  03:25:18p

17       A.   Yes.                                          03:25:18p

18       Q.   And you let them expire, under the Rabco      03:25:19p

19   Leasing, Inc.  You did not renew them.                 03:25:23p

20       A.   Rabco Leasing, Inc., has no funds with which  03:25:27p

21   to procure them.                                       03:25:30p

22       Q.   At the time prior to their expiration, were   03:25:33p

23   they or were they not estate property?                 03:25:37p

24       A.   Probably were, yes.                           03:25:42p

25       Q.   Do these domain names have value?             03:25:43p

Page 176

1       A.    Probably do have some value.                      03:25:49p

2       Q.    Did you inform the Trustee that these domain      03:25:51p

3   names were about to expire, and you were going to let        03:25:54p

4   them expire?                                                 03:25:56p

5       A.    Yes.                                               03:25:57p

6       Q.    You did inform them?  And how did you inform       03:25:58p

7   them?                                                        03:26:03p

8       A.    We were at the Trustee meeting, I told her        03:26:03p

9   they were going to expire.                                   03:26:09p

10      Q.    And on what date was that Trustee meeting?         03:26:11p

11      A.    I don't recall the date.                           03:26:14p

12      Q.    And who was the Trustee?                           03:26:19p

13      A.    Beth Ann Sherrer.                                  03:26:22p

14      Q.    Did you inform her in writing?                     03:26:24p

15      A.    I was sitting across from her.                     03:26:28p

16      Q.    You informed her that Rabco Leasing, Inc., had     03:26:30p

17  domain names that had some value, that were about to         03:26:33p

18  expire, and she said it was okay to let them expire.         03:26:38p

19  Is that my understanding?                                    03:26:42p

20      A.    I told her -- I didn't say "of value."  I said    03:26:43p

21  there were websites that were going to be expiring.          03:26:48p

22      Q.    And I asked you, did these domain names have       03:26:51p

23  value?                                                       03:26:53p

24            MR. SMELTZER:  Asked and answered.                 03:26:55p

25            THE DEPONENT:  I answered that question.           03:26:56p

Page 177

1    BY MR. LEYVA:                                              03:26:58p

2        Q.    So you let Rabco Leasing, Inc.-owned domain     03:26:58p

3    names expire.                                             03:27:05p

4            MR. SMELTZER:   Objection, asked and              03:27:06p

5        answered.  Now you're badgering him like you're       03:27:07p

6        in trial.                                             03:27:09p

7            MR. LEYVA:   I'm trying to understand here.       03:27:09p

8        Q.    You let them expire and you bought them on      03:27:11p

9    your own behalf; is that correct?                         03:27:13p

10       A.    I can't let them expire.                        03:27:14p

11       Q.    Yes, you can.                                   03:27:16p

12       A.    How is that?                                    03:27:17p

13       Q.    Because you don't renew them.                   03:27:18p

14           MR. SMELTZER:   Objection, argumentative.         03:27:19p

15   BY MR. LEYVA:                                             03:27:22p

16       Q.    Did you not get a notice of their expiration?   03:27:22p

17       A.    Yes.                                            03:27:25p

18       Q.    Could you have renewed them at the time?        03:27:25p

19       A.    No.                                             03:27:27p

20       Q.    Why?                                            03:27:29p

21       A.    Rabco had no funds to renew them.  You have to  03:27:31p

22   pay for that.                                             03:27:34p

23       Q.    You had no -- zero funds to renew?              03:27:35p

24       A.    Rabco had no funds.  I had no ability --        03:27:37p

25   availability of Rabco funds --                            03:27:40p

```
 1      Q.   Okay, that's all I'm trying to understand.        03:27:42p

 2   And you communicated that to the Trustee.                 03:27:44p

 3      A.   I told the Trustee that sites were expiring.      03:27:47p

 4      Q.   But you did not tell the Trustee that these       03:27:49p

 5   sites had value.                                          03:27:52p

 6      A.   It's in the Petition.                             03:27:53p

 7      Q.   No, no.                                           03:27:56p

 8      A.   I don't know --                                   03:27:57p

 9      Q.   I'm asking you a specific question.  You          03:27:57p

10   said -- you said that they had value.                     03:27:59p

11        MR. SMELTZER:  Objection, argumentative.             03:28:02p

12   BY MR. LEYVA:                                             03:28:02p

13      Q.   I'm asking you if you told the Trustee that       03:28:02p

14   these domain names had value?                             03:28:05p

15        MR. SMELTZER:  That's been asked and                 03:28:06p

16     answered two times.                                     03:28:07p

17        MR. LEYVA:  I don't think it has been asked          03:28:08p

18     and answered.                                           03:28:09p

19        MR. SMELTZER:  Yeah, it has.                         03:28:09p

20        MR. LEYVA:  No.                                      03:28:10p

21        MR. SMELTZER:  It has.                               03:28:11p

22        MR. LEYVA:  No.                                      03:28:11p

23        MR. SMELTZER:  You can read it back.                 03:28:11p

24        MR. LEYVA:  Let's read it back.                      03:28:12p

25        MR. SMELTZER:  You can take a time-out,              03:28:13p
```

Page 179

| | | |
|---|---|---|
| 1 | because you're badgering him. | 03:28:14p |
| 2 | MR. LEYVA:  No, I'm not.  I'm trying to get | 03:28:16p |
| 3 | at what he told the Trustee.  He told the | 03:28:18p |
| 4 | Trustee something.  I want to understand exactly | 03:28:20p |
| 5 | what he told the Trustee. | 03:28:22p |
| 6 | MR. SMELTZER:  He said it twice.  You want | 03:28:23p |
| 7 | to read it back? | 03:28:25p |
| 8 | MR. LEYVA:  He did not. | 03:28:26p |
| 9 | MR. SMELTZER:  He said it twice. | 03:28:27p |
| 10 | MR. LEYVA:  That they had value? | 03:28:28p |
| 11 | MR. SMELTZER:  No.  He said what he told | 03:28:30p |
| 12 | her twice. | 03:28:31p |
| 13 | MR. LEYVA:  Well -- | 03:28:32p |
| 14 | MR. SMELTZER:  You asked -- | 03:28:33p |
| 15 | MR. LEYVA:  No.  I'm asking a different | 03:28:34p |
| 16 | question.  I'm asking if -- | 03:28:36p |
| 17 | MR. SMELTZER:  You asked that, too.  You | 03:28:37p |
| 18 | said, "Did you tell her that they had value?" | 03:28:38p |
| 19 | And he said, "I didn't say that they had value. | 03:28:41p |
| 20 | I said that they were about to expire." | 03:28:43p |
| 21 | MR. LEYVA:  Okay.  Okay, we're good. | 03:28:45p |
| 22 | Q.   Mr. Rabon, let's move on to the settlement | 03:28:58p |
| 23 | agreement between you and Mr. Gwynn.  Okay? | 03:29:01p |
| 24 | You and Mr. Gwynn had worked together for some | 03:29:07p |
| 25 | period of time; is that correct? | 03:29:09p |

| | | | |
|---|---|---|---|
| 1 | A. | Correct. | 03:29:11p |
| 2 | Q. | Approximately how long? | 03:29:12p |
| 3 | A. | In dog years or -- you know, I don't know. | 03:29:17p |
| 4 | | Fourteen to 16 years maybe, perhaps. | 03:29:22p |
| 5 | Q. | So he was an employee -- he was your employee, | 03:29:24p |
| 6 | | W2 employee, is that correct, in Rabco Leasing, Inc.? | 03:29:26p |
| 7 | A. | Yes. | 03:29:29p |
| 8 | Q. | And he was also your partner in Hurricane Pass | 03:29:29p |
| 9 | | Traders, Inc., is that correct?  A shareholder. | 03:29:34p |
| 10 | A. | Yes. | 03:29:38p |
| 11 | Q. | You guys owned Hurricane Pass Traders, Inc. | 03:29:38p |
| 12 | A. | Yes. | 03:29:41p |
| 13 | Q. | He owned 50 percent of the shares and you | 03:29:41p |
| 14 | | owned 50 percent of the shares; is that correct? | 03:29:43p |
| 15 | A. | Yes. | 03:29:45p |
| 16 | Q. | And what led to Mr. Gwynn being released from | 03:29:48p |
| 17 | | Rabco Leasing, Inc.? | 03:29:54p |
| 18 | A. | Well, that's kind of a long story. | 03:30:13p |
| 19 | Q. | All right.  You can tell the short version, if | 03:30:18p |
| 20 | | you'd like. | 03:30:21p |
| 21 | A. | At one point, I was going to tell him over a | 03:30:22p |
| 22 | | beer when it all happened, so how do you want me to | 03:30:24p |
| 23 | | answer that? | 03:30:29p |
| 24 | Q. | Just summarize it for me. | 03:30:29p |
| 25 | A. | Summarize it.  He refused to take a position | 03:30:31p |

1   that I needed him to take, to help the company preserve          03:30:34p

2   expenses and try to preserve its existence.  Not only            03:30:40p

3   did he refuse to do it, he cussed me up and down, said           03:30:42p

4   he would not do it.                                              03:30:46p

5        Q.   Okay.                                                  03:30:48p

6        A.   At that point I realized I did not have                03:30:49p

7   someone on my team, so I began to -- I literally                 03:30:52p

8   thought I could switch the Internet from here to here.           03:30:56p

9   Found out that I could not do that the way the websites          03:30:59p

10  were set up.                                                     03:31:03p

11        And the fact that he was not cooperating,                  03:31:06p

12  taking over a store from me, even on a temporary basis,          03:31:12p

13  it was a cumulative effect and I had no other choice.            03:31:16p

14       Q.   Let me ask you this:  What was the deal that           03:31:20p

15  you asked him to take and that he refused to take, that          03:31:26p

16  he turned down?                                                  03:31:29p

17       A.   I asked him to either go into the John's Pass          03:31:29p

18  store or go into the Bay Walk Hurricane Pass store,              03:31:36p

19  either one of them.                                              03:31:39p

20       Q.   Right.                                                 03:31:40p

21       A.   Run the store so I can either lay off a                03:31:41p

22  manager or cut them back, cut their hours back.  I               03:31:45p

23  would take the other store, and while he was in the              03:31:48p

24  store he could continue to work on the Internet.                 03:31:53p

25       Q.   Did you ask him to take a reduction in pay?            03:31:57p

Page 182

```
1      A.   I asked everybody to take a reduction in pay.     03:31:59p

2      Q.   How much was that reduction in pay?               03:32:01p

3      A.   For who?                                          03:32:03p

4      Q.   For everybody.  You said you asked everybody      03:32:04p

5   to take a reduction in pay.                               03:32:06p

6      A.   I don't remember the exact number.  It could      03:32:08p

7   have been around 10 percent.  I don't remember the        03:32:10p

8   exact number.                                             03:32:12p

9      Q.   Did all employees take this 10 percent            03:32:13p

10  reduction?                                                03:32:15p

11     A.   People took reductions in different ways.         03:32:18p

12  Some might have been a percentage; some might have just   03:32:22p

13  had their hours cut.  So, generically, everyone was       03:32:25p

14  affected by either a percentage cut, hourly cut -- not    03:32:32p

15  hourly cut -- but yeah, hours that they could work.       03:32:37p

16     Q.   Did you take a 10 percent?                        03:32:40p

17     A.   Yes, I did.                                       03:32:42p

18     Q.   -- cut?                                           03:32:44p

19          MR. SMELTZER:  Wait.  You didn't wait for         03:32:44p

20      him to finish.  He said 10 percent -- there was       03:32:46p

21      a percentage at the end of that.                      03:32:48p

22          THE DEPONENT:  He said, did I take a cut?         03:32:51p

23          MR. LEYVA:  No, I said 10 percent.                03:32:53p

24          MR. SMELTZER:  He said 10 percent.                03:32:54p

25          THE DEPONENT:  I don't know what I took.          03:32:55p
```

Page 183

1        MR. SMELTZER:  That's why you're not          03:32:55p

2     supposed to talk over each.                       03:32:56p

3  BY MR. LEYVA:                                         03:32:58p

4     Q.   The question was, did you also take a 10      03:32:58p

5  percent cut?                                          03:33:00p

6     A.   I don't remember what mine was.               03:33:01p

7     Q.   In any case, they would be reflected in the   03:33:04p

8  payroll records.                                      03:33:07p

9     A.   Yes.                                          03:33:07p

10     Q.   And so, if I understand you correctly,       03:33:08p

11  Mr. Gwynn refused to accept these assignments that you  03:33:12p

12  offered him --                                        03:33:16p

13     A.   Yes.                                         03:33:17p

14     Q.   -- is that correct?  Okay.                   03:33:18p

15        Now, during this time, was Corporate Pride     03:33:23p

16  hosting your Internet service, or was Martin, Jr. and  03:33:34p

17  Martin Gwynn together hosting your Internet service?  03:33:42p

18        MR. SMELTZER:  I'll object to the form of      03:33:44p

19     the "during this time."  I'm not sure what         03:33:47p

20     you're talking about.                             03:33:49p

21        THE DEPONENT:  What period of time?            03:33:49p

22              ////////////////                         03:33:51p

23  BY MR. LEYVA:                                         03:33:51p

24     Q.   The period of time when you asked Mr. Gwynn to  03:33:51p

25  take a reduction in pay and to take a new assignment,  03:33:54p

1    and he refused, okay.  At that time, was Corporate          03:33:58p

2    Pride hosting your servers, Rabco's servers?               03:34:05p

3        A.    Could have been in and around that time.         03:34:09p

4        Q.    One month prior to that time, who was hosting    03:34:15p

5    your servers?                                              03:34:19p

6        A.    The prior server host was Aztec 1, who we        03:34:20p

7    contracted with.                                           03:34:27p

8        Q.    At what point in time did Corporate Pride        03:34:27p

9    start hosting your servers?                                03:34:31p

10       A.    I don't know specifically.  It might have been   03:34:38p

11   in early -- late '08, early '09.                           03:34:40p

12       Q.    Okay.  And at what point in time did you         03:34:46p

13   terminate Mr. Gwynn's employment?                          03:34:48p

14       A.    July 22nd, 1909 -- or 2009.  1909.               03:34:51p

15             MR. SMELTZER:  You guys have been together       03:34:58p

16       a long time.                                           03:34:59p

17   BY MR. LEYVA:                                              03:35:00p

18       Q.    During that time you were paying, were you      03:35:00p

19   not, a monthly service fee for Corporate Pride to host     03:35:04p

20   your servers?                                              03:35:07p

21       A.    Service fee?                                     03:35:11p

22       Q.    A fee.                                           03:35:12p

23       A.    Who was I -- Ask the question again.             03:35:14p

24       Q.    Did you pay Corporate Pride a fee to host your   03:35:16p

25   servers?                                                   03:35:19p

Page 185

1    A.   I paid Corporate Pride as an outside vendor,        03:35:21p

2  at his recommendation, to be our -- the host.              03:35:25p

3    Q.   Yes, that's all I'm asking.                         03:35:30p

4    A.   Yes.                                                03:35:31p

5    Q.   Yes.  And what was that monthly fee?  Do you        03:35:32p

6  remember?  Do you recall?                                  03:35:34p

7    A.   Five to six hundred dollars.                        03:35:39p

8    Q.   And at the time that you terminated                 03:35:43p

9  Mr. Gwynn's employment, was there money still owed to      03:35:45p

10  Corporate Pride, past due?                                03:35:50p

11    A.   For what?                                          03:35:54p

12    Q.   For hosting your servers.  Did they do             03:35:56p

13  something else for you?                                   03:36:00p

14    A.   Not to my knowledge.                               03:36:01p

15    Q.   All right.  Then that's what it was.               03:36:02p

16         Was there money past due for the hosting           03:36:04p

17  services that they were providing, money that you owed    03:36:07p

18  Corporate Pride, that you hadn't paid?                    03:36:10p

19    A.   Not for hosting, not to my knowledge.              03:36:11p

20    Q.   Then for what?  Was there any money owed?          03:36:14p

21    A.   No.                                                03:36:17p

22    Q.   There was no money owed?                           03:36:17p

23    A.   No.                                                03:36:18p

24    Q.   Absolutely none?                                   03:36:19p

25    A.   Not to my knowledge.                               03:36:20p

1    Q.   No unreimbursed expenses that Mr. Gwynn had,          03:36:20p

2    that he had incurred on behalf of Rabco?                   03:36:23p

3    A.   Corporate Pride, as far as I understood, is           03:36:25p

4    the son, and he had a server that our sites were on,       03:36:30p

5    and as far as I know, the fees, the bills for his --       03:36:34p

6    that service, as far as I know, were paid.                 03:36:39p

7    Q.   That's fine.                                          03:36:41p

8         So at the time that you terminated Mr. Gwynn,         03:36:43p

9    your contention is you owed Corporate Pride no amount,     03:36:45p

10   no past due amount; is that correct?                       03:36:50p

11   A.   Absolutely, as far as I recall, sure.                 03:36:52p

12   Q.   That's fine.  Did Mr. Gwynn have any                  03:36:53p

13   unreimbursed expenses that he had incurred on behalf of    03:36:58p

14   Rabco that had not been paid to Mr. Gwynn, that he had     03:37:01p

15   incurred as an employee, as a W2 employee of Rabco?        03:37:05p

16   Were there unreimbursed expenses at the time that you      03:37:10p

17   terminated Mr. Gwynn?                                      03:37:14p

18   A.   To my knowledge, no.  It was simultaneous.            03:37:40p

19   Q.   Explain to me --                                      03:37:46p

20   A.   He had receipts for stuff that he had paid            03:37:48p

21   for, like he had done for years.  He had not turned        03:37:52p

22   them in.  We had asked him to turn them in.  I like        03:37:56p

23   little payments.  We'd asked him, over time, to turn       03:38:00p

24   them in.                                                   03:38:03p

25        So when he was terminated, we needed to               03:38:04p

Page 187

```
 1    confirm that what we were going to pay him for was, in        03:38:10p
 2    fact, legitimate stuff that was on the websites.  His         03:38:16p
 3    receipts, often times, were in disarray.  One time I          03:38:19p
 4    got a receipt for a carton of cigarettes from him.            03:38:22p
 5         Q.   Mr. Rabon, I asked you a specific question,         03:38:24p
 6    and this is a "Yes" or "No" answer.                           03:38:28p
 7              At the time that you terminated Mr. Gwynn,           03:38:30p
 8    were there unreimbursed expenses that Mr. Gwynn, as a         03:38:33p
 9    W2 employee of Rabco, was due and had not been paid?          03:38:37p
10    "Yes" or "No"?                                                03:38:42p
11         A.   No, not to my knowledge.                            03:38:43p
12         Q.   All right.  None?                                   03:38:45p
13         A.   Not to my knowledge.                                03:38:48p
14         Q.   So, these expenses that you were referring to      03:38:49p
15    earlier, what were they?                                      03:38:52p
16         A.   What were the expenses?                             03:38:54p
17         Q.   Yeah.  That he had incurred.                        03:38:55p
18         A.   Rabco's Earthlink account, Rabco's Constant         03:38:57p
19    Contact account.  Rabco's stuff we incurred talking to       03:39:01p
20    a Russian tech guy to help on the carts.  Things of          03:39:07p
21    that nature.  There's a list.                                 03:39:13p
22         Q.   Let me ask you this:  Are those not               03:39:15p
23    unreimbursed expenses that Mr. Gwynn incurred on behalf       03:39:17p
24    of Rabco?                                                     03:39:22p
25         A.   They weren't unreimbursed.  He was paid.          03:39:25p
```

Page 188

1      Q.   He was paid in full at the time of the          03:39:28p

2  settlement agreement?                                     03:39:31p

3      A.   To my knowledge, yes.                            03:39:32p

4      Q.   Wasn't there an exchange of money as part of     03:39:36p

5  signing the settlement agreement?                         03:39:41p

6      A.   Yes.                                             03:39:42p

7      Q.   What was that exchange of money about?  Why      03:39:43p

8  did you pay Mr. Gwynn an amount of money at the time of   03:39:46p

9  the settlement agreement?                                 03:39:49p

10     A.   Those were for these various expenses that he    03:39:50p

11 had not turned in, that dollar -- That check was for      03:39:53p

12 that.                                                     03:39:57p

13     Q.   Were these expenses that he incurred on behalf   03:39:57p

14 of Rabco as a W2 employee, "Yes" or "No"?                 03:40:00p

15          MR. SMELTZER:  Wait.  It presupposes that        03:40:03p

16     it's only "Yes" or "No."  He can not know.            03:40:05p

17          THE DEPONENT:  I don't know.                     03:40:09p

18 BY MR. LEYVA:                                             03:40:11p

19     Q.   But you characterized -- I'm going to ask you    03:40:11p

20 to characterize them one more time, and we can move       03:40:14p

21 on --                                                     03:40:16p

22          The kinds of expenses that you paid for at the   03:40:17p

23 time of the settlement agreement, there was a list of     03:40:21p

24 expenses, were there not?                                 03:40:24p

25     A.   Yes.                                             03:40:25p

```
 1        Q.    And those expenses were paid on a condition      03:40:27p
 2   that Mr. Gwynn would sign a settlement agreement; is        03:40:31p
 3   that true?                                                  03:40:34p
 4        A.    No, it wasn't a condition.                       03:40:41p
 5        Q.    So you would have paid Mr. Gwynn those           03:40:44p
 6   expenses even if he wouldn't have signed the settlement     03:40:47p
 7   agreement?                                                  03:40:49p
 8        A.    I always had.                                    03:40:50p
 9        Q.    It was not a condition of the agreement; is      03:40:54p
10   that correct?                                               03:40:55p
11            MR. SMELTZER:  Asked and answered.                 03:41:00p
12            THE DEPONENT:  I don't -- I don't know that        03:41:01p
13       it would have been a total condition.                  03:41:02p
14   BY MR. LEYVA:                                               03:41:13p
15        Q.    Do you understand that the settlement           03:41:13p
16   agreement is a contract between the parties?                03:41:14p
17        A.    The parties?                                     03:41:17p
18        Q.    Rabco Leasing, Inc., the parties that signed     03:41:18p
19   the settlement agreement.                                   03:41:21p
20        A.    Yes.                                             03:41:22p
21        Q.    Who were the parties that signed the             03:41:22p
22   settlement agreement?                                       03:41:24p
23        A.    It would have been Rabco Leasing and Martin.     03:41:25p
24        Q.    Correct.  Is it your understanding that          03:41:30p
25   settlement agreement is a private contract, it's a          03:41:33p
```

| | | |
|---|---|---|
| 1 | contract between those two parties? | 03:41:36p |
| 2 | A.   I don't know that I understand that. | 03:41:39p |
| 3 | Q.   You don't understand the nature of a contract, | 03:41:44p |
| 4 | from a business perspective? | 03:41:46p |
| 5 | A.   Probably not as well as an attorney, no. | 03:41:48p |
| 6 | Q.   No.  I mean -- | 03:41:50p |
| 7 | A.   I mean -- | 03:41:52p |
| 8 | Q.   Didn't you enter into many contracts while you | 03:41:53p |
| 9 | were President of Rabco? | 03:41:56p |
| 10 | A.   Not a lot.  Not many. | 03:41:58p |
| 11 | Q.   Was a leasing agreement a contract? | 03:42:00p |
| 12 | A.   A leasing agreement would be a contract that | 03:42:04p |
| 13 | could last 15 years and I'd never look at it again. | 03:42:07p |
| 14 | Q.   But it's a contract. | 03:42:10p |
| 15 | A.   What is a contract? | 03:42:12p |
| 16 | Q.   But it was a contract.  I'm just asking -- | 03:42:13p |
| 17 | MR. SMELTZER:  I'll object to the line -- | 03:42:16p |
| 18 | BY MR. LEYVA: | 03:42:17p |
| 19 | Q.   I'm asking if it was your understanding that | 03:42:17p |
| 20 | that was a contract? | 03:42:20p |
| 21 | MR. SMELTZER:  Let me object to the line of | 03:42:20p |
| 22 | questioning on relevance grounds.  I don't see | 03:42:22p |
| 23 | the relevance of any of this. | 03:42:26p |
| 24 | THE DEPONENT:  It was an agreement. | 03:42:29p |
| 25 | BY MR. LEYVA: | 03:42:34p |

```
 1      Q.   And in the contracts that you've entered into     03:42:34p
 2  as an executive, is there usually value exchanged in       03:42:38p
 3  those types of agreements?  You enter into an              03:42:43p
 4  agreement, and one party gets something and the other      03:42:46p
 5  party gets something; is that correct?                     03:42:48p
 6      A.   Yeah.                                              03:42:51p
 7      Q.   Okay.  And what was the value that Rabco got       03:42:52p
 8  from the settlement agreement?                             03:43:01p
 9      A.   The value that Rabco got ultimately was we got    03:43:05p
10  all that stuff that we paid for, all the shopping          03:43:10p
11  carts, the Earthlink stuff, the Constant Contact stuff,    03:43:15p
12  we got all that.                                           03:43:21p
13      Q.   And what was the value that Mr. Gwynn got,         03:43:22p
14  from your perspective, from signing the settlement         03:43:25p
15  agreement?                                                 03:43:27p
16      A.   He got ninety-some hundred dollars.               03:43:30p
17      Q.   How would you characterize those $9,600?          03:43:36p
18      A.   $9,600 or so.                                     03:43:40p
19      Q.   Of unreimbursed expenses?                         03:43:42p
20      A.   What do you mean, how would I characterize        03:43:44p
21  it?                                                        03:43:47p
22      Q.   Were they unreimbursed expenses?  "Yes" or        03:43:47p
23  "No"?                                                      03:43:49p
24      A.   He was reimbursed.                                03:43:49p
25      Q.   He was reimbursed by the payment of the           03:43:51p
```

Page 192

1    $9,000?                                                     03:43:53p

2        A.   I would say.                                       03:43:54p

3        Q.   Okay, that's fine.  We can move on.                03:43:55p

4             I want to ask you a little bit about access to     03:44:04p

5    HPT records.                                                03:44:07p

6                 (Recess held at this time.)                    03:44:23p

7             (Said deponent wished to read and sign the         05:58:03p

8        deposition, and the taking of this deposition           05:58:03p

9        was recessed at this point)                             05:58:03p

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 193

1                    CERTIFICATE OF REPORTER OATH

2

3       STATE OF FLORIDA

4

5       COUNTY OF PINELLAS

6

7

8                    I, the undersigned authority, certify that

9       BRUCE RABON personally appeared before me on

10      August 18th, 2010, at 9:04 a.m. and was duly sworn.

11                    WITNESS my hand and official seal this

12      18th day of August, 2010.

13

14

15

16      _____

17                    Jerry P. Lefler
                       CSR RPR CRR CM
18                    Notary Public - State of Florida
                       Commission No:  DD553697
19                    My Commission Expires:  May 14, 2014

20

21

22

23

24

25

Page 194

1                    CERTIFICATE OF COURT REPORTER

2

3      STATE OF FLORIDA

4

5      COUNTY OF PINELLAS

6

7          I, Jerry P. Lefler, Court Reporter, certify that I
       was authorized to and did stenographically report the
8      deposition of BRUCE RABON; that a review of the
       transcript was requested; and that the transcript is a
9      true and correct record of my stenographic notes.

10         I FURTHER CERTIFY that I am not a relative,
       employee, or attorney, or counsel of the parties, nor
11     am I a relative or employee of any of the parties'
       attorneys or counsel connect with the action, nor am I
12     financially interest in the action.

13         DATED this 18th day of August, 2010.

14

15

16

17     _____

18                Jerry P. Lefler RPR CRR CM

19

20

21

22

23

24

25

1       PLEASE ATTACH TO THE DEPOSITION OF: BRUCE RABON
TAKEN ON AUGUST 18, 2010, IN THE CASE OF GWYNN VS RABCO
2  LEASING, ET AL

3                     ERRATA SHEET

4

          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
5
        _____
       Page No.   Line No.   Change       Reason
6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18
     Under penalties of perjury, I declare that I have
19   read the foregoing document and that the facts
     stated therein are true.
20

     _____
21   DATE                         BRUCE RABON

22

23   Orig.:  Carlos A. Leyva, Esq, Digital Business Law
     Group, P.A., 1001 Starkey Road, #18, Largo, Florida
24   33771

25

Page 196

                    Executive Reporting Service
               13555 Automobile Boulevard, Suite 100
                     Clearwater, Florida 33762
                          (727) 823-4155

                                        August 20, 2010


        Mr. Robert Smeltzer, Esq.
        Lowis & Gellen, LLP
        200 W. Adams Street, Suite 1900
        Chicago, Illinois 60606

        Re:  Gwynn vs Rabco Leasing

        Dear Mr. Smeltzer:

             The deposition of BRUCE RABON taken on
        August 18, 2010, in the above-styled case is ready
        for review.  Please have your client make an
        appointment to review the transcript in our office.

             In the alternative, if you have ordered a copy
        of the transcript, and will be handling reading and
        signing, have your client note any corrections on
        the errata sheet provided.

             The review must be complete on or before
        September 20, 2010, and the errata sheet returned
        to: Executive Reporting Service, 13555 Automobile
        Boulevard, Suite 100, Clearwater, Florida 33762, so
        it may be included with the original transcript.

             Please contact our office if there are any
        questions you may have.  Thank you for your prompt
        and careful attention to this matter.

                              Sincerely,



                              Executive Reporting Service



        cc:  Carlos A. Leyva, Esq, Digital Business Law
        Group, P.A., 1001 Starkey Road, #18, Largo, Florida

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARTIN GWYNN,

     Plaintiff,

v.                         Case No.: 8:09-cv-02093

RABCO LEASING, INC.,
BRUCE D. RABON,
ALTON CATES, VIRGINIA HUNTER,
and HURRICANE PASS TRADERS,
INC.,

     Defendants.
_____/

VOLUME II
DEPOSITION OF:
BRUCE RABON

TAKEN BY:    Attorney for Plaintiff

DATE:       August 18, 2010

TIME:       9:04 a.m. - 5:57 p.m.

PLACE:     Executive Reporting Services
            13555 Automobile Boulevard
            Clearwater, Florida 33762

Examination of the witness taken before:

Jerry Lefler CSR RPR CRR CM
Executive Reporting Service
Ulmerton Business Center
13555 Automobile Boulevard, Suite 100
Clearwater, Florida 33762

Page 198

1     APPEARANCES:

2
              CARLOS A. LEYVA, ESQ.
3             Digital Business Law Group, P.A.
              1001 Starkey Road, #18
4             Largo, Florida 33771

5             Attorneys for Plaintiff

6
              ROBERT SMELTZER, ESQ.
7             Lowis & Gellen, LLP
              200 W. Adams Street, Suite 1900
8             Chicago, Illinois 60606

9             Attorney for Virginia Hunter

10

11    ALSO PRESENT:

12    Martin Gwynn
      Virginia Hunter
13

14                    I N D E X

15                                              PAGE

16      Direct Examination by Mr. Leyva          200

17      Cross Examination by Mr. Smeltzer        232

18      Redirect Examination by Mr. Leyva        243

19      Certificate of Court Reporter           256

20      Certificate of Reporter Oath            257

21      Errata Sheet                            258

22      Read and Sign letter                    259

23

24

25

1                    E X H I B I T S

2
                                                      MARK
3        Rabon

4    10    Email August 13, 2010, 5:40 pm, Subject:    230
           Archiving
5
     12    Series of engagement letters from Alton    232
6          Cates

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THEREUPON,

2                         BRUCE RABON

3          was adduced as the deponent herein, and being first

4          duly sworn upon oath, was questioned and testified

5          as follows:

6                    DIRECT EXAMINATION (Cont'd)

7     BY MR. LEYVA:

8          Q.   Mr. Rabon, you ready?

9          A.   Yes.

10         Q.   I would like to ask you some questions

11    surrounding the access to HPT, Inc.'s, records that

12    Mr. Gwynn requested.

13         A.   Okay.

14         Q.   Did he request access to some records that

15    were denied by you?

16         A.   I don't recall denying it.

17         Q.   What do you recall?

18         A.   I recall him pressing the HPT business at this

19    whole culmination of his termination, and I said,

20    "Martin, let's give it a few days, let this settle

21    down.  I'll talk to you about it anytime."

22         Q.   I understand that.  But he asked to see

23    HPT, Inc.'s, records as a 50 percent shareholder, made

24    a request.  Did you deny that request?

25         A.   I don't recall denying it.  I recall he saw

1    them.

2         Q.    Okay.  Do you recall that Mr. Gwynn had to

3    invoke a Florida statute that requires access to

4    shareholder's books, before Mr. Gwynn got access?

5         A.    Ask that one more time.

6         Q.    Do you recall that Mr. Gwynn had to use the

7    authority provided by a Florida statute that allows for

8    shareholders to come and inspect books?

9         A.    I remember he used it.  I didn't remember he

10   had to.

11        Q.    Because you were willing to give him access?

12        A.    Absolutely.

13        Q.    But on your own time frame, when you got ready

14   to.

15        A.    No, just in a couple days.  It was a lot going

16   on --

17        Q.    Is there an E-mail --

18             MR. SMELTZER:  Wait, wait.  Let him finish

19        his answer.

20             MR. LEYVA:  Okay, that's fine.

21             THE DEPONENT:  There was a lot going on.  I

22        was trying to get my life back in order, my

23        business in order.

24             MR. LEYVA:  That's fine.

25             THE DEPONENT:  And I simply asked a 50

1       percent partner, "Give me a few days."

2   BY MR. LEYVA:

3     Q.   Now, is there an E-mail -- Are you aware of an

4  E-mail correspondence between you and Mr. Gwynn that

5  said, "I'll give you access when I get ready to give

6  you access"?

7     A.   I don't recall that.

8     Q.   Okay.  Okay.

9       And when Mr. Gwynn did get access to HPT's

10  books, were there any Rabco staff that were provided to

11  assist the review?

12     A.   The staff that would have been in the office

13  at that point.

14     Q.   Were they available at the time that Mr. Gwynn

15  came to review the books, on the first occasion?

16     A.   Sure.

17     Q.   And on the second occasion, when he came with

18  counsel and his accounting team, and counsel requested

19  assistance from Rabco's staff, were any Rabco staff

20  present at Ms. Martini's office at the time?

21     A.   There's some attorney/client privilege there

22  that I should have.

23     MR. SMELTZER:  Well, read back the

24  question.

25     (Record read at this point.)

```
 1          MR. SMELTZER:  All he's asking you is
 2     whether any staff were present or not.  That's
 3     all he's asking.
 4          THE DEPONENT:  None were there.
 5  BY MR. LEYVA:
 6     Q.  Mr. Rabon, I'm going to move to a different
 7  topic now and ask you some questions about a criminal
 8  complaint that you filed against Mr. Gwynn.
 9          Can you describe to me the nature of that
10  criminal complaint, and why it was filed.
11     A.  He had used Rabco property to try to gain
12  business for another client that he had, and I
13  considered that theft of Rabco property.
14     Q.  Specifically, what Rabco property?
15     A.  In one particular case, the Constant Contact
16  account information.
17     Q.  And in whose name was the Constant Contact
18  account held?  In Rabco Leasing, Inc.'s name or in
19  Martin Gwynn's name?
20          MR. SMELTZER:  Object to the form.  It
21     presupposes it can only be those two.
22          THE DEPONENT:  It wasn't Rabco Leasing.
23  BY MR. LEYVA:
24     Q.  It was not, correct?
25     A.  Correct.
```

1    Q.   So it was not Rabco Leasing, Inc., who had

2   that account?

3        MR. SMELTZER:  Objection as to form.

4   BY MR. LEYVA:

5    Q.   Was Rabco Leasing, Inc.'s name on the Constant

6   Contact account that you're saying was Rabco's

7   property, or --

8    A.   On the account, no.

9    Q.   Okay.  So what aspect -- There was something

10  contained within the account that was Rabco's property?

11       MR. SMELTZER:  Objection as to form.

12  BY MR. LEYVA:

13   Q.   Answer the question, please.

14   A.   Ask the question again.

15       MR. LEYVA:  Repeat the question for him.

16       (Record read at this point.)

17       THE DEPONENT:  Yes.

18  BY MR. LEYVA:

19   Q.   Now, were you aware that Martin had this

20  Constant Contact account?

21       MR. SMELTZER:  Objection as to form, and

22       states facts not in evidence.

23       THE DEPONENT:  No.  I was aware there was

24       an account.

25       MR. LEYVA:  Okay.

 1      Q.   You were not aware of what type of account?

 2      A.   I thought its my account -- Rabco's account.

 3  Sorry.

 4      Q.   Why would you think it was Rabco's account?

 5      A.   Well, I was billed every month for it that we

 6  had it.

 7      Q.   Correct.  You're not -- You don't contend that

 8  every time you get billed for a service, you own the

 9  property that you get billed for.

10      A.   From an employee that is in charge of handling

11  that for me, yes.

12      Q.   Were you aware that Mr. Gwynn was doing

13  business with a Constant Contact account with other

14  vendors?

15      A.   No.

16      Q.   Is there not an E-mail where you asked

17  Mr. Gwynn for your Constant Contact list -- not the

18  account, but the list -- and you reference the fact

19  that he -- you know that he's using the list for Bobby

20  Chan?  Is there not an E-mail that you're aware of to

21  that effect?

22      A.   That I knew he was using it for Bobby Chan?

23      Q.   Is there an E-mail to that effect, yes?

24      A.   Not to my knowledge, not that I'm aware of.

25      Q.   Okay.  So, you filed a criminal complaint

1    because you thought Mr. Gwynn had stolen your property;

2    is that correct?

3         A.   Correct.

4         Q.   Okay.  And who did you meet with?  Did you

5    file this with the Clearwater Police Department?

6         A.   Yes.

7         Q.   Who did you first meet with at the Clearwater

8    Police Department?

9         A.   Detective Smith.

10        Q.   Did you know Detective Smith prior to filing

11   the criminal complaint?

12        A.   No.

13        Q.   Did you know any of Detective Smith's

14   superiors?

15        A.   Yes.

16        Q.   Do you know Detective Smith's direct boss?

17        A.   I wouldn't know that.

18        Q.   Who did you know?  Who of Detective Smith's

19   superiors at the Clearwater Police Department did you

20   know?

21        A.   Dirk Curls.

22        Q.   Can you spell the last name, please.

23        A.   K-u-r-l-s, C-u-r-l-s.

24        Q.   Did you contact Mr. Curls in reference to this

25   criminal complaint?

1      A.   I contacted Detective Curls about that, plus

2    over the years other items similar to this.

3      Q.   You contacted Detective Curls.  Was Detective

4    Curls a personal friend of yours?

5      A.   I'd known him.

6      Q.   For how long?

7      A.   I've known him for -- I probably have known

8    him for 12 to 15 years.  Probably see him once every

9    five years.

10     Q.   Now, did Mr. Curls refer the complaint to

11   Detective Smith?

12     A.   Did he refer it to him?

13     Q.   Yes.  Did he assign him the work?

14     A.   I'm assuming that's what he did, yeah.

15     Q.   Did Detective Smith call you?

16     A.   I don't recall if he called me or I called

17   him.

18     Q.   Okay.  Did you go down to the Clearwater

19   Police Department, and was there an interview conducted

20   and taped at the time that you filed the complaint?

21     A.   I don't recall any -- I don't recall anything

22   being taped.

23     Q.   Okay.  Now, the Clearwater Police Department

24   eventually did not pursue this case; is that correct?

25     A.   Yes.

1     Q.   Did they give you a reason as to why they did

2  not pursue the case?

3     A.   No, not really a reason.  They just -- They

4  just kind of wanted to wash their hands of it and told

5  me, "If you've got a problem with him, handle it

6  civilly."

7     Q.   During the conversations you had with

8  Detective Smith, did you share the fact that you and

9  Mr. Gwynn were 50/50 percent shareholders in Hurricane

10  Pass Traders, Inc.?

11     A.   I don't recall that.

12     Q.   Did you share the fact that Corporate Pride

13  hosted your Internet website?

14     A.   I don't recall that.

15     Q.   What do you recall?

16     A.   I recall telling him that this was a private

17  list owned by Rabco Leasing that was used for financial

18  gain for other people than what the list was intended

19  for.

20          Our privacy statement says it will not be

21  shared with anybody else.

22     Q.   That's fine.  Now, was part of this criminal

23  complaint cyber intrusion?

24     A.   I don't know the legal term that you would

25  call it.  I would describe what happened, and I don't

1    know what the detective would label it.

2        Q.   Okay.  But from your understanding, was

3    someone trying to hack into your site?

4        A.   Somebody was trying to gain access into the

5    shop -- the administrative area of the shopping cart.

6        Q.   Let me ask you this:  During this time, were

7    you in the process of having City Mine remove your

8    websites from Corporate Pride's server?

9        A.   It was prior to that.

10       Q.   What do you mean, "prior to that"?

11       A.   City Mine --

12       Q.   At what time?  What do you mean, "prior to

13   that"?

14       A.   City Mine was done.  The attempts were after

15   City Mine had everything complete.

16       Q.   And do you recall Detective Smith calling

17   Martin Gwynn, Jr., and asking him to delete some

18   information?

19           MR. SMELTZER:  Objection as to foundation.

20           THE DEPONENT:  I don't recall exactly what

21       he asked his son.

22                    ////////////////

23   BY MR. LEYVA:

24       Q.   Do you recall -- Let me ask you the specific

25   question.  Do you recall having a conversation with

1    Detective Smith when Detective Smith informed you that

2    he was going to call Martin Gwynn, Jr. and have him

3    delete some information on Corporate Pride's servers

4    that allegedly was Rabco's property?

5        A.    I can't recall what he would call him and ask

6    him.  I don't recall that specifically.

7        Q.    You and Detective Smith did not have a

8    conversation about this?

9        A.    We had lots of conversations.

10       Q.    No.  About this particular topic.

11       A.    I don't recall that.

12       Q.    Do you recall following up with Martin Gwynn,

13   Jr., to ensure that said information had been deleted?

14       A.    I don't remember an E-mail a year ago.

15       Q.    Did you call him by phone?

16       A.    Who?

17       Q.    Martin Gwynn, Jr.

18       A.    I don't recall that.

19       Q.    Okay.

20       A.    I don't know how or if I communicated with

21   him.

22       Q.    Did Detective Smith ever share with you

23   information related to the fact that City Mine had not

24   cleaned up everything from the server, removed

25   everything from the server that they should have, and

1    that was the reason that you were getting notifications

2    that you shouldn't have been getting?  Did Detective

3    Smith ever share that with you?

4        A.   No.

5        Q.   He did not.

6             Mr. Rabon, let me ask you about how Rabco

7    gained control of Mr. Gwynn's Constant Contact

8    account --

9             MR. SMELTZER:  Objection --

10             MR. LEYVA:  -- that was registered --

11             MR. SMELTZER:  -- form.

12   BY MR. LEYVA:

13        Q.   Did Rabco eventually --

14             MR. SMELTZER:  Misstates facts not in

15        evidence.

16   BY MR. LEYVA:

17        Q.   -- take ownership of Mr. Gwynn's Constant

18   Contact account?

19             MR. SMELTZER:  I'll object to the

20        mischaracterization of the evidence, misstates

21        facts not in evidence.

22             MR. LEYVA:  Answer the question.

23             THE DEPONENT:  Ask it one more time.

24            (Record read at this point.)

25             MR. SMELTZER:  Same objection.  Also

1      object, to the extent it calls for a legal

2      conclusion.

3   BY MR. LEYVA:

4      Q.   Do you now have control of the account?

5      A.   Yes.

6      Q.   At what point in time did you gain control of

7   this account?

8      A.   I believe it was sometime in August.

9      Q.   And how did you gain control?  Did you know

10  the user I.D. and password?  Did you -- how did you

11  gain control?

12     A.   Our main E-mail address that our Internet

13  store used is Hurricane Pass at Earthlink.net.  We use

14  that for communication with vendors, customers, any

15  communications they needed to do.

16     Q.   Okay.

17     A.   That E-mail address was used as the E-mail

18  address to send a password recovery information to.

19  Rabco, the company that owned the Constant Contact

20  account, had the recovery password information that

21  Constant Contact sent us.

22     Q.   Let me see if I understand this correctly.

23          You sent an E-mail to Constant Contact asking

24  for a user -- a password.

25     A.   No.

1      Q.    No?  Well, how did you get the password?

2      A.    Have you ever signed up for an account and you

3    need to give it -- you need to give whatever you're

4    signing up for password -- you know, for recovery of

5    your password information, this is the address you want

6    to use?

7      Q.    Correct.

8      A.    That's what that was.  That was set up with

9    Constant Contact, not by me.

10     Q.    Well, how did you get --

11     A.    We had it on file.

12     Q.    At what point in time did you have the

13   password on file?

14     A.    Well, there is an E-mail, that would be dated,

15   that we received it.  I used it August 5th.

16     Q.    And at what point in time prior to August 5th

17   did you have this password?

18     A.    Well, it's in E-mail form.  It's there from

19   whenever it was sent.  I would have to have it in front

20   of me to see the date.

21     Q.    And the entity that sent this password to you

22   was Constant Contact?

23     A.    Yes.

24     Q.    And the request, again, was how?  How did you

25   request this?

1          I mean, they didn't just send it out of the

2     blue, right?  How did you request them to send it to

3     you?

4          MR. SMELTZER:  Objection as to form.

5          THE DEPONENT:  I didn't request it.

6     BY MR. LEYVA:

7          Q.   Well, how did they send it to you?

8          A.   I don't recall how it was sent, or why.

9          Q.   So your contention is that the password showed

10    up in your E-mail account out of the blue?

11         A.   That's not what I said.

12         Q.   Well, I'm asking you, how did you happen to

13    get the password?

14         A.   I said I don't recall why or how.

15         Q.   Okay.  But it was prior to August -- on or

16    about August 5th; is that correct?

17         A.   I don't know when that E-mail came.

18         Q.   Okay.  So Constant Contact sent the E-mail,

19    though, correct?

20         A.   At some point.

21         Q.   Therefore, we presume there should be a

22    record, because I think they keep records of that sort

23    of thing, that it was sent.

24          And give me the name of, once again, please,

25    the name of where that password was sent.  The E-mail

1    address.

2        A.    HurricanePass@Earthlink.net.

3              MR. SMELTZER:  I think it's in our

4        production.

5              THE DEPONENT:  It's in the productions.

6        You've got it.

7              MR. SMELTZER:  There's a hard copy of the

8        E-mail.

9              MR. LEYVA:  With the password?

10             MR. SMELTZER:  Yeah, I think it's -- yeah,

11       I think it's actually on there.

12             THE DEPONENT:  Everything you need.

13       Everything you need.

14   BY MR. LEYVA:

15       Q.    I just want to understand this one more time.

16   There was no request made on your part to get this

17   E-mail.

18       A.    That's correct.

19       Q.    Okay.  So, usually there's two forms of

20   authentication that you have to provide when you get

21   access to an account.  You have to provide a user I.D.

22   and you have to provide a password, correct?

23       A.    Correct.

24       Q.    I mean, is that your experience --

25       A.    Yeah, that would be the experience.

1      Q.    Okay.  So, by what manner did you get the user

2   I.D. to the Constant Contact account?

3           MR. SMELTZER:  Objection as to form.  And

4       it presupposes that he's the one that did it,

5       gave the user -- got the E-mail.

6   BY MR. LEYVA:

7      Q.    Rabco Leasing -- You've already said that

8   Rabco Leasing assumed control of this account and now

9   has control of the account.  Is that not correct?

10     A.    Right.

11     Q.    You said -- you stated that Constant --

12     A.    I said Rabco has the account now.

13     Q.    Correct.  And you stated that Constant Contact

14  sent you the password via an E-mail in a document that

15  we allegedly have.

16          MR. SMELTZER:  Not him.  Rabco.

17          THE DEPONENT:  Rabco.

18      HurricanePass@Earthlink.net.

19  BY MR. LEYVA:

20     Q.    They sent it to Rabco at Hurricane --

21          MR. SMELTZER:  At some unknown point in

22      time.

23          MR. LEYVA:  Okay.

24          MR. SMELTZER:  So there's an E; mail -- I'm

25      just cutting through, because we're going

1        around -- So there's an E-mail sent.  I don't

2        know if it's a month before August or whatever.

3        It's just in your "In" box.

4            MR. LEYVA:  No, I understand.

5            MR. SMELTZER:  From Constant Contact.

6            MR. LEYVA:  I'm moving on.  I accept your

7        explanation of how you got the password, okay.

8        Q.   My point is, there's two forms of

9  authentication that you usually have to have to get

10  access to an account.

11        A.   Yes.

12        Q.   One is a password.

13        A.   Yes.

14        Q.   The other is a user I.D.

15        A.   Yes.

16        Q.   So, by what mechanism did Rabco obtain the

17  user I.D. to the Constant Contact account to be able to

18  log in to the Constant Contact account?

19            MR. SMELTZER:  Objection as to foundation.

20        You can answer, if you know.

21            THE DEPONENT:  What's that?

22            MR. SMELTZER:  I said objection as to

23        foundation, but you can answer, if you know.

24            THE DEPONENT:  It's on the same document.

25  BY MR. LEYVA:

1        Q.   In this same E-mail?

2        A.   Yes.  As I recall.

3        Q.   Okay.  And -- Off the record.

4             (Discussion held off the record.)

5             MR. LEYVA:  We can go back on the record.

6        Q.   So, now you had the two pieces of

7   authentication you needed to gain access -- Rabco did,

8   not you personally -- to gain access to that account;

9   is that correct?

10       A.   Gain access to what?

11       Q.   To gain access to the account.

12       A.   My account, Rabco's account, yes.

13       Q.   Well, it was formerly Mr. Gwynn's account, was

14  it not?

15            MR. SMELTZER:  Objection as to form.

16  BY MR. LEYVA:

17       Q.   Who initially registered that account?

18       A.   Probably Gwynn, on behalf of Rabco.

19       Q.   Who paid for that account?

20       A.   I did.  Rabco.  Sorry.

21       Q.   Did Mr. Gwynn pay for that account and you

22  reimbursed him?

23       A.   That did happen.

24       Q.   You're not saying that you paid -- that it was

25  Rabco's credit card that was associated with that

1     account when Mr. Gwynn had control, are you?

2          A.    No.

3          Q.    Okay.  So Mr. Gwynn was paying the monthly

4     fees at Constant Contact, and Rabco was reimbursing

5     him; is that correct?

6          A.    Correct.

7          Q.    Okay.  And it was your understanding that

8     Mr. Gwynn only use the Constant Contact account, the

9     account, for Rabco business?

10         A.    Yes.

11         Q.    And for none other?

12         A.    Yes.

13         Q.    Not for Bobby Chan, not for any other

14    customer?

15              MR. SMELTZER:  Objection.  I'll object to

16         lack of time frame.

17              THE DEPONENT:  I never knew there was

18         anything else on the list.

19    BY MR. LEYVA:

20         Q.    What do you mean by "the list"?

21         A.    The account.

22              MR. SMELTZER:  That's -- Why don't you read

23         back the question.  That's not the question.

24              (Record read at this point.)

25              MR. SMELTZER:  The question was whether it

```
 1        was your understanding that Martin never used

 2        the Constant Contact account for anybody else

 3        other than Rabco.  And I object to that question

 4        because it lacks a time frame.

 5             At what point are you asking for his

 6        understanding?

 7   BY MR. LEYVA:

 8        Q.   At any point prior to the time that Rabco

 9   assumed control of the account via the mechanism that

10   you described.

11        A.   Just days before.

12        Q.   Can you explain?

13        A.   Sometime maybe late July or early August.

14        Q.   And what happened in late July or early

15   August?

16        A.   The Internet store got some unsubscribe

17   E-mails, people opting out of Rabco's E-mail list.

18        Q.   Right.  Mr. Rabon, are you aware of the

19   fact -- do you understand how these E-mail marketing

20   accounts work?

21        A.   Specifically how?  What?

22        Q.   Do you understand that a particular account

23   can have many lists on it?

24        A.   Now I do.

25        Q.   Do you recall an E-mail that you sent Martin
```

1    asking for Rabco's list?  And specifically Rabco's

2    list.  Not Rabco's account, but Rabco's list.  Do you

3    recall an E-mail?

4        A.   I don't recall that E-mail.

5            MR. SMELTZER:  You want to make a copy,

6    because I was going to give him this anyway and

7    clarify it afterwards.

8            MR. LEYVA:  What's that?

9            MR. SMELTZER:  To refresh his recollection

10   with Exhibit G to the Amended Complaint.  If you

11   want to make a copy, you can do it.

12           MR. LEYVA:  I mean, it's Exhibit G, the

13   Bobby Chan.

14           MR. SMELTZER:  Right.  We referred to it.

15   We're going to show Mr. Rabon Exhibit G to the

16   Second Amended Complaint in this matter, which

17   is document number 34-7, and it's an E-mail

18   dated August 5th, 2009, and we'll see if that

19   refreshes his recollection.

20               Then maybe we can read back the

21   question exactly.

22           THE DEPONENT:  Okay.

23           MR. SMELTZER:  Why don't you read back the

24   question, Jerry.

25   BY MR. LEYVA:

1    Q.   Are you done?  We can make a copy.  I'd just

2    like to have a copy.  Can we go off the record so we

3    can get that made?

4              (Recess held at this time.)

5    BY MR. LEYVA:

6    Q.   You ready to proceed?

7    A.   Ready.

8    Q.   I'm looking at Exhibit G here, and this is an

9    E-mail from you to Mr. Gwynn, is it not?

10   A.   Yes.

11   Q.   And it's dated -- Actually, it's dated

12   August 5th, 2000, I believe, the date sent; is that

13   correct?

14   A.   Correct.

15   Q.   And you're asking for the user name and

16   password and all log-in information pertaining to the

17   Constant Contact account; is that correct?

18   A.   Yes.

19   Q.   Now, we just had a long discussion regarding

20   the fact that you had that information in this E-mail

21   that was sent, correct?

22   A.   Correct.

23   Q.   Is that prior to this time?

24   A.   Is this E-mail prior?

25   Q.   No.  Is the time of that E-mail where you got

1    sent the user I.D. and password, correct, to the

2    HurricanePass@Earthlink.net, from Constant Contact, was

3    that prior to this time?

4        MR. SMELTZER:  I think you -- The E-mail

5        was from Constant Contact.

6        MR. LEYVA:  Yes.  No, no, right.

7    Q.   All I'm asking for is, this E-mail was sent

8    from Mr. Rabon to Mr. Gwynn, according to the header,

9    right, on August 5th, 2009.

10   A.   Correct.

11   Q.   My question is:  Did you not have this E-mail

12   that was sent from Constant Contact, with the user I.D.

13   and password, prior to that?

14   A.   The E-mail, yes, it was sent before that, but

15   I wasn't aware of it at that point.

16   Q.   You didn't know you had it?

17   A.   Right.

18   Q.   Okay.

19   A.   Thousands of E-Mails.

20   Q.   Okay.  Now, this second sentence -- I think

21   I'm just going to read and ask you a question.  It

22   says, "As you recall, this was to be part of all the

23   information you were to give me when you received your

24   final payment for all expenses you personally incurred

25   while operating Rabco's websites.  As you know, the

1    Constant Contact bills you paid were in that payout to

2    you."

3              MR. SMELTZER:  Is that a question?

4              MR. LEYVA:  Yes, I'm sorry.  I was thinking

5         here.  It's getting a little late.

6              MR. SMELTZER:  Yeah, I know.

7    BY MR. LEYVA:

8         Q.  When you say "all the information that you

9    were to give me," at any point in time, did Mr. Gwynn

10   say he was going to be turning over his entire Constant

11   Contact account to you -- to Rabco?  Sorry, not to you.

12        A.   Did he say he was going to turn over -- Read

13   it to me, please.

14        Q.  I'm going to read the second sentence again so

15   we're all clear.

16        A.   Okay.

17        Q.  "I need the user name, password and all log-in

18   information."  Then it goes on to say, "As you recall,

19   this was to be part of all the information you were to

20   give me when you received final payment for all

21   expenses you personally incurred," et cetera, et

22   cetera.  Okay.

23              So I want to understand what "all the

24   information" means, and was that in a document

25   somewhere, captured?

1      A.   As I recall, the settlement agreement talked

2   about various types of accounts as they would be

3   related to Rabco's Internet business.  "Any and all

4   accounts," it says something to that language.  It's

5   more defined than what I'm saying.

6      Q.   We would have to go back and review that.  My

7   question is to you -- and you may not know and we may

8   have to go back and look at that.

9           As part of the settlement agreement, or at any

10  other time, did Mr. Gwynn agree to turn over not your

11  account list, okay, but his Constant Contact account

12  itself to Rabco?

13          MR. SMELTZER:  I object to the

14          characterization of the account.

15          THE DEPONENT:  He agreed to turn over the

16          Constant Contact account.

17  BY MR. LEYVA:

18     Q.   Now, here, the last sentence, you say, "You

19  would be well aware, this list is proprietary to Rabco

20  Leasing and should not be used for other accounts you

21  have, such as Bobby Chan," correct?

22     A.   Yes.

23     Q.   You make a reference to a list.  What list is

24  that in reference to?

25     A.   That would be the list of E-mail names,

1     customers that signed up to receive our E-Mails.

2        Q.   And this is the list that was maintained by

3     Mr. Gwynn on the Constant Contact account; is that your

4     understanding?

5        A.   It was Rabco's list --

6        Q.   Yes.

7        A.   -- on the Constant Contact account.

8        Q.   Yes, I understand that's what you were

9     referring to.  It was Rabco's list on the Constant

10    Contact account.

11        MR. SMELTZER:  Don't fight with him.  Now

12        we're using neutral language about the Constant

13        Contact account.  Just call it that.  Accept the

14        olive branch.

15    BY MR. LEYVA:

16        Q.   Do you recall an E-mail, E-mail correspondence

17    between you and Mr. Gwynn where apparently Mr. Gwynn

18    sent out an E-mail blast to the wrong list, and somehow

19    you got wind of it and you said, "Martin, I --" I'm

20    paraphrasing "-- what are you doing sending," you know,

21    blah, blah, blah.

22        Do you recall an E-mail correspondence that

23    contained something like that?

24        A.   Just give me a minute.  And then I'm going to

25    ask you to read it back.

1            (Record read at this point.)

2            MR. SMELTZER:  I just object to the form,

3       but you can answer if you --

4            THE DEPONENT:  I don't recall an E-mail in

5       that language.

6  BY MR. LEYVA:

7       Q.   Do you recall an E-mail in any language --

8       A.   I don't recall.

9            MR. SMELTZER:  I'll object to the form of

10      that.

11           MR. LEYVA:  Let me finish my question.

12      Q.   Do you recall an E-mail, in any language -- I

13  don't want to paraphrase what the language is, because

14  I don't have the E-mail in front of me -- where Martin

15  apparently sent out a blast from his Constant Contact

16  account -- It's got nothing to do with this.  Okay?

17           MR. SMELTZER:  The Constant Contact

18      account.  We were getting there.  The

19      Constant --

20           MR. LEYVA:  Yes, the Constant Contact

21      account, okay.

22      Q.   And apparently Martin sent it out to the wrong

23  list, and Rabco became aware of the fact that Martin

24  had sent it out to the wrong list and you called him on

25  it?  You said, "What are you doing?  You sent this --

1    How come you sent this list, this blast to this list?"

2    Something to that effect.

3           Do you recall any E-mail correspondence like

4    that?

5    A.   I don't recall E-mail correspondence about

6    that.  It kind of resembles the last sentence here,

7    but --

8    Q.   Okay.

9    A.   But, you know, it says "It should not be used

10    for other accounts you have, such as Bobby Chan."

11    Q.   That's fine.  If you don't recall, you don't

12    recall.  We're moving on.  We're almost done here.

13           I would like to introduce Exhibit 12.  These

14    are engagement letters from Alton Cates, I believe, to

15    HPT.

16           (Plaintiff's Exhibit 12 was marked for

17    identification.)

18           THE DEPONENT:  Okay.

19    BY MR. LEYVA:

20    Q.   Now, these represent engagement letters -- I

21    think they're virtually identical -- sent from

22    Mr. Cates, starting in 2003, that describe the services

23    that he would provide to Hurricane Pass Traders, Inc.,

24    and they go through '09.

25    A.   Okay.

1      Q.   Now, if we'd start on page 1 and go to page 2.

2    Is that your signature on page 2?

3      A.   Yes.

4      Q.   And you've flipped through these.  Is that

5    your signature on all these?

6      A.   Yes.

7      Q.   Mr. Rabon, were you the HPT, Inc., corporate

8    officer that signed the HPT, Inc., tax forms prepared

9    by Mr. Cates?

10     A.   Yeah, I probably was, yes.

11     Q.   Mr. Rabon, let me call your attention to the

12   fourth paragraph on the first page.  Can you just read

13   it again.  I'm going to ask a question regarding it.

14     A.   Okay.

15     Q.   Is it your understanding that Mr. Cates is

16   indicating here that management of HPT, Inc., has final

17   responsibility for the tax return?

18     A.   It says, "Final."

19     Q.   And that the appropriate corporate official

20   should review the return carefully before an authorized

21   officer signs and files it.

22     A.   Yes.

23     Q.   Now, did you and Mr. Gwynn jointly review the

24   HPT, Inc., tax forms before you signed it, or how did

25   that work?

1      A.    I don't know if he ever looked at them.    I

2   would look at them.

3      Q.    Okay.  So you reviewed them before you signed

4   them, right?

5      A.    Yes.

6      Q.    Okay.  No further questions on this.

7            Mr. Rabon, we're almost home here.  I would

8   like to ask you a few questions regarding your Celerant

9   point of sale system.

10     A.    Good old Celerant.

11           MR. SMELTZER:  Are we marking these

12        differently?  We're just out of order.

13           MR. LEYVA:  We're out of order.

14           MR. SMELTZER:  Okay.

15           (Plaintiff's Exhibit 10 was marked for

16        identification.)

17           THE DEPONENT:  Okay.

18   BY MR. LEYVA:

19     Q.    So my question is, to start with is, how long

20   do you believe you have -- going back in time, how many

21   years of information do you believe you have on your

22   point of sale system today?

23     A.    I don't know how much would be in there.

24     Q.    Have you ever deleted any information?

25     A.    No.

1    Q.    Okay.  So it should be as much as you ever put

2    in there.  Is that your understanding?

3    A.    Yes, sir.

4    Q.    I mean --

5    A.    Yes.

6    Q.    Right?  And in the ordinary course of

7    business, you didn't have -- or did you have a process

8    by which you went and deleted and archived?

9    A.    Not that I'm aware -- I don't recall that, and

10   I wouldn't know how to do that.

11   Q.    No, that's fine.

12   A.    Right.

13   Q.    That's, you know, when you get too many

14   records, sometimes that's required.  You know what I

15   mean?  So my only question is --

16   A.    I don't --

17   Q.    You think you have all the records that you've

18   ever had there.

19   A.    My guess is yes.

20   Q.    And in what year did you first start using the

21   Celerant point of sale system?

22   A.    I don't recall.

23   Q.    But you can find out.

24   A.    Yes.

25   Q.    I mean, the system can probably tell us,

 1   right?  Because it's going to have entries going back

 2   in time to a particular point, correct?

 3        A.   Yes.

 4             MR. LEYVA:  That's all the questions I have.

 5             MR. SMELTZER:  Okay.  Why don't we take

 6        another break, because I do have come

 7        clarifications this time.

 8                  (Recess held at this time.)

 9                     CROSS EXAMINATION

10   BY MR. SMELTZER:

11        Q.   Okay, we back on the record.

12             Mr. Rabon, earlier in response to Mr. Leyva's

13   questioning you were talking about Jenna Hunter

14   reporting to you as of the time that people first began

15   -- employees first began reporting to you at Shorts,

16   Inc.  Do you recall that testimony?

17        A.   Yes.

18        Q.   At the time that you were speaking of, do you

19   know for sure whether Ms. Hunter was an employee of

20   Shorts, Inc.?

21        A.   I don't believe she was.

22        Q.   Who do you think she was an employee of?

23        A.   Southern Apparel or Fact-O-Let.

24        Q.   Okay.

25        A.   The same company.

1      Q.   Is it fair to say that she was not reporting

2   to you as an employee of Shorts, Inc.?

3      A.   Yes.

4      Q.   So in what capacity were you communicating

5   with her at that time?

6      A.   If I saw her in the office to say, "Hello."

7      Q.   Okay.  How long did Shorts, Inc., lease

8   computers from Mr. Gwynn?

9      A.   Approximately a year.

10      Q.   Do you recall what year that was?

11      A.   2003.

12      Q.   And how do you know it was 2003?

13      A.   I think there's a 1099 to that effect.

14      Q.   Okay.

15           MR. LEYVA:  Excuse me.  Can you repeat the

16      question and answer, please.

17           (Record read at this point.)

18   BY MR. SMELTZER:

19      Q.   Do you recall your earlier testimony about a

20   confirming agreement of the asset transfer from Shorts,

21   Inc., to Rabco Leasing, Inc., in about 2002 to 2003?

22      A.   Yes.

23      Q.   Did anyone -- and you said that was executed

24   recently.

25      A.   Yes.

1    Q.   Do you recall -- Well, I'm sorry.  You were

2    asked whether Mr. Bill Short executed that document on

3    behalf of Shorts, Inc., and you said, "No."  Is that

4    correct?

5    A.   That's correct.

6    Q.   Did anyone execute that document on behalf of

7    Shorts, Inc.?

8    A.   I did, Bruce Rabon.

9    Q.   Anyone else execute it on --

10   A.   Virginia Hunter.

11   Q.   At the time of the asset transfer from Shorts,

12   Inc., to Rabco Leasing, Inc., were you an officer of

13   Shorts, Inc.?

14   A.   Yes.

15   Q.   And what position did you hold at that time?

16   A.   President.

17   Q.   And was Ms. Hunter an officer of Shorts, Inc.,

18   at the time of that transfer?

19   A.   Yes.

20   Q.   What office did she hold?

21   A.   Secretary.

22   Q.   I want to redirect your attention to Exhibit

23   Number 2, if you could look at page 4 again.  And who

24   is listed on this trademark registration as the owner

25   of the Hurricane Pass Outfitters and Trading Company

1      and design of a marlin sailfish?

2          A.     Hurricane Pass Outfitters and Trading Company.

3          Q.     And was that an actual legal entity, Hurricane

4      Pass Outfitters and Trading Company?

5          A.     That was a dba for William Short Clothiers.

6          Q.     Also known as Shorts, Inc.?

7          A.     Shorts, Inc..

8          Q.     And turning your attention to page 7 of

9      Exhibit 2, who is listed as the applicant for the

10     trademark?

11         A.     Is this this page?

12         Q.     Yes, we're looking at the same one.

13         A.     The applicant name, Hurricane Pass Outfitters

14     and Trading Company.

15         Q.     And, again, at the time of this registration,

16     was that a legal entity?

17         A.     It was a dba for Shorts, Incorporated.

18         Q.     And the applicant's business address is listed

19     as 12420 73rd Court North, Largo, Florida.  Is that

20     accurate?

21         A.     Correct.

22         Q.     And whose business was located at that

23     address?

24         A.     That was Shorts, Incorporated's office.

25         Q.     All right.  What was your intent in filing

1     this trademark registration on behalf of the applicant,

2     Hurricane Pass Outfitters and Trading Company?

3          A.   Ask that one more time.

4          Q.   Well, let me ask it in this way:  By filing

5     this application for a trademark registration, did you

6     intend a separate corporation, Hurricane Pass

7     Outfitters, Inc., to own this Hurricane Pass trademark?

8          A.   No.

9          Q.   And what entity first used the trademark

10    "Hurricane Pass" or "Hurricane Pass Outfitters"?

11         A.   Shorts, Inc.

12         Q.   And when did that occur, the first use of that

13    trademark?

14         A.   '95.  Could have been as early as perhaps '94.

15              MR. LEYVA:  I object.  It's asking for a

16         conclusion of law.  "First use of trademark" is

17         a term of art.

18              MR. SMELTZER:  Well, I can --

19         Q.   I'm asking in the sense of, as far as you're

20    aware, who actually used that name to do business?

21         A.   Shorts, Incorporated.

22         Q.   And you said that was in what time period?

23         A.   '95 to perhaps even as early as '94.

24         Q.   And did the corporation called Hurricane Pass

25    Outfitters, Inc., that you organized, ever do any

1    business?

2         A.    No.

3         Q.    Did it ever use that mark, "Hurricane Pass

4    Outfitters and Trading Company," in any way?

5         A.    No.

6         Q.    Was there any period of time in which Shorts,

7    Inc., stopped using the Hurricane Pass trademark?

8         A.    William Short -- Shorts, Inc., would have

9    stopped using it when Rabco purchased all the assets

10   from Short's.

11        Q.    Okay.  Up until that late 2002, early 2003

12   time period, to your knowledge, did Shorts, Inc., ever

13   discontinue its use of the Hurricane Pass --

14        A.    No.

15        Q.    -- trademark?

16              After the transfer of assets from Shorts,

17   Inc., to Rabco Leasing, and all the way up until the

18   time that Rabco Leasing ceased business, did Rabco ever

19   stop using the trademark "Hurricane Pass"?

20        A.    No.

21        Q.    Why did you incorporate a company called

22   Hurricane Pass Outfitters, Inc.?

23        A.    It was to preserve the name so that no one

24   else could use it.

25        Q.    The corporate name?  To what name do you

1  refer?

2      A.   Hurricane Pass, Inc.

3      Q.   Did Hurricane Pass Outfitters, Inc., ever file

4  a tax return?

5      A.   No.

6      Q.   Did it ever have any employees?

7      A.   No.

8      Q.   Do you know for sure whether Hurricane Pass

9  Outfitters, Inc., ever issued shares of stock?

10     A.   No.

11     Q.   I want to turn your attention to the group of

12  websites that Mr. Gwynn helped create while an employee

13  of Shorts, Inc., and/or Rabco.

14          Did you ever see a copyright notice on any of

15  those sites that Mr. Gwynn created, the copyright

16  notice saying "Hurricane Pass Outfitters"?

17     A.   Yes.

18     Q.   Who was responsible for putting the copyright

19  notices on the websites that Mr. Gwynn helped create

20  while an employee of Shorts, Inc. and/or Rabco?

21     A.   Mr. Gwynn.

22     Q.   Do you know of anybody else other than

23  Mr. Gwynn that could have put such a copyright notice

24  on any of those websites?

25     A.   No.

1          MR. LEYVA:  Can you read back the question

2     and answer, please.

3          (Record read at this point.)

4          MR. LEYVA:  I have an objection.  It

5     assumes that he created it on behalf of said

6     organizations.

7          MR. SMELTZER:  I said "while he was an

8     employee."  I didn't say "on behalf."  I'm

9     trying to be neutral, but that's fine.

10          MR. LEYVA:  Okay.

11     BY MR. SMELTZER:

12     Q.   Now, you earlier testified about some of the

13     involvement that you had with the websites that

14     Mr. Gwynn helped create while an employee of Shorts,

15     Inc., and/or Rabco.  Do you recall that testimony?

16     A.   Yes.

17     Q.   Did you ever help create any of the text used

18     on any of those websites?

19     A.   Yes, we would discuss that.

20     Q.   Okay.  Did Mr. Gwynn ever come to you asking

21     for help in creating the text used on any of those

22     websites?

23     A.   Yes.

24     Q.   Was that a common occurrence, or how often did

25     it occur?

1      A.    Periodically, you know.  Early on, I did

2    all -- a great deal of the text.

3      Q.    I want to talk about the Zimmerman settlement

4    agreement and the $6,300, I believe it was, that

5    Mr. Gwynn paid to Ms. Zimmerman as part of that.

6           Do you know how long after Mr. Gwynn wrote

7    that check to Ms. Zimmerman that he was reimbursed?

8      A.    I don't know the exact date, but I believe it

9    was within a few months, or pretty close.

10      Q.    I want to go back to your testimony about the

11    expiration of the domain names belonging to -- or that

12    you said belonged to Rabco Leasing, Inc., as of the

13    time of its Chapter 7 Petition.

14           At the time any of those domain names expired,

15    were you in control of any of Rabco Leasing, Inc.'s

16    moneys?

17      A.    No.

18      Q.    At the time of the expiration, who was in

19    control of any money that Rabco Leasing had?

20      A.    The Trustee.

21      Q.    Now, turning your attention back to your

22    testimony in response to Mr. Leyva's questions about

23    Corporate Pride hosting your servers.  Did Rabco

24    Leasing, Inc., own any servers other than its point of

25    sale server?

1    A.    No other servers.

2    Q.    Okay.  To the best of your knowledge, what

3   servers was Corporate Pride hosting on Rabco's behalf?

4    A.    They weren't hosting our servers.

5    Q.    Well, I didn't say your servers.  What servers

6   were they hosting on your behalf, regardless of who

7   owned them?  What kinds of servers?  Well, strike that.

8   Let me ask it to you this way.

9         Was Corporate Pride, as of late 2008, early

10   2009, hosting the server through which Rabco's E-mail

11   communications were going?

12    A.    Yes.

13    Q.    And it was hosting the server on which the

14   websites that you claim as Rabco's were resident?

15    A.    Yes.

16    Q.    Do you know who owned those -- who owned those

17   particular servers?

18    A.    I believed it to be Gwynn, Jr.

19    Q.    At the time that you terminated Mr. Gwynn's

20   employment with Rabco Leasing, were you aware of any

21   pending request for reimbursement for employee

22   expenditures on his part?

23    A.    I knew he had some expenses.

24    Q.    Had he submitted any documentation as of the

25   time of his termination to support those expenses?

1      A.   As I recall, it was -- it was just a list of

2   the various expenses and dollar amounts, and I

3   requested specific receipts.

4      Q.   Did he give you those receipts prior to the

5   time that you terminated him?

6      A.   Yes, right at that time.

7      Q.   I'm not sure I understand your testimony when

8   you say "right at that time."

9      A.   Well, ultimately I got all the receipts for

10  all the various expenses.

11     Q.   My question really, though, is whether you had

12  any receipts prior to the time you --

13     A.   No.

14     Q.   -- let him know that he was being terminated.

15     A.   No.

16     Q.   And how much did you pay -- You paid Mr. Gwynn

17  $9,600 as part of the settlement?

18     A.   Thereabouts, yeah.  I don't remember the exact

19  number, but that's about -- that's close to it.

20     Q.   Do you know for sure whether Rabco owed

21  Mr. Gwynn all of the money it paid him pursuant to the

22  settlement agreement?

23     A.   I don't know that.

24          MR. SMELTZER:  Okay.  That's all I have.

25          MR. LEYVA:  Okay.  I have a couple

1      questions.

2                    REDIRECT EXAMINATION

3      BY MR. LEYVA:

4         Q.   I just want to understand, Mr. Rabon, this

5      confirming agreement and how it was executed and on

6      whose behalf it was executed.  I just want to make sure

7      I understood the testimony correctly.

8              Did you say you executed it -- you personally,

9      as an officer of Rabco, on behalf of Rabco?  Is that --

10        A.   As the President of Rabco.

11        Q.   Yes.

12        A.   Yes.

13        Q.   So, on the Rabco side of the agreement, this

14     confirming agreement, you executed it on behalf of

15     Rabco.

16        A.   Yes.

17        Q.   As the President of Rabco; is that correct?

18        A.   Yes.

19        Q.   Okay.  And on the WSC side of the execution --

20     Again, I'm trying to understand how this worked.  On

21     the WSC side of the execution of this agreement, you

22     again executed it as a former officer of WSC?

23        A.   As President.

24        Q.   Former officer and President of WSC, right?

25              At the time that you executed this agreement,

1      you were not a -- you were no longer a WSC employee,

2      were you?

3          A.   Correct.

4          Q.   So it would be former President --

5          A.   Correct.

6          Q.   -- of WSC.

7               And Ms. Hunter also executed this agreement as

8      a former what of WSC?

9          A.   Secretary.

10         Q.   She was an officer of WSC?

11         A.   Yes.

12         Q.   She had the title of Secretary?

13         A.   Yes.

14              MR. SMELTZER:  Big "S" Secretary.

15     BY MR. LEYVA:

16         Q.   I have a follow-up question.  I'm not going to

17     go back into the details; I think we've beat it to

18     death.  But I do want to ask you a question as to

19     intent.

20              If you intended to protect this name on behalf

21     of WSC, why, then, did you not file it on behalf of

22     WSC?

23              MR. SMELTZER:  Objection,

24          mischaracterization of who he filed it on behalf

25          of.

1          MR. LEYVA:  Counsel, you raised the

2     question as to intent, and I'm asking the

3     question as to intent to protect the name.

4          THE DEPONENT:  Well, it -- it was --

5          MR. SMELTZER:  Same objection.

6          THE WITNESS:  It was clearly used for -- in

7     the William Short Clothiers store.

8          MR. LEYVA:  Correct.

9          THE DEPONENT:  And that was the intent.

10    BY MR. LEYVA:

11     Q.   No, I understand that you had an intent to

12    protect the name.

13          My question is, if you had such an intent, why

14    did you not just file it under the corporate name of

15    WSC?

16     A.   I can't answer that now.

17     Q.   Okay, that's fine.  That's fine.

18          Now, Counsel asked you some questions about

19    the use of the "Hurricane Pass" trademark, correct, and

20    first use and whatever.  And I don't want to confuse

21    you with the terminology, but I do want to try to

22    understand, at that point in time when you were

23    answering the first-use question, all right -- and this

24    was related to WSC, correct -- what sorts of goods and

25    services was that trademark used in conjunction with?

1        A.    The trademark William -- I mean "Hurricane

2    Pass Outfitters and Trading Company"?

3        Q.    No.   Hurricane Pass, sir.  I believe we were

4    talking about Hurricane Pass.  I believe counsel was

5    talking about Hurricane Pass.

6            MR. SMELTZER:  Well, just to let you know

7        what I was talking about --

8            MR. LEYVA:  Okay.

9            MR. SMELTZER:  Since the formal name is

10        Hurricane Pass Outfitters and Trading Company,

11        and that's what was in the trademark

12        application, and the other stuff was disclaimed.

13            MR. LEYVA:  Excluded, yes, exactly.

14            MR. SMELTZER:  I was only -- I was saying

15        that "Hurricane Pass" is the operative part of

16        that Hurricane Pass --

17            MR. LEYVA:  We're in agreement on that.

18            MR. SMELTZER:  Right.

19            MR. LEYVA:  It is the operative part of it.

20            MR. SMELTZER:  Right.

21    BY MR. LEYVA:

22        Q.    That's why I'm saying the "Hurricane Pass"

23    part, because the other part was excluded in the

24    application.

25        A.    Yes.

1      Q.   So my question is, during this time of first

2   use, or when William Short used it in commerce, all

3   right, what goods was that trademark associated with?

4   What kind of goods?

5      A.   The Hurricane Pass Outfitters and Trading

6   Company?

7      Q.   No.  Just Hurricane Pass.

8           MR. SMELTZER:  That's -- Object to the

9       form.  It's the same thing.

10          MR. LEYVA:  Okay.

11     Q.   Was the mark, as used on goods and services --

12   This is a more specific question.  It's a different

13   question.

14          Was the mark, as used on goods by WSC, did it

15   contain the entire "Hurricane Pass Outfitters and

16   Trading Company," or was it just "Hurricane Pass"?

17          MR. SMELTZER:  I object to the form.  I

18       don't think he said --

19          THE DEPONENT:  I don't understand the

20       question.

21          MR. SMELTZER:  -- what it was used on,

22       necessarily.

23          MR. LEYVA:  Okay.  It's an important

24       question.  Counsel raised it, so I'm trying to

25       clarify.

1      Q.    Trademarks -- Is it your understanding that

2      trademarks are used in conjunction with goods or

3      services?

4      A.    Yes.

5      Q.    All right.

6      A.    Yes.

7      Q.    If they're used with services, they're called

8      "service marks," but for all intents and purposes, they

9      function the same.

10          But a trademark is assigned a particular

11     class.  Is that your understanding?  A class of goods.

12     A.    Okay.

13     Q.    In this case, in this application, it was

14     Class 25.  I really don't know, I mean, if this

15     description of "Clothing" is the description of the

16     entire class, you know.  But there is a Class 25, and

17     I'm sure the State of Florida has a Class 25 and

18     there's a listing of goods that are related to Class

19     25.  Okay?

20          And so my question is, since we can't

21     determine from this, is at the time that it was used --

22     the mark -- what kinds of goods was the mark associated

23     with?

24          MR. SMELTZER:  Well, I object to the

25          characterization that you can't tell what kind

1      of uses it had from this document.  The document

2      very clearly says what kind --

3              MR. LEYVA:  Clothing.

4              MR. SMELTZER:  Yeah.

5              MR. LEYVA:  I mean, clothing and --

6              MR. SMELTZER:  And labels, brochures,

7      embroidery, screen prints, newspaper, postcards,

8      magazines, advertisements.

9              MR. LEYVA:  Well, that was the mode and

10     manner in which it was used.

11             MR. SMELTZER:  Right.

12             MR. LEYVA:  So that's the mode and manner,

13     and "Class" apparently here is clothing.  All

14     I'm saying is, we have no way of telling from

15     this what Class 25 is.

16             Is Class 25 clothing, or has it got

17     some other description?  I don't know.  I don't

18     think we can answer that question.

19             THE DEPONENT:  Yeah, I don't know.

20     BY MR. LEYVA:

21     Q.   But my question is, given all that, a mark, a

22     trademark -- It's not like a copyright that you get

23     when you put something, a fixed tangible medium.

24             MR. SMELTZER:  Well, I'm going to object,

25     Carlos.  You're really making statements.

1            MR. LEYVA:  Okay.  I'm trying to clarify.

2       You raised the question.

3            MR. SMELTZER:  Just ask him how it was

4       used.

5            MR. LEYVA:  Okay.  That's what I'm trying

6       to ask him.

7            MR. SMELTZER:  You're going around the

8       mulberry bush a little bit.

9   BY MR. LEYVA:

10      Q.   How was the mark used by William Short

11  Clothiers?

12      A.   This mark here?

13      Q.   Yes.

14      A.   It was a dba for William Short Clothiers.  It

15  was a department in the store, there was a dba of

16  William Short Clothiers.

17      Q.   No.  A trademark is associated with a type of

18  goods.  In this case, it's goods Class 25.  It's not a

19  label that you put on a store, you know.  It's

20  associated -- it's associated --

21            MR. SMELTZER:  I'm objecting.  Again,

22       you're testifying about -- and you're wrong

23       about it.

24            MR. LEYVA:  I'm not wrong about it.

25            MR. SMELTZER:  A trademark can be -- When a

1        store uses that name in conjunction with its

2        overall operations, its overall clothing retail,

3        it's being used in association with all of its

4        goods and services --

5            MR. LEYVA:  Correct.

6            MR. SMELTZER:  -- as a store name.  And it

7        doesn't mean that the store name is a trademark.

8            MR. LEYVA:  Correct.

9            MR. SMELTZER:  It's an indicator of the

10       source.

11   BY MR. LEYVA:

12       Q.   My question I'm trying to get answered,

13   though, during the first use, what was that first use?

14   Was it associated with goods?  Was it associated with a

15   store name?  What was the first use of the mark by WSC?

16       A.   The first use of the mark was to describe the

17   goods that was in this department in William Short

18   Clothiers.

19       Q.   And where was that description?  Where was

20   that description?

21       A.   Well, we had advertisement -- placards in the

22   store or advertisements in the paper, postcards.

23       Q.   Okay.  And it was a description of a

24   particular type of goods --

25       A.   Those goods that that represented, yes.

1    Q.   Okay.  Now, Counsel said that this mark was

2    used continually over time, correct?

3    A.   Correct.

4    Q.   WSC used it; Rabco used it, et cetera.

5         The use over time, did the use change to a

6    different type of good, or was it always the same good

7    products that were --

8    A.   Merchandise?

9    Q.   Yes.

10   A.   Very similar merchandise over the years.

11   Q.   What does that mean?  What does "very similar"

12   mean?

13   A.   Well, resort tropical sportswear and any, you

14   know, sportswear that we brought in.

15   Q.   So, T-shirts?

16   A.   Jimmy Buffet T-shirts, yep.

17   Q.   Okay.  And what do you mean by "sportswear"?

18   Just outdoor wear?

19   A.   Sportswear, you know.

20   Q.   What about the Max Slacks stores?  Was the

21   trademark used for that?

22   A.   It would not be used for that.

23   Q.   Because that was in a different demographic.

24   A.   Right.

25   Q.   Okay.  I want to ask you a little bit about

1    when you said you assisted Mr. Gwynn in creating text

2    for the websites.

3           Would you actually -- First, what do you mean

4    by "text"?  I just want to make sure that we're --

5      A.    Well, Martin called me the Director of Words.

6      Q.    Okay.

7      A.    So when he would put an image on the website,

8    he would say, "Go at it, you're the Director of Words,"

9    so I would go in there and begin to type in the

10   description of the product, the description of the

11   lifestyle of the product, what that product

12   represented.

13     Q.    Okay.  So you actually created the copy --

14     A.    On a number of occasions.

15     Q.    -- right?  That would be like ad copy.  You

16   actually created that.

17     A.    Yes.

18     Q.    Okay.  I want to ask you a question about at

19   the time -- the question Counsel raised at the time

20   that some of these domain names expired, and you had --

21   I don't want to mischaracterize, but I think your

22   answer was you had no control of Rabco funds at the

23   time --

24     A.    Correct.

25     Q.    -- is that correct?  But that the Trustee

1    had --

2         A.    Correct.

3         Q.    -- control of Rabco's funds at the time.

4               Are you aware of the amount of funds that the

5    Trustee had in control on behalf of Rabco at the time?

6         A.    Ballpark.

7         Q.    Tell me the ballpark.

8         A.    You know, maybe close to 50,000.

9         Q.    Okay.  I'm going to move on to -- and just try

10   to clarify here Corporate Pride, the Rabco servers,

11   Corporate Pride servers.

12              I mean, it was your understanding that your

13   websites were hosted at Corporate Pride; is that right?

14        A.    Correct.

15        Q.    You didn't have any physical boxes, servers

16   that Rabco owned that were hosted at -- or did you?

17        A.    We did not have servers hosted on their

18   server.

19        Q.    That's correct, that's my understanding.

20              And you don't know for a fact, do you, whether

21   those were -- the servers that your websites ran on,

22   whether they were Corporate Pride-owned servers or

23   Corporate Pride leased them from a third party.

24        A.    I don't know.  I paid Corporate Pride.

25              MR. LEYVA:  Right, right.  Okay.  That's

1          all I have.

2               MR. SMELTZER:   Okay.   We'll reserve.

3               (Said deponent wished to read and sign the

4          deposition, and the taking of this deposition

5          was concluded at 5:57 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 256

1               CERTIFICATE OF REPORTER OATH

2

3       STATE OF FLORIDA

4

5       COUNTY OF PINELLAS

6

7

8               I, the undersigned authority, certify that

9       BRUCE RABON personally appeared before me on

10      August 18th, 2010, at 9:04 a.m. and was duly sworn.

11              WITNESS my hand and official seal this

12      18th day of August, 2010.

13

14

15

16      _____

17      Jerry P. Lefler
        CSR RPR CRR CM
18      Notary Public - State of Florida
        Commission No:  DD553697
19      My Commission Expires:  May 14, 2014

20

21

22

23

24

25

Page 257

1                    CERTIFICATE OF COURT REPORTER

2

3      STATE OF FLORIDA

4

5      COUNTY OF PINELLAS

6

7          I, Jerry P. Lefler, Court Reporter, certify that I
       was authorized to and did stenographically report the
8      deposition of BRUCE RABON; that a review of the
       transcript was requested; and that the transcript is a
9      true and correct record of my stenographic notes.

10         I FURTHER CERTIFY that I am not a relative,
       employee, or attorney, or counsel of the parties, nor
11     am I a relative or employee of any of the parties'
       attorneys or counsel connect with the action, nor am I
12     financially interest in the action.

13         DATED this 18th day of August, 2010.

14

15

16

17     _____

18                  Jerry P. Lefler RPR CRR CM

19

20

21

22

23

24

25

1      PLEASE ATTACH TO THE DEPOSITION OF: BRUCE RABON
       VOLUME II, TAKEN ON AUGUST 18, 2010, IN THE CASE OF
2      GWYNN VS RABCO LEASING, ET AL

3                         ERRATA SHEET

4
                DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
5      _____
       Page No.    Line No.    Change           Reason
6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18
       Under penalties of perjury, I declare that I have
19     read the foregoing document and that the facts
       stated therein are true.
20
       _____
21     DATE                              BRUCE RABON

22

23     Orig.:  Carlos A. Leyva, Esq, Digital Business Law
       Group, P.A., 1001 Starkey Road, #18, Largo, Florida
24     33771

25

Page 259

1                    Executive Reporting Service
                13555 Automobile Boulevard, Suite 100
2                      Clearwater, Florida 33762
                           (727) 823-4155
3
                                        August 20, 2010
4

5        Mr. Robert Smeltzer, Esq.
         Lowis & Gellen, LLP
6        200 W. Adams Street, Suite 1900
         Chicago, Illinois 60606
7
         Re:  Gwynn vs Rabco Leasing
8
         Dear Mr. Smeltzer:
9
10            The deposition of BRUCE RABON taken on
         August 18, 2010, in the above-styled case is ready
11       for review.  Please have your client make an
         appointment to review the transcript in our office.

12            In the alternative, if you have ordered a copy
         of the transcript, and will be handling reading and
13       signing, have your client note any corrections on
         the errata sheet provided.
14
              The review must be complete on or before
15       September 20, 2010, and the errata sheet returned
         to: Executive Reporting Service, 13555 Automobile
16       Boulevard, Suite 100, Clearwater, Florida 33762, so
         it may be included with the original transcript.
17
              Please contact our office if there are any
18       questions you may have.  Thank you for your prompt
         and careful attention to this matter.
19
                             Sincerely,
20

21
                             Executive Reporting Service
22

23
         cc:  Carlos A. Leyva, Esq, Digital Business Law
24       Group, P.A., 1001 Starkey Road, #18, Largo, Florida
         33771
25